Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

- - - - - - - - - - - - - - - -x

SECURITIES AND EXCHANGE          :

COMMISSION,                      :

              Plaintiff,     :Civil Action No:

    v.                         :1:10-cv-03374-WSD

PAUL T. MANNION, JR., et al.,  :

           Defendants.    :

- - - - - - - - - - - - - - - -x

             Washington, D.C.

             Tuesday, December 13, 2011

      Deposition of ANDREW S. RECKLES, a

witness herein, called for examination by counsel

for the Plaintiff in the above-entitled matter,

pursuant to notice, the witness being duly sworn

by CATHERINE S. BOYD, a Notary Public in and for

the District of Columbia, taken at the offices of

K&L Gates LLP, 1601 K Street, N.W., Washington,

D.C.  20006-1600, at 9:57 a.m., Tuesday, December

12, 2011, and the proceedings being taken down by

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 2

1   Stenotype by CATHERINE S. BOYD and transcribed
2   under her direction.
3   APPEARANCES:
4      On behalf of the Plaintiff:
5        DAVID WILLIAMS, ESQ.
6        Assistant Chief Litigation Counsel
7        Division of Enforcement
8        ADAM S. ADERTON, ESQ.
9        Senior Counsel
10      Division of Enforcement
11      U.S. Securities and Exchange Commission
12      100 F Street, N.E.
13      Washington, D.C.  20549-4010
14      Phone:  (202)551-4548
15   On behalf of the Defendants:
16      STRAVROULA E. LAMBRAKOPOULOS, ESQ.
17      MATTHEW B. BOWMAN, ESQ.
18      ADAM POLLET, ESQ.
19      K&L Gates LLP
20      1601 K Street, N.W.
21      Washington, D.C.  20006-1600
22      Phone:  (202)778-9428

Page 3

1   ALSO PRESENT:
2   DAN REIDY
3   VIDEOGRAPHER
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 4

1         C O N T E N T S
2   WITNESS         EXAMINATION BY COUNSEL FOR
3   ANDREW S. RECKLES        PLAINTIFF  DEFENDANTS
4     By Mr. Williams        7
5     By Ms. Lambrakopoulos         345
6     By Mr. Williams        368
7        Afternoon Session - page 165
8         E X H I B I T S
9   EXHIBIT NUMBER              PAGE
10   35:  SEC-MANNION0301555 through       20
11      SEC-MANNION0301590
12   36:  SEC-MANNION0049475            41
13   37:  SEC-MANNION0044137 through      49
14      SEC-MANNION0044138
15   38:  Response of Defendant to       59
16      Plaintiff's first set of
17      interrogatories
18   39:  SEC-MANNION0019098 through      67
19      SEC-MANNION0019101
20   40:  SEC-MANNION0019102 through      68
21      SEC-MANNION0019104
22   (Continued)

Page 5

1   EXHIBIT NUMBER              PAGE
2   41:  SEC-MANNION0016545           73
3   42:  SEC-MANNION0301654          114
4   43:  SEC-MANNION0044124          119
5   44:  Transcript          209
6   45:  SEC-MANNION0016741 through      236
7      SEC-MANNION0016746I
8   46:  SEC-MANNION0298998          279
9   47:  SEC-MANNION0016235 through      286
10      SEC-MANNION0016236
11   48:  SEC-MANNION0016547          289
12   49:  SEC-MANNION0049174          310
13   50:  SEC-MANNION0051114          312
14   51:  SEC-MANNION0042744 through      313
15      SEC-MANNION0042746
16   52:  SEC-MANNION0024525 through      318
17      SEC-MANNION00224569
18   53:  SEC-MANNION0000574          328
19
20
21
22

2 (Pages 2 to 5)

1    P R O C E E D I N G S
2         THE VIDEOGRAPHER:  This begins Tape 1
3    of the video deposition of Andrew Reckles.
4         This is taken by the Plaintiff in the
5    matter of the SEC versus Mannion, filed in the
6    U.S. District Court for the Northern District of
7    Georgia, the Atlanta Division, Case No.
8    110-cv-03374-WSD.
9         Today's deposition is being held at the
10   law offices of K&L Gates, LLP, 1601 K Street,
11   Washington, D.C. 20006.
12        For identification purposes, my name is
13   Dan Reidy, the video operator.
14        The court reporter is Kathy Boyd, and
15   we both represent Alderson Court Reporting.
16        Today's date is December 13th, 2011.
17   The time on the video is 9:57 a.m.
18        We are on the record.  At this time,
19   will all counsel please introduce yourself and
20   who you represent, starting with Plaintiff's
21   counsel, please?
22        MR. WILLIAMS:  Good morning -- David

1    Williams and Adam Aderton for the Plaintiff
2    Securities and Exchange Commission.
3         MS. LAMBRAKOPOULOS:  Good morning --
4    Stavroula Lambrakopoulos of K&L Gates, together
5    with Matt Bowman and Adam Pollet here on behalf
6    of the Defendant as well as the Defendant Andrew
7    Reckles, who is the witness here today.
8         THE VIDEOGRAPHER:  Would the court
9    reporter please swear in the witness?
10   Whereupon,
11        ANDREW S. RECKLES,
12   was called as a witness by counsel for Plaintiff,
13   and having been duly sworn by the Notary Public,
14   was examined and testified as follows:
15        EXAMINATION BY COUNSEL FOR PLAINTIFF
16   BY MR. WILLIAMS:
17   Q.  Good morning, Mr. Reckles.
18   A.  How are you?
19   Q.  Good.  My name is Dave Williams, and as
20   I just said, I represent the Plaintiff in this
21   case.
22        And we have asked you to come here

1    today to answer a few of our questions as part of
2    the litigation.
3         Is that okay?
4    A.  Yeah.
5    Q.  Okay.  And have you ever sat for a
6    deposition in a civil case before, sir?
7    A.  Yes.
8    Q.  Okay.  Good.  So you're going to be a
9    little bit more familiar with the procedure than
10   you otherwise would be, but let me cover a few
11   ground rules before we get started substantively
12   just so, just so we're clear, okay?
13   A.  Sure.
14   Q.  You're, you're under oath here today.
15   I'm going to be asking you questions, and when I
16   ask you a question, from time to time, I'll ask
17   questions that are objectionable for whatever
18   reason, and accordingly, your counsel may from
19   time to time propound objections to my questions.
20        That said, because there's no judge
21   here today to rule on the objections, they will
22   be preserved for the record, so you are, you

1    should feel free to continue to answer a question
2    even after your counsel has objected to the
3    question.
4         Do you understand that?
5    A.  Sure.
6    Q.  And the only time that you don't answer
7    a question is if your counsel directs you not to
8    answer the question.
9         Do you understand that?
10   A.  Yes, sir.
11   Q.  Okay.  And as you see, there's a
12   videographer taping your testimony, and you see
13   to my left is a court reporter who will be
14   transcribing everything that's said here today.
15        And in order for the record to be
16   clear, I would ask you to wait until I finish
17   asking my question before you respond, and I'll
18   try to extend you the same courtesy, allow you to
19   finish your answer before I ask my next question.
20        Is that fair?
21   A.  Absolutely.
22   Q.  Okay.  And is there any reason, are you

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1   on any medication or is there any reason why you
2   can't testify truthfully and completely here
3   today?
4       A.   The medication I take wouldn't cause
5   that, any, any problem.
6       Q.   So it wouldn't cause you any problem?
7       A.   No.
8       Q.   Okay.  Mr. Reckles, can you please
9   describe your educational background past high
10  school?
11      A.   Some college, many certifications, and
12  a variety of different business and negotiating
13  techniques from a variety of different colleges
14  and universities.
15      Q.   Any, any degrees?
16      A.   No degrees.
17      Q.   Okay.  After, after school, what
18  profession did you go into?
19      A.   Sales.
20      Q.   Okay.  What sort of sales?
21      A.   Well, at what age are you asking?
22      Q.   I want to get sort of a feel for your

1   background, sort of after your, your education.
2           So did you attend college directly
3   after high school?
4       A.   Yeah, absolutely.  I also worked
5   directly and during high school.
6       Q.   Where did you work?
7       A.   I worked in electronics sales.
8       Q.   Okay.  And did there come a point where
9   you began working in the financial sector?
10      A.   Yes.
11      Q.   And when did that happen?
12      A.   I seem to recall like 1992-ish.
13      Q.   And how did you start in the financial
14  sector?
15      A.   Went to work for a financial services
16  firm, was required to get a series of different
17  licenses, which I did, and began working with
18  them in '92 or '93.
19      Q.   Okay.  What sorts of licenses did you
20  obtain?
21      A.   Let's see.  At first, a Series 6 and a
22  63, then a 7, a 3 -- 7, 3, variable insurance

1   products, 65.
2           I've got like ten.  Who knows?
3       Q.   Okay.
4       A.   It's been 20 years.
5       Q.   Fair enough.  So the various licenses
6   that, that you obtained, they pertained to the
7   financial markets or being a broker-dealer, or
8   something else?
9       A.   All of the above.
10      Q.   Okay.  And you indicated you began
11  working for a financial services firm.
12          What firm was that?
13      A.   I don't remember the first one.
14      Q.   Okay.  And what, what capacity were you
15  in when you first started working within
16  financial services?
17      A.   Broker.
18      Q.   Okay.  And that was in the early
19  nineties I think?
20      A.   Um-hm.
21      Q.   And how long were you a broker?
22      A.   Gosh, until '96, '97.  I guess to some

1   extent, as long as you're selling securities,
2   whether it be to institutions or to individuals,
3   you're a broker to some extent, so I mean to this
4   day, I guess you could consider that I'm still a
5   broker.
6       Q.   Okay.  And in '96 or '97, where did you
7   go employment-wise?
8       A.   Oh, in '96 or '97, I was with J.W.
9   Genesis?  Were they Genesis yet?  Maybe not.
10          C.W. Charles, they got bought by
11  another firm and became J.W. Genesis.
12          I don't remember exactly what point in
13  the late nineties that happened.
14      Q.   And that was a broker-dealer?
15      A.   Yes.
16      Q.   And what were you doing for that firm?
17      A.   We were, I was involved in
18  institutional private placements.
19      Q.   What's an institutional private
20  placement?
21      A.   Really?  Okay.  It is the private
22  placement of securities to a variety of

Page 14

1  definitionally, by definition, institutional
2  clients in public or private companies.
3      Q.   Okay.  And how long were you doing
4  that?
5      A.   Still am.
6      Q.   I see.  Were you with, with the firm
7  J.W. -- what was the firm?  J.W.?
8      A.   It was either Charles or Genesis,
9  depending on the point in time you're asking
10  about.
11      Q.   I see.  Either J.W. Charles or J.W.
12  Genesis, how long were you with that firm?
13      A.   From '94-ish to 2000 when they were
14  purchased by First Union Bank.
15      Q.   And when they were purchased by First
16  Union Bank, what did you do professionally?
17      A.   Opened my own firm.  Chose not to move
18  to Charlotte and work for a large bank.
19      Q.   And what was the name of that firm?
20      A.   HPC Capital.
21      Q.   And did you open that firm by
22  yourself --

Page 15

1      A.   No.
2      Q.   -- or with partners?
3      A.   With partners.
4      Q.   Who were your partners?
5      A.   Paul Mannion.
6      Q.   Anyone else?
7      A.   Well, there was Vince Sbarra, but I
8  don't think he was actually a partner in the firm
9  at that time.
10      I think he was an employee of the firm.
11      Q.   And what did HPC Capital do?
12      A.   Private placements, institutional
13  private placements for public and private
14  companies.
15      Q.   And how long did you work for HPC
16  Capital?
17      A.   From its inception until -- I can't
18  remember if it was '08 or '07 when I resigned.
19      Q.   And when you resigned from HPC Capital,
20  what did you do?
21      A.   Nothing for a while.
22      Q.   Okay.  And did there come a point where

Page 16

1  that changed?
2      A.   Yeah.
3      Q.   And when was that?
4      A.   Gosh -- end of '09 maybe?  Sound about
5  right?
6      Q.   Okay.  And what did you do at that
7  point?
8      A.   Went to work with -- I replaced my
9  license with a, a broker-dealer called Moody
10  Capital and started building my own brand of
11  investment bank underneath that umbrella, which
12  we're doing today.
13      Q.   So the firm that you're with today is
14  called Moody?
15      A.   Actually the firm I'm with is called
16  Intellivest Capital, Intellivest Securities.  I
17  don't -- it's probably Securities Capital.
18          And the firm that I own or the brand
19  that we're allowed to operate under is C4
20  Capital.
21      Q.   So you mentioned a firm called Moody,
22  Moody Capital?

Page 17

1      A.   Yeah.
2      Q.   And is that the same as Intellivest?
3      A.   No.  No.  When I was transitioning back
4  into the industry -- I took a, I took a year off.
5      Q.   Okay.
6      A.   And I believe there's a rule that if --
7  you have to have your license somewhere.  If you
8  don't have it with the broker-dealer for some
9  period of time, I can't remember if it's two
10  years or 18 months, it goes defunct and you've
11  got to re-test, and that's an awful lot of
12  licenses and an awful lot of tests, so I didn't
13  want to go re-do it.
14      Q.   I see.  So you went for, went back with
15  Moody Capital for a period of time --
16      A.   Um-hm.
17      Q.   And then you went to Intellivest?
18      A.   Yes, which is where I am now and have
19  been there since February, March of this year.
20      Q.   I see.  And so under the umbrella of
21  Intellivest --
22      A.   Um-hm.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1     Q.  -- you, you were with a firm called C4
2  Capital?
3     A.  Right.  It's our own brand.
4     Q.  And who do you operate that with?
5     A.  My partner, J.T. Schroeder.
6     Q.  Anyone else?
7     A.  No.
8     Q.  And what does C4 Capital do?
9     A.  We do institutional private placements
10 for public and private companies.
11    Q.  Any other sort of work?
12    A.  No.  No.
13    Q.  Okay.  Have you heard of a fund called
14 Palisades?
15    A.  Sure.
16    Q.  And when did you first hear of a fund
17 called Palisades?
18    A.  When I invented it.
19    Q.  And when did you invent it?
20    A.  2001.
21    Q.  And did you invent it with -- by
22 yourself, or with someone else?

1     A.  No.  It was, it was formed in 2001 by
2  myself and Paul Mannion were the two founding
3  principals.
4     Q.  Okay.  And was there a, a structure of
5  the fund?
6        And describe for me if the structure of
7  the fund changed as time went on.
8     A.  I don't really quite understand what
9  you mean.
10       That, that could have a lot of
11 meanings.
12       So if you could be more specific, that
13 would be helpful.
14    Q.  Sure.  Was it a partnership, or some
15 other sort of entity?
16    A.  Well, the management company was a
17 partnership.
18       There was a, an on-shore component to
19 the fund that if memory serves me, was an LP, so
20 that would be a partnership.
21       And there was an off-shore component to
22 the fund, and I seem to recall that that was a

1  corporation.
2     Q.  And what was the management company?
3     A.  PEF Advisors.
4     Q.  And were you one of the principals of
5  PEF Advisors?
6     A.  I was one of the general partners, yes.
7  That would be correct.
8     Q.  Okay.  And you indicated that there
9  were on-shore and off-shore components.
10       What was the on-shore component called,
11 if you recall?
12    A.  That was called -- I don't recall.
13    Q.  You don't recall?
14    A.  I don't recall.
15    Q.  Fair enough.  Let me show you a
16 document --
17    A.  I'm sure it's probably in some document
18 you sent me.
19       MR. WILLIAMS:  Sure.  Let me ask the
20 court reporter to label this document as Exhibit
21 No. 35.
22            (Exhibit No. 35

1            was marked for
2            identification.)
3        BY MR. WILLIAMS:
4     Q.  And document No. 35 appears to be a
5  multiple page document Bates number
6  SEC-MANNION0301555 through 1590.
7        It appears to be a confidential
8  offering memorandum for the Palisades Equity
9  Fund, L.P.
10       What is the Palisades Equity Fund, LP?
11    A.  I think that would be the answer to the
12 question you asked me prior to handing me the
13 exhibit.
14       So that would be the on-shore
15 component.
16    Q.  Okay.  And let me ask you have you ever
17 seen this document before?
18    A.  I'm sure I have.
19    Q.  Okay.  To the best of your
20 recollection, did you play a role in the drafting
21 or preparation of this document?
22    A.  Not really.

Page 22

1      Q.   How did this document, if you know,
2  come to be drafted?
3      A.   I really couldn't speculate.  It needs
4  to be, it needed to be drafted in order to raise
5  capital for the fund, so -- or invest our own
6  capital for the fund.
7           You have to invest pursuant to some set
8  of terms, if you will.  It was drafted by
9  counsel, so --
10     Q.   Did you, the best of your recollection,
11 the best of your recollection, provide input on
12 the type of, the sorts of information that would
13 be included in this document?
14     A.   You know, I can't recall specifically.
15 I would speculate that I probably had some
16 oversight or, or input into some aspects, but --
17     Q.   Given your role, it's likely, but as
18 you sit here today, you can't recall?
19     A.   I can't recall specifically.
20     Q.   Okay.  Was there a particular
21 investment structure that Palisades employed?
22     A.   I mean at the time that the fund was

Page 23

1  created, the, the strategy that has been deemed
2  subsequently a PIPE fund strategy did not exist.
3           So today, in hindsight, one could say
4  that it was a quote, unquote, PIPEs fund.
5           At the time of its inception, it was
6  just a fund that invested in private placements
7  into public companies.
8           So in answer to your question, it's
9  really a point in time question, that, you know,
10 at inception?
11          No, not particularly.  We had a
12 particular group of investments that we would
13 choose to make.
14          Now it's called a PIPE fund ten plus
15 years after inception, but the industry has
16 changed.
17     Q.   What is a PIPE?
18     A.   Private investment into a public
19 equity.
20     Q.   Okay.  And as I think you indicated,
21 that's the type of investment that Palisades
22 participated in?

Page 24

1      A.   Yes.
2      Q.   Okay.  And did Palisades participate in
3  any other sorts of investments?
4      A.   Generally, no.
5      Q.   How was it determined which particular
6  private investments that Palisades would make?
7      A.   It's been a long time.  You know, I, I
8  really can't recall.  I really can't recall.
9      Q.   As between you and your partner,
10 Mister, Mr. Mannion --
11     A.   Um-hm.
12     Q.   -- was one or the other of you
13 responsible for making, for choosing investments,
14 or both?
15     A.   I think that, I think that it was a, it
16 was a joint, to my recollection anyway, it was a
17 joint event.
18          However, we were a small shop.  There
19 was just effectively the two of us, and so from
20 time to time, I guess there would be investments
21 that may get more attention from one partner than
22 another.

Page 25

1           But I think generally, investments
2  were, were, were made at the kind of joint
3  agreement of the two, the two partners.
4      Q.   I see.
5      A.   If that makes any sense to you.
6      Q.   Sure.  Other than yourself and Mr.
7  Mannion, did anyone else participate in the
8  investment decisions of the fund?
9      A.   You know, we had a, we had a head of a,
10 a chief advisor, Tom Shields, who we met with or
11 spoke to frequently.
12          He probably came to the office at least
13 once a month.  He lived in Atlanta.
14          He didn't have decision-making
15 authority.
16          It was an advisor, you know, but you
17 know, he was a smart guy, having been the chief
18 investment officer of Invesco Global, so we took
19 a lot of what he said to heart.
20     Q.   Okay.  And Mr. Shields, his role was
21 advisor?
22     A.   Just an advisory, an advisory board

7 (Pages 22 to 25)

Page 26

1  member.
2     Q.  How about trading activity at the
3  Palisades?
4        Did do any trading in stock?
5     A.  Just generally the disposition of --
6  maybe we should put a sign up.
7        MS. LAMBRAKOPOULOS:  Just give me five.
8        MR. WILLIAMS:  Why don't we just go off
9  the record?
10       THE VIDEOGRAPHER:  We're going off the
11 record.
12       The time on the video is 10:16 a.m.
13       (A discussion was held off the record.)
14       THE VIDEOGRAPHER:  We're back on the
15 record.
16       The time on the video is 10:17 a.m.
17       BY MR. WILLIAMS:
18    Q.  Mr. Reckles, I believe my question to
19 you was did Palisades do any trading activity?
20    A.  Thanks.  Yeah, mostly the disposition
21 or the sale of the underlying securities or the
22 securities that were purchased pursuant to a

Page 27

1  broad placement.
2     Q.  And, and who was responsible for, for
3  that trading?
4     A.  It would depend on at what point in the
5  life of the fund that you, that you're referring
6  to.
7     Q.  Well, well, who was responsible?  And
8  explain if it changed during the period.
9     A.  Okay.  So at the early stages, it was a
10 small fund with very cheap positions, and the
11 trading could be managed pretty effectively by
12 Mr. Mannion or by myself.  I mean either one of
13 us could do it.
14       That continued throughout the life of
15 the fund.  We had the authority to trade on
16 behalf of the fund.
17       As the fund got larger, had more
18 positions to manage, and required more of our
19 individual time in other areas such as diligence
20 or, or interfacing with the limited partners or
21 capital raising, what have you, we went out and
22 hired a trader to manage the trading book of the

Page 28

1  fund.
2        So I can't recall point in time, or
3  date in time when Mr. Batista came in, but I
4  would hazard to guess some time in early '05,
5  maybe late '04.
6     Q.  Okay.  And Mr. Batista, is that David
7  Batista?
8     A.  Um-hm.
9     Q.  And was he --
10    A.  Yes.
11    Q.  -- was he a trader for the fund?
12    A.  He acted as the trader for the fund.
13    Q.  And how would Mr. Batista know when to
14 trade securities?
15    A.  Well, we gave him pre-defined
16 parameters on the positions themselves, and we
17 would speak or e-mail with Mr. Batista
18 frequently.
19    Q.  And would he communicate the trading
20 activity that he did on a daily basis?
21    A.  Let me, let me, let me ask you to ask
22 that a different way because it seemed like you

Page 29

1  were implying that we were trading on a daily
2  basis, and we, we weren't an actively -- we
3  didn't have that type of fund.
4     Q.  Okay.
5     A.  So I would answer that question when
6  there were positions that were being traded,
7  David would report the trades to us as he made
8  them.
9     Q.  The day of the trade?
10    A.  The day of the trade.
11    Q.  Okay.  One thing you mentioned --
12    A.  To my, to my recollection.  I mean it
13 may be the following morning in some cases,
14 but --
15    Q.  Fair enough.  One thing you mentioned
16 was that one of the, one of the responsibilities
17 that Mr. Mannion took on as the fund progressed
18 was interfacing with limited partners.
19       And my first question, what's a limited
20 partner?
21    A.  They would have been one of the, the
22 investors in the fund.

Page 30

1       Q.   And when you say interfacing with the
2   limited partners, what do you mean?
3       A.   Taking their phone calls, answering
4   their questions, managing the relationships with
5   those individuals.  Excuse me.
6       Q.   And, and your view was that as between
7   yourself and Mr. Mannion, that was Mr. Mannion's
8   responsibility?
9       A.   I think that -- and you've met Mr.
10  Mannion, and he was better suited for that role.
11       I don't think, in answer to your
12  question, and, and maybe I'd like you to kind of
13  repeat the question back.  I don't think it would --
14       MS. LAMBRAKOPOULOS:  Do you want him to
15  repeat it back?
16       THE WITNESS:  Yeah.  Why don't you
17  repeat it exactly like you stated it?  Because it
18  was your wording that --
19       BY MR. WILLIAMS:
20       Q.   Sure.  And if the question suggests
21  something that's not entirely accurate --
22       A.   Yeah.

Page 31

1       Q.   -- feel free to point that out.  I'm
2   not trying to --
3       A.   No.  I understand.
4       Q.   I just want to know when you say that
5   Mr. Mannion -- the question now escapes me.
6       A.   Yeah.
7       Q.   But you indicated that Mr. Mannion's
8   role was interfacing with limited partners.
9       So was it your perception that as
10  between yourself and Mr. Mannion, Mr. Mannion was
11  the one who had responsibility for dealing with
12  the limited partner?
13       A.   That's close to how you asked it
14  before.
15       My -- it wasn't a perception.  It was a
16  bifurcation of responsibilities.
17       So he was better suited for it.  His
18  personality was better suited for it.
19       Q.   So it wasn't sort of an informal thing?
20  It was an actual formal bifurcation?
21       A.   I would say it like this.  There was no
22  job description board or file in the Palisades

Page 32

1   offices that said Paul, you do this, this and
2   this, and Andy, you do this, this and this.
3       But when you work with someone for 14
4   years, you get to know their strengths and their
5   weaknesses.  He knew mine.  I knew his.
6       Furthermore, the original investors
7   outside of myself and Mr. Mannion were
8   relationships of his.  They were within his
9   circle.
10       And so it seemed clearly more prudent
11  for Paul to be interfacing with people that he
12  already was friends with or acquaintances with
13  than somebody that wasn't.
14       And as the fund grew and those people
15  referred their friends to us, there was a nexus
16  of relationships between the additional referral
17  source and the next guy, and that was Paul.
18       So it just, it just grew into a role
19  that I think that he managed and managed well.
20       Q.   Okay.  And were there areas in which
21  you had primary responsibility?
22       A.   Sure.  So I, I was always best at

Page 33

1   structuring transactions, working with the
2   companies, working with co-investors.
3       That was pretty much my responsibility
4   for the seven years, six years that the fund was
5   around?  Seven years?
6       Q.   And can you describe for me, if you can
7   describe for me generally, how the fund marketed
8   itself to, to potential investors?
9       A.   Well --
10       MS. LAMBRAKOPOULOS:  Objection as to
11  form.
12       BY MR. WILLIAMS:
13       Q.   Potential limited partners.
14       A.   I wouldn't say that we marketed.  There
15  was no proactive effort to market.
16       We, we published our, our results in a
17  variety of just data bases.
18       We, we didn't, as far as I can recall,
19  and again, not my, not my side of the bifurcation
20  of the responsibilities, we didn't ever go out
21  and hire a third party marketer, which many
22  people do.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1          We, we did it kind of the hard way.  We
2   put in our own capital.  We invested that
3   capital.  We generated a track record.
4          The track record was I guess good
5   enough that other people were attracted to it,
6   and over the course of time, the fund grew.
7          It wasn't like today where you read
8   about all these guys go out and they get a
9   billion dollars in 15 minutes.
10         It was hard work, and it took years to,
11  to build the fund.
12         I don't know how the guys do it today.
13  It's crazy.
14      Q.  And you indicate that you published
15  your results in the various publications.
16         What publications?
17      A.  I don't recall the names specifically.
18  There were a bunch of databases, and those
19  databases are still out there today.
20      Q.  And by your results, I take it you mean
21  the returns that the fund generated, or something
22  else?

1       A.  That -- yeah, performance, returns for
2   the, for the on-shore fund initially, and then
3   when the off-shore fund was created, for both.
4       Q.  So publication of the, the returns of
5   the fund was, was the extent of, of a marketing
6   effort?
7       A.  Yeah.  I think that that's, that's
8   fair.
9          I think there was a lot of
10  referral-based, you know, marketing, if you will.
11         I mean marketing, that's not even a
12  good word.
13         Money came in via referral, you know.
14  I mean we had some, some folks in there early
15  with us that were astute and well respected in
16  the financial community.
17         And after time and performance, they
18  referred it to people they knew, and then, of
19  course, after having your, your returns posted in
20  databases, people start calling and requesting
21  information and things of that nature, so --
22      Q.  I see.  And so when people called and

1   requested information, what, what, if anything,
2   would they be provided?
3       A.  I didn't actually deal with any of it.
4       Q.  Okay.
5       A.  So I really couldn't tell you.
6       Q.  Okay.  That was more Mr. Mannion's
7   side?
8       A.  Yes.
9       Q.  I see.  And with respect to these
10  returns, how often did the fund calculate its
11  returns?
12      A.  Monthly.
13      Q.  And how did the firm calculate its
14  returns on a monthly basis, to the best of your
15  recollection?
16      A.  I'm, I'm sorry.  That's a very vague
17  question.
18      Q.  Was there a process that the firm used
19  to determine what its returns were?
20      A.  I'm sorry.  When you said how, it's
21  like we used an abacus.  Sorry.
22         Was there a process?  Sure.  I mean in

1   here, in this Exhibit No. 35, there is a litany
2   of pages, to my recollection, that talk about
3   what we invested and how we, we deal with the
4   valuation of whatever might be in our portfolio.
5          And of course, we had an administrator
6   to the fund whose responsibility from -- was, was
7   to oversee and to, and to create those valuations
8   on a monthly basis, and to represent that those
9   valuations were I guess accurate.
10      Q.  Okay.  And you mentioned an
11  administrator.
12         Who was the administrator for the fund?
13      A.  Again, it would depend on a point in
14  time.
15         For the, for the vast majority of the
16  term of the fund, and I think during the term of
17  why we're all here, it would be Beacon Fund,
18  Beacon Fund Advisors?  Beacon Fund Services?
19      Q.  And --
20      A.  I can't recall what the Beacon date
21  sets.
22      Q.  Dave, Dave Sims was your point of

Page 38

1   contact?
2      A.  He was the head of the firm.  We had a
3   variety of points of contact through the years,
4   staff accountants or what have you.
5      Q.  And the role of the administrator, at
6   least in regard to the monthly, the valuations,
7   was, was what?
8      A.  Well, my, my understanding of their
9   roles and responsibilities were to take the
10  assets of the fund at the end of every month,
11  apply the, the valuation policies that were in
12  writing to that book of, or that pool of assets,
13  and when there were issues potentially between
14  what, what existed in the portfolio and how it
15  needed to be valued, they were the adjudicator of
16  I guess of that decision.
17     Q.  And, and how would they know whether
18  there were issues?
19         I mean what do you mean?
20     A.  Well, the valuation process, as I
21  recall, and I had almost nothing to do with it
22  from inception of the fund forward, was a lengthy

Page 39

1   one every month.
2          It was a 15 or 20-day process whereby
3   we were inundated back and forth with e-mails
4   from the administrator and just verifying that
5   this is the position that you hold, these are the
6   trades you did in the month, et cetera, et
7   cetera.
8          And this is a fund that, unlike -- and
9   I think that this is an important thing for --
10  and I know you guys, for all the folks at home --
11  to understand that this wasn't a mutual fund,
12  that this wasn't like daily trading with liquid
13  stocks of IBM.
14         This was a fund that was invested in
15  securities that were illiquid for great periods
16  of time based on the registration statements of
17  the underlying securities.
18         And so valuation and how things were
19  valued every month was based on certain
20  parameters that were in writing, but there, there
21  was also the need to be flexible and to have
22  discretion over those parameters when situations

Page 40

1   arose, and from time to time, those situations
2   arose over the life of the fund, and those were
3   the things that Paul and the administrators, and
4   to a lesser extent, I would work with during the
5   months where we had to work with them.
6      Q.  Okay.
7      A.  Sometimes it was very cut and dry.
8   Sometimes it wasn't.
9      Q.  Okay.  And you seemed to be suggesting,
10  correct me if I'm wrong, that Mr. Mannion had a
11  greater degree of involvement in that process
12  than yourself?
13     A.  That -- I would, I would absolutely say
14  that.
15     Q.  And what was, what was Mr. Mannion's
16  role in that process?
17     A.  Well, he interfaced directly with the
18  administrators, and then on an annual basis, with
19  the auditors when it came time to audit the fund.
20         So his roles at the fund, from my
21  chair, were I think mainly the monthly
22  valuations, working with the administrators, and

Page 41

1   working with the auditor at the end of the year
2   during the audit, and then interfacing the LPs
3   and, and things like that, as I've already
4   testified to.
5          And mine was working on new
6   transactions and working with transactions that
7   we were already in where there may be challenges
8   with registration or additional capital or
9   working with co-investors on a capital range or
10  what have you, and that we had full-time jobs
11  with each of those.
12     MR. WILLIAMS:  I show you a document
13  that I'm going to ask the court reporter to label
14  as Exhibit No. 36.
15         (Exhibit No. 36
16          was marked for
17          identification.)
18     BY MR. WILLIAMS:
19     Q.  And I'll represent to you that --
20     A.  Thank you.
21     Q.  Exhibit No. 36 is a one-page document
22  Bates number SEC-MANNION0049475.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1    And it appears to be an e-mail
2  communication; subject, Re:  August NAV queries.
3    My first question to you, Mr. Reckles,
4  is you have you seen this document before?
5    A.  I don't believe so.
6    Q.  Okay.  Well, it appears to be a
7  response to NAV queries.
8    Did you, did you have the occasion to
9  receive queries on a monthly basis from someone
10  named Leslie at Beacon Securities?
11    A.  I'm sorry.  Would you say that again?
12    Q.  Yeah.  Did you have occasion to receive
13  monthly queries with respect to NAV calculations
14  from someone named Leslie at Beacon Securities?
15    A.  Les, yeah.  It's a, it's a guy.
16    Q.  Les, okay.
17    A.  Yeah.
18    Q.  And would Les send you e-mails on a
19  monthly basis --
20    A.  Um --
21    Q.  -- asking about various positions?
22    A.  Sorry.  As I, as I testified, mostly,

1  mostly to Paul.
2    Occasionally, if there was a question
3  that Paul couldn't answer, specific, as I said,
4  my role and responsibilities were dealing with
5  the companies to a great degree, so if there was
6  a question about a pending registration
7  statement, the e-mail may come to me or get
8  forwarded to me and be asked to respond what is
9  the status of the registration with this
10  particular issue or what have you.
11    Generally, I would not have occasion to
12  interface with Les frequently.
13    Q.  Okay.  And as I look at this e-mail,
14  for, for the position listed under the No. 1, and
15  the position listed under No. 4 and No. 6 and No.
16  8 and 9, there appear to be in brackets Paul T.
17  Mannion, Jr.
18    Do you see that?
19    A.  Yes.
20    Q.  And why is Mr. Mannion's name bracketed
21  there, if you know?
22    A.  Well, I, I would have to, I would have

1  to speculate, but I think it's a pretty decent
2  speculation that this is a photocopy of an e-mail
3  mail that had multiple people that were
4  responding on it, right?
5    So I think that that's Paul's notation,
6  that that's Paul's answer.
7    Q.  I see.  So some of the notations, by
8  your speculations, belong to Mr. Mannion, and
9  some of the responses belong to you?
10    A.  No.  I think -- I don't think any of
11  the responses belong to me.  I think that --
12    Q.  Okay.
13    A.  -- all of the responses belong to Paul
14  or to, or Les.
15    They're either questions from Les or
16  responses from Paul.
17    If you look, the answers are in dark,
18  right?  There's two different type fonts here, so
19  based on the limited technical skills I have with
20  computers, it sure looks like he cropped and
21  pasted an e-mail and overlaid it, and then
22  answers.

1    Q.  I see, but based on the signature line
2  at the bottom of the document, it appears to be
3  an e-mail that, that you authored?
4    A.  Yeah.  It looks like I sent it, but
5  it's -- as you can see from, from the document,
6  those are Paul T. Mannion.
7    So again, I said I was speculating, but
8  it seems to me that those were answers that he
9  provided to a list of queries.  That's why he put
10  his name next to them.
11    Q.  I see.  And would you and Mr. Mannion
12  work together to respond to, to the monthly
13  queries?
14    A.  Occasionally, occasionally, as I
15  testified to.
16    Q.  Okay.  And under subheading No. 5, with
17  respect to Perma-Fix, do you see, do you see that
18  part of the document?
19    A.  Yes.
20    Q.  And the question relates to when do
21  restricted shares at Citi become unrestricted to
22  cover the short sales?

1        And my question to you was was it the
2  practice of Palisades to sell short securities --
3        A.  Well --
4        Q.  In about August of 2005?
5        A.  I think I, I don't think that the
6  question is a reasonable one.  I think you have
7  to --
8        Q.  Why is that?
9        A.  -- define whether you're shorting
10  securities or whether you're shorting against the
11  box.
12        They're very different things.
13        Q.  Okay.
14        A.  Very different things.
15        Q.  What does it mean to short against the
16  box?
17        A.  So you're already long on a security.
18  You own it outright or you own a derivation of
19  the security, i.e., a convertible preferred stock
20  or a convertible note.
21        You own the security, so in that
22  circumstance, you're not actually shorting the

1  stock.
2        You're just selling what you have.
3        Q.  I see.  And so when you say shorting
4  against the box, what does shorting mean in that
5  context?
6        A.  It means a sale, so -- you know, and
7  you folks over there at the SEC many years ago
8  did some good work on this stuff.
9        I mean it was -- for many years, a lot
10  of people were just selling and doing all sorts
11  of funky stuff with their own securities or their
12  convertibles, and you guys cleaned up that
13  process, but in the old days, people were taking
14  advantage of that.
15        What we did was if we owned a security,
16  when it was effectively registered, you would
17  sell via the open market, and you have a
18  conversion of those shares.
19        And is it short exempt?  Is that the
20  term?  I've forgotten.  I haven't done this in
21  four plus years, but I think the term was short
22  exempt, so you're not --

1        Q.  Okay.
2        A.  -- required to go get a predetermined
3  borrow because you own the security, and you're
4  selling, waiting on just -- that's not shorting.
5        Shorting to me is when you don't own
6  any derivation of the security, and you have to
7  go out and get, borrow, borrow the security.
8        I think that's the dispositive,
9  dispositive from the -- I've forgotten all the
10  terminology.
11        Q.  I see.  So a short would be if you, if
12  you establish a short position when you didn't
13  own a long position in the security?
14        A.  I would, like I said, I would deem a
15  short position to be one whereby you are going
16  out and affirmatively, that's affirmatively
17  borrowing the underlying shares from the third
18  party just like they teach you in the Series 7
19  manual, all right?
20        When you're short exempt, you already
21  own it.  You don't have to borrow from somebody,
22  and that was some of the stuff that I believe the

1  SEC worked on pretty diligently in '04 and '05,
2  so that funds that were participating in private
3  placements were able to dispose of shares without
4  having to necessarily go find a pre-borrow.
5        They gave a short exempt period, and I
6  think that that's what No. 5 question was talking
7  about.
8        The shares are coming back from the
9  transfer agent is what it says there, so --
10        Q.  And so with respect to No. 5 there, the
11  long position that would be coming unrestricted
12  would be delivered to, to, to satisfy the short
13  sale?
14        A.  The long position would be coming from
15  the transfer agent.
16        MR. WILLIAMS:  Let me ask you about
17  another document I'll ask the court reporter to
18  label as Exhibit No. 37.
19        (Exhibit No. 37
20        was marked for
21        identification.)
22        BY MR. WILLIAMS:

1      Q.   And Mr. Reckles, I'll represent to you
2  that Exhibit No. 37 is a two-page document Bates
3  number SEC-MANNION0044137 and 138.
4            And it appears to be a two-page
5  document; subject, last few queries August NAV
6  from Les at Beacon.
7            And my question to you, my first
8  question to you is are you familiar with this
9  document?
10     A.   Am I familiar with it?  Not really.  I
11 mean I'm sure -- it's been seven years, six
12 years, so --
13     Q.   Sure.  But is there any reason, do you
14 have any reason to think you didn't get this
15 document in about September of 2005?
16     A.   No.  I have no reason to believe that I
17 didn't.
18     Q.   And the e-mail address in the to
19 heading, Andyreckles@aol.com --
20     A.   A-huh.
21     Q.   -- was that an e-mail address that you
22 used in about September 2005?

1      A.   Yes.
2      Q.   Okay.  And how many, how many e-mail
3  addresses did you have in about September 2005?
4      A.   A few; probably three probably sounds
5  about right.
6      Q.   Okay.  So there's this one, and do you
7  recall any others --
8      A.   Um --
9      Q.   -- that you used?
10     A.   Yeah.  I had my own at PEF Advisors.
11     Q.   Okay.  How about one at --
12     A.   HPC Capital, yeah.
13     Q.   And were those the three primary e-mail
14 addresses that you used?
15     A.   Yes, to the best of my recollection.
16     Q.   And would you check those on a daily
17 basis?
18     A.   Yeah.  Yeah.  That's, that's fair.
19     Q.   Okay.
20     A.   I'm surprised, to be honest with you,
21 that Les would have sent it to
22 Andyreckles@aol.com, but I mean that kind of

1  reinforces my statement earlier that Paul did
2  most of the interfacing because he's sending it
3  to Paul on fund business, and he didn't really
4  work with me much on fund business.
5            So he's just got my -- that's my
6  personal e-mail address.  It's not even my fund
7  e-mail address, and I have one, so --
8      Q.   What's your fund e-mail address?
9      A.   I think it was andy@pefadvisors.
10     Q.   I see.  And with respect to the last
11 few queries there, there appears to be a
12 reference to a side pocket.
13            What's a side pocket?
14     A.   Are you asking me in general, or in
15 specific, Dave?
16     Q.   Specific with reference to what Les
17 appears to be asking you about.
18     A.   Okay.  So as it relates to the side
19 pocket created for the World Health assets, it
20 was a segregation of some difficult to value
21 assets in a particular issuer that I think
22 subsequently became a C class or a new class of

1  shares within our fund.
2            That's what it was.
3      Q.   And we looked at, we looked at Exhibit
4  No. 35, which appears to be the offering
5  memorandum for Palisades Equity Fund.
6            And was, was the, the creation of a
7  side pocket contemplated by the offering
8  memorandum of Palisades Equity Fund, to the best
9  of your recollection?
10     A.   To the best of my recollection, no, not
11 specifically.
12            Certainly there was the, the ability to
13 do so.
14     Q.   What do you mean?
15     A.   Well, the managers had discretion to do
16 quite a bit as it related to both valuation and
17 to appropriately manage the fund.
18     Q.   Okay.  And so was there, did there come
19 a point when you went to investors to, or limited
20 partners to, to enlist their approval for the
21 creation of the side pocket?
22     A.   Absolutely.

Page 54

1      Q.  And why did you do that?
2      A.  You know, I don't recall specifically.
3  I believe it was a belt and suspenders type of
4  issue for us.
5          I think without -- and I want to be
6  sure that this isn't a privilege issue.
7          MS. LAMBRAKOPOULOS:  Sure.  And I would
8  direct you to respond to the question only to the
9  extent that you're not going to disclose anything
10  that's privileged, any communications with your
11  attorneys.
12         THE WITNESS:  Okay.  On advice of
13  counsel, and in working with counsel, the side
14  pocket was clearly something that I think from
15  everyone's view in August of 2005 could be
16  established, but that both disclosure and consent
17  would be very, very good things to have, and
18  that's why we did that.
19         BY MR. WILLIAMS:
20     Q.  I see.  And what, what, what was the
21  security that was the subject of the side pocket?
22     A.  There are a series of securities, all

Page 55

1  from the same company.
2      Q.  What company is that?
3      A.  World Health -- sorry.
4      Q.  And did there come to be a problem with
5  World Health in about August of 2005?
6      A.  Yeah.  There, there was a large problem
7  with the company.
8      Q.  Okay.  Prior to August of 2005, had
9  Palisades invested in a private placement for
10  World Health, or some other sort of investment?
11     A.  Several.
12     Q.  Several?
13     A.  I'm sorry -- several private
14  placements.
15     Q.  Okay.  And as of August of 2005, was
16  World Health a significant position of Palisades?
17     A.  Yes, sir.
18     Q.  And do you recall approximately to what
19  extent that Palisades's assets were, were World
20  Health securities in various forms?
21     A.  You know, I don't recall specifically,
22  but a lot.  It was significant.

Page 56

1      Q.  Okay.  Was World Health the fund's
2  largest investment in about August of 2005?
3      A.  I would say that would be true.
4      Q.  I see.  And how did the fund come to
5  invest in World Health originally, if you recall?
6      A.  Wow!  You know, I don't.
7      Q.  Okay.
8      A.  I've really tried to move on, you know.
9      Q.  Sure.  Can you say whether or not it
10  was something that Mr. Mannion had the lead on or
11  whether it was something that you had the lead
12  on?
13         Can you be that specific?
14     A.  I, I would say that during the course
15  of the, the time that we were invested in World
16  Health, I had the larger responsibility and role
17  in interfacing with the company, and structuring
18  the investments.
19         I think that it would be fair to say
20  that it would be me and not Mr. Mannion
21  specifically.
22     Q.  Okay.  Who was the CEO of World Health

Page 57

1  during the period of the fund's investments with
2  the company?
3      A.  Richard McDonald.
4      Q.  And did you have a relationship with
5  Mr. McDonald?
6      A.  Did I have a relationship with him?  I
7  guess I had the same relationship that a lot of
8  people did, which was a, a person that he could
9  defraud and use very effectively.
10     Q.  I see.  So how did you come to meet Mr.
11  McDonald?
12     A.  Let's see.  He was, I mean it was a, it
13  was an opportunity to invest capital just like,
14  you know, hundreds of others that we, we, we
15  would see, you know at that point on an annual
16  basis.
17         I can't remember how this particular
18  company was introduced to me or to the fund.
19     Q.  Okay.  Okay.  You indicated Mr.
20  McDonald defrauded you.
21         How did Mr. McDonald defraud you?
22     A.  You know, we're, we're, we've moved

1  forward back to 2011, right?  Because we were
2  talking about 2005, so I just want to be sure
3  because these are only things that I know today,
4  as the result of six years worth of your work,
5  you collectively, of the SEC, and the Justice
6  Department and the bankruptcy trustee, and then a
7  lot of other people.
8       So in 2004, 2005, and even into some of
9  2006, this is just not stuff that I knew.
10      Q.  Okay.
11      A.  What I know now is that he broke a
12  significant number of securities laws, stole
13  money, that he, that he allegedly was trading
14  shares of his own into the open market without
15  disclosure.  Didn't pay taxes.
16      I mean there's a whole slug of things
17  here apparently that, allegedly that he did.
18      I don't know that he's gone to trial
19  yet or not, but I know he did settle with the
20  SEC.
21      Q.  Okay.  And so your, your statement
22  that, that he defrauded you is, arises from your

1  status as an investor with World Health, or from
2  some other relationship?
3      A.  That would be the only relationship
4  that I had with him.
5      We were an investor in this company.
6      MR. WILLIAMS:  Sure.  Let me hand you
7  another document that I'm going to ask the court
8  reporter to label as Exhibit No. 38.
9          (Exhibit No. 38
10             was marked for
11             identification.)
12      BY MR. WILLIAMS:
13      Q.  And Exhibit No. 38 is a multiple page
14  document I'll represent to you was produced to us
15  by your counsel.
16      It's the response of Defendant Andy S.
17  Reckles to Plaintiff's first set of
18  interrogatories to Defendant Andrew S. Reckles.
19      I'll ask you to turn to the, page 20 of
20  the document.
21      A.  Okay.
22      Q.  And I'm going to ask you is this your

1  signature?
2      A.  Yes, sir.
3      Q.  Okay.  And the question I want to ask
4  you about is this interrogatory No. 3, which
5  begins on page 11 of the document.
6      A.  Okay.
7      Q.  And this question asks about various
8  shares of stock in World Health deposited into a
9  brokerage account at Westminster Securities on
10  various dates throughout 2005 between February
11  and August of 2005.
12      A.  Um-hm.
13      Q.  And my first question to you is did you
14  have an individual brokerage account at
15  Westminster Securities?
16      A.  I believe I did, yes.
17      Q.  Okay.  And with respect to, to your
18  response, there appear to be seven lettered
19  inquiries there.
20      And with respect to the first six of
21  those seven inquiries, your response, beginning
22  in the first full paragraph of page 13, indicates

1  that securities acquisitions identified in items
2  (a) through (f) with an underlying warrant were
3  issued by World Health to Defendant or PEF
4  Advisors, Limited, PEF Advisors, LLC, of which
5  Defendant is a general partner, as compensation
6  for or in connection with investment banking or
7  financing work performed by Defendant and Mr.
8  Mannion on behalf of World Health.
9      My question to you is what investment
10  banking or financing work did you do for World
11  Health?
12      A.  A tremendous amount, a tremendous
13  amount -- arranging financing for the company,
14  helped them locate, structure and finance the
15  largest acquisition that the company made, which
16  was a fantastic acquisition for the company, and
17  the crown jewel of their assets, which is why --
18  and which still exists today about four miles up
19  the road from my house, doing gangbuster
20  business.
21      Q.  What's that?
22      A.  Well, JC Nationwide was acquired by the

Page 62

1  company, and it was our, we introduced the
2  company to JC Nationwide.
3        We financed it. We paid off the debt
4  at JC Nationwide in order to make it clean for
5  the acquisition -- a lot of work over the course
6  of the relationship.
7        Q. Okay. So you had a relationship with
8  World Health beyond, beyond just being an
9  investor in the company, correct?
10       A. Yeah. I mean I think so. Initially,
11 it was, it was acting as an investor, putting in
12 capital, but over the course of time, it was
13 helping tremendously to raise additional capital
14 to help the company with its, with its business
15 plan.
16       Q. Sure. And were the investments that
17 Palisades made into World Health a part of the
18 investment banking work that that you received
19 compensation for?
20       A. Could you ask that again? I'm sorry.
21       Q. Yeah. Were the investments that
22 Palisades made with World Health, were those

Page 63

1  investments a part of the investment banking work
2  that you did for World Health?
3        A. Yeah, some.
4        Q. Okay.
5        A. Can you bear with me one second? I
6  just want to re-read one thing.
7        Q. Sure. Sure.
8        A. I just -- we moved really fast and --
9          (The witness reviewed the document.)
10       MR. WILLIAMS: Why don't we go off the
11 record?
12       THE WITNESS: Is that okay?
13       MR. WILLIAMS: Yeah. Take a break.
14       MS. LAMBRAKOPOULOS: Sure.
15       THE VIDEOGRAPHER: This completes Tape
16 No. 1 of the deposition of Andrew Reckles. The
17 time on the video is 10:54 a.m.
18       We are off the record.
19       (A recess was taken.)
20       THE VIDEOGRAPHER: This is begins Tape
21 No. 2 in the video deposition of Andrew Reckles.
22 The time on the video is 11:08 a.m.

Page 64

1        We are on the record.
2        BY MR. WILLIAMS:
3        Q. Mr. Reckles, I had asked you some
4  questions about Exhibit No. 38.
5          Was there something that you wanted to
6  clarify?
7        A. Yeah. Thank you. So on page 13 of
8  exhibit -- is this 38?
9        MS. LAMBRAKOPOULOS: Thirty-eight.
10       THE WITNESS: Yes. So it reads subject
11 to and without waiving the general -- I'm sorry.
12       The first paragraph, first full
13 paragraph of page 13, I'm not going to read it.
14       It, it, it states that in the shared
15 deliveries discussed on pages 11 and 12 (a)
16 through (f) are, and I quote, "...issued by World
17 Health to Defendant, or PEF Advisors Ltd. or PEF
18 Advisors LLC, of which Defendant is a general
19 partner, as compensation for or in connection
20 with investment banking or financing work..."
21       I just wanted to point out that that's
22 correct on (a) through (e); (f) was actually

Page 65

1  500,000 shares that I owned that were purchased,
2  paid for.
3        BY MR. WILLIAMS:
4        Q. Oh, I see.
5        A. They were not received in connection
6  with.
7          They were received as a purchase.
8        Q. So those shares were received in
9  connection with a purchase, an open market
10 purchase --
11       A. No.
12       Q. -- or somebody's own purchase?
13       A. It was, it was a purchase of World
14 Health convertible securities that PEF Advisors,
15 I believe it was PEF, Limited, purchased in July
16 or August of '05, and those were the underlying
17 shares to that convertible security.
18       Q. I see. I see. So with respect to (a)
19 through (e), in the statement the response is
20 correct that these were --
21       A. Yes, sir.
22       Q. -- provided as compensation in

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1    connection with investment banking or financing
2    work?
3        A.   Yes, sir.  I just thought it would be
4    important to be very specific and clarify that.
5        Q.   I appreciate that.
6        MS. LAMBRAKOPOULOS:  And I'll be happy
7    to add a supplement or amend his interrogatory
8    answers just to have it here for the record.
9        THE WITNESS:  I mean technically, you
10   could almost put it under financing work, but I
11   think it's slightly enough different that I felt
12   like I should put it on, on, you know, clarify it
13   for you.
14       BY MR. WILLIAMS:
15       Q.   Fair enough.  And subheading (e) --
16       A.   Yes.
17       Q.   -- in reference to the 300 purported
18   unrestricted shares you received on July 25th,
19   2005, do you recall that, that share transfer?
20       A.   Not specifically, no.
21       MR. WILLIAMS:  Let me show you a
22   document, and I'm going to ask the court reporter

1    to label this document as Exhibit No. 39.
2        (Exhibit No. 39
3        was marked for
4        identification.)
5        BY MR. WILLIAMS:
6        Q.   And Exhibit No. 39 is a multiple page
7    document Bates number SEC-MANNION0019098 through
8    SEC-MANNION19101.
9        A.   Okay.
10       Q.   My question to you is have you ever
11   seen this document before?
12       A.   Boy, I don't recall it.
13       Q.   Okay.
14       A.   That doesn't mean that I haven't.  I
15   just, I just don't recall.
16       Q.   Okay.  And can you, can you describe
17   for me what, what this -- it's a document
18   addressed to Palisades Master Fund and Bristol
19   Investment Fund.
20       And my question is what is Bristol
21   Investment Fund?
22       A.   It's just another I guess fund.  They

1    are what they are.  I guess they're just another
2    investment fund.
3        Q.   Okay.  And did you bring Bristol
4    Investment Fund to a World Health investment?
5        A.   They were a co-investor in -- I don't
6    recall if I brought them in or not.
7        Q.   Okay.  And this, this document appears
8    to be a "Waiver of Liquidated Damages and
9    Maturity Date Extension on Convertible
10   Debenture."
11       A.   Okay.
12       Q.   And my question is do you recall this
13   transaction?
14       A.   I, I don't specifically, no.
15       MR. WILLIAMS:  Okay.  Let me ask you to
16   take a look at another document that I'll ask the
17   court reporter to label as Exhibit No. 40.
18       (Exhibit No. 40
19       was marked for
20       identification.)
21       BY MR. WILLIAMS:
22       Q.   Exhibit No. 40 is multiple page

1    document Bates number SEC-MANNION0019102 through
2    9104.
3        This appears to be a letter also dated
4    July 19, 2005, related to a securities purchase
5    agreement dated May 17, 2005, among World Health
6    and the purchasers.
7        My question to you is do you recognize
8    this document?
9        A.   I don't specifically, no, sir.
10       Q.   And directing your attention to the
11   third page of the document, do you recognize your
12   signature on that page?
13       A.   I do.
14       Q.   Okay.  And the first page of the
15   document indicates that WHAI -- I'm looking at
16   the last sentence of the first paragraph where it
17   says, "Accordingly, WHAI hereby agrees to issue
18   each of you 300,000 shares of common stock
19   simultaneously with the completion of the
20   Restructuring."
21       A.   Okay.
22       Q.   And the first sentence of that

1   paragraph, it refers to WHAI incurring liquidated
2   damages for failure to timely file a registration
3   statement for the purchasers in connection with
4   the SPA.
5           And my question to you is does
6   Exhibit 40 relate to Exhibit 39?
7      A.   Does Exhibit 40 relate to -- I wouldn't
8   want to speculate to that being the case.  I
9   mean --
10     Q.   Sure.
11          MS. LAMBRAKOPOULOS:  Take a minute and
12  read it.
13          THE WITNESS:  Yeah.  I would need more
14  than a minute to read all of this.
15          MS. LAMBRAKOPOULOS:  Well, take more
16  than a minute.
17          THE WITNESS:  So --
18          (The witness reviewed the document.)
19          THE WITNESS:  I would, I would say yes.
20  That would be my, my, my, my -- in answer to your
21  question.
22          I think you asked was 40 relating to

1   39.
2           BY MR. WILLIAMS:
3      Q.   Yes, sir.
4      A.   And I would say it would appear so.
5      Q.   Appears to be?
6      A.   It appears to be.
7      Q.   And with respect to Exhibit No. 40,
8   again, going back to the first paragraph where it
9   says, "You have agreed to structure a transaction
10  with the Purchasers whereby they waive their
11  liquidated damages and extend the maturity date
12  of the debentures they own pursuant to the SPA."
13          And my question to you is if the
14  purchasers are waiving liquidated damages, why
15  are 300,000 shares going to you?
16     A.   Well, we were restructuring, at least
17  it looks like here, they've got it in quotes, the
18  restructuring, we were restructuring a
19  significant amount of debt that was held by not
20  ourselves, but other people.
21          So it's investment banking work being
22  done specifically for the company, as it relates

1   to securities they've got outstanding with
2   multiple parties.
3      Q.   Sure, but the, the, the purchasers are
4   waiving liquidated damages, correct?
5      A.   And extending maturity of a piece of
6   debt.
7      Q.   Right.  So --
8      A.   I'm not sure what else there was.  I
9   don't know if that was all.
10          You know, I'm not sure if that was all
11  that they were doing, but it looks like they were
12  amending the purchase agreement, the debentures,
13  the warrants, the reg rights agreements -- I'm
14  sorry -- reg, r-e-g.
15          It looks like there was quite a bit of
16  stuff that was being done there in paragraphs,
17  was that 3, 4 and 5 of Exhibit 39?
18     Q.   Sure.
19     A.   I don't have a great recollection of
20  any one thing from six, seven years ago, so --
21     Q.   Sure, but in connection with Exhibit
22  No. 40, can you explain to me why, why the shares

1   were going to yourself and Mr. Mannion directly?
2      A.   Well, they could have just as easily
3   gone to HPC Capital, which we were the owners of,
4   and then been bifurcated out 50/50, or they could
5   have just gone to us individually.
6           It's, from our perspective, six to one,
7   half dozen of the other.
8      Q.   What I'm getting at is in connection
9   with purchasers waiving various rights that they
10  have, why wouldn't the consideration for the
11  waiver be going to the purchasers?
12     A.   This was paid for the work being done
13  on behalf of the company with other investors,
14  not just Palisades, or not Palisades
15  specifically.
16          MR. WILLIAMS:  Sure.  Let me show you
17  another document, a one-page document that I'll
18  ask the court reporter to label as Exhibit No.
19  41.
20          (Exhibit No. 41
21          was marked for
22          identification.)

BY MR. WILLIAMS:
Q. And Exhibit No. 41 a one-page document Bates number SEC-MANNION0016545; subject, post effective, dated July 27, 2005.
It appears to be Andy Reckles to someone named Rich at Better Solutions, Inc. and rich@whstaff.com.
And my question to you is are you familiar with this e-mail?
A. Only to the extent that you put it in front of me.
I don't recall it.
Q. You don't recall it, but it appears to be the e-mail you sent?
A. It appears to be, yes, sir.
Q. Okay. And were you, were you saying -- and the ASR at the bottom of the document, those are your initials?
A. Yes, sir.
Q. And where you say, "Rich, we MUST see a draft today," is this an e-mail addressed to the CEO of World Health?



A. It would appear so.
Q. Okay. And in the third sentence, it says, "The folks at Bristol received no consideration for waiving the prior defaults or for collecting a significant amount of capital for waiving the liquidated damages."
And is that in reference to Exhibit No. 39? Can you, can you tell?
A. I mean I can't speculate. I mean, you know, it's possible. It's possible.
Q. Okay. Do you recall this transaction that's reflected in Exhibit 41?
A. No. No, I don't.
Q. And so you don't recall the circumstances leading to, to Bristol receiving no consideration for waiving prior defaults?
A. No, I, I don't. It's been a very long time.
Q. I understand.
A. Is it Dave or Mr. Williams?
Q. Mr. Williams for the record. When we go off the record, it's Dave.



A. Mr. Williams, it's been a very long time. A lot's happened in six plus years both personally and professionally, so it's --
Q. That's fair.
A. Yeah.
Q. So do you ever recall disclosing to, to investors of Palisades the extent to which you received consideration for investment banking work done on behalf of World Health?
A. Not specifically, but our, our, I do specifically recall that our -- all these things here -- what is this thing called -- an offering memoranda?
Q. Sure.
A. Yeah. I know that it, or I seem to recall that it discussed in detail that, you know, we, we, that being Paul and myself, owned HPC Capital, and that it was a company who by design was in the business of receiving remuneration for the placement of private placements of securities, so I know that the disclosure's in there.



I don't recall that there was specifically we were paid this on this or this on this or this on this or what have you.
Q. You're aware that there was a general disclosure in the offering memorandum?
A. I seem to recall there was, sir.
Q. And, and beyond the, the, the disclosure that may have appeared in the offering memorandum, was there ever any other disclosure to investors about the, the extent of your compensation for your investment banking work?
A. I don't recall.
Q. Not that you recall?
A. Not that I recall.
Q. Do you recall ever being asked by an investor the extent of, the extent to which your work at HPC Capital might be a conflict of interest with your work for the fund?
A. You know, I think as I testified earlier, I had so little interaction with the investors that I think I can say pretty certainly that I've never had a conversation with an



fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1  investor where that was ever discussed.
2      Q.  I see.  Fair enough.  Just one quick
3  question about an exhibit that's already been
4  marked for identification as Exhibit No. 3.
5          Let me hand that to your counsel first
6  before I share it with you.
7      A.  Oh, do you want me to take it?  Thank
8  you.
9      Q.  This is a document that's previously
10 been marked as Exhibit No. 3.
11         And my question to you is this -- do
12 you recognize this document?
13     A.  Can I have a second?
14     Q.  Oh, sure.  I'm sorry.
15     A.  Sorry.
16     Q.  That's a fair question.
17         (The witness reviewed the document.)
18         THE WITNESS:  No, I do not recognize
19 this document.
20         BY MR. WILLIAMS:
21     Q.  Have you, have you ever seen a document
22 like this before?

1          MS. LAMBRAKOPOULOS:  Objection as to
2  form.
3          BY MR. WILLIAMS:
4      Q.  Have you ever seen a document in this
5  format before?
6      A.  I'm not trying to be evasive.  I really
7  don't know what you're asking me.
8          Are you asking me if I've ever seen a
9  due diligence work sheet before?
10     Q.  Yes.
11     A.  Yeah, but not in the context of why
12 we're all here.
13         I've seen due diligence work sheets for
14 companies and what have you over 19 years of
15 being in the industry.
16     Q.  Okay.  That's fair.  Have you ever seen
17 a due diligence work sheet for Palisades?
18     A.  No, I never have.
19     Q.  Okay.
20     A.  Never have.
21     Q.  So if someone in Palisades prepared a
22 due diligence work sheet for investors, it wasn't

1  you?  Is that fair?
2      A.  That's correct.
3      Q.  Okay.  So with respect to the fund's
4  investment in World Health, you indicated that
5  there came to be a problem in about August of
6  2005.
7          Is that -- do you recall that's your
8  prior testimony?
9      A.  Yeah.  That was, that was what we
10 talked about I think before we broke.
11     Q.  Right.  And what was the nature of the
12 problem that the company had, as you understood
13 it?
14     A.  Well, again, I want to, I want to try
15 to --
16     Q.  At the time.
17     A.  Yeah.  I mean I think that's the really
18 difficult, difficult thing here, Mr. Williams.
19         You know, I mean I, you know, my brain
20 works like most people's brains, and once you
21 know something, it's hard to remember at what
22 point you didn't know that.

1          For example, I know now based on public
2  record and investigation results and things that
3  I didn't know then.
4      Q.  Sure.
5      A.  So for me to be able to tell you with
6  certainty what I knew, when I knew it, as it
7  relates to the, the problems at World Health,
8  you're going to have to forgive me because it's,
9  it's tough.
10     Q.  That's fair.
11     A.  What I can say is that in August of
12 2005, there was something that occurred that,
13 that something -- as I recall, it was the CEO of
14 the company did not show up for an earnings call,
15 a broadcast for the quarterly earnings, which is
16 certainly strange.
17         And I recall that in the, the days
18 immediately thereafter, let's call it August the
19 15th through the 20th of the 2005 year, there was
20 a lot of chaos at the company, that there were,
21 were some -- what's the right word -- there were,
22 because again, I know, I now know them to be

Page 82

1   true, but at the time, there was, there was some
2   suspected issues of wrongdoing by the CEO, and
3   that he had absconded himself to a treatment
4   facility of some kind.  And that's what we knew
5   at that time.
6        There was obviously a very negative
7   reaction in the market for the company's stock
8   price, but there was some significant funding
9   issues for the company as well that immediately
10  came to the information front as a result of, you
11  know, kind of this very chaotic situation.
12     Q.   And when you say funding opportunity,
13  what does that mean?
14     A.   Well, you know, we, we, as you know, we
15  were not the only source of capital for this
16  company.
17        And, you know, a business of this
18  nature met its daily operating needs by -- what's
19  the -- financing its cash flows I guess would be
20  the right way to say it.
21        And so they worked with a very large
22  lender called CapitalSource, which I think is

Page 83

1   from up around here somewhere, or was from up
2   around here somewhere, and that lender turned
3   them off.
4        That lender refused to lend against
5   invoices until such a time as they could get
6   comfortable with what was going on at the company
7   with the CEO, with the things that were being
8   suggested at that time may or may not be true,
9   which was a huge problem for a company that had,
10  that was in the temporary staffing business.
11     You know, this is a company that, that
12  employed on a contract basis, best guess, shy of
13  a thousand people that were due payroll, and you
14  couldn't fund operations, so you couldn't pay
15  your people, and if you can't pay your people and
16  your people are what you're selling in a business
17  like this, they leave.
18        And so that was a very chaotic, very
19  difficult time.
20     Q.   And so in response to that situation,
21  what, if anything, did Palisades do?
22     A.   Well, we, we provided capital.  We lent

Page 84

1   capital to them on very short notice when it
2   became -- them being World Health -- when it
3   became clear that their traditional funding
4   source was in fact not going to meet their
5   capital requirements for a series of payrolls at
6   the end of all of '05.
7      Q.   I see.  And I'm going to hand you a
8   document that's previously been marked in this
9   case as Exhibit No. 9.
10     A.   All right.
11     Q.   And Exhibit No. 9 is a one-page
12  document that appears to be an e-mail
13  communication that appears to be from yourself to
14  someone named John at WH Staff; subject, help us,
15  dated August 24th, 2005.
16        And my question is do you recognize
17  this e-mail?
18     A.   You know, I, I, I wrote it.  I don't, I
19  don't, I don't recall it specifically here today.
20     Q.   Sure.  And it indicates that, under
21  subheading one, that you bridged the company $4
22  million on August 17th, is that correct?

Page 85

1      A.   That's what the e-mail says, yes, sir.
2      Q.   And did that happen?
3      A.   I can't recall the specific date.  I
4   know that there were two, two loans in the month
5   of August of 2005.
6      Q.   Okay.
7      A.   I'm going to accept that, that if I
8   wrote it, then my date's probably right pursuant
9   to this e-mail.
10     Q.   Okay.  And those advances were after
11  the, the difficulty that you, that you just
12  talked about with respect to the, the CEO not
13  showing for the earnings call and the subsequent
14  cut-off of immediate funding?
15     A.   Yeah.  I would say that it was at the
16  very beginning of the difficulty, to be frank
17  with you.
18        That's one of those things where you
19  can look back and go wow!
20        You know, things over the course of the
21  next several months were very difficult across,
22  you know, all channels here with this particular

1   investment.
2        I'm being a little bit flippant with
3   your choice of words. I didn't mean to be.
4        It's just there were periods of time in
5   August where, you know, as I said, we didn't
6   really know what was going on.
7        It was very confusing. It was very
8   dynamic. It was very chaotic.
9        And what we do know is that we're
10  getting calls, this being myself or Mr. Mannion,
11  were getting calls from John here, who was the
12  former COO of the company, who's now been thrust
13  into a role of running the company because Mr.
14  McDonald is no longer with the company, or from
15  their lawyers, which are cc'ed on this e-mail,
16  Mr. Barker at Pogo Law.
17       And we're getting calls saying look,
18  this company is going to be shut down because
19  CapitalSource, which I mentioned here in this
20  e-mail somewhere right here, is not funding them,
21  and they can't pay their people.
22       And, you know, we just tried to help.

1   Q.  Okay. And you indicated that CapSource
2   had cut off the funding because they, they were,
3   they had questions about -- well, I don't want to
4   misstate your testimony.
5        Why did CapitalSource cut off the
6   funding?
7   A.  Well, I can't tell you why they, they
8   did. I don't work there.
9        I, I can only tell you what I know now
10  in hindsight, right?
11       So I don't think that that's really a
12  reasonable way to answer your question.
13  Q.  Okay. Well, if the company's original
14  source of funding had cut off --
15  A.  Um-hm.
16  Q.  -- its funding, I guess my question is
17  prior to investing Palisades's funds with, with
18  World Health, what, if anything, did you do to
19  satisfy yourself that World Health would be able
20  to, to repay you those funds?
21  A.  Well, I think that, I think that
22  there's a really, really important distinction

1   that needs to be made here, and I tried to make
2   it before.
3        I tried to make it when we discussed
4   the World Health matter with the folks in
5   Philadelphia when I discussed with it Mr. Aderton
6   over there, what was that, two years ago,
7   something like that?
8        Just because you have a bad egg doesn't
9   mean that the whole dozen is bad.
10       What we know now in hindsight -- this
11  is where it is important -- is that Mr. McDonald,
12  to a great extent, acted alone.
13       That's what I understand from reading
14  the indictments and all the other things.
15       There were a couple of people there
16  that were complicit with him, and they've all
17  settled with you, but generally, he was a very
18  bad guy that was doing some bad things, and a lot
19  of people got hurt badly by him, me as well,
20  millions of my own dollars, millions.
21       I mean pretty much every dollar I had.
22  I lost my house as a result of this investment,

1   okay, and my ownership, so it's, it's difficult.
2        But it was a great company. It was a
3   great company. It's still in business today in
4   its pieces, as I mentioned earlier.
5        It's part of Jackson Healthcare, which
6   is a multiple, hundred million dollar private
7   business out of Atlanta, Georgia, one of the most
8   respected employers in the southeast, whose
9   offices are literally four miles from where my
10  office is.
11       I know the principal, Rick Jackson,
12  kind of through social circles. We share some
13  common friends.
14       He, he picked up a steal when he bought
15  this thing out of bankruptcy. It was a great
16  business. It was a great business. It still is
17  a great business.
18       We believed that the business would
19  survive, and that's why we lent them the money.
20       I'm not investing into, I wasn't
21  investing into Rich McDonald's pockets, although
22  from what I now understand six years later, some

Page 90

1    of that money went directly into his pockets
2    because he stole it, but we were investing in the
3    company, and we believed in the company.
4         And I happened to know the industry
5    reasonably well.  I come from a background in the
6    medical industry.  I understand it, the staffing
7    and medical staffing and locum tenens doctors.
8         It's a good profitable business, low
9    margins, but good cash flows.
10        They generally pay back debt.  That's
11   why CapitalSource had extended them a near
12   $40 million line.
13        We felt comfortable that the company
14   would survive.
15        What happened to management, Mr.
16   McDonald, Mr. Sercu, didn't know anymore than
17   anybody else new at that time.
18        It was pure chaos.
19   Q.   Okay.  You thought that World Health
20   was a good investment?
21   A.   Absolutely.
22   Q.   Okay.  You indicated earlier today that

Page 91

1    the World Health was a significant investment for
2    Palisades, correct?
3    A.   Yes.
4    Q.   In fact, you indicated it was
5    Palisades's largest investment in about August of
6    2005, correct?
7    A.   Yes.  I indicated that I believed it
8    was.
9    Q.   Yeah.  And are there other limitations
10   or guidelines on the extent to which Palisades
11   can be invested in a single company?
12   A.   You know, I don't recall if they were,
13   were specific.
14        I seem to recall that there was like a
15   20 percent rule, but I don't know if it's in, if
16   it's in the offering memorandum or not
17   specifically.
18        I haven't read the offering memorandum
19   in ten years, nine years.
20   Q.   Okay, but you, you understood that
21   there was a 20 percent guideline in some context?
22   A.   Yeah, in some context.

Page 92

1    Q.   Okay.  And if I told you that it was in
2    the offering memorandum, that wouldn't be
3    inconsistent with your recollection?
4    A.   If you told me it was, you pointed me
5    to the page, I'd say sure, there it is.
6         I wouldn't -- I recall that there was.
7    I just don't remember specifically what the terms
8    and conditions of it were.
9    Q.   Okay.  And where was the company's,
10   where was Palisades's position in World Health
11   relative to that 20 percent guideline?
12   A.   You know, I don't recall.  Probably
13   pretty close.
14   Q.   Okay.  And so was there any concern
15   with respect to investing additional capital into
16   World Health, as good as the investment was, as
17   you described, was there any concern with
18   investing additional capital into the company in
19   about August 17th of 2005?
20   A.   Well, Mr. Williams, that's a little
21   kind of open-ended.
22        I don't mean to be disrespectful, but

Page 93

1    is that in relation to the 20 percent?
2         Is that in relation to what we knew in
3    the diligence at the time?
4         Is that -- I mean sure, there's always
5    concerns when you make an investment of any kind,
6    right?
7         I mean that's part of the business.
8    You're putting capital at risk, and risk is the
9    operative term.  Whether you're investing in IBM
10   shares or World Health, there's risk involved in,
11   in that.
12        So if you could maybe be more specific.
13   Q.   Sure.  Well, you understood that World
14   Health needed funds because it's original source
15   of funding was no longer willing to risk its
16   capital, correct?
17   A.   Yes, sir.
18   Q.   And so you were, you were putting up
19   funds of Palisades?
20   A.   Yes.
21   Q.   Correct?  And in connection with
22   putting up funds of Palisades, were you concerned

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1    that Palisades would be too overly-concentrated
2    in its investment of, in World Health?
3        A.  I don't believe that I can really
4    recall what my concerns were in any order of
5    magnitude at that particular time.
6            There were a lot of concerns, obviously
7    the first and foremost being that within let's
8    call it three days of, you know, learning that
9    the CEO of the company is in a whatever, mental
10   institution, and was raving about how he had done
11   all sorts of really bad things which were now
12   potential allegations and concerns for us, there
13   was clearly the concern that we might have too
14   big a position in light of all of those other
15   concerns.
16           But those also had to be weighed
17   against the real risk, at least as it was
18   presented to me by Mr. Sercu and Mr. Barker, and
19   I forget the name of the CFO at the company at
20   the time.
21           But I remember being on a call with the
22   three of them, Mr. Barker, in order to make sure

1    that Mr. Sercu and whoever the CFO were, didn't
2    violate any insider information because they were
3    privy to things that I was not privy to.
4            But what was, what was related to me
5    was that if we didn't help them, if we did not
6    fund them that $4 million on the 17th, that they
7    would not be able to make payroll.
8            If they could not make payroll, they
9    would need to close their doors before the 30th
10   of the month, period, the end.
11           They would have no way to pay their
12   staff, and that staff means all the folks they
13   have out in the field operating as temporary
14   staff nurses, temporary staff physicians,
15   temporary staff pharmacists, et cetera, right?
16           Their product is people, professions,
17   and people of that ilk don't take kindly to
18   finding out that they're not getting paid.
19           You might be able to pull that off with
20   somebody at Seven Eleven, but you don't pull it
21   off with a guy that's got a degree from Johns
22   Hopkins.

1            So we were put into the position that
2    whatever we had invested in that company at that
3    point was all at risk because every single
4    employee would leave.
5            That was the presentation to us from
6    management and their counsel, and that of all the
7    risks seemed to be the greatest.
8        Q.  Okay.  So you were concerned that,
9    well, just, just so we're clear, you were
10   concerned that the fund's entire position at
11   World Health would be in substantial jeopardy if
12   you didn't advance the six million in the two
13   tranches?
14       A.  Yeah.  And I probably could have said
15   that better for you.
16           There were a lot of things that I was
17   concerned about, that we were concerned about.
18           The primary at that particular time,
19   because you're asking about those particular
20   loans on those particular days, was that as
21   presented to us, if they did not receive capital
22   from somebody to make payroll, that the company

1    would cease to exist, and that would obviously
2    have very negative impact to the investment that
3    we already had in World Health within the fund.
4        Q.  And it would negatively impact the --
5        A.  The entire --
6        Q.  -- positions?
7        A.  Yes, sir.
8        Q.  But you understood that the company's
9    capital, original capital source had been cut off
10   because the lender had concerns as to whether the
11   lender would get paid back, correct?
12       A.  That's not what I said.
13       Q.  Oh, I apologize.
14       A.  I never said that.
15       Q.  Okay.
16       A.  What I, what I said was I don't work at
17   CapitalSource, never worked at CapitalSource, and
18   I don't know what their logic was at that time.
19           What it turned out to be in hindsight
20   was that Mr. McDonald had actually forged the
21   amount of exposure that he had taken out under
22   the CapitalSource Line.  I think I got that

Page 98

1  correct, something like that.
2       So that they were actually
3  over-extended in the company, which is partly
4  their own fault.
5       I mean somebody should have been doing
6  the math on their side, too, but at the end of
7  the day, they were over-extended based on the
8  collateral that Mr. McDonald was apparently
9  pledging.
10      He was pledging --
11  Q.  I see.
12  A.  -- receipts or invoices, and either he
13  was double pledging them or triple pledging them
14  or just manufacturing them, but they were lending
15  against that.
16      And what we've learned in hindsight
17  that we didn't know then and that CapitalSource
18  couldn't have even known right then, was that
19  they had more money extended than they had
20  collateral or invoices to cover.
21  Q.  So they, so World Health was
22  over-extended?

Page 99

1  A.  That's what we know now.  That's what
2  we know now.
3       What we knew then and what Mr. Sercu
4  knew then, what I knew then, what everybody knew
5  then was that CapitalSource, their current
6  lender, had told them that we will not be giving
7  you money to make payroll next week and we will
8  not be giving you money to make payroll the
9  following week.
10  Q.  Correct.
11  A.  Now --
12  Q.  Did --
13  A.  Go ahead.  I'm sorry.
14  Q.  Did you have an explanation from anyone
15  as to why CapitalSource had did that at the time?
16  A.  I spoke to some folks at CapitalSource.
17  I don't remember their names.
18  Q.  Okay.
19  A.  They were, they were not real helpful.
20  They were not real helpful.
21  Q.  So do you recall what information they
22  supplied you with respect to their decision, if

Page 100

1  any?
2  A.  They didn't, they didn't, didn't supply
3  any information --
4  Q.  Okay.
5  A.  -- for why they did what they did.
6  Q.  Fair enough.  I ask you to take a look
7  back at Exhibit No. 35, the --
8  A.  Okay.
9  Q.  -- the offering memorandum for
10  Palisades Equity Fund, and I'm going to direct
11  your attention in particular to page 9 of the
12  document.
13  A.  Okay.
14  Q.  And do you find the part of the
15  document that appears to indicate investment
16  strategies and methodology?
17  A.  I see it.
18  Q.  And I want to refer you to the first
19  sentence of the third paragraph at the very
20  bottom of the page.
21      (The witness reviewed the document.)
22      THE WITNESS:  Okay.

Page 101

1       BY MR. WILLIAMS:
2  Q.  In reference to that part of the
3  document, it indicates that "The Manager intends
4  to diversify the Fund's selection of securities.
5  It will endeavor not to invest more than 15% of
6  the Fund's assets in any one security, and will
7  under no circumstances invest more than 20% of
8  the Fund's assets in any one security without
9  consent from the investors."
10      Did I read that correctly?
11  A.  Yeah.  And I told you if it was in here
12  and you pointed it out, I would tell you there it
13  is, and --
14  Q.  Sure.  And my question is at the time
15  of the investments in late, in mid and late
16  August in World Health on behalf of Palisades,
17  wasn't Palisades over-extended in World Health?
18  A.  I don't know the numbers.  I know that
19  we sought consent from the investors for a
20  variety of different things in August and
21  September.
22      I seem to recall that one of those

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 102

1    items was consent to, to broach the 20 percent
2    limitation.
3         I seem to recall that we got consent to
4    form the side pocket.
5         At, at the moment in time, I don't
6    recall what the dollar amount that we had
7    invested is, what the percentage of assets under
8    management it was.
9         I just -- I'm sorry -- I don't.
10    Q.   Okay.  And so you do recall obtaining
11   or seeking to obtain the consent of the fund's
12   investors or the limited partners to broach the
13   20 percent limitation?
14    A.   Yes, I do recall that.
15    Q.   Okay.  And was the reason for that
16   consent the, the two investments in late August?
17    A.   You know, I don't recall if it was for
18   that specifically, or if it was for -- I mean
19   there was, there was so much else that happened.
20        It's, it's, it's -- you're, you're
21   aware.
22        I mean it was either over the, these

Page 103

1    loans, or it was over the, the restructuring that
2    we were going to lead that began at the end of
3    August or so.
4         We were going to put in another
5    $15 million and effectively buy a very large
6    controlling share of the company along with some
7    other investors, re-capitalize the company.
8         As I said, we thought it was a great
9    business.
10        As I said, it turned out to be a very
11   good business, and still is, so --
12    Q.   Did that -- go ahead.
13    A.   You're fine.  Go ahead.
14    Q.   Did the, did the $15 million investment
15   happen?
16    A.   It never went into the company.  We, we
17   negotiated it for several weeks, went through
18   term sheets.
19        We wired the funds into escrow.  We
20   went through the documentation.  I know counsel
21   prepared documents, to my recollection, but it
22   never got done.  It never got done.

Page 104

1    Q.   Okay.  Let me ask you to look back at
2    Exhibit No. 9, which is the one-page e-mail
3    entitled help us.
4    A.   Okay.
5    Q.   And in that, the paragraph that follows
6    the four bullet points, and in particular, I want
7    to ask you about the fourth sentence in where it
8    says that we need someone to help us out.
9    A.   Let me see here.  Okay.  I'm with you.
10    Q.   Okay.  The current value of our shares
11   in the fund is approximately $610,000.
12        And my question to you is how did you
13   calculate that, that, that number?
14    A.   Yeah.  I have no idea.
15    Q.   You don't recall?
16    A.   Today, I don't.
17    Q.   That's fair.  Okay.  And I'm going to
18   ask you to look at the, in that paragraph, the
19   fifth sentence from the bottom of that paragraph.
20    A.   Can you tell me what it starts with?
21    Q.   It starts with in a time of crisis.
22    A.   In a time of crisis --

Page 105

1         (The witness reviewed the document.)
2         THE WITNESS:  Okay.  I don't know how
3    far you want me to go, but I've, I read it from
4    there to the end, so --
5         BY MR. WILLIAMS:
6    Q.   Well, the statement includes the
7    sentence that we're going to show such huge loss
8    to our LPs that we fear large-scale redemptions,
9    and this could cause the end of our fund.
10        And my question to you is was that, was
11   that your concern in about August of 2005?
12    A.   You know, this was a very, as I said,
13   and I guess I've got to keep stressing it, this
14   was a very, very chaotic, very stressful time.
15        You know, I can't ask you questions,
16   so -- it's very -- I can understand I think how a
17   lot of the people that were defrauded by Mr.
18   Madoff felt.
19        Mr. McDonald was very good at what he
20   did.
21        And so I was personally floored.  As I
22   testified some time ago, and I'm never going to

Page 106

1  forget this, he -- you know, I'm, I'm, I'm a
2  Christian person, right?
3       I was a Sunday school teacher at the
4  time teaching young adults.
5       And somehow or another, during one of
6  our conversations early in the relationship, it
7  came up that I had a Sunday school event at my
8  house or something, and I happened to mention to
9  him that I can't talk to you after such and such
10 because I'm having my whole Sunday school class
11 over and cooking dinner for them or something,
12 something like that.  This is back in early,
13 early in the relationship.
14      And the next -- you know, then he
15 starts -- and I can see it now in hindsight,
16 right?
17      He leveraged my, my faith and he
18 leveraged my relationship with church and he oh,
19 well, you know, I'm a youth group leader myself
20 and this and that and the other, and you know,
21 would quote Bible verses to me, you know, things
22 like that.

Page 107

1       And I look back, and I just -- it makes
2  my skin crawl, right, because the devil quotes
3  Bible verses for his own benefit.
4       And I was floored.  I was, I was
5  emotionally just blown for 15, 20 days.
6       I got to tell you August 24th is my
7  wife's birthday.  I mean that's just -- May 24th
8  is her birthday, and I'm here writing this crap
9  instead of out dealing and celebrating with my
10 wife.
11      I'm, I'm absolutely floored about
12 everything that's gone on.
13      I mean my trust is shattered.  Some guy
14 that tells me he's a youth group leader and he's
15 in the same faith as me, and we've got a, you
16 know, we believe in this business, and when he
17 calls, we fund him and bla, bla, bla.
18      The next you know, the guy, at least we
19 know in hindsight, robbed everybody blind.
20      He committed pretty much every crime
21 you can commit as CEO of a company, the best I
22 can figure, you know.

Page 108

1       And this was I think at the very end of
2  the day, an e-mail written in a very passionate
3  heat of the moment time where I couldn't tell you
4  what was happening, whether I was coming or
5  going.
6       I felt like we had done everything
7  correctly.
8       I still feel like we did pretty much
9  everything correctly, and that they, you know,
10 had come to us in some real dire need after, on
11 their watch, their CEO defrauded us, and we
12 bailed them out of all of that, and now we're in
13 a position where, you know, seven days before the
14 end of the month, we're trying to figure out
15 okay, how are we going to deal with this issue,
16 how are we going to deal with these assets, what
17 are we going to do?
18      We're having conversations with
19 counsel.
20      We're having conversations with limited
21 partners and investors, and this was an effort by
22 me to basically put them on notice that you guys

Page 109

1  need to step up and help us out here.  You need
2  to make it right.
3       We shouldn't be going down with the
4  ship here.  There's no ship that needs to go
5  down.  We can fix this problem, but we shouldn't
6  be taking these massive losses for bailing your
7  company out.
8  Q.  What massive losses?
9  A.  Well, what ended up happening -- it
10 didn't happen then.  It happened a year later.
11 Happened in bankruptcy.
12      It didn't have to go to bankruptcy.  We
13 offered them another $15 million to keep it out
14 of bankruptcy.
15 Q.  And when you say, when you say, when
16 you say massive losses, you mean losses of the
17 Palisades investment in your company, or
18 something else?
19 A.  Well, what you said that I wrote here,
20 which didn't subsequently happen necessarily in
21 the month of August.
22      This is seven days before the end of

Page 110

1  the month, and you know, we were forced to deal
2  with side pocketing assets, and we had to look at
3  actual valuations and how we were going to value
4  and tear into the company, and we came to the
5  conclusion at least the company had value, which
6  is the reason why we agreed to put another
7  $15 million in.
8      And we were comfortable with what the
9  company was doing and what the, it was worth.
10      I had to get past the, the guy and get
11 focused on the company.
12      This is an e-mail where I'm focused on
13 the guy.  This is Andy here defrauded, sad,
14 completely blown away by somebody that he thought
15 was his friend that just stole all his money, you
16 know.
17      And you know, there was, there was a
18 lot of up and down kind of emotions during that
19 period of time.
20  Q.  Okay.  In the sentence prior to the one
21 that we just looked at, you appear to be asking
22 for 15.4 million shares.

Page 111

1   A.  Well, I think -- let me read this here.
2  I view --
3      (The witness reviewed the document.)
4      THE WITNESS:  I think what I'm asking
5  for -- this is obviously a very badly written,
6  disjointed e-mail, but I think that that's in
7  relation to a couple of sentences up above where
8  you kind of have a numerator and a denominator of
9  some things, and I think that's probably what
10 we're saying is that we had this much of, of
11 stock or dollars worth of stock, and it's going
12 to be converted into this preferred C at this
13 price, which would equate to that many shares on
14 a conversion basis.
15     BY MR. WILLIAMS:
16  Q.  And that amount would have been equal
17 to the amount of loss in the, in the Palisades's
18 long position?
19  A.  Well, in a theoretical loss.
20  Q.  Okay.  And that was based presumably on
21 the market value of the company stock?
22  A.  Theoretically.  I can't answer without

Page 112

1  knowing what the price of the stock was, you
2  know, but --
3   Q.  Sure.
4   A.  -- what I can say is that if you take
5  25 cents, I would hazard a guess that if you
6  divide that by, you know, into the number up
7  there, you probably come up to that number.
8   Q.  Sure.
9   A.  Somewhere around there.
10  Q.  And when you -- in reference to that,
11 to that decrease in value, you say we are willing
12 to receive this in restricted common stock
13 salable under Rule 144?
14  A.  Correct.
15  Q.  Or tenderable in sale, but we need
16 help.  We are going to have to take a massive
17 loss this month in our fund, and it just isn't
18 fair to us.
19     And that's in reference to the decrease
20 in the, the long position?
21  A.  Well, I mean I think what I'm saying
22 here is it's an effort to get him to do something

Page 113

1  that I want him to do.
2      You know, I think it was playing a
3  little bit on his heart strings more than
4  anything else.
5      And again, on August the 21st, I didn't
6  really know where we were.
7   Q.  Okay.
8   A.  Didn't really know where everything
9  was.
10  Q.  Okay.  And the sentence that we talked
11 about earlier where it says we truly feel that
12 we've stepped up in a time of crisis and we hate
13 to ask now, but if we don't have it by month's
14 end, we're going to serve such a huge loss to our
15 LPs, we fear large-scale redemptions, and this
16 could cause the end of our fund.
17     Was that, was that your state of mind
18 on August 24th?
19  A.  You know, I think that was certainly
20 something that we were or I was concerned about.
21  Q.  And in fact, did you get the shares
22 that you were asking for?

Page 114

1       A.  No.  No, we did not.
2           MR. WILLIAMS:  Let me ask you, let me
3    show you another document that I'll ask the court
4    reporter to label as Exhibit No. 42.
5               (Exhibit No. 42
6               was marked for
7               identification.)
8    BY MR. WILLIAMS:
9       Q.  Okay.  Mr. Reckles, I'll represent to
10   you that Exhibit No. 42 is a one-page document
11   Bates number SEC-MANNION0301654; subject, "Re:
12   WHAI."
13          And I'll give you a minute to read it.
14      A.  I've already read it.  Thanks.  Yeah,
15   once you handed it to me.
16      Q.  Sure.  Have you seen this document
17   before?
18      A.  No -- yes, I've just seen the document.
19   I don't recall the document from 2005, but it
20   would appear that I sent it from, from my e-mail.
21      Q.  Okay.  And in the second sentence on
22   the -- excuse me.

Page 115

1           The third sentence, the second line,
2    you indicate that you can't be the investment
3    banker in the deal because of the size of our
4    position, so we have turned over, this over to
5    Emerging Growth.
6           What's that in reference to, if you
7    recall?
8       A.  I, I don't.
9       Q.  Okay.  And in the fifth line of the
10   paragraph, the first full sentence, it begins the
11   deal must close by this Wednesday?
12      A.  Right.
13      Q.  And you indicated that "...or the
14   company will probably fail."
15          Do you see that part of the document?
16      A.  Right.  I see it.
17      Q.  And was that your belief on about
18   August 29th, that if the deal didn't close by,
19   you know, the upcoming Wednesday, the company
20   would probably fail?
21      A.  You know, knowing me, I was probably
22   just trying to push Mr. Brezzi.

Page 116

1       Q.  And who's Mr. Brezzi?
2       A.  He was just a gentlemen that was a
3    co-investor in a lot of deals.
4           I can't recall if he invested in World
5    Health prior to that.
6           I think he may have.
7       Q.  And, and by the way, the e-mail address
8    in the to is mbrezzi@dmitrust.com.
9           And is Mr. Brezzi someone that you
10   solicited to invest, or --
11      A.  Yeah.  He's a friend of mine, a
12   co-investor, actually still a, still quite a
13   close friend.
14      Q.  Okay.
15      A.  And -- yeah.
16      Q.  Okay.
17      A.  You know, actually I think I had
18   alluded earlier that we were, we were trying to
19   restructure the company, infuse a great deal of
20   capital into the company so that there wouldn't
21   have to be these weekly here's some money, here's
22   some money.

Page 117

1           Mr. Brezzi was one of those folks that
2    I had hoped would participate in that with us.
3       Q.  Did Mr. Brezzi participate?
4       A.  It never happened, as everyone knows.
5    It never, never occurred.
6       Q.  Okay.  And shortly after the end of the
7    month, the end of August of 2005, it came time
8    for, for Palisades to do its monthly valuation,
9    correct?
10      A.  Well, yeah.  I mean you did your
11   valuation at the end of every month, so that's
12   correct.
13      Q.  Sure.  And do you recall the process of
14   preparing that valuation in particular?
15      A.  You know, I do only to the extent that
16   it was one of the few over the course of many
17   years that I ever really had any significant
18   involvement in, because we were facing a
19   heretofore never experienced event.
20          You know, we had never been through
21   anything of this nature or magnitude, and I'm --
22   so I do recall a good deal about this.

Page 118

1    Q.  Okay.  And could you describe the
2  process by which that, that particular valuation
3  was done?
4    A.  Oh, it wasn't any different in the, in
5  the main.
6       I mean it was still overseen by the
7  administrators, and there was just a, a lot more
8  things happening at that time.
9       I mean there was the, the formation of
10  the side pocket because it was deemed to be the
11  best solution for all of the LPs to, due to the,
12  the difficulty in, in assessing valuation for
13  these assets that were now liquidity challenged.
14       And, and so that was something new, had
15  never been done by us before, so that was
16  happening at the same time.
17       There was a need to value the assets
18  that were being segregated into the side pocket.
19       There was a need to value all the other
20  assets outside of World Health.  So it was, there
21  was a lot going on.
22       I can't remember any one specific

Page 119

1  thing.
2       I just remember it being chaotic and
3  crazy.
4       MR. WILLIAMS:  Sure.  Let me hand you a
5  document I'll ask the court reporter to label as
6  Exhibit No. 43.
7            (Exhibit No. 43
8            was marked for
9            identification.)
10      THE WITNESS:  Okay.
11      BY MR. WILLIAMS:
12    Q.  I will represent to you that
13  Exhibit No. 43 is a one-page document Bates
14  number SEC-MANNION0044124.
15       It appears to be subject,
16  "EliteStability Fund Stablerock
17  Compartment/Subscription to the P..." and dated
18  September 7, 2005, to someone named T. Dumbauld
19  at aillc.us from you.
20    A.  Well, actually this is a forward.
21    Q.  Oh, a forward?
22    A.  This is actually a response to a

Page 120

1  forward, so I really don't even know what the
2  genesis to the whole chain is.
3       If you could produce the chain, that
4  would help, but this is taken in, you know.
5    Q.  Sure.
6    A.  I don't know that this was sent from me
7  or if this was an e-mail that when I printed it,
8  or when it was printed just, you know, because
9  it's a re of a force.
10       I don't know.  Not that it -- well,
11  this matters, but I just don't, don't know the
12  context.
13      MS. LAMBRAKOPOULOS:  Well, let him
14  ask --
15      THE WITNESS:  Yeah.
16      MS. LAMBRAKOPOULOS:  -- let him ask his
17  question.
18      BY MR. WILLIAMS:
19    Q.  That's fair, but my question to you is
20  simply do you know who T. Dumbauld is?
21    A.  Yeah, I know who Ted is.
22    Q.  And who is Ted?

Page 121

1    A.  I don't remember his exact title, but
2  he was somebody that worked at Access, Access
3  International.
4    Q.  And what was Access International's
5  relationship, if any, to the Palisades fund?
6    A.  They were an investor.  They became an
7  investor.
8    Q.  Okay.  And was it Access
9  International's idea to create the side pocket?
10    A.  They certainly opined on it.
11    Q.  What was their opinion, the best of
12  your recollection?
13    A.  They thought it was, it was a good
14  idea.
15    Q.  I see.  And so were they an investor
16  that came into the fund before or after the side
17  pocket?
18    A.  They only came in after its
19  establishment.
20    Q.  I see.  So they came in after the
21  establishment of the side pocket, and they
22  offered the opinion that the side pocket was a

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1    good idea?
2         MS. LAMBRAKOPOULOS:  Just objection as
3    to form to the extent the use of your word came
4    in.
5         BY MR. WILLIAMS:
6    Q.   They, they became limited partners in
7    the fund after the creation of the side pocket,
8    is that right?
9    A.   They became investors.  I don't
10   remember if they invested on-shore or off-shore.
11        And there's a fine designation whether
12   they're limited partners or investors, you know,
13   shareholders, so I don't remember.
14   Q.   Sure.  And they, when you say they
15   opined on the creation of the side pocket, did
16   they suggest to Palisades that the side pocket be
17   created?
18   A.   Well, I think, I think that's, I think
19   I answered that.
20        I think that they, they were a group of
21   people that certainly gave us their opinion on
22   how we should deal with this issue relating to

1    World Health and the assets.
2         It wasn't any one person.  There were
3    several investors and people that suggested that
4    a side pocket was a good way to go.
5         It wasn't just Access, and I don't
6    recall that they specifically -- they weren't an
7    investor in the fund at the time, so they didn't,
8    as you say, have a dog in the hunt.
9         But we certainly discussed it with
10   them, as I think this e-mail would indicate.
11   Q.   At the time of this e-mail,
12   September 7th, 2005, had, had Access become
13   investors yet?
14   A.   I don't recall.  I don't recall.
15   Q.   Sure.  And in your reference to Mr.
16   Dumbauld, it appears to be an indication that
17   "This will therefore eliminate the need for a
18   side letter as the side pocket agreement will
19   remove the WHAI debt investments from the books
20   and NAV calculations of the Master Fund and
21   therefore eliminate the risk inherent to new
22   money investors as of September 1."

1         My question to you is, the first
2    question to you is what was the reference to a
3    side letter?
4    A.   I could only speculate.
5    Q.   Do you recall Access asking for a side
6    letter to be a part of their agreement to invest
7    with Palisades?
8    A.   I don't recall specifically, no.
9    Q.   Do you recall generally?
10   A.   You know, I didn't, I didn't do most of
11   the work with Access, so I don't really know
12   what, what they were requesting.
13        I know that there's an e-mail in front
14   of me that talks about a side letter, and it
15   talks about a side pocket letter, all of which
16   happened six and a half years ago.
17        I don't recall specifics, you know,
18   here.  Some stuff I do, but this I don't.
19   Q.   Okay.  And who was the primary
20   interface on the Palisades end with Access?
21   A.   Well, as I've testified, as with most
22   LPs or shareholders, it was Mr. Mannion.

1    Q.   I see.  And in the latter part of the
2    sentence I just read where it talks about
3    eliminating the risk inherent to new money
4    investors as of September 1, was that one of the
5    purposes of creating the side pocket, to
6    eliminate the risk of, with respect to the World
7    Health debt as to new investors?
8    A.   Well, there, there, there was really
9    three main reasons for creating the side pocket.
10        The first reason for creating the side
11   pocket was the protection of all of the LPs.
12        And I know it sounds strange, but
13   because of how our fund worked, if you put money
14   in on a given day, your money was locked up for a
15   period of time.  It was just locked up.
16        But if you had your money in for a
17   certain period of time, you could redeem your
18   money.
19        And we had, including Paul and myself
20   had invested significantly in August of '05 as
21   well.
22        We had taken a good bit of money over

Page 126

1   the summer, so there was a lot of new capital in
2   the fund that was all locked up, as I said,
3   including some of my own money, but significant
4   money from a fund in London and significant money
5   from other investors.
6         MR. WILLIAMS:  Why don't we go off the
7   record?
8         THE VIDEOGRAPHER:  This concludes Tape
9   No. 2 of the video deposition of Andrew Reckles.
10  On the video, the time is 12:10 p.m.
11        And we're off the record.
12        (Pause.)
13        THE VIDEOGRAPHER:  This begins Tape No.
14  3 of the video deposition of Andrew Reckles.  The
15  time on the video is 12:14 p.m.
16        We are on the record.
17        BY MR. WILLIAMS:
18     Q.   Okay.  Mr. Reckles, I had asked you
19  earlier about whether or not the purpose of
20  creating the side pocket was to eliminate, one of
21  the reasons was to eliminate the risk inherent in
22  new money investors, and you were explaining to

Page 127

1   me the, the three purposes of creating a side
2   pocket.
3      A.   Yes.  So -- and I think I'd like, since
4   we're fortunate that the tape needed to be
5   changed, I'm going to make it a little bit
6   shorter and easier.
7         I'm going to just answer that question
8   in relation to the e-mail in front of me --
9      Q.   Okay.
10     A.   -- which is Exhibit 43.
11     Q.   Okay.
12     A.   Since, since these -- Access was going
13  to be a new money investor.
14        Clearly one of the things that they
15  needed to understand was that if they were going
16  to be making a new money investment into our fund
17  at a time where, whether it was $1.00 or
18  $10 million worth of an asset, that was a
19  valuation challenge, they needed to be exempt
20  from their dollars being allocated towards that
21  investment.
22        As we were already in the process of

Page 128

1   creating the side pocket at that point, that was
2   one of the solutions that afforded new money
3   investors to be able to invest in the Palisades
4   fund, but not participate in the World Health
5   asset, thus allowing the World Health asset to
6   belong to everybody that rightfully it should
7   belong to, the folks that were invested in the
8   fund up to that point.
9      Q.   And was, was Access likely to be or
10  potentially a very large investor in Palisades?
11     A.   You know, I don't recall specifically
12  how much they invested.
13     Q.   Do you recall Access discussing
14  creating an entirely new fund that would be
15  managed by Mister, Mr. Mannion and yourself?
16     A.   You know, I don't.  I recall that they
17  were going to invest money, that they wanted to
18  have us go to, go to Europe, which we did, with
19  them, and meet several what I assumed to be
20  investors for our fund, and, and that's what we
21  did.
22        The specifics of the relationship, I

Page 129

1   don't really, I don't recall six years later.
2         I would, I would agree with your that I
3   think legally we believed that it was going to be
4   a relationship of some substance.
5      Q.   Okay.
6      A.   Yeah.
7      Q.   And, and you indicated that at some
8   point, Access became an investor.
9         Did that, did that investment
10  relationship end shortly thereafter?
11     A.   You know, they, they invested money,
12  and then they redeemed their money, and they made
13  a nice rate of return on their money.
14     Q.   And do you recall approximately when
15  they, they requested to redeem their investment?
16     A.   I don't.  It was very quickly.  It was
17  within like the period of time that they were,
18  you know, allowed to redeem.
19     Q.   And do you recall if it was in about
20  November of 2005?
21     A.   I don't.  I don't remember
22  specifically.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1    Q.  Do you recall why they redeemed their
2  investment?
3    A.  No.
4    Q.  Did they, did they tell you why?
5    A.  They did not, to my recollection, offer
6  any specifics.
7    Q.  Okay.  And I'm going to ask you to look
8  back at Exhibit No. 42 briefly.
9      It was the e-mail, subject, re:  WHAI,
10  that we talked about earlier, dated August 29,
11  2005.
12      Do you find that document?
13    A.  Forty-two?
14    Q.  Yes, sir.
15    A.  Okay.
16    Q.  My question is about the last
17  sentence --
18    A.  Okay.
19    Q.  -- of the paragraph that, that is
20  reflected in the e-mail where it says, "I wish we
21  could do more than we are doing but we are at our
22  mandate on this name."

1      What, what does that, what does that
2  mandate on this name, what is that in reference
3  to?
4    A.  Mr. Williams, I don't, I don't know.
5    Q.  Is that in reference to the 20 percent?
6    A.  I could speculate, but I, I couldn't
7  tell you what I'm referring to.  I mean six years
8  and two, three months later.
9    Q.  Sure.  As I look at it, I'm wondering
10  if that's in reference to the 20 percent
11  threshold that Palisades fund has.
12      And what's your, what's your reaction
13  to that?
14    A.  As I said, I could speculate that would
15  be one of a couple of things that I would, I
16  would ascribe that to, you know.
17      I wouldn't say that you, that's wrong
18  or that -- but I just don't know.  I mean it's --
19    Q.  Okay.
20    A.  -- I mean six plus years, man.
21    Q.  Sure.
22    A.  That's a long time.

1    Q.  Let me hand you another document that
2  has been previously marked as Exhibit No. 20.
3      MS. LAMBRAKOPOULOS:  I'm sorry.  This
4  is 44?
5      MR. WILLIAMS:  No.  This is previously
6  marked Exhibit No. 20.
7      MS. LAMBRAKOPOULOS:  Okay.  Thank you.
8      BY MR. WILLIAMS:
9    Q.  And I'll give you a few minutes to take
10  a look at the e-mail or the document.
11    A.  Okay.
12      (The witness reviewed the document.)
13      THE WITNESS:  Okay.
14      BY MR. WILLIAMS:
15    Q.  And Exhibit No. 20 appears to be a
16  two-page e-mail from Mr. Mannion to, to Les
17  Elliott, with attached a spreadsheet-type
18  document.
19      And my question to you is have you seen
20  this document before?
21    A.  No.  No, I haven't.
22    Q.  And as you look at the, the subsequent

1  spreadsheet attachment that follows the second
2  page of the document, does this document, does
3  this form of document appear to be familiar to
4  you?
5    A.  Are you pointing me to a specific page,
6  or just the --
7    Q.  Well, generally, this, the information
8  that appears to be contained in various, what
9  I'll refer to as spreadsheet-type documents.
10    A.  Well, I mean, I mean this looks like
11  it's just a trade blotter for a month.
12    Q.  Okay.
13    A.  That's what it looks like to me.
14  The -- so you know, pages 3, 4, and 5, that's
15  what that looks like to me.
16    Q.  Page 3, 4 and 5 appear to be a trade
17  blotter for a particular month?
18    A.  Yeah.  I mean that's what it appears.
19  It looks like dated, trades, and part of the
20  month of August.
21      It doesn't give me a year here, but by
22  reference back, assuming that this is the actual

Page 134

1   attachment to this actual e-mail, then they look
2   like they're referring back to August of '05.
3        But I could never really say that with
4   any certainty because I don't really know who put
5   this package together.
6        Q.  Okay.  And is, is, is a trade blotter
7   part of the information that would be provided to
8   the fund administrators on a monthly basis?
9        A.  Absolutely.
10       Q.  As a part of calculating valuation?
11       A.  Absolutely.  You would have to provide
12  a trade blotter.
13       Q.  Okay.  And how about the next page
14  following the three pages that you indicate
15  appear to be a trade blotter?
16       A.  You know, that looks like the name of
17  issuer, quantity, exercise, price, maturity.
18        I'm going to guess that this is a
19  warrant list.
20       Q.  Okay.
21       A.  I don't know as of what day or what
22  have you.

Page 135

1        Q.  And is, is a warrant list also
2   information that would be provided to the
3   administrator on a monthly basis in the context
4   of calculating a valuation?
5        A.  Well, I mean I think they consistently
6   had the last -- sure.  I, I guess.
7        Q.  Okay.  How about next page?  It appears
8   to be a page in reference to World Health.
9        A.  Okay.
10       Q.  Do you recognize this page?
11       A.  No.  No, I don't.  I didn't recognize
12  it when it was first shown to me a year and a
13  half ago.
14       Q.  And that's in reference to your
15  investigative testimony in this case?
16       A.  Yes, sir.
17       Q.  Okay.  And you never -- did you
18  participate in the creation of this document?
19       A.  No.
20       Q.  Okay.  Do you know who created this
21  document?
22       A.  Well, I don't.  I don't want to, I

Page 136

1   don't want to speculate.
2        And I don't obviously have a copy of my
3   testimony from the investigative record, but I, I
4   don't want to speculate.
5        I don't know if it was represented to
6   me by Mr. Aderton that this was created by Mr.
7   Mannion or if it was created by somebody at the
8   administrator.
9        I just don't recall.  I didn't create
10  it, and I can't tell you who did.
11       Q.  Okay.  You didn't create it, and you
12  don't know who did?
13       A.  Yeah.
14       Q.  Okay.  And with respect to the column
15  that's indicated on this page that says estimated
16  recovery percentage, did you -- you indicated I
17  think earlier that you had some role in the
18  valuation of World Health for this particular,
19  for the month of August of 2005.
20        Is that correct?
21       A.  Um-hm.  Yes, I did.
22       Q.  Okay.  And as a part of that

Page 137

1   participation, did you have conversations with
2   Mr. Mannion or anyone else about the percentage
3   of recovery that, that you would estimate might
4   be recoverable from the investment in World
5   Health?
6        A.  You know, I don't believe so.  I had a
7   lot of conversations with Mr. Mannion every day.
8        We shared an office where, you know, we
9   shared one office together, so we talked all the
10  time.
11        And this was clearly a, a watershed
12  event for us, and we had a lot of conversations.
13        I don't recall with any specificity
14  whatsoever that I believed at any point in time
15  that early in the flow of events that we could
16  accurately put X, Y or Z percentage recovery on
17  anything, which was the reason for the
18  formulation of the side pocket in the first
19  place.
20        It was in an effort to protect the LPs
21  because we had assets that were difficult to
22  value, and we could not determine with any great

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 138

1  specificity certainly within 30 days of the
2  mysterious disappearance of Mr. McDonald what the
3  value of each individual piece of paper would be.
4      Q.  So from your perspective, you had no
5  idea whether or not the investment would be
6  recoverable or not, is that fair?
7      A.  No.  That's not, that's not quite
8  right.
9      Q.  Okay.
10     A.  Again, we have to go back to something
11 that I testified to earlier, and I was pretty
12 vocal on this point.
13         And I don't think you're trying to, to
14 trick me or anything, but this -- we owned debt.
15 We owned debt, top of the capital structure.
16         You've got government.  You've got
17 secured debt.  You've got debt.
18         We were up very high on the capital
19 structure here.
20         We have a bad guy doing bad things at
21 the company, stealing money.
22         They're a good company.  Once we got

Page 139

1  past that week where we -- excuse me -- where we
2  had to lend for the payrolls, and at this point,
3  what is this now -- September the 13th --
4  CapitalSource, as I recall, is lending again.
5          So I don't really have any overwhelming
6  concerns about my debt.
7          I've got a viable issuer who is able to
8  pay its bills.
9          We're working on a restructure,
10 infusing more capital to pay down ostensibly the
11 CapitalSource line with a huge amount of new
12 capital, and I feel reasonably good by
13 September 13th that our debt is recoverable, but
14 I can't put a number on it, and I didn't.  I
15 didn't create this.
16     Q.  Sure.  And do you recall with respect
17 to the -- and when I talk about your debt in the
18 context of this question, I'm referring to the
19 six million that was advanced to the company in
20 about August of 2005.
21         Do you recall by the terms of those
22 advances when that debt was supposed to be

Page 140

1  repaid?
2      A.  Well, I recall that, that it was very
3  short term.
4          I don't recall specifically.  You know,
5  I seem to recall that, that the first one, the
6  four million or the, I think it was the four
7  million, was a very short term, couple of weeks.
8          I don't recall what the terms of the
9  two million were, and I think it all ended up
10 getting resolved later with, with, when it was
11 all re-cast and re-characterized in, I guess in
12 September or October.
13         I just don't recall the dates.
14     Q.  Do you recall that whether or not as of
15 September 13th, 2005, the six million was in
16 default?
17     A.  You know, I don't recall that it was
18 or that it wasn't.
19         If, if you had a copy of the note and
20 it said that it was in, you know, that it was due
21 on this date, then I could opine on it, but I
22 just don't remember.

Page 141

1      Q.  By, by -- did you have a note with
2  respect to the six million?
3      A.  You know, I know we did on the four.  I
4  seem to recall the two was going to be -- and
5  again, all of it was supposed to be
6  re-characterized into this, this restructure.
7          All of that was going to become Series
8  C preferred along with new money at the
9  $15 million, and bla bla bla bla bla.
10         So there was, gosh, there was so much
11 going on.
12     Q.  When you say all of it was going to be
13 re-characterized into Series C preferred, who
14 told you that?
15     A.  Well, that was the, the, kind of the
16 terms of the deal we were all working out, myself
17 and the company and our counsel.
18         And we were, as I testified to earlier,
19 in one of these e-mails, it kind of talks about
20 this.
21         We're, you know, we're working all of
22 this time on a restructuring of the company's

Page 142

1  balance sheet, infusing more capital into the
2  company.
3      Q.  So did someone at the company tell you
4  that the debt would be re-characterized into
5  Series C preferred?
6      A.  I believe those were the terms of the
7  deal that we were working towards completing.
8          It never got completed.
9      Q.  I mean I understand that that was what
10  you wanted.
11         My question is did someone at the
12  company say that the company is going to do that?
13     A.  Well, I mean you don't -- yes and no.
14  Yes, we were in discussions with counsel, with
15  members of management, about doing all this.
16         Money was put into escrow.  Documents
17  were crafted.
18         I don't know where and at what point in
19  the corporate structure the decision was made not
20  to move forward with the restructuring.
21         I don't remember when the decision was
22  made not to move forward with the restructuring.

Page 143

1          I know that we were working pretty
2  diligently to, to do that deal and to, and to get
3  more capital put into the company, have a lot of
4  the security that we owned reclassified into one
5  big group of Series C preferred, and et cetera.
6      Q.  Okay.  I understand that that, that was
7  the subject of the negotiations that you're
8  discussing.
9          But what I'm trying to, to figure out
10  is in the context of those discussions, was there
11  someone at World Health who gave you an
12  indication that, that restructuring into
13  Series C preferred was a probability?
14     A.  Well, yeah.  It's not like we were
15  talking to ourselves on the phone.
16         We were talking with Bob Barker, who
17  was their attorney.
18         He -- I mean I've got to go back here
19  for you to exhibit -- what is this?  Is this 9?
20  It's got an 11 and a 9 on it.
21         MS. LAMBRAKOPOULOS:  Exhibit 9.
22         THE WITNESS:  Okay, nine; I mean

Page 144

1  you've got R. Parker at Pogo Law, Bob Barker at
2  Pogo Law, dmocasio@srff.com, who was our
3  attorney, and the CEO or acting CEO of the
4  company --
5          BY MR. WILLIAMS:
6      Q.  Okay.
7      A.  -- all on an e-mail where the guts and
8  core of it -- you're focusing on the please help.
9          I'm focused when I read it on the
10  restructuring of the series preferred C and all
11  of the other minutia details that are in there.
12         And this is an 8/24 e-mail, so
13  somewhere around here we've already started
14  having those conversations.
15         And at some point, somebody at EGE,
16  which was the investment banker on this deal, got
17  involved.
18     Q.  Is that Greg Berlocher?
19     A.  You know, I, I don't know.  EGE was
20  Emerging Growth Equities, if I recall.  That's
21  what I know.
22         And they got involved to raise the

Page 145

1  capital for the company, and a term sheet was
2  crafted.  I know that.  And I know documents were
3  crafted because I remember working over Labor Day
4  weekend on the documents.
5      Q.  Okay.
6      A.  So I don't remember when Labor Day was
7  in 2005, but some time in early September.  So
8  this was very fluid.  It was all happening --
9  your question is did somebody at the company give
10  you an indication?
11         Well, absolutely, because they -- I'm
12  corresponding with their attorneys, and my
13  attorneys are not working for free to just create
14  some documents that I'm hopeful someone is going
15  to do something with.
16         It didn't work out, but we were, we
17  were actively negotiating a deal.
18     Q.  Right.  And I guess what I'm asking you
19  is in the context of those negotiations -- I'm
20  not saying did anyone, did, did you reach a final
21  agreement?
22         What I'm saying is did someone on the

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1   company's end give you an indication that, that
2   this, this conversion, issuance of preferred C
3   stock would happen?
4       A.  I don't think that we would have
5   proceeded to create documents if we weren't being
6   given indication by the company or its counsel or
7   someone there that we should proceed down that
8   path.
9       Q.  Okay.  So my next question is who gave
10  you that indication?
11      A.  I don't recall, but I would suggest it
12  was probably somebody on this distribution list
13  here, whether it be John at WH Staff, R. Barker
14  at Pogo Law, you know, somebody in Emerging
15  Growth that was representing the company, because
16  that was the banker.
17      I can't recall with specificity.  I
18  talked to everybody multiple times a day.
19      Q.  Okay.
20      A.  I keep trying to say this was chaotic.
21  It was dynamic.  It was fluid.
22      It was a company that was a thousand

1   employees, needing capital, you know,
2   restructuring, and as I understand it, at that
3   point, by that point, an internal investigation,
4   I mean a lot of stuff happening, all this stuff
5   happening.
6       Q.  Sure.  And so, and so in the context of
7   the conversion of, the issuance of preferred C
8   stock, you feel that someone gave you an
9   indication that that was fair to say possible?
10      A.  Yeah.  Fair to say?  Yeah, I think so.
11      Q.  But you can't recall who that was?
12      A.  And I can't remember when it no longer
13  became something that was going to happen,
14  either.
15      Q.  Okay.  Do you recall Palisades filing a
16  lawsuit against World Health?
17      A.  I do recall Palisades filing a lawsuit
18  against World Health.
19      Q.  And was it -- and why did Palisades
20  file a lawsuit against World Health?
21      A.  I don't recall.  I know that we did.  I
22  just don't recall.

1       Q.  Was it, was it for the failure to pay
2   money back?
3       A.  You know, I don't recall why we did it.
4   I mean if you showed me a copy of the complaint,
5   that would probably refresh my memory.
6       Q.  Okay.  That's fair.  And did you, well,
7   did you, did you review the complaint at the time
8   it was filed?
9       A.  I don't recall.  Yeah, I would suspect
10  that, that I would have.
11      Q.  And would, would you agree with me
12  that, or maybe you wouldn't agree with me that
13  the filing of the lawsuit was an indication that
14  you didn't believe that an agreement was likely?
15      A.  Mr. Williams, without being able to
16  look at the complaint, I don't remember what the
17  lawsuit was over.
18      Maybe I was suing him because they
19  were, you know, in violation of something, you
20  know, other document that we had from a different
21  series of investment, but we were still
22  negotiating on this one.

1       I mean you see that all the time, that
2   companies sue each other, but they're still doing
3   business between this division and this division.
4       I just don't recall what the lawsuit
5   was about.
6       Q.  Okay, but well, that's a fair point.
7   The lawsuit involved, among other things, the
8   $6 million?
9       A.  Do you have a copy of the lawsuit that
10  I could review at lunch perhaps?
11      Q.  That's a fair question, but I don't
12  have a copy.
13      A.  Okay.
14      Q.  Sorry.  So my question to you is at the
15  point at which the valuation was being done for
16  August, which was in about mid-September of 2005?
17      Does that sound about right?
18      A.  Early to mid, yeah.
19      Q.  Was there -- you indicated earlier, and
20  I think you were quite clear that you believed
21  that the valuation was, was challenging and
22  difficult.

Page 150

1        Is that fair?
2        A.  Yeah.  Absolutely.
3        Q.  All right.  And so consistent with the
4    challenges and the difficulties, do you recall if
5    Palisades followed its publicly disclosed
6    valuation principles in valuing the World Health
7    assets?
8        A.  Oh, absolutely.  We --
9        Q.  Okay.
10       A.  -- we absolutely did because our, our
11   policies and procedures specifically have
12   language that provides for manager discretion in
13   a circumstance where a fair value is hard to
14   determine.
15       Q.  And did you exercise that discretion to
16   depart from the, from the general principles that
17   would ordinarily guide a valuation in connection
18   with World Health?
19       A.  I don't think you meant anything by it,
20   but I don't, I don't think that that was a very
21   fair way to say that.
22       Q.  In what respect?

Page 151

1        A.  Well, your statement was -- perhaps I
2    just didn't like the the, the tone of it.
3            We used our discretion to best value
4    what was difficult to value in a very chaotic
5    period of time based on information flow that
6    was -- what's the right word -- information flow
7    that was coming from a lot of sources, including
8    public 8-K disclosures, and using, you know, our
9    best ability to figure out what we had in each
10   subsequent month post-August the 15th.
11           And I think that we did a good, as good
12   a job as we could do given the flow of
13   information that we had, the changing dynamic of
14   the relationship that Palisades had with the
15   company, given the fact that the company went
16   through, as I recall, two different restructuring
17   officers or corporations, one being Marsal &
18   Alvarez, and another -- and then those guys
19   either being fired or resigning, and then another
20   one being brought in, dealing with three
21   different sets of lawyers representing the
22   company.

Page 152

1        I think we did the best job we could
2    with the information flow we had.
3        Q.  Okay.  And looking at Exhibit No. 9
4    that we talked about --
5        A.  I've got it in front of me.
6        Q.  You indicated in the fourth to last
7    sentence, line of the large paragraph --
8        A.  Fourth to the last?
9        Q.  In a time of crisis.
10       A.  Okay.  I gotcha.
11       Q.  And after the comma, it says but if we
12   don't have it by month's end, we're going to show
13   such huge loss to our LPs that we fear
14   large-scale redemptions, and this could cause the
15   end of our fund.
16           And my question to you is after the
17   valuation that you disseminated to the Palisades
18   limited partners for August of 2005, did you have
19   large-scale redemptions?
20       A.  You know, I don't recall when the
21   redemptions started coming, but that, you know,
22   we started talking about the three reasons for

Page 153

1    the creation of the side pocket.
2            Here is reason No. 1.  This was, this
3    was the reason.
4            If you have a fund like ours where
5    money comes in and has a lock-up period on it,
6    and you have older money in that isn't locked up,
7    and you have an asset that's either illiquid or
8    very difficult to value, in a circumstance where
9    people who have money in for a time can redeem,
10   they can effectively leave those that can't
11   redeem in a very unfair and untenable position.
12           And by bifurcating an asset or the,
13   let's call it the difficult asset or assets, into
14   its own class, into its own side pocket, that
15   everybody has its proportionate share, and
16   everybody is welcome to redeem pursuant to their
17   rights within the document, but everybody will
18   own their proportionate share of the stuff that's
19   difficult.  Therefore, nobody is prejudiced.
20           And that was the reason.  That was the
21   primary reason -- protection for everybody.
22           I mean we had investors that had

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1    invested money on August 1st and that period
2    July, June, they were all in lock-up.
3         We had investors that had invested with
4    us three years earlier, and they were still in
5    the fund that weren't locked up.
6         If those folks chose to redeem -- and I
7    don't know who redeemed and when they redeemed.
8    Paul was probably more readily able to tell you
9    that. I just don't recall, and I wasn't involved
10   in that, to be -- but if they had all chosen to
11   redeem in September, and we went into Armageddon
12   mode, at least everybody would have been treated
13   fairly.
14        And that's, that was the reason, and I
15   think that it served its purpose.
16    Q.   And so do you recall that once the
17   August valuation was disseminated in September of
18   2005, were there redemptions?
19    A.   I don't recall. I don't recall.
20    Q.   Do you recall there came a point
21   where --
22    A.   Absolutely. There was a point.

1     Q.   And do you recall approximately when
2    that point was?
3     A.   I don't think we saw significant
4    redemptions until 2006 or even 2007.
5     Q.   And was that, was that the point at
6    which it became known what the value of the World
7    Health investment would be?
8     A.   You know, I don't, I don't recall. I
9    don't think, I don't think so.
10        I don't think so, but it's possible.
11    Q.   Okay. Okay.
12    A.   You know, ultimately the valuation in
13   the side pocket was irrelevant. It was
14   completely irrelevant.
15        I know that your side of this equation
16   seems to think differently, but it didn't matter.
17        No money could come into it, and no
18   money could leave it until there was a
19   dispositive event.
20        And by its very nature, it took
21   something that was difficult to quantify, whether
22   it was ever quantifiable or not, and disseminated

1    it broadly amongst everybody that deserved a
2    proportionate share.
3         Whether it was worth a dollar, whether
4    it was worth a million dollars, it didn't matter,
5    because it didn't have any affect on what those
6    people could do with the rest of their money, and
7    if somebody else wanted to invest money, they
8    couldn't come in and be treated or prejudiced by
9    us having it.
10        If they wanted their money back, they
11   could take their money back, but they were going
12   to have to wait until there was a dispositive
13   event with their pro rata share of this asset.
14        We could have just all called it zero,
15   but we weren't allowed to do that by our
16   auditors, and it would have been reckless and
17   silly for us to do that anyway because we felt
18   that it had value.
19    Q.   You would agree with me, wouldn't you,
20   that an investor who sought to redeem their
21   assets prior to the creation of the side pocket,
22   for that investor, valuation of the side pocket

1    would be relevant?
2     A.   If they had redeemed prior to the
3    creation of the side pocket, they would have been
4    paid out on a net asset value that would have
5    been, that would have not factored in the side
6    pocket.
7     Q.   Right.
8     A.   So if you had redeemed in June of that
9    year, you would have made great money. Our fund
10   was doing great, returning great numbers to all
11   our investors.
12        If you had redeemed in July, you would
13   have done great.
14    Q.   But the investors who participated in
15   the side pocket would have shared in whatever --
16    A.   Everybody participated in the side
17   pocket.
18        MS. LAMBRAKOPOULOS: Why don't you let
19   him finish his question?
20        THE WITNESS: I'm sorry.
21        BY MR. WILLIAMS:
22    Q.   The investors that participated in the

Page 158

1  side pocket would have redeemed their interest in
2  the side pocket based on whatever the ultimate
3  value of the side pocket was, correct?
4      A.  I'm not sure I quite understand what
5  you're asking me, so --
6      Q.  Okay.
7      A.  -- can you --
8      Q.  What I'm asking you is that for the
9  investors that participated in the side pocket --
10     A.  A-huh.
11     Q.  -- their interest in the side pocket
12  would have been whatever value the assets in the
13  side pocket ultimately wound up producing for the
14  fund?
15     A.  Right.  If you were an investor in our
16  fund as of August 1, then you were a participant
17  in the side pocket, period, because the
18  investment period, you know, your money had to be
19  in by the first value date of the new month, so
20  you probably wired your money in some time at the
21  end of July so that you were an investor as of
22  August 1.

Page 159

1      Q.  Do you recall what date the side pocket
2  was created?
3      A.  I don't.  I don't.
4      Q.  Was it, was it in September or in
5  August?
6      A.  I don't recall.
7      Q.  Okay.
8      A.  There were discussions happening about
9   its formation and creation in August, and I don't
10  know if it was formally documented in September
11  or August.
12         I recall that we actually went to the
13  LPs and got their consent to do it.
14         I think we discussed that earlier in,
15  in our conversations today, but I don't remember
16  exactly.
17     Q.  Okay.
18     A.  All --
19     Q.  And we'll come back to that.
20     A.  Yeah.  All I'm saying is that everybody
21  that was an investor in our fund up to that
22  point, if they had money in the fund, they now

Page 160

1  owned a share of the side pocket.
2         They owned a share, their own pro rata
3  percentage of that pool of assets, whatever its
4  value may be.
5         But until there could be a dispositive
6  event with those assets, right, ultimately it
7  didn't really matter what the valuation along the
8  way was.
9         What, what was relevant was what the
10  end valuation would be.
11         Everybody hoped, right, everybody hoped
12  that because we held debt in what we believed to
13  be a very good company, right, that they would
14  get through whatever Mister, whatever Mr.
15  McDonald, the bad egg, did, and we would end up
16  with a viable company.
17         We didn't know what that meant for, for
18  months.
19         We didn't know if that meant that it
20  was going to be privatized or somebody was going
21  to buy it, if they were going to remain public,
22  if they were going to -- we didn't know.  We

Page 161

1  didn't know.
2         What we did know is that by the
3  creation of the side pocket, our investors were
4  protecting from, each other from some random,
5  from one investor running on the bank because his
6  money was in at a point in time sooner than
7  another guy's money was in.
8      Q.  I see.  And would you agree with me
9   that the ultimate legal value of this side pocket
10  assets was pretty close to zero?
11         MS. LAMBRAKOPOULOS:  Objection as to
12  form.
13         Go ahead and answer if you can.
14         THE WITNESS:  You know, honestly, I
15  don't know.
16         I don't even know what the disposition
17  of the bankruptcy has been.
18         I know that there was some agreement
19  that there was like $3 million paid for the
20  benefit of creditors, and we've never seen it.
21         We were the largest subordinated
22  creditor, so I'd love to know where that money

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 162

1  is.
2        It's probably in the same place as the
3  Lehman Brothers' bankruptcy money is, just
4  running around with the trustee.
5        I don't know, so I don't -- I can't say
6  yes or no.
7        What I do know is that today, we've
8  received nothing.
9        Is there money out there?  I was led to
10  believe there was.
11       BY MR. WILLIAMS:
12   Q.   Okay.  In connection with the creation
13  of the side pocket, and I'll show you some
14  documents that will help you pin down the dates,
15  I'm not trying to pin you down on the date, but
16  with respect to soliciting partners in creating
17  the side pocket, did any of the partners or
18  investors choose to redeem their assets rather
19  than participating in the side pocket?
20       MS. LAMBRAKOPOULOS:  Objection as to
21  form with respect to the word soliciting.
22       Otherwise, he can answer.

Page 163

1        THE WITNESS:  You know, I don't recall.
2  I don't recall.
3        BY MR. WILLIAMS:
4    Q.   That might have happened, but as you
5  sit here today, you can't recall one way or the
6  other?
7    A.   I really can't.  I seem to recall that
8  we had a, if it wasn't unanimous, it was a nearly
9  unanimous consent to create the side pocket.
10       But I don't, I don't recall whether it
11  was 97 percent, 95 percent, 99 percent.
12       I know that we had -- the vast majority
13  of the assets under management had agreed to the
14  formation and creation of the side pocket.
15   Q.   And you do recall that some investors
16  didn't agree?
17   A.   I don't recall.  I don't recall
18  specifically.
19       I just -- I remember that it was
20  resoundingly to the positive.
21       I don't know.  It may have been 100
22  percent.  I really don't.

Page 164

1        I didn't manage the process.
2    Q.   Who managed the process?
3    A.   Mr. Mannion, administrators; I didn't
4  manage the process.
5        MR. WILLIAMS:  Okay.  Okay.  And with
6  that, why don't we, why don't we go off the
7  record for a lunch, lunch period?
8        THE WITNESS:  Okay.
9        THE VIDEOGRAPHER:  We're going off the
10  record.
11       The time on the video is 12:50 p.m.
12       (Whereupon, at 12:50 p.m., the
13  deposition was recessed, to reconvene at 2:00,
14  p.m. the same day.

Page 165

1        AFTERNOON SESSION
2            (2:06 p.m.)
3        THE VIDEOGRAPHER:  We're back on the
4  record.
5        The time on the video is 2:06 p.m.
6  Whereupon,
7        ANDREW L. RECKLES,
8  the witness on the stand at the time of recess,
9  having been previously duly sworn, was further
10  examined and testified as follows:
11       FURTHER EXAMINATION BY COUNSEL FOR
12       PLAINTIFF
13       BY MR. WILLIAMS:
14   Q.   Mr. Reckles, I had asked you earlier
15  today about Palisades's investments in World
16  Health in about late August of 2005.
17       I'm going to show you a document that's
18  previously been marked for identification as
19  Exhibit No. 13 in this case.
20   A.   Thanks.
21   Q.   Exhibit No. 13 I'll represent to you is
22  a series of documents, and the one I'm going to

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 166

1  ask you about is the first page of the exhibit,
2  which appears to be a September 29, 2005, letter
3  to Mr. Mannion.
4       A.  Let's see here.
5          (The witness reviewed the document.)
6       THE WITNESS:  Okay.
7       BY MR. WILLIAMS:
8       Q.  Okay.  My question to you, Mr. Reckles,
9  is directing your attention to the first page of
10 the document, in particular the letterhead, it
11 appears to be, the return address in South
12 Carolina, and the e-mail address is LO Dworjanyn.
13         And my question to you is do you
14 recognize that name, LO Dworjanyn?
15      A.  Not particularly.
16      Q.  Okay.  You don't recognize the last
17 name Dworjanyn as the last name of an investor in
18 Palisades?
19      A.  If he was, he was.
20      Q.  But you don't recognize the name?
21      A.  Not particularly.
22      Q.  Okay.  And to your knowledge, did you

Page 167

1  ever have conversations with --
2       A.  Not to my, not to my recollection.
3       Q.  -- Mr. Dworjanyn?
4       A.  I'm sorry.  I'm sorry.  Not to my
5  recollection.
6          As I've testified to, I didn't really
7  often speak to any of our investors.
8       Q.  Okay.  Were you aware generally in
9  September of 2005, any investors who articulated
10 objections to Palisades investing these, the
11 additional $6 million in World Health?
12      A.  No.  No, I'm not.
13      Q.  Okay.  If there had been objections,
14 would those have been communicated to Mr. Mannion
15 as opposed to you given what you've described
16 about his role with respect to interacting with
17 the limited partners?
18      MS. LAMBRAKOPOULOS:  Objection.  Calls
19 for speculation.
20         You can answer to the extent you can.
21      THE WITNESS:  Well, I, I would say that
22 I would have to speculate, that the answer is

Page 168

1  yes, they would have probably gone to Mr.
2  Mannion.
3          The letter that you've put in front of
4  me was directed to, to Mr. Mannion, not even to
5  Mr. Mannion and Mr. Reckles, so one, one could
6  assume that he didn't even know that I existed.
7       BY MR. WILLIAMS:
8       Q.  Okay.  And were you aware of any
9  request for withdrawals of investments in
10 Palisades in September 2005?
11      A.  I have no recollection of any.  I sure
12 don't remember.
13         This is the first time I've actually
14 ever seen this document.
15      Q.  Okay.
16      A.  You know.
17      Q.  Let me you ask this.  If a
18 communication from an investor to Palisades came
19 into the office, who would receive that document
20 in about September 2005?
21      A.  Well, clearly it would depend on who it
22 was addressed to.

Page 169

1          If it was addressed to Mr. Mannion, he
2  would, would open it.
3          It could also have been sent to the
4  administrators.
5          They often in, in the course of our
6  history together, received communications from
7  investors.
8       Q.  Okay.  And with respect to the address
9  under Mr. Mannion's name, the first page of
10 Exhibit 13, do you recognize that address?
11      A.  Yes.
12      Q.  And whose address is that --
13      A.  That --
14      Q.  -- in September of 2005?
15      A.  That was the, the offices for the fund.
16      Q.  Okay.  Do you recognize the phone
17 number beneath the address?
18      A.  Yeah.
19      Q.  Vaguely?
20      A.  Vaguely, yeah.
21      Q.  Okay.  And what phone number do you
22 recognize that as?

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 170

1     A.  Well, I recognize it as one of the
2  phone numbers for, for the fund.
3     Q.  Okay.  Okay.
4     A.  Yeah.
5     Q.  And directing your attention to the
6  second to last sentence in the bottom paragraph
7  of the first page, and it refers to a telephone
8  conversation of September 21st in which you, in
9  reference to Mr. Mannion, said the total
10 investment in WHA was 25.4 percent.
11       And my question to you is is that
12 percentage consistent with your understanding of
13 Palisades's investment in World Health in about
14 September of 2005?
15    A.  I'm sorry.  Would you repeat that?
16    Q.  Yeah.  My question is with respect to
17 the figure 25.4 percent, and my question is is
18 that consistent with your understanding of
19 Palisades's investment in World Health in about
20 September of 2005?
21    A.  I think I testified earlier that I just
22 didn't really recall what our ownership

Page 171

1  percentage was.
2     Q.  You don't -- so did you have, do you
3  have a general sense such as you can indicate
4  whether or not that 25.4 percent is consistent or
5  inconsistent with what you believe the percentage
6  was?
7     A.  It, it seems high to me, but I don't
8  really have a sense.
9        I would need a lot more information in
10 front of me to be able to, to make that
11 assessment.
12    Q.  Okay.  And as you worked for Palisades
13 in about August and September of 2005, how often
14 did you make that sort of calculation with
15 respect to the concentration of your investment
16 in World Health, or did you make that
17 calculation?
18    MS. LAMBRAKOPOULOS:  Objection as to
19 form, but go ahead.
20    THE WITNESS:  I think I would answer
21 that by saying that it would be done with the
22 NAVs because it's a point in time issue versus a

Page 172

1  daily.
2        We didn't -- you know, unlike a, a
3  normal mutual fund or a daily liquidity hedge
4  fund where you have a daily NAV, we have a
5  monthly NAV.
6        There's a monthly point in time where,
7  you know, you've gone from August to September or
8  November to December, and so there's a stop and
9  then a start.
10       And I would probably say that it would
11 be on the monthly NAV point that a calculation
12 like that would be, would be looked at.
13    BY MR. WILLIAMS:
14    Q.  And in about that timeframe, say the
15 summer of 2005, the NAV -- and NAV is a, is a, is
16 an acronym for net asset value, correct?
17    A.  Yes, sir.  Sorry.  I should have been
18 more specific.
19    Q.  And that calculation for Palisades was
20 made as of the last day of the month, is that
21 correct?
22    A.  Yes.  Yes.  Correct.

Page 173

1     Q.  Okay.
2     A.  Generally speaking, but yes, correct.
3  Sorry.  I was taking a drink.
4     Q.  Sure.  Were there exceptions to that
5  general rule that you recall?
6     A.  Specifically, the August of 2005's NAV,
7  net asset value.
8     Q.  And the best of your recollection, what
9  day was that calculated as of?
10    A.  You know, I think just a couple of days
11 beyond the 31st of August, just a couple of days.
12    Q.  And do you have a recollection as to
13 why it was calculated as of a couple of days
14 beyond August 31st?
15    A.  Excuse me.  Not, not a specific one
16 other than we were again dealing with such an
17 enormous confluence of issues.
18       We were, we were dealing with the
19 creation of a side pocket, which had our, our
20 administrators quite busy on that because they
21 were integral in its formulation, and making sure
22 that all, that it was a properly -- there was

Page 174

1    information flow that was pretty consistent and
2    constant and chaotic, as I've testified before.
3         So I think it had mostly to do with
4    just the lack of enough people.
5         I mean again, as I've already
6    testified, we were a small shop. There was a lot
7    going on with whatever the percentage, a very
8    large significant investment for our fund, and I
9    think that the NAV calculation was, was just
10   late.
11        I think we were just late in getting
12   everything all packed and tied together.
13   Q.   Okay. Let me show you a document
14   that's been previously marked in this case as
15   Exhibit No. 22.
16        (The witness reviewed the document.)
17        THE WITNESS: All right.
18        BY MR. WILLIAMS:
19   Q.   And Exhibit No. 22 is a multiple page
20   document.
21        And my question, the first question to
22   you is do you recognize this document?

Page 175

1    A.   Well, I honestly, I have a very
2    difficult time seeing what is document pages 1
3    and 2. It's, it's --
4    Q.   Okay.
5    A.   -- either my eyesight, or it's very,
6    very small, but I'm having a difficult time
7    making it out.
8    Q.   On the first page, that appears to be
9    titled Palisades Equity Fund, LP --
10   A.   Okay.
11   Q.   -- August 31st, 2005, partnership
12   interest, is that text difficult for you to read?
13   A.   I can read that. I just am having a
14   hard time reading some of the detail below.
15   Q.   I see. And it appears to be a list of
16   names of individuals, including -- your name
17   appears to be the first name on the list.
18        Can you make that out?
19   A.   Yeah. I can see my name there, yes.
20   Okay?
21   Q.   Okay. And is this a list of the
22   partners in Palisades Equity Fund, if you know?

Page 176

1    A.   I mean it, it appears to be. I'm going
2    to kind of do it this way.
3         Yeah, it appears to be, sir.
4    Q.   Okay. And the bottom of this first
5    page, the list of names, there's a name Lee
6    Dworjanyn.
7         Does that -- am I reading that
8    correctly?
9    A.   Yeah, I see that there. Okay?
10   Q.   And what I want to ask you about in
11   particular, I'm going to ask you to turn into the
12   document.
13   A.   Okay.
14   Q.   To the page that's Bates numbered
15   SEC-MANNION0301603.
16   A.   Okay.
17   Q.   And let me ask you do you recognize
18   the, the, this page of the document?
19   A.   It appears to be, it appears to be --
20   what does it say here -- account holdings lead
21   schedule.
22        It looks like it's just a listing of

Page 177

1    positions within the fund.
2    Q.   Okay. And turning back to -- I'm
3    sorry. Turning back to three pages prior to
4    that, there's a page Bates number SEC-MANNION0301600?
5    A.   Okay.
6    Q.   And is this the net asset value
7    calculation for Palisades Master Fund?
8    A.   It says across the top net asset value
9    statement, January 1 through August 31.
10        It looks like a, I mean it looks like
11   part of the net asset value documents.
12   Q.   Okay. And so what, what, to your, to
13   your understanding, what would the net asset
14   value documents consist of?
15   A.   Well, what I can recall seeing would be
16   something like, like what you've put in front of
17   me combined with a list of positions combined
18   with some of the other stuff we've looked at like
19   a trade blotter.
20        You know, I very seldom saw, if I can
21   recall ever seeing a final product.
22        I usually, if I was involved in any

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 178

1   given month, saw the guts of what went into it,
2   so the trade blotter, the, the movement of
3   monies, the wire, the references, what have you.
4        Q.   And would those documents be the sort
5   of documents that we saw in Exhibit 20 when we
6   looked at that earlier today?
7        A.   Yeah.  I don't remember which one was
8   20, but we looked at something that kind of had a
9   lot of what the guts of formulating.
10            I'd have to see.  Is that 20?  Okay.
11   That's the trade blotter.
12            That would be part of the, the, the
13   backfill or the guts to getting to what I guess
14   this is here.
15            I didn't generally, you know, look at
16   this or this was crafted by the, the
17   administrators.
18        Q.   Do you know who generally looked at
19   this document?
20        A.   Well, I would assume Paul, Mr. Mannion,
21   did that a lot more than I, and then this was
22   crafted by the administrators.

Page 179

1        Q.   And when you say you assume that Mr.
2   Mannion did that a lot more than you, why do you
3   assume that?
4        A.   Because that's what he did at the fund.
5        Q.   Okay.
6        A.   It was kind of the major role and
7   responsibility that he took on.
8        Q.   Okay.  Was this a document that was
9   shared with the fund's investors?
10        A.   You know, I honestly don't know.  I
11   know that they received statements, but I don't
12   know what form the statements took.
13        Q.   And the statements would indicate the
14   monthly performance of the fund among --
15        A.   You know, I can't speculate because I
16   don't, I don't recall.
17            I know that I actually received them
18   because I had investments of my own in the fund
19   as we just -- but it's been so many years, I just
20   don't recall what, what the detail was.
21        Q.   I see.  Let me ask you to turn back to
22   page, with the Bates number ending 1603.

Page 180

1        A.   Okay.  All right.  All rightee.
2        Q.   And I'm going to direct your attention
3   to the part of the document that appears to be
4   related to side pocket.
5        A.   Okay.
6        Q.   Do you find that part of the document?
7        A.   I can see it.
8        Q.   And there's an indication of five
9   different types of World Health Alternatives
10   investments.
11            Do you see that?
12        A.   Yes.
13        Q.   And it offers a market value for a
14   World Health Alternatives investment that's in
15   the category SLD.
16            Do you see that?
17        A.   Yes.
18        Q.   And do you know what SLD is?
19        A.   It's self-liquidating, so
20   self-liquidating debenture.
21            It's a, a bond, a note.
22        Q.   And the market value indicated for that

Page 181

1   self-liquidating debenture is approximately
2   7.3 million, correct?
3        A.   That's what, that's what it shows here,
4   yes.
5        Q.   Okay.  And there's a promissory note
6   from World Health in the amount of four million?
7        A.   Um-hm.
8        Q.   Do you see that part?
9        A.   Yes, sir.
10        Q.   And another loan in the amount of two
11   million and restricted stock in the amount of
12   1.894 million approximately, and apparently
13   unrestricted stock in the amount of $110,000.
14            And my question is, it's going to be in
15   reference to Exhibit No. 20, so let me ask you to
16   get Exhibit No. 20 in front of you.
17            Do you have Exhibit No. 20?
18        A.   Got it.
19        Q.   And in particular, with respect to the
20   very last page, the second to last page of
21   Exhibit No. 20, there appear to be some values
22   for World Health?

Page 182

1    A.   Sir, we're on the page that's 1663 --
2    Q.   Yes, sir.
3    A.   Bates number -- okay.  All right.  I'm
4 with you.
5    Q.   And there appear to be four different
6 categories of World Health positions reflected on
7 this table.
8         Do you see that?
9    A.   I do.
10   Q.   Okay.  And with respect to the
11 $4 million investment and the $2 million
12 investment, those figures appear to be consistent
13 with what's reflected on Exhibit No. 22, correct?
14   A.   They do.
15   Q.   With respect to the self-liquidating
16 debenture, the amount estimated on Exhibit No. 20
17 is 3.3 million, and the amount, the amount
18 reflected as a market value in Exhibit No. 22 is
19 approximately 7.3 million.
20        Do you see that?
21   A.   Yes, I do.
22   Q.   And as you sit here today, do you know

Page 183

1 how to account for the difference?
2        MS. LAMBRAKOPOULOS:  And objection to
3 your question to the extent it presumes that
4 Exhibit 20 reflects the valuations of these
5 securities and notes.
6        BY MR. WILLIAMS:
7    Q.   You can answer if you can.
8    A.   Okay.  So I'd like you to read back or
9 just say that for me one more time --
10   Q.   Sure.
11   A.   -- the way that you said that.
12   Q.   I'll repeat the question.
13   A.   Thank you.
14   Q.   With respect to the approximately $3.5
15 million figure reflected on Exhibit 20 --
16   A.   Um-hm.
17   Q.   -- and the approximately $7.3 million
18 figure reflected on Exhibit No. 22 --
19   A.   Um-hm.
20   Q.   -- do you know what accounts for the
21 difference between those two numbers?
22   A.   Well, I think it's fundamentally that

Page 184

1 Exhibit No. 20, page 1663, is an internal work
2 product that was not a NAV.
3        And I think as I testified earlier
4 today, and as I testified in my interview
5 whenever that was back in May of whenever it
6 was -- was it last year?  I can't recall.  Sorry.
7        MS. LAMBRAKOPOULOS:  Longer than that.
8        THE WITNESS:  Two years ago, whenever
9 it was -- that, you know, I have felt and
10 continue to feel that this document 1663 was
11 taken completely out of context by you folks.
12        As I've tried to explain over and over
13 again, apparently not very well, we were dealing
14 with a very chaotic situation.
15        And there were some days where, as I've
16 testified, you know, either Mr. Mannion or myself
17 probably wanted to jump out of our ground floor
18 office window.  We would have done a lot of
19 damage to ourselves.
20        But there were some days where you
21 got over feeling sorry for yourself, and you said
22 you know, this is still a really good company.

Page 185

1        There was probably some point in there
2 where, and again, I think as I testified earlier,
3 that I assume or suspected that this was created
4 by Mr. Mannion because it wasn't created by me,
5 that he was playing some back-of-the-envelope
6 numbers for his own calculations.
7        And somehow or another, your group over
8 there has decided that this is what we felt all
9 of that paper was worth, and that's just not the
10 truth.
11        That's just not the truth.
12        BY MR. WILLIAMS:
13   Q.   Where is the calculations you referred
14 to in Exhibit No. 20?
15   A.   Page 1663, Exhibit No. 20, Bates 1163.
16   Q.   And where does that calculation come
17 from?
18   A.   I couldn't begin to tell you.  This is
19 a, this is just words on a page that aren't
20 attached to anything.
21        This exhibit number, with all respect,
22 exhibit number, is this five that I'm looking at?

Page 186

1   Twenty-two?
2        MS. LAMBRAKOPOULOS:  Twenty-two.
3        THE WITNESS:  Twenty-two, Bates No.
4   1603, is the final say in the matter.  That's
5   what the administrators put out.
6        It's not what I put out.  And the
7   administrators have the call.  Ultimately, they
8   have the call.
9        They aggregate the data we provide, and
10  they aggregate, as you put other exhibits in
11  front of me, answers to their queries, and they
12  put all that together, and they create a NAV.
13       BY MR. WILLIAMS:
14    Q.   And did the administrators create the
15  valuations of the World Health position based on
16  what either you or Mr. Mannion told them?
17    A.   They created a NAV for those positions
18  based entirely on the information that was
19  provided to them as provided to us by the
20  attorneys, the company, and everybody else that
21  could provide input during those very chaotic
22  days, and ultimately the reason why this side

Page 187

1   pocket was created in the first place.
2        As I said to you earlier, and I mean
3   this with all due respect, the value of the side
4   pocket really had no bearing on anything until
5   there could be a final disposition.
6        Its sole purpose was for the benefit of
7   the protection of the investors from each other.
8        The only reason why we even bothered to
9   apply value to it at all is because several of
10  our investors were very large funds of funds
11  themselves, and they had to be able to respond to
12  their investor as to what the value of their
13  holdings was.
14    Q.   And were, were you aware of whether or
15  not the value of the World Health position as of
16  August of 2005 was included in the net asset
17  value of Palisades?
18    A.   I'm sorry?
19    Q.   Yeah.  Was the value of the side pocket
20  of World Health health position as of
21  August 31st, 2005, included in the net asset
22  value of Palisades?

Page 188

1    A.   Well, again, I'm trying to -- I don't
2   want to be impolite.
3        MS. LAMBRAKOPOULOS:  Do you understand
4   the question?
5        THE WITNESS:  Well, I, I'm not sure
6   that I do.
7        You're asking me if the side pocket
8   values were included in the net asset values for
9   August of, of '05?
10       BY MR. WILLIAMS:
11    Q.   Yes.
12    A.   Is that what you're asking me?
13    Q.   Yes, sir.
14    A.   Let me see one thing.
15       (The witness reviewed the document.)
16       THE WITNESS:  I don't have anything in
17  front of me that could tell me whether they were
18  or whether they weren't.
19       I think we looked at something here
20  just recently that pointed out this is part of
21  the -- so on page 1603, we have the side pocket
22  delineated.

Page 189

1        BY MR. WILLIAMS:
2    Q.   Go ahead.
3    A.   We have the side pocket delineated on
4   page 1603, but I don't have the, the rest of the
5   back-up.
6        My assumption is, is yes, but I can't
7   say that specifically.
8        If it's delineated in, in 1603, which
9   is the backfill data that's crafted by the
10  administrators to create the total NAV, then one
11  would have to leap forward and say yes, it was
12  calculated as part of the overall NAV.
13    Q.   And in particular, I direct your
14  attention to the page with the Bates number
15  ending in 1600.
16    A.   Okay.
17    Q.   And does the, does that document appear
18  to reflect as an asset the side pocket
19  investments?
20       (The witness reviewed the document.)
21       THE WITNESS:  Yeah, it does.
22       BY MR. WILLIAMS:

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 190

1    Q.   And it reflects a value of
2  approximately 15.3 million?
3    A.   Yeah, roughly 5.3, yes.
4    Q.   And the net asset value of Palisades,
5  that figure is used, among other things, to
6  calculate the returns of the fund, is that
7  correct?
8    A.   Is that --
9    Q.   The net asset value.
10    A.   Yeah, I guess so.  Yeah.
11    Q.   As far as you know?
12    A.   Yeah, as far as I know.
13         MR. WILLIAMS:  Okay.  Why don't we go
14  off the record for a moment to allow the
15  videographer to change the tape?
16         THE VIDEOGRAPHER:  This concludes Tape
17  No. 3 in the video deposition of Andrew Reckles.
18  The time on the video is 2:32 p.m.
19         We are off the record.
20         (Pause.)
21         THE VIDEOGRAPHER:  This begins Tape No.
22  4 in the video deposition of Andrew Reckles.  The

Page 191

1  time on the video is 2:33 p.m.
2         We are on the record.
3         BY MR. WILLIAMS:
4    Q.   And I asked you a second ago whether or
5  not the net, the NAV was used to calculate the
6  returns of the fund, and I believe you indicated
7  that you believed that they were?
8    A.   Yes.
9    Q.   Is the net asset value also used to
10  calculate the manager's fees, as far as you know?
11    A.   No.  No.  That wouldn't be the, the --
12  how you would do it.
13    Q.   How would you do it?
14    A.   Well, you know, I apologize.  I mean to
15  some extent, yes, but so you've got, it's --
16  assets under management, fee is one determining
17  factor for the management fee.
18         And the performance fee is based on the
19  realized increase in net asset value month over
20  month.
21         So yes, it, it is important to the
22  extent that in month, you know, August, you have

Page 192

1  a net asset value of 10 and in month September,
2  you have a net asset value of 12, but that, that
3  delta of two was a realized gain.
4         It had to have been a dispositive
5  event.  It can't be just a movement in numbers.
6    Q.   That's a performance fee?
7    A.   Yeah.  Yes.
8    Q.   So for the management fee it's
9  simply --
10    A.   Assets under management, so a decrease
11  in assets under management would yield a lower
12  management fee, and an increase in assets under
13  management would increase a, a, a, an increase in
14  fees.
15    Q.   Would yield an increase in management
16  fee?
17    A.   It would be more, correct.
18    Q.   And you indicated in your testimony a
19  few minutes ago that with respect to the page
20  pertaining to World Health in Exhibit No. 20,
21  that the SEC has unfairly taken a document
22  somewhat out of context?

Page 193

1    A.   Um-hm.
2    Q.   And considered that as reflective of a
3  net asset value that wasn't really a net asset
4  value?  Is that fair?
5    A.   I think, I think that that's reasonably
6  fair.  I think a lot worse, but --
7    Q.   Okay.  That's fair enough.
8    A.   Okay.
9    Q.   Let me ask you to take a look at
10  Exhibit No. 35.
11    A.   Which one is that?
12    Q.   That's the Palisades Equity Fund
13  confidential offering memorandum.
14    A.   Okay.  I have it.
15    Q.   And I'll direct your attention in
16  particular to page 17 of that document.
17    A.   Okay.
18    Q.   And in particular, I want to ask about
19  the portion of the document relating to
20  calculation of net asset value.
21         Do you find that part of the document?
22    A.   I, I do.  It's the bottom half of the

1  page there.
2     Q.  Okay.  And it talks about, at the very
3  last paragraph, valuation for common stock where
4  there is no trading market, where there exists a
5  trading market, but there's no current price
6  or -- and common stock for which no established
7  trademark exists shall be valued in the sole
8  discretion of the general partner using publicly
9  traded comparables, third party appraisals or
10  other appropriate measures.
11        And then it goes on to say transactions
12  consisting of convertible debentures or preferred
13  purchased under Regulation D shall be valued at
14  cost until such time as the investment is
15  converted into common stock and gets sold.
16        Then it says, "However, if the Manager
17  determines that the value of any security or
18  other investment is not representative of fair
19  value, the Manager shall assign a value to such
20  security or other investment as they may
21  reasonably determine and shall set forth the
22  basis of such valuation in writing in the Fund's

1  records."
2        And did I read that part of the
3  document correctly?
4     A.  Yes -- verbatim.
5     Q.  And my question to you is does there
6  exist some writing other than the World Health
7  page on Exhibit No. 20 that explains Palisades's
8  valuation of its side pocket in World Health
9  assets?
10    A.  Well, I mean, Mr. Williams, I think
11  that again, and you're doing your job, and you're
12  doing a good job of it, but --
13        MS. LAMBRAKOPOULOS:  Just answer his
14  question.
15        THE WITNESS:  I am.  You're, you're,
16  you're taking one page -- everything we've looked
17  at today, every e-mail, every correspondence that
18  Adam Aderton and Julie Riewe and everybody in
19  Philadelphia, boxes worth of this stuff, has from
20  our fund, for that finite period of time is part
21  of that record, all of that, e-mails back and
22  forth between myself and Mr. Sercu, e-mails back

1  and forth between myself and Mr. Barker,
2  everything that took place during that period of
3  time went into the, the calculation of net asset
4  value in that particular month, because it was
5  the only source of information we had about a
6  situation that was chaotic, as I keep saying.
7        BY MR. WILLIAMS:
8     Q.  Sure.
9     A.  So all of this is part of that.  And
10  this is just one piece.
11        I don't know if Mr. Mannion was at home
12  one Sunday afternoon watching NFL football and
13  had a twelve pack and decided that this is what
14  he thought.  I don't know.
15        What I do know is that this is not what
16  the NAV was determined to be at the end of the
17  period.
18    Q.  All right.  But you would agree with me
19  that Exhibit Number 20, at least the World Health
20  page, appears to --
21    A.  Which is 20 again?
22    Q.  It's the one that's right in front of

1  you right now.
2     A.  Got it.  Okay.  Thank you.
3     Q.  That document appears to aggregate
4  Palisades's investments in World Health and tries
5  to explain how much those assets are worth.
6        And what I'm asking you is there any
7  other document like that with respect to World
8  Health?
9     A.  As I testified to, I think everything
10  that you've shown me contributes towards that to
11  what became Exhibit 22.
12        I would also point out that since I
13  know that this is just a tab in a bigger
14  spreadsheet, it was the same tab after we had
15  written the whole thing off.
16        So you're suggesting, using your logic,
17  one would have to argue that after we had already
18  taken the losses on this thing, right, that this
19  value was still there.
20        It just wasn't updated.  It just wasn't
21  eliminated.
22        It was just a human error issue, and

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1   you guys have latched on to this thing like it's,
2   like it's, you know, the third guy behind the
3   grassy knoll or something like that.
4           This was just work product by one
5   individual, not me, that had a belief about
6   something that he put on paper that ultimately
7   didn't come to fruition because our NAV was
8   different, and that was established by both
9   myself, Mr. Mannion and the administrators.
10          So at some point, this, whatever he was
11  thinking that put, that prompted him to put this
12  down, for whatever reason, is not where he ended
13  up.
14      Q.  Well, would you agree with me that,
15  that the confidential offering memorandum for, at
16  least for Palisades Equity Fund appears to
17  contemplate that if you're going to deviate or
18  make some determination that the, that a value of
19  a security is not representative of a fair value,
20  the basis for that determination is supposed to
21  be reflected somewhere in a writing?
22      A.  I don't disagree.  And I think that, as

1   I've said, and I'm, maybe I'm not doing it very
2   well, but every e-mail, correspondence back and
3   forth between Mr. Mannion and the administrators
4   in that given month, any e-mail between myself
5   and the administrators in that given month,
6   would, from my view of this document, fall into
7   that category.
8       Q.  But you would agree with me that
9   e-mails back and forth over a period of time are
10  not a writing that explain a valuation?
11      A.  No.
12          MS. LAMBRAKOPOULOS:  Objection as to
13  form.
14          Go ahead and answer.
15          BY MR. WILLIAMS:
16      Q.  Would you agree with me?
17      A.  I wouldn't, I wouldn't agree with you.
18      Q.  I see.  So to the extent that the
19  offering documents call for a written explanation
20  for the basis of the valuation, presumably that
21  would be so that there exists some sort of --
22  well, I don't mean to testify.

1           Let me ask you as the, one of the
2   principles of the manager of the fund, in your
3   mind, why does, does the fund's offering
4   documents call for a written explanation of how a
5   particular asset has been valued?
6       A.  You're asking me why was the offering
7   memoranda written, why it was written, or how it
8   was written?
9       Q.  Well, let me, let me, let me strike the
10  question and ask you a different question.
11      A.  Okay.
12      Q.  Were you aware that the offering
13  documents required a written explanation that set
14  forth the basis of the valuation in writing in
15  the fund's records in about August and September
16  2005?
17          MS. LAMBRAKOPOULOS:  Objection as to
18  form to the extent that your question presumes a
19  requirement that may or may not be there.
20          But go ahead and answer.
21          (The court reporter asked for a
22  clarification.)

1           MS. LAMBRAKOPOULOS:  Shall we have that
2   read back?
3           THE WITNESS:  No.  I'm good.  I just
4   want to make sure that everybody's good.  Okay.
5           I can't recall what I, what I remember
6   of the PPM from August or September of 2005.
7           I would just say to you again that I
8   believe that anything that was put in writing
9   specific to World Health, because it's the only
10  asset that ever went into a side pocket, it's the
11  only time that this happened over a year, so as
12  it related to this circumstance, and given the
13  nature of the, the, the fraud of the company and
14  the flux with financing and all of the other
15  moving parts that went on, I believe that we met
16  that requirement as you deemed it here in this,
17  in this offering memorandum, with a lot of the
18  backfill that was provided to the folks at
19  Beacon, in order for them to get to where they
20  got on Exhibit 22.
21          BY MR. WILLIAMS:
22      Q.  And, and part of the e-mail

1  communication that we've looked at going back and
2  forth today are e-mail communications in which
3  you are worried about showing a significant loss
4  to the fund's investors, correct?
5      MS. LAMBRAKOPOULOS:  Objection to the
6  extent that you're mischaracterizing his state of
7  mind at the time that he wrote the e-mail.
8      But go ahead and answer.
9      THE WITNESS:  I, I also think that, you
10 know, the e-mails to those individuals were not
11 the e-mails that I was referring to.
12     I was referring to e-mails between
13 myself and the administrator or myself and other
14 parties in the fact gathering.
15     You're -- you've asked me two
16 questions, right?
17     One was how did you arrive at this
18 valuation, and did you document how you arrived
19 there?
20     And the other is well, did -- you had a
21 bunch of e-mails where you were concerned about
22 the fund.

1      Well, sure.  They're not mutually
2  exclusive from one another.
3      One is we're having to gather
4  information in order to come up with a number,
5  and the other is, you know, either A, me
6  expressing my feelings, or B, me trying to get
7  somebody to do something that I need them to do
8  for me.
9      BY MR. WILLIAMS:
10     Q.  Okay.  And let me show you a document
11 that's previously been marked as an exhibit in
12 this case, Exhibit No. 21.
13     (Pause.)
14     BY MR. WILLIAMS:
15     Q.  And with respect to Exhibit No. 21, it
16 appears to be a one-page document.  It's an
17 e-mail; subject header, WHAI update.
18     And my question to you, Mr. Reckles, is
19 do you recognize this document?
20     A.  I don't, but I see that it was sent to
21 me.
22     Q.  And it was sent from Les Elliott, and

1  it appears to be asking yourself and Mr. Mannion
2  for written documentation for why you feel you
3  would be able to recover various positions as per
4  your side pocket schedule.
5      Do you see that part of the document?
6      A.  Oh, yeah, absolutely.
7      Q.  And what was the written documentation
8  that you provided to the fund administrator?
9      A.  I don't know.  I have no idea six and a
10 half years later what he was aggregating.
11     I'm sure that you could probably
12 produce it.
13     Q.  I see.  So as you sit here today, you
14 don't know what it was?
15     A.  No.  I mean I would see copious amounts
16 of e-mails and whatever.
17     You know, if you don't have the other
18 side of this, I can't speak to what was provided.
19     Q.  Okay.  And --
20     A.  I do note that its incorrect, but --
21     Q.  You note that what's incorrect?
22     A.  Well, his math is wrong.  He's got the

1  same promissory note twice in the e-mail.
2      I mean I'm not -- sure you noticed that
3  too, but --
4      Q.  Okay.  Fair enough.  And with respect
5  to the document, it appears to be dated
6  September 15th of 2005, that appears to be --
7      A.  Yep.
8      Q.  -- two days after the e-mail from Mr.
9  Mannion in Exhibit 20, and --
10     A.  Okay.
11     Q.  -- it appears to reflect World Health
12 common shares 950,000 and zero dollar recovery.
13     Do you see that part of the document?
14     A.  We're back to Exhibit No. 21?
15     Q.  Exhibit 21.
16     A.  Yes, I see that.
17     Q.  And I'm trying to, wonder, trying to --
18 strike the question.
19     I'm wondering if you look at the World
20 Health side pocket part of Exhibit No. 22, which
21 is on --
22     A.  Okay.  I'm here.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 206

1      Q.  And it appears to be --
2      A.  And I want to make sure.  Am I on 7412?
3      MS. LAMBRAKOPOULOS:  He's using the
4   bottom numbers, 1600.
5      THE WITNESS:  I'm sorry -- 1600?
6      BY MR. WILLIAMS:
7      Q.  Yes.
8      A.  Okay.  I'm with you.
9      Q.  Okay.  And there appears to be a
10  reference to 950 shares of restricted stock
11  there?
12     A.  Not on 1600.
13     Q.  Oh, I'm sorry -- 1603.  I apologize.
14     A.  Okay.  Thank you.  All right.  Okay.  I
15  gotcha.
16     Q.  There appears to be an indicated value
17  of 1,894,921 and change?
18     A.  Okay.
19     Q.  And that seems to be substantially
20  greater than what's reflected in the e-mail in
21  Exhibit 21 and on the schedule provided by Mr.
22  Mannion in Exhibit No. 20.

Page 207

1      And I'm wondering if you have an
2   explanation for that.
3      A.  No.  I mean I don't.  I can only tell
4   you that there was, as I think we've discussed
5   earlier in the day, and as we discussed whenever
6   it was, a couple years back, I mean there were
7   ongoing conversations, as I can recall, about all
8   of this common stock being rolled into this
9   restructuring that we were doing under the Series
10  C preferred.
11     I don't remember at what point in time
12  those discussions, you know, ended for good, so I
13  don't know if ultimately that was part of what
14  was factored in, that we were factoring in, the
15  fact that we wouldn't have this common at the end
16  of the NAV period, but ultimately, the NAV is
17  based on August.  It's not based on September.
18     So I guess what I would want to see is
19  what took place with the September NAV, which
20  would be reflected in, you know, e-mails probably
21  back and forth in October, right, because you're
22  always factoring, you're doing your NAV after the

Page 208

1   close of that month, right?  So --
2      Q.  Right.
3      A.  -- as of August 31st, let's call it
4   September 1st at the outside, there was, in my
5   estimation, arguably enough going on to warrant
6   that the value of the common should be given some
7   credit because we were, at that point, under the
8   belief that it wasn't going to exist anymore,
9   this it was going to become series C preferred
10  and be valued back at its, you know, fully
11  invested value from earlier in the month.
12     So you can't overlap ten more days
13  because you're trying to calculate as of a date
14  that's already behind you, you know.
15     Q.  So you're trying to calculate as of --
16  I don't follow your explanation.
17     You're trying to calculate as of a
18  prior period, correct?
19     A.  Well, yeah.  I mean we're talking about
20  August.
21     Q.  Right.
22     A.  On September 15th e-mails, but you're

Page 209

1   having to ascribe value to something based on
2   diligence and events that were taking place in
3   August, and in August, we were working towards a
4   local restructuring of the company, including the
5   disposition of this common stock going back to
6   the company in exchange for Series C preferred.
7      Q.  And so in August, there were --
8      A.  And it was ongoing even at this point.
9      Q.  And do you recall exactly when it was
10  you filed your lawsuit against them?
11     A.  No.  No, I don't.  We talked about that
12  earlier.
13     MR. WILLIAMS:  I'm looking for a
14  document that I'm going to ask the court reporter
15  to label as Exhibit 45?  Forty-four -- I'm sorry.
16     (Exhibit No. 44
17      was marked for
18      identification.)
19     BY MR. WILLIAMS:
20     Q.  And you mentioned earlier that you gave
21  testimony, investigative testimony, in connection
22  with this investigation, correct?

53 (Pages 206 to 209)

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 210

1      A.  I did.
2      Q.  And that was on or about May 14th,
3  2009?
4      A.  Okay.
5      Q.  Is that about right?
6      A.  It says so right here.
7      Q.  Okay.  And I'm going to direct you --
8  and I'll represent to you that Exhibit No. 44 is
9  a transcript of that testimony.
10     A.  Okay.
11     Q.  And in connection with that testimony,
12  I'm going to direct you to page 100.
13        (The witness reviewed the document.)
14        THE WITNESS:  So you're in the upper
15  right-hand corner of -- just make sure I'm in the
16  right place -- upper right-hand corner of a page
17  that's got a 26 at the very bottom?
18        BY MR. WILLIAMS:
19     Q.  That's correct.
20     A.  Okay.
21     Q.  And you appear to be being asked
22  questions about a document that's been referred

Page 211

1  to as Exhibit No. 5, correct?
2        MS. LAMBRAKOPOULOS:  Well, why don't
3  you go ahead and read starting at page 100 down
4  to page 101 before he responds to the question?
5  So about two years ago.
6        THE WITNESS:  I mean it says, "And
7  looking back at the side pocket there on
8  Exhibit 5..."
9        MS. LAMBRAKOPOULOS:  To yourself.
10        THE WITNESS:  Okay.
11        (The witness reviewed the document.)
12        THE WITNESS:  Okay.  Go ahead.
13        BY MR. WILLIAMS:
14     Q.  Okay.  In Exhibit No. 22 that we've
15  been talking about today, as you look at the
16  first page of that document, does it appear that
17  Exhibit No. 22 was previously identified in the
18  investigation of this case as Exhibit No. 5?
19     A.  Just bear with me.  I have to figure
20  out which one is 22.
21        Okay.  That's 22, and it says over here
22  No. 5.  Okay.

Page 212

1      Q.  Okay.  So it appears that Exhibit
2  No. 22 was the document that you were being asked
3  about on page 100 of the transcript that I just
4  handed you?
5      A.  Okay.  I, I -- okay.
6      Q.  As far as you know?
7      A.  As far as I know, this one says five
8  over here, so he's asking me about a five here on
9  page 100.
10     Q.  And I'll direct your attention to, in
11  particular to line No. 18 where it says question:
12  "It's 950,000 shares valued at $1,894,921.67.
13        "That number is not consistent with the
14  number of shares times the current market price."
15        Answer:  "Yeah, you're right."
16        Question:  "Can you tell me how that
17  number -- "
18        Answer:  "Somebody doesn't know how to
19  use a calculator.
20        "You know, when you started looking at
21  that line, I thought oh, that doesn't add up.  It
22  should be like $189,000.  I think they

Page 213

1  just --"..."  "... they just put in -- I think it
2  was just an error.  And I don't know if this was
3  ultimately the final NAV statement that was
4  produced or not produced, you know, but that's
5  clearly incorrect."
6        Were you asked those questions, and did
7  you give those answers sir?
8      A.  Could you repeat what you just said?
9      Q.  Were you asked those questions, and did
10  you give those answers?
11     A.  Yeah.
12     Q.  And you were, you were under oath when
13  this testimony --
14     A.  Sure.
15     Q.  Okay.  And let me show you another
16  document.
17        (Pause.)
18        BY MR. WILLIAMS:
19     Q.  And this document is a document that's
20  previously been identified as Exhibit No. 17 in
21  this case.
22        And Mr. Reckles, have you seen Exhibit

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 214

1  No. 17 before?
2      A.  Yes.
3      Q.  And it appears to be a series of two
4  e-mails.
5          And what I want to ask you about in
6  particular is the one from mannion1@aol.com to
7  paul@hpccapital, cc various individuals,
8  including yourself, Andyreckles@aol.com, update
9  on World Health.
10     A.  Okay.
11     Q.  Did you play any role in drafting this
12  letter?
13     A.  Some; I mean I seem to recall that I
14  helped with some of the, kind of the factual
15  background on, on World Health.
16     Q.  To your knowledge, who participated in
17  drafting this letter?
18     A.  Well, counsel, and Mr. Mannion, and I
19  seem to recall there was input from the
20  administrator as well.
21     Q.  And when you say input from the
22  administrator, do you mean Mr. Sims, or someone

Page 215

1  else?
2      A.  I can't recall specifically.
3      Q.  Okay.  And do you recall the nature of
4  the input from the administrator?
5      A.  No, I don't.
6      Q.  Okay.  Do you, do you have a sense of
7  who drafted the lion's share of that document?
8      A.  You know, I don't really recall.
9      Q.  Okay.  Fair to say it's collaborative?
10     A.  I think that's very fair to say.
11     Q.  Okay.  And it appears to be dated
12  September 8th, 2005.
13         Do you know if it was drafted on or
14  about that date?
15     A.  I assume it was drafted in and around
16  there.  It could have been drafted, you know,
17  multiple days before that.
18     Q.  It appears --
19     A.  I don't know if this is the final or a
20  draft or what have you.
21     Q.  Okay.  And the e-mail appears to have
22  gone to Mr. Dumbauld, who we referred to earlier

Page 216

1  today.
2      A.  Um-hm.
3      Q.  And do you know why it would have been
4  sent to him?
5      A.  Not specifically.
6      Q.  Okay.  And by the way, it's, it appears
7  to, Mr. Mannion appears to have sent the e-mail
8  cc to your AOL e-mail address.
9          Was it, was it, was it typical that you
10  received Palisades-type e-mails at the AOL e-mail
11  address?
12     A.  Was it typical?  You know, I guess it
13  was, it wasn't uncommon.
14     Q.  Okay.
15     A.  I think, you know, if, if everybody in
16  here has used Outlook, you know, it kind of
17  batches everybody by, once you're in there, by
18  name, so if you, I don't know if you type Andy
19  and that happened to be the first one in his
20  queue and you just hit enter, then that's where
21  it would go as opposed to maybe PEF Advisors
22  which might have been the third one in the queue

Page 217

1  under my name in his Outlook, so I -- you know,
2  who knows?
3      Q.  So, so would it be fair to say that
4  whether it be sent to your AOL address or your
5  HPC Capital address --
6      A.  I would have received it.
7      Q.  You would have received it?
8      A.  Yeah.
9      Q.  Or your PEF Advisors e-mail?
10     A.  Sure.  Absolutely.
11     Q.  Okay.  And you indicate, I think you
12  indicated -- correct me if I'm wrong -- that you
13  were responsible for some of the financial
14  information in this document, is that right?
15     A.  I think factual --
16     Q.  Factual -- okay.
17     A.  -- is what I said.
18     Q.  Factual in what respect?
19     A.  Just -- excuse me.  Just to some extent
20  what, what we had been doing or what I had been
21  doing in interfacing with folks at the company or
22  their attorneys in trying to give an overall

Page 218

1  update.
2      I mean I think that this was a, as it
3  says here, update on World Health, so since I was
4  doing a lot of that work with interfacing with
5  the folks over there, I had a lot of knowledge
6  that would need to go into, you know, a primer on
7  it, if you will.
8      Q.  Okay.  And directing your attention to
9  the bottom paragraph of the first page of the
10 document where it discusses Palisades's total
11 investment in World Health, do you see that part
12 of the document?
13     A.  I do.
14     Q.  And it refers to a 4.12 million in free
15 trading and restricted stock.
16         Where did that number come from?
17     A.  I don't recall.
18     Q.  Okay.  Did it come from without -- did
19 it come from you, or someone else?
20     A.  I don't recall.
21     Q.  Okay.  You don't know.  Okay.
22         MS. LAMBRAKOPOULOS:  I think his

Page 219

1  testimony was he doesn't recall.
2         BY MR. WILLIAMS:
3      Q.  You don't recall, right?
4      A.  Yeah.
5      Q.  And on the second page, the third full
6  paragraph appears to, to indicate some various
7  financial information or sales information with
8  respect to World Health.
9          Do you know where that data came from?
10     A.  I don't.  I don't.  I mean I can't
11 recall after six years.
12     Q.  Sure, but you indicated that you were
13 the -- well, I don't mean to characterize what
14 you said before, but were you the primary point
15 of contact for World Health in terms of obtaining
16 information from the company, or no?
17     A.  Yeah.  And, and I don't think you're
18 mischaracterizing at all, but it's also been six
19 and a half years, right?
20     Q.  Sure.
21     A.  So I mean I just can't remember every
22 nuance and detail at this point.

Page 220

1          I mean to be frank with you, the last
2  time I saw this was probably two years ago May
3  the last time I was with Mr. Aderton over there,
4  and the last time I saw it prior to that was
5  probably when it was created.
6          So I've seen this document twice in its
7  almost seven years, and I just don't recall a lot
8  of the minutia.
9      Q.  Sure.
10     A.  I don't really want to speculate.  I
11 don't think that would be beneficial.
12         So it's easier for me to say I don't,
13 don't recall.
14     Q.  Okay.  That's fair.  And it refers to,
15 in the very last paragraph at the top of page 3,
16 a consent form in order to allow us to complete
17 the net asset values for August 2005.
18         And my question to you is, my first
19 question to you is what consent form were you
20 sending to investors?
21     A.  I don't know which -- there were two.
22 There was the, the, what's called the 20 percent

Page 221

1  consent form, but there was the, the formation of
2  the side pocket, and I don't know if it was
3  either/or, both, or what have you.
4      Q.  Okay.  And my next question to you is
5  how would the consent form facilitate the
6  completion of the net asset value for August?
7      A.  Yeah.  I don't know.  I don't know.
8  That's fair.
9          How it was phrased is, you know, why it
10 was phrased that way six and a half years ago, I
11 can't, I can't gather or hazard a guess.
12     Q.  And let me ask you to look back at the
13 first page of the document under the line where
14 it says Dear Friends and Investors.
15     A.  Um-hm.
16     Q.  Do you find that part of the document?
17     A.  Yes.
18     Q.  And in the second sentence, it says by
19 opening this e-mail, you agree to hold this
20 information confidential and have restricted
21 trading in the security until this information
22 has been publicly disclosed by the company

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 222

1    through a public filing.
2        And my question to you is what
3    information was, was confidential such that
4    trading had to be restricted?
5        A.  I'm not sure that there was anything in
6    there that was, was confidential.
7        I mean I think probably if I was
8    rewriting this six and a half years later, I
9    probably would say something more to the effect
10   you should probably consult with your counsel as
11   to whether or not any of the information
12   contained herein would restrict you from trading
13   in the security.
14       It's not my place to tell them whether
15   any of this is not in the public domain or
16   whether it is, what's confidential and what's
17   not.
18       So I'm not sure that anything in here
19   was, was not public or not, or was confidential.
20       Q.  Would you agree with me that the
21   statement gives the impression to the investor
22   that the, that the common stock of the company

Page 223

1    couldn't be sold by Palisades --
2        MS. LAMBRAKOPOULOS:  Objection.
3        BY MR. WILLIAMS:
4        Q.  -- at the time of the representation?
5        MS. LAMBRAKOPOULOS:  Objection. Calls
6    for speculation.
7        THE WITNESS:  Well, it's more than
8    that.
9        You're asking me to agree with you as
10   to how other people would feel upon receipt of
11   this letter.
12       I can't possibly tell you what 68
13   people might think.
14       BY MR. WILLIAMS:
15       Q.  You were an investor at Palisades?
16       A.  I was also the general partner in
17   Palisades.
18       Q.  And as an investor of Palisades, if you
19   received this statement, would you have believed
20   that the fund was, was unable to trade in the
21   security until the public disclosure of the
22   information contained in Exhibit No. 17?

Page 224

1        MS. LAMBRAKOPOULOS:  Objection. Calls
2    for speculation.
3        Go ahead and answer.
4        THE WITNESS:  Again, I want to be sure.
5    You're asking me to tell you what I would think
6    if I was an investor in Palisades based on the
7    receipt of this letter and Palisades's ability to
8    trade in the security?
9        BY MR. WILLIAMS:
10       Q.  Yes.
11       A.  I wouldn't have the foggiest.  I
12   wouldn't have the foggiest.  Again, not, not
13   attempting to be difficult, but I don't think it
14   was a well-written letter, all things considered.
15       I think probably I would use different
16   language, as I've already testified.
17       I think, you know, six and a half years
18   older, a little bit wiser, God only hopes, I
19   would use, I would use different language.
20       And again, I'm not sure because you go
21   into the third paragraph, all of these details
22   are available for your perusal in the recently

Page 225

1    filed 8-Ks, which pretty much tells me that
2    everything was already in the public domain.
3        So I'm not sure that the entire first
4    paragraph was necessary.
5        Q.  Okay.  But you would, well, and I won't
6    ask the question that way because maybe you won't
7    agree with me.
8        A.  Okay.
9        Q.  But --
10       A.  Thank you.
11       Q.  But the statement that, that -- strike
12   that.
13       A hard to value asset is -- would you
14   agree with me that a publicly, a freely traded
15   asset is not hard to value?
16       MS. LAMBRAKOPOULOS:  Objection. Can
17   you repeat that?
18       MR. WILLIAMS:  Sure.
19       MS. LAMBRAKOPOULOS:  I apologize.
20       BY MR. WILLIAMS:
21       Q.  Would you agree with me that a freely
22   traded security traded on a public exchange is

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 226

1  not hard to value?
2      A.  I think it's more of a facts and
3  circumstances issue, but, you know, no, I don't
4  think I can entirely agree with that.
5         I'm, I'm not a CPA.  I understand that
6  there's all sorts of stuff like mark to market
7  accounting, and there's fair value accounting, so
8  it's like saying that, you know, today because
9  American Airlines told everybody a week ago that
10  they filed for bankruptcy, but their stock is
11  still trading at 80 cents.  Well, why?  Why?  I
12  can't explain that.
13         GM announced that they were going to go
14  bankrupt.  They did in fact go bankrupt, but the
15  day before they went bankrupt, their stock was
16  still trading at 60 cents.
17         If you were a mark to market accounting
18  guy, you would have had to mark your books to 60
19  cents, right?  But the next day, it was zero.
20         So I don't know that you can always
21  just cut and dry say that a freely tradable
22  publicly traded security can just be carte

Page 227

1  blanche, is easily valued.
2         It's facts and circumstances much like
3  you know, the GM situation or the American
4  Airlines situation or the World Health situation.
5         There was too many moving parts,
6  including the potential for an entire global
7  restructuring of the company.
8      Q.  That's fair.  And World Health
9  ultimately did wind up in bankruptcy?
10      A.  They ultimately did wind up in
11  bankruptcy.
12      Q.  And --
13      A.  And not to interrupt you, but I think
14  with all due respect, and with all fairness to
15  Mr. Mannion and myself, 30 days later, the common
16  stock was valued at zero in our portfolio,
17  30 days later.
18         So there was enough evidence and
19  movement in our knowledge base, right, and in our
20  discussions with the company, and the positioning
21  of the parties, that we were no longer confident
22  that the common stock had any value.

Page 228

1         As a result of that, we did what was
2  appropriate, and beginning in September NAV, you
3  saw mark-downs, and, and continued throughout the
4  process, so --
5      Q.  Well, fair, fair point, but with
6  respect to exhibit, for example, Exhibit
7  No. 20 --
8      A.  Twenty; 22.
9      Q.  There's an indication in, on the World
10  Health page of Exhibit No. 20 that you're holding
11  right now --
12      A.  Okay.  Got it.
13      Q.  There's an indication that as of
14  September 13th, whoever drafted that particular
15  page believed that the common stock of World
16  Health was valued at zero as of right then,
17  correct?
18         MS. LAMBRAKOPOULOS:  Objection to the
19  extent your question presumes that the author of
20  this document had that belief, which is not in
21  evidence.
22         MR. WILLIAMS:  Okay.  Well --

Page 229

1         THE VIDEOGRAPHER:  The microphone.
2         THE WITNESS:  I'm sorry.  I wanted to
3  pick something up.
4         MS. LAMBRAKOPOULOS:  Do you want a
5  minute break?
6         THE WITNESS:  No.  I don't need a break
7  at all.  I just want to get something because I
8  can't do this in my head.
9         I apologize.  It's like being that guy
10  at the gas station that drives off with the thing
11  in the gas tank without the fire.
12         Um, look --
13         MS. LAMBRAKOPOULOS:  Was there a
14  question?
15         THE WITNESS:  Yeah.
16         BY MR. WILLIAMS:
17      Q.  With respect to the page Bates number
18  SEC-MANNION0301663, the indication that for, a
19  value in terms of estimated recovery percentage
20  for the World Health common shares is, is zero,
21  correct?
22      A.  That's what's on the page here.

Page 230

1    Q.   Okay.  And on Exhibit No. 21 --
2    A.   Which is?
3    Q.   The e-mail from Les Elliott to yourself
4  and Mr. Mannion.
5    A.   Got it.
6    Q.   And what, what, what's the recovery
7  estimated for the 950,000 common shares of World
8  Health?
9    A.   He shows zero recovery.
10   Q.   Okay.  And the, the NAV for August 2005
11 indicates for the World Health common shares --
12 and that's going to be in Exhibit 22.
13   A.   Got it.
14   Q.   It appears to be 1.89 million for the
15 restricted and 110,000 for the common, correct?
16   A.   Let's call it two million and 4,000 for
17 both pieces, right?
18   Q.   Right.
19   A.   I think that's the math.  Okay.
20   Q.   Is that right?
21   A.   Okay.  So I'm just waiting if there's
22 a -- is there a question?

Page 231

1    Q.   No.
2    A.   Okay.
3    Q.   And I think I asked you this before,
4  but I, I'll ask you again just to make sure.
5         When the Exhibit No. 17, the
6  September 8 letter to friends and investors, was
7  sent out, did the responses come to you, or to
8  someone else?
9    A.   You know, I don't recall where the
10 responses went.
11        I mean I -- they, they could have gone
12 to either the administrator, or they could have
13 been faxed into the office.
14        They could have been e-mailed in to
15 Paul.
16        They didn't come to me.
17   Q.   And so if someone -- the e-mail
18 appeared to have been sent to Mr. Mannion from
19 Mr. Mannion's e-mail address or --
20   A.   Right.
21   Q.   So presumably someone replied.
22   A.   Right.

Page 232

1    Q.   It would have been to him.  So my
2  question to you is did you see any of the
3  responses to the September 8, 2005, letter?
4    A.   You know, I can't recall.  I don't, I
5  don't recall.
6         I know that, I know that they were
7  received.
8         I seem to recall that there was a
9  pretty overwhelming disposition towards the
10 consents, you know, in the affirmative, so I just
11 don't recall the specifics.
12   Q.   And so when you say there was a pretty
13 overwhelming affirmative, how do you know that?
14   A.   Just, just from conversations with Mr.
15 Mannion from years ago, I mean from back then.
16   Q.   Okay.  Any basis other than your
17 conversation with Mr. Mannion?
18   A.   No, none that I can recall.
19        MR. WILLIAMS:  Why don't we go off the
20 record for a minute?
21        THE VIDEOGRAPHER:  We're going off the
22 record.

Page 233

1         The time on the video is 3:12 p.m.
2         (A recess was taken.)
3         THE VIDEOGRAPHER:  We're back on the
4  record.
5         The time on the video is 3:32 p.m.
6         BY MR. WILLIAMS:
7    Q.   Mr. Reckles, we've talked about World
8  Health, Palisades's investment in World Health in
9  about August of 2005.
10        My question to you is during the time
11 that Palisades was investing the four million and
12 subsequent two million dollars into World Health,
13 you personally were selling your World Health
14 stock, correct?
15   A.   I think I sold a very small percentage
16 of it.
17   Q.   A small percentage of your --
18   A.   I sold some of my stock, yes.
19   Q.   Why were you selling your stock?
20   A.   Well, I mean I think -- excuse me.  I
21 think that -- I can't remember which one of these
22 exhibits it is, but it was the one that gave the,

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 234

1  the LP breakdown, ownership of the fund.
2       I don't remember which one it was.  It
3  may have been this one.
4       Q.  Exhibit 20?
5       A.  You know, as I recall, by August of
6  '05, you know, I had somewhere in the fund in the
7  neighborhood of two, two point, two and a half
8  million dollars of my net worth, which is a
9  substantial portion of my net worth.
10      So I was a large investor in, in the
11  fund, and subsequently a large investor in, in
12  World Health through, through the fund.
13      I had received over the course of a
14  year, and I think we talked about this earlier on
15  a different exhibit that you put in front of me,
16  I can't recall quite where, I think it was the
17  one that I had to come back and clarify on,
18  but --
19      Q.  Right.
20      A.  -- that I had received a, a good
21  portion of my compensation in my investment
22  banking services throughout all of '04 and '05 in

Page 235

1  this company in restricted shares of stock, which
2  was again a very large percentage of my net
3  worth.
4       And at the beginning of the summer of
5  '05 when some of those restrictions were lifted,
6  I was able to sell some of those shares, and then
7  I was selling, if I remember correctly, in June
8  and July some of those shares.
9       And so there was a capital gains to be
10  considered, and at the point in time at the end
11  of August, when the shares went to wherever they
12  went at the end of August, it seemed like a very
13  sensible thing to do to be able to offset a lot
14  of the capital gains that I took in the earlier
15  part of the summer with these sales, you know.
16      I paid for, as you know, two, two sets
17  of a million, 22,000 shares that I had a cost
18  basis of over I think like $3.00 a share, and if
19  you're selling it at 22 cents, you're able to
20  realize that loss.
21      And that was all.  It was more I think
22  just personal kind of tax planning than anything

Page 236

1  else.
2       And I, and I maintained a very large
3  investment in it through, through the fund from
4  my perspective.
5       You know, I owned at that point, you
6  know, 5 or 7 percent of the total assets of the
7  management were, were mine, and we had a large
8  position in World Health, as we've discussed
9  here.
10      Q.  And in August and September 2005, you
11  sold your entire position of free trading World
12  Health stock?
13      A.  I don't believe I sold my entire
14  position.
15      I don't believe so.
16      MR. WILLIAMS:  I ask the court reporter
17  to label this document as Exhibit No. 45.
18           (Exhibit No. 45
19           was marked for
20           identification.)
21      BY MR. WILLIAMS:
22      Q.  And I'll represent to you that Exhibit

Page 237

1  No. 45 is a multiple page document Bates number
2  SEC-MANNION0016741 through 6746.
3       It appears to be a brokerage account
4  statement from Westminster Securities Corporation
5  in your name.
6       A.  Yes, sir.
7       Q.  And is this your brokerage account
8  statement in about August 2005?
9       A.  Yes, sir.
10      Q.  Okay.  And directing your attention
11  specifically to the third page of the document,
12  it appears to reflect some selling activity in
13  the securities of World Health Alternatives, is
14  that correct?
15      A.  Yes, sir.  I see that.
16      Q.  And there appears to be a sale in about
17  April 15th of 2005 of 125,000 shares at $3.51 a
18  share.
19      And do you see that part of the
20  document?  August 15th --
21      A.  Yes, I do see that.
22      Q.  And the 300, $3.51 a share price, is

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 238

1    that, was that typical of the, of the trading
2    price of World Health prior to the situation that
3    we spoke of earlier today with Mr. McDonald?
4        MS. LAMBRAKOPOULOS:  Objection as to
5    form.
6        Go ahead and answer.
7        THE WITNESS:  I mean I can only answer
8    that, you know, with the very limited data in
9    front of me based on what I see in front of me.
10       And I see trades on August the 3rd at
11   $3.68, and I see trades on the 4th at $3.83, and
12   trades on the 9th at 3.69 and 64 and so on, so I
13   think it's reasonably fair.
14       I mean it's slightly lower than it was
15   earlier in the month, but you know, plus or minus
16   10 percent.
17       BY MR. WILLIAMS:
18    Q.  And directing your attention to the
19   last -- excuse me -- page Bates number
20   SEC-MANNION0016745.
21    A.  Where?  The same document?
22    Q.  The same document, page 4 of 7.

Page 239

1     A.  Three, four -- okay.
2     Q.  There appears to be a sale indicated on
3    August 26 of two thousand -- there appears to be
4    a sale, a transaction on August 26, 2005, of
5    World Health stock.
6        Do you see that?
7     A.  I'm sorry.  I don't follow you.  I'm on
8    page 4, but I don't -- am I looking at the
9    wrong --
10    Q.  Oh, I think four and five are out of
11   order.
12       MS. LAMBRAKOPOULOS:  Go to the next
13   page.
14       THE WITNESS:  Oh, okay.  All right.
15   Yeah.
16       MS. LAMBRAKOPOULOS:  Four of five.
17       THE WITNESS:  Okay.  I'm with you now.
18   Thanks.
19       BY MR. WILLIAMS:
20    Q.  Okay.  And you appear to have sold
21   approximately 380,000 shares of World Health at
22   about 26 cents a share.

Page 240

1        Do you see that transaction?
2     A.  I do.
3     Q.  And is that what you were talking about
4    in terms of tax planning?
5     A.  That was taking a tax loss, yeah.
6     Q.  Okay.  And was that -- did you, did you
7    have a belief in about August 26, 2005, that
8    World Health would recover?
9     A.  Well, I think, again, I've tried, I've
10   tried to do this, again, I might be doing a real
11   bad job of it, but I think that there's a very
12   big difference between what, you know, that
13   recovery meant.
14       I didn't know what the outcome would
15   be, right?
16       I didn't know that the company would
17   remain a public company.
18       I didn't know that the company wouldn't
19   be bought by some third party company.
20       I didn't know that the company would
21   decide to maintain being a reporting filing
22   company.

Page 241

1        But I did believe that the assets that
2    we held had value, because we held essentially
3    debt.
4        And so because of our position in the
5    capital structure, I felt very secure that our
6    recovery, our recovery, not necessarily World
7    Health's recovery as much, but our recovery was
8    very, very solid because when you're in the
9    capital position that we were in in the capital
10   structure, and based on our fundamental belief of
11   what the business was worth, that even in a dooms
12   day scenario, at least from our perspective, and
13   what was later reported to us by their investment
14   bankers Houlihan Lokey, that the value of the
15   company in a bankruptcy sale, which is invariably
16   where it went, should have been X, and based on
17   the amount of debt that was ahead of us, we
18   should have recovered almost 90 cents on the
19   dollar on our debt.
20       And this is all hindsight.  This is all
21   stuff that we learned in November and December,
22   but, but we have, and they've been given to you

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 242

1   and you have them, we have discovery from the
2   investment bankers that were tasked with the sale
3   of the asset, and they did big reports and they
4   showed us what they thought certain assets were
5   worth and what the revenues were and all those
6   different things.
7            And you could, you could do a cash flow
8   analysis from those things.
9        Q.  So when I, when I asked you whether or
10  not you thought that World Health would recover,
11  I think you indicated that, that you weren't, you
12  weren't sure whether it would recover to its
13  prior form, but you believed that the assets that
14  you, that Palisades held were secure because of
15  the form of asset is debt.
16           But, but my question is did you believe
17  that, that World Health would recover as, as, as
18  it had been originally constituted?
19       A.  On August 31st, I didn't know -- oh,
20  okay.  I didn't know -- or August 26th or 31st,
21  whatever, what have you, I didn't know what the
22  final outcome would be.

Page 243

1            We were still only eleven days removed
2   or twelve days removed or so from, you know,
3   proverbial stuff hitting the fan, you know.
4            What I did know and what I continued to
5   believe for a good period of time was that I felt
6   that the company had enough value, the company,
7   the business, okay, the business had enough value
8   that we, we were better lending them the
9   additional $6 million than not because the
10  business had value.
11           I believed that how we valued those
12  assets from August to September to October to
13  November was, was accurate, or had done at a
14  minimum, to the best of our abilities given the
15  information and data that we had, and our
16  fundamental belief that the business had value.
17       Q.  And so the sale that we see on
18  August 26th of 2005, of 380 some thousand shares
19  at 26 cents a share, that's not an indication
20  that you didn't believe that World Health wasn't
21  going to last?
22       A.  No, not at all.  I had, I had booked a

Page 244

1   very large profit personally.
2            I had spent an entire year working for
3   the company from an investment banking
4   perspective, receiving most of my remuneration in
5   the form of restricted stock.
6            Most of the rest of my assets were tied
7   up in my funds, so from a liquid capital
8   position, it was essential for me to have the
9   ability to pay my bills and things like that.
10           And these shares had been tied up for,
11  in some cases ten, eleven months.
12           And when the stock price went to 22
13  cents, it was an opportunity to reduce my tax
14  burden on a lot of what I had sold earlier in the
15  summer.
16           I mean just because you're -- I sold
17  stock on the 26th, but I sold stock on June 26th,
18  too.  I didn't feel any different on June 26th.
19       Q.  Do you recall what, do you recall when
20  the Palisades advanced World Health an additional
21  $2 million?
22           Was it on or about that day?

Page 245

1        A.  I believe it was before that day.
2        Q.  Okay.
3        A.  I seem to recall it was actually on my
4   wife's birthday.
5            I seem to recall it was on the 24th.
6        Q.  The 24th?
7        A.  Um-hm.
8        Q.  Okay.  So two days later, you sold
9   380,000 shares from your personal account at 26
10  cents?
11       A.  Um-hm.
12           MS. LAMBRAKOPOULOS:  You have to
13  answer.
14           THE WITNESS:  Oh, I'm sorry.  Yes.
15           BY MR. WILLIAMS:
16       Q.  I'm going to ask you -- and by the way,
17  this document indicates that as of the end of
18  August of 2005, you had 302,150 -- I'm looking at
19  the last page of the document.
20       A.  Got it.  I'm with you.
21       Q.  302,150 shares of unrestricted World
22  Health stock.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 246

1    And do you recall if you sold all of
2  those shares in about early September?
3    A.  I don't recall.  I don't recall.
4    Q.  Okay.
5    A.  And I know that, I notice I had another
6  480,000 of restricted.
7    Q.  Of restricted?
8    A.  Yeah.
9    Q.  Okay.  Can we turn to another subject?
10  And I'll show you a document that has been
11  previously marked as Exhibit No. 23.
12    And it appears to be a series of
13  e-mails with the subject Region account?
14    A.  Okay.
15    Q.  And it appears to be from Mr. Les
16  Elliott to Mr. Mannion.
17    And my question is -- and from Mr.
18  Mannion, it appears to have been forwarded to,
19  back to Mr. Elliott and to you, to your e-mail at
20  AOL.
21    And my question to you is with respect
22  to a transaction on July 19th, two thousand,

Page 247

1  2005, there appears to be reflected a $2 million
2  deposit from PEF Advisors, and there's a question
3  of whether or not is this a subscription by PEF
4  Advisors, Limited, and then there appears to be a
5  response that this was PEF Advisors repaying
6  Palisades Master Fund for its two million
7  participation that was advanced by PMF.
8    And my question to you is are you
9  familiar with that transaction?
10    A.  Yes.
11    Q.  Can you explain what that transaction
12  was?
13    A.  Yeah, I can.  I, I'd be glad to.  It's,
14  aside from the fact that as you would expect, I
15  completely disagree with your position in just
16  about everything in this entire scenario, this is
17  the one that, of all the things, sticks my craw
18  the most.
19    Q.  Okay.
20    A.  It just does.  And I think it has a lot
21  to do with how your, your higher-ups did their
22  press release and how that was subsequently

Page 248

1  characterized in the press, and it's, it's pretty
2  shameful I mean I've got to tell ya.
3    This was, this is an non-event.  With
4  the permission of the head of the administrative
5  firm, who also had the obligation to sign off on
6  any wires above a million dollars, so signed off
7  by the administrator, the fund who had money
8  on-shore, the, the advisor whose money was
9  off-shore, and couldn't make a closing date
10  on-shore on the same day because it took two days
11  to wire the money, couldn't hit for value date,
12  with the permission of everybody involved, the
13  people that are the gatekeepers advanced the, the
14  advisor money only after the advisor had already
15  wired the money back to the fund.
16    The fact that it hit the fund on the
17  19th shows that it was the next day, but it was
18  wired the same day.
19    The question I got asked way back in
20  May of '09 is do you feel like this was a
21  disclosure event?
22    No, I don't feel like it was a

Page 249

1  disclosure event.
2    We went to the administrator.  If the
3  administrator felt like it was a disclosable
4  event, then he would have told us no, it can't be
5  done, and it needs to be disclosed if you want it
6  done.
7    It was not a problem.  The
8  administrator knew that the funds were good.
9  They were in our account in the off-shore bank,
10  and he required that we advance wire those funds,
11  and we did, and they were received back into
12  Regions Bank the very next day.
13    I don't even think 24 hours elapsed,
14  but somehow or another, in Mr. Khuzami's
15  announcement, it made it look like we stole
16  $2 million from the fund.
17    Come on.  That's shameful, shameful,
18  guys.  That's dirty pool.
19    Q.  Can you explain the transaction?
20    A.  I just did.
21    Q.  What was the transaction?
22    A.  We -- the transaction's right above

Page 250

1   that.
2         We were participating with our own
3   money.
4       Q.   When you, when you say we --
5       A.   We, the, the advisor -- I apologize.
6   PEF Advisors was purchasing $2 million worth of a
7   World Health bond from a third party investor
8   that was selling their position.
9       Q.   So PEF Advisors was investing in a
10  World Health bond?
11      A.   Yes, with our own money.
12      Q.   With PEF Advisors's money?
13      A.   Yeah, with our own money.
14      Q.   And the funds were paid to whom?  To
15  the company, or someone else?
16      A.   Oh, no.  They were paid to the original
17  owner of the debt security, another fund.
18      Q.   Is that Midsummer?
19      A.   Yes.
20      Q.   And the funds that were paid to
21  Midsummer came from Palisades's account, is that
22  correct?

Page 251

1       A.   Yes, and were reimbursed the same day
2   by PEF Advisors.
3       Q.   And the funds that went out of
4   Palisades were reimbursed into Palisades by PEF
5   Advisors?
6       A.   Yeah.
7       Q.   Is that right?
8       A.   Immediately, same day.  The same day
9   that they were wired out, they were wired back
10  in -- just a value date issue between an on-shore
11  and an off-shore wire.
12      Q.   When you say a value date issue, what
13  does that mean?
14      A.   It's just banking lingo.  You can't
15  wire from an off-shore account to an on-shore
16  account and have it happen the same day.  There's
17  no credit.  At least that bank didn't.
18      Q.   Okay.
19      A.   It couldn't be credited the same day,
20  so we couldn't make the closing for the actual
21  transaction on the date ascribed for closing
22  unless we were wiring from on-shore.

Page 252

1       Q.   And how did you know that you couldn't
2   make the closing?
3       A.   Because we called the bank, and we said
4   hey, we need to have this money, you know, wired
5   today.
6         Well, Mr. Reckles, we can't do the --
7   you know, it will be value dated tomorrow.
8         Well, that's a problem, so --
9       Q.   Was it you who spoke to the bank?
10      A.   No.  I was being, I was being
11  colloquial.  I apologize.
12        I don't recall.  I don't think it was.
13      Q.   Okay.
14      A.   I don't think it was.
15      Q.   Were you on the call?
16      A.   No.  I very seldom worked with the
17  banks.
18      Q.   Do you know --
19      A.   But I know enough about the interplay
20  that you couldn't value date.
21        I mean I've wired money before.  I've
22  been -- I've done it before.

Page 253

1         May not have been this circumstance.
2       Q.   Do you know who, who was responsible
3   for this transaction?
4       A.   It was either, it was either myself or
5   Paul Mannion.
6         I can't recall specifically who talked
7   to the bank and wired the money.
8       Q.   I see.  So it was either you or Mr.
9   Mannion?
10      A.   Yeah.  Absolutely.
11      Q.   And so the bank informed you that
12  because of what do you say?  Value date?
13      A.   Value date; it can't make it to a U.S.
14  bank the same day.
15      Q.   Okay.
16      A.   So --
17      Q.   So --
18      A.   We called the administrator.  Well, I'm
19  sorry.
20        You want to ask a question -- please.
21      Q.   So because it couldn't happen the same
22  day, you asked the administrator to advance the

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 254

1  funds from Palisades because Palisades was
2  on-shore?
3    A.  Yeah.  They were a bank at Regions
4  Bank, which is, as you probably know, is a U.S.
5  bank based in Alabama.
6    Q.  Okay.  And what did the administrator
7  say when you asked the administrator to forward
8  the funds from Palisades's account?
9    A.  Well, he gave his permission, and he
10  actually had to sign off.
11    Q.  And you've indicated that, that PEF
12  replaced the funds --
13    A.  Absolutely.
14    Q.  -- the next day, is that right?
15    A.  Actually, the same day.  In, in real
16  world time, it was received the next day.  That's
17  the whole value date thing.
18      It was back in the account on the 19th,
19  but it was actually submitted the same day,
20  because we couldn't wire from our, our account,
21  the advisory account, on the 18th and have it hit
22  the closing account for the transaction on the

Page 255

1  18th.
2      We just moved the instructions to have
3  it hit the Regions account for Palisades.
4      Whether it was twelve hours later or
5  ten hours, I can't even tell you at what point in
6  time on the clock that account saw the money, but
7  it was less than 24 hours.
8      It was probably less than 12 hours.
9    Q.  So why, why, why did you delay the
10  closing?
11    A.  We had, we had an investor that wanted
12  to be out of this position.
13    Q.  So you couldn't delay the closing?
14    A.  We, we didn't delay the closing.  You
15  know, in hindsight, we probably could have.  In
16  hindsight, we probably could have.
17      I never would have dreamed, and I still
18  have a hard time -- as you can probably tell from
19  my tone, it's just very agitating to me that this
20  is, that this is why we're here.
21      I mean this is, this is silly.  It's
22  silly.  When there's so much other stuff out

Page 256

1  there, this is silly.
2    Q.  Well, let me, let me --
3    A.  That's just my opinion, sir; just my
4  opinion.
5    Q.  Fair enough.  Let me, and let me ask
6  you in respect to your, your characterization, do
7  you think that it's inconsequential that
8  Palisades funds were used for the benefit of some
9  entity other than Palisades?
10    A.  I would say to you that if this was
11  anything other than what exactly happened here,
12  then I think it would be consequential, and I
13  believe that it would require a disclosure.
14      However, because the money was, was
15  moving at the same time, it was literally
16  crossing in, you know, in the air, it was, there
17  it was, it was of an inconsequential nature.  It
18  was a non-event.
19      And had it been consequential, I would
20  have relied on the administrator to tell us that
21  you cannot do it because at the end of the day,
22  it's his job.

Page 257

1      So if he felt, if he felt that it was
2  inconsequential, if he felt that it was not a
3  matter that required disclosure, if he felt that
4  he had no problem not only allowing, but because
5  any wire over a million out of Regions required
6  an A and a B signature and he was one of those
7  signatures, right, so if he signed off and agreed
8  to the wire, then I have to suggest that, then I
9  have to suggest that --
10    Q.  Why don't we -- I apologize for
11  interrupting your answer.
12      Why don't we go off the record briefly?
13    THE VIDEOGRAPHER:  This concludes Tape
14  No. 4 of the video deposition of Andrew Reckles.
15  The time on the video is 3:55 p.m.
16    We're off the record.
17    (Pause.)
18    THE VIDEOGRAPHER:  This begins Tape No.
19  5 in the video deposition of Andrew Reckles.  The
20  time on the video is 3:58 p.m.
21    We are on the record.
22    BY MR. WILLIAMS:

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 258

1    Q.  Okay.  Mr. Reckles, you indicated that
2  you believed that the movement of the $2 million
3  that we've been speaking of was I think as you
4  put it a non-event.
5         And my question to you is do you think
6  it's significant, or, or, or, or do you think
7  it's significant that the assets of Palisades are
8  used for a purpose other than investment for the
9  benefit of the fund?
10      MS. LAMBRAKOPOULOS:  Objection as to
11  form.
12      THE WITNESS:  You know, I think I've
13  testified how I feel about this issue.
14      BY MR. WILLIAMS:
15      Q.  Okay.
16      A.  I think I've testified.  I think that
17  the instance in question, in my estimation, and I
18  believe it to this day, it's a non-issue.
19         I think that any reasonable person,
20  when shown the facts here, any reasonable person,
21  that the gatekeeper had given permission, the
22  gatekeeper had actually wired the funds, and that

Page 259

1    the funds were replaced in real terms at the same
2  time, other than a value date issue, which is
3  just banking lingo for a lag time between an
4  off-shore and on-shore account, I think any
5  reasonable person or peer would think that this
6  was a non-event.
7      Q.  And when you speak of the gatekeeper,
8  you're referring to the fund administrator?
9      A.  Yes.  Yes.
10      Q.  And how did the fund administrator come
11  to be the administrator of the fund?
12      A.  He was hired.
13      Q.  By whom?
14      A.  By the fund.
15      Q.  Who made the decision to hire the
16  administrator?
17      A.  I can't recall.  I would, I would
18  speculate that it was Paul and myself whenever
19  that decision was made.
20         He came highly recommended.  I remember
21  that.
22      Q.  I see.  And with respect to the fund

Page 260

1  administrator being the gatekeeper, is that the
2  reason why you think that this, that the transfer
3  of the $2 million was a non-event, because the
4  fund administrator approved it?
5      A.  I think that's only part of the overall
6  picture.
7      Q.  Okay.
8      A.  I think you have to take the entire
9  facts and circumstances of this issue and look at
10  it for what it was.
11         We had permission.  It was paid back in
12  real time at the same time.
13      Q.  Okay.
14      A.  In fact, the wire to pay back the money
15  that was wired to, on behalf of PEF happened at
16  the same time that the wire to PEF was done.
17      Q.  Okay.
18      A.  Because they both had to be done with
19  the administrator.
20      Q.  If the wire had taken place a day
21  later, do you think that that would have been an
22  issue?

Page 261

1      A.  I don't think --
2      MS. LAMBRAKOPOULOS:  Objection.  Calls
3  for speculation.
4      THE WITNESS:  My personal opinion?
5      BY MR. WILLIAMS:
6      Q.  Yes, sir.
7      A.  Is that it wouldn't have happened any
8  other way.  It wouldn't have happened.
9      Q.  Why is that?
10      A.  Because if the circumstances had been
11  such that we could not pay back at the same time,
12  then we wouldn't have even done it.  We wouldn't
13  have even asked.
14         We knew we had -- I'm sorry.  We knew
15  that we had the funds.
16         It wasn't -- we're already taking more
17  time on this than I think it's worth.  I'm sorry.
18         Just if, if it was another day or two,
19  we wouldn't have done it.
20         If we didn't have the money to pay back
21  at the same time, except for the value date
22  issue, we wouldn't have done it.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 262

1    Q.  Why?
2    A.   Just because it's a lot of money, but
3  because of the facts and circumstances here, I
4  view it as a non-event because we had the money.
5        It all transferred at the exact same
6  time because Dave Sims was responsible for being
7  involved in both wires.
8        He was pulling the trigger on the wire
9  to pay back the fund at the same time as he was
10  pulling the trigger to wire the money for the
11  benefit of the advisor.
12       It all happened at the same time.  It's
13  just a value dating issue.
14     What would you -- you know, I'm not
15  probably allowed to ask you questions, but what
16  would --
17       MS. LAMBRAKOPOULOS: Let's not ask
18  questions.
19       THE WITNESS: Okay.
20       MS. LAMBRAKOPOULOS: Let's wait for his
21  question.
22       THE WITNESS: Okay.

Page 263

1        BY MR. WILLIAMS:
2    Q.  Okay.  And you had indicated that if it
3  had been a day later, that Palisades, that if PEF
4  hadn't had the funds a day later, you wouldn't
5  even have asked to do it?
6    A.  Absolutely.
7    Q.  Do you, do you believe it was improper
8  to do it?
9        MS. LAMBRAKOPOULOS: Objection. Calls
10  for a legal conclusion.
11       THE WITNESS: I don't know that I can
12  answer that in terms of what's proper or not
13  proper.
14     We just -- I wouldn't have done it.
15       BY MR. WILLIAMS:
16     Q.  Based on your judgment as the --
17     A.  Well, my judgment, we wouldn't have
18  done it.
19       If I didn't know that I already had the
20  money to pay back, I wouldn't have done it,
21  absolutely.
22     Q.  Why?

Page 264

1    A.  Because that, that wouldn't be right.
2    Q.  Okay.
3    A.  That wouldn't be right.
4    Q.  Let me show you another document that's
5  previously been marked as Exhibit 24.
6        And Mr. Reckles, I'll represent to you
7  that Exhibit No. 24 is a three-page document that
8  appears to be an e-mail communication from Mr.
9  Elliott to Mr. Mannion and yourself dated August
10  10th, 2005; subject, July 2005 NAV.
11       And my question to you is have you ever
12  seen this document before?
13     A.  You know, I mean I'm on the
14  distribution list.
15       I'm sure I've seen it at some point
16  five years ago.
17     Q.  Okay.  And the questions I have for you
18  pertain to the second page of the document.
19     A.  Okay.
20     Q.  And there appears to be a bolded
21  paragraph or bolded sentence or bolded paragraph
22  that begins PEF Advisors, Limited.

Page 265

1        Do you see that part of the document?
2    A.  I do.
3    Q.  And it indicates that PEF Advisors,
4  Limited, owes Palisades Master Fund $12,803.09
5  for the purchase of their portion of Bluefly
6  warrants and the Beacon invoice which PMF paid on
7  behalf of PEF Advisors, Limited.
8        And my question to you is did Palisades
9  Master Fund purchase Bluefly warrants for PEF
10  Advisors?
11     A.  Did Palisades -- not to my
12  recollection.
13       I don't recall.
14     Q.  Do, do you understand what Mr. Elliott
15  is referring to in that sentence?
16     A.  Well, I mean I can see what he's
17  referring to.
18       I don't, I don't have a recollection of
19  it.
20     Q.  Okay.  And in your opinion, would it be
21  appropriate for Palisades Master Fund to purchase
22  warrants for PEF Advisors?

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 266

1    A.  I, I'd have to know more about the
2   facts and the circumstances.  I mean I really
3   would.
4         This is -- I just don't have a
5   recollection, so if I had more, more data, I
6   could, I could better answer your question.
7    Q.  Okay, but given what the sentence says,
8   you can't --
9    A.  It's hard for me to give you any kind
10  of reasonable answer other than I see here that
11  PEF Advisors, Limited, owes Palisades Master Fund
12  $12,803 that is made up of a sum of money split
13  between, in some percentages, an invoice which I
14  don't quite understand because I don't know how
15  PEF Advisors, Ltd., could ever have an invoice
16  payable to Beacon because we were the
17  administer -- we were the advisor to the fund.
18  We weren't the fund.
19        And the fund was the one that would
20  have the invoice, so I'm not sure that I even
21  understand that component.
22        And then I don't have any detail around

Page 267

1   the warrant exercise, so I -- yeah.
2    Q.  Were you aware that Palisades Master
3   Fund ever funded, other than what we've talked
4   about with respect to the $2 million, were you
5   aware that the Palisades Master Fund ever funded
6   investments on behalf of PEF Advisors?
7         MS. LAMBRAKOPOULOS:  Objection to the
8   extent your questions presume the earlier
9   transaction was a funding by Palisades.
10        MR. WILLIAMS:  Okay.
11        MS. LAMBRAKOPOULOS:  Go ahead and
12  answer.
13        THE WITNESS:  Actually, I wasn't until,
14  until you sued us.
15        BY MR. WILLIAMS:
16   Q.  Okay.  That was your first inkling?
17   A.  Didn't know it.
18   Q.  Okay.  And in your opinion, would it be
19  inappropriate for Palisades Master Fund to fund
20  investments on behalf of PEF Advisors, Limited?
21        MS. LAMBRAKOPOULOS:  Go ahead and
22  answer.

Page 268

1         THE WITNESS:  Okay.  Again, it's a
2   facts and circumstances issue just like I
3   answered relating to the, the other matter.
4         I'd have to know a lot more facts and
5   circumstance.
6         I'd have to understand what the details
7   were, whether the funds were available for
8   immediately, immediate repayment, whether it was
9   authorized by the administrators, et cetera, et
10  cetera.
11        BY MR. WILLIAMS:
12   Q.  Is that sort of transaction something
13  that should be disclosed to investors or limited
14  partners in the fund so that they can evaluate
15  the facts and circumstances of various
16  transactions?
17   A.  You know, I don't believe that in the
18  case of the $2 million, knowing those facts and
19  circumstances, that it, that it needed to be.
20        Because I don't know enough of the
21  facts and circumstances relating to the Bluefly
22  warrant, I can't really answer that well.

Page 269

1         It's possible that should have been
2   disclosed based on the facts and circumstance,
3   but without knowing them, I can't say
4   unequivocally yes.
5    Q.  Well, let me you ask this.  Did you
6   have conversations with the auditors for the
7   Palisades Master Fund at the end of, for the 2005
8   annual audit?
9    A.  You know, believe it or not, I never in
10  seven years spoke to auditors.
11   Q.  You never had a conversation?
12   A.  Never spoke to the auditors.
13   Q.  So would it be fair to say that all the
14  conversations involving Palisades and its
15  auditors involved Mr. Mannion?
16   A.  I think that, between the two of us,
17  yes, that would be correct.
18   Q.  Okay.  As between you and Mr. Mannion,
19  it was always Mr. Mannion dealing with the
20  auditors, is that fair?
21   A.  Yes, sir.
22   Q.  Who else in connection with the fund

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 270

1    dealt with the auditors, to your knowledge?
2        A.  The administrators.
3        Q.  Beacon?
4        A.  Yes.  Yes.
5        Q.  Okay.  Do you know who at Beacon
6    participated in the audit?
7        A.  I don't.
8        Q.  Okay.  And let me show you another
9    document that I -- was previously marked as
10   Exhibit No. 25.
11          And I'll give you a moment to look at
12   it.
13          (The witness reviewed the document.)
14          THE WITNESS:  Okay.
15          BY MR. WILLIAMS:
16       Q.  Exhibit No. 25 appears to be a two-page
17   document to investors of the Palisades Equity
18   Fund, LP.
19          And do you recognize this document?
20       A.  No, I mean other than looking at it
21   now.
22       Q.  Okay.  And what I want to ask you about

Page 271

1    is on the second page of the document, it appears
2    to have been from PEF Advisors, LLC?
3        A.  Okay.
4        Q.  And my question to you is given it
5    appears to be signed PEF Advisors, LLC, would you
6    have had a role in the drafting of this document?
7        A.  It's, it's possible.
8        Q.  Okay.
9        A.  It's possible.
10       Q.  Is it fair to say it would have been
11   either you or Mr. Mannion?
12       A.  Or both.
13       Q.  Or both?
14       A.  Collaboratively, as we said earlier.
15       Q.  And is this the sort of document that
16   appears to be a letter to investors describing
17   the return on, from Palisades Equity Fund, LP, is
18   this the type of document that you and Mr.
19   Mannion would collaborate on?
20       A.  Yeah.  I think that's, I think that's a
21   fair statement.
22       Q.  Okay.  And what I want to ask you about

Page 272

1    in particular is the second to last paragraph of
2    the document on the second page.
3          It says also are reducing our
4    personal redemption amounts by 162, five each,
5    162,500 each, to reflect a transfer of World
6    Health Alternatives, Inc. warrants in
7    August 2005.
8          And my question to you is are you
9    familiar with that transaction?
10       A.  Yes, sir.
11       Q.  And how did you come to transfer World
12   Health Alternatives warrants to yourself?
13       A.  Well, we were, we, that's -- the fund
14   was asked to exercise, and I believe one of the
15   other documents here we, we, we actually account
16   for that, a lot of our warrant holdings in the
17   company going into the, whatever it was, second
18   or third quarter of earnings call, we received
19   that request from the CEO, Mr. McDonald.
20          By August, the whatever you call it,
21   first or so, you know, the fund had in its, under
22   its ownership, enough World Health, in our

Page 273

1    estimation, that we didn't want to invest more
2    money into World Health.
3          We were comfortable with our position
4    obviously until fifteen days later and the world
5    changed for us.
6          But we, we agreed the company needed
7    the capital.  They requested the capital.  They
8    wanted the warrants overhang removed from their
9    balance sheet, and Paul and I determined that
10   since we valued all warrants on our balance sheet
11   at zero, so that it was an asset of no
12   consequence or value to the net assessment value,
13   that we would use our own capital to inject the
14   capital into World Health that needed the money.
15          In hindsight, it was a terrible
16   decision, terrible decision for a lot of
17   different reasons, one of those reasons being we
18   lost all the money, so that's, that's never a
19   good thing.  You lose a million dollars.
20          And then secondarily, it just, it just
21   wasn't the right thing to do.  It just wasn't the
22   right thing to do.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 274

1       The funds should have just lost the
2   assets, you know.
3       But then, you know, in hindsight,
4   the fund should have just invested the money or
5   not invested the money.
6       We self-disclosed it.  I in fact
7   disclosed it to the SEC myself voluntarily in
8   investigative testimony back in Philadelphia in
9   2005 or six or whenever it was, and we
10  self-penalized.
11      We, we took -- we already lost a
12  million dollars.  I mean all the shares were
13  effectively, you know, they were converted at
14  whatever they were converted at, $2.80 or
15  whatever.  I can't remember the exact amount.
16      I know I wired roughly a million
17  dollars, and I got back roughly, you know,
18  nothing, so I mean it was a substantial loss of
19  principal value.
20      And then we took the balance of the
21  loss, and I think we, I think we self, you know,
22  self --

Page 275

1       Q.  Go ahead.
2       A.  Self-flagellated or whatever term you
3   want to use appropriately.  It was disclosed to
4   the shareholders.  It was -- we paid for it.  We
5   paid back the fund more than I think -- the asset
6   had no value, so we actually paid the fund money
7   for something that it carried at a zero value in
8   the first place, but we, that's what we did.
9       Q.  I see.  And when you say you
10  self-disclosed, you didn't disclose it at the
11  time of the assignment, correct?
12      A.  No.  No.
13      Q.  And this, this document that we're
14  looking at, Exhibit No. 25, do you know what,
15  when this document was, was sent to investors?
16      A.  No.  Actually I was actually going to
17  ask you if you could tell me what the date was.
18  It's not on the document, so I --
19      Q.  It's not on the document.
20      A.  Yeah, so I don't recall.
21      Q.  Okay.  It appears to refer to, on the,
22  in the preceding paragraph, it refers to a

Page 276

1   redemption request pending for June 30 of 2006?
2       A.  Yeah.  I, I see that.
3       Q.  And on the first paragraph, it appears
4   to refer to a net return of negative 4.38 percent
5   for the month of May.
6       Do you think this document could be
7   from some time in June of 2006?
8       A.  Well, my read is it's going to be some
9   time between May 1st and let's say June 15th,
10  somewhere in that range probably.
11      Q.  Of 2006?
12      A.  Yeah.  That's what it looks like.  It's
13  a best guess based on what's within the document.
14      Q.  Okay.  And you mentioned that you had
15  disclosed this in testimony to the, to the SEC in
16  Philadelphia, correct?
17      A.  Yes.
18      Q.  Do you recall approximately when that
19  testimony was?
20      A.  I don't.
21      Q.  Okay.
22      A.  I don't.

Page 277

1       Q.  Did you, do you know if Palisades
2   auditors were ever told about this assignment in
3   connection with the 2005 year-end audit?
4       A.  Well, I've already testified that I
5   never spoke to the auditors.
6       Q.  Okay.  Do you know if the assignment
7   was reflected in the books and records of
8   Palisades Master Fund in about August of 2005?
9       MS. LAMBRAKOPOULOS:  Objection as to
10  form.
11      THE WITNESS:  You know, I don't.  I'd
12  have to go back and look.
13      I just don't -- I don't know if the
14  warrants spreadsheet, for example, was updated
15  for September.
16      BY MR. WILLIAMS:
17      Q.  Okay.  Whose responsibility would that
18  have been?
19      A.  Mr. Mannion kept that, so it's one of
20  these things.
21      Q.  Are you looking at Exhibit No. 20?
22      A.  Yeah, but this is -- the dates would be

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 278

1    off by a month.  I'd be looking for the following
2    month.  That's where -- because this is, this is
3    August.
4        Q.  This would pertain to August?
5        A.  Yeah, but I don't know when.  Actually,
6    yeah, it's reflected there.
7        Q.  Where is it?
8        A.  Well, the -- it's, a lack of being
9    there is reflecting that the warrants are no
10   longer, that the warrant position is updated, so
11   it doesn't, it doesn't exist.
12       Q.  And where are you looking on this
13   document?
14       A.  I'm sorry.  I'm looking at 1662.
15       Q.  Okay.
16       A.  Well, if, if we, we were holding a
17   World Health warrant, then it would be one would
18   think after Wave Rider alphabetically, so --
19       Q.  So you take it by virtue of the fact
20   that it just doesn't appear on this sheet?
21       A.  Yeah, unless there's another page that
22   you just haven't included in this exhibit, I'm

Page 279

1    just assuming that by, by virtue of it not being
2    there, that, that the books and records have been
3    updated to the administrators and reflect that.
4        Q.  I see.  And that's your basis about
5    what you're looking at, this page?
6        A.  That's all I have to -- in front of me,
7    so --
8        Q.  Fair enough.  Let me hand you a
9    document that I'll ask the court reporter to
10   label as Exhibit No. 46.
11           (Exhibit No. 46
12               was marked for
13               identification.)
14       BY MR. WILLIAMS:
15       Q.  And Exhibit No. 46 is a one-page
16   document Bates number SEC-MANNION0298998.
17           And it appears to be a fax cover sheet
18   from PEF Advisors, LLC.
19           And my question to you, Mr. Reckles, is
20   do you recognize the handwriting on this
21   document?
22       A.  Yeah.  Sure.

Page 280

1        Q.  Whose handwriting is it?
2        A.  It's mine.
3        Q.  Yours?
4        A.  Absolutely.
5        Q.  And does this pertain to the assignment
6    that we've, we've just been speaking of?
7        A.  It would appear to, yes.
8        Q.  Okay.  And it indicates "...issue
9    unlegended shares pursuant to the Post Effective
10   Amendment that we are individually covered on!"
11           Do you see that part of the document?
12       A.  Um-hm.
13       Q.  And is that a reference to a
14   registration statement, or something else?
15       A.  Well, it's a, it's a reference to a
16   post effective amendment to a registration
17   statement, yes.
18       Q.  Okay.  And that's something that, that
19   you and Mr. Mannion were covered on?
20       A.  Well, I believe we were listed as
21   selling shareholders on the post effective
22   amendment.

Page 281

1        Q.  Okay.  And what effect would that
2    document have in terms of your ability to sell
3    the stock?
4        A.  Perhaps I don't follow the question.
5        Q.  What, what's the significance of it
6    being listed in the post effective amendment to a
7    registration statement?
8        A.  Well, I mean I'm not a securities
9    lawyer, but my understanding is that it --
10       Q.  I understand.
11       A.  -- it allows the shares to be traded.
12       Q.  And was that your intention upon
13   exercising a warrant, to trade the shares?
14       A.  Not initially; I mean not immediately,
15   not immediately; at some point certainly.
16       Q.  Okay.  Did you, were you -- did you in
17   fact sell the shares in August of 2005 almost
18   immediately after the shares hit your account?
19       A.  Not almost immediately.
20       Q.  Okay.  Let's go back and look at
21   Exhibit No. 45.
22       A.  Forty-five -- oh, thank you.  Okay.

1    Q.  And referring you to the fifth page of
2  the document --
3    A.  Now is this page 5 of 7, or actually
4  number --
5    Q.  The fifth page of the document, which
6  says page 4 of 7.
7    A.  Okay.
8    Q.  Okay?
9    A.  Okay.
10   Q.  And there's an indication in terms of
11  withdrawals and deposits of securities, and
12  there's one on 8/12/2005 from World Health in the
13  amount of 522,198.
14       Do you see that?
15   A.  Okay.  I do.
16   Q.  And is that the shares that you
17  received pursuant to the assignment?
18   A.  I don't know.
19   Q.  I would like to refer you to your
20  answers to interrogatories --
21   A.  Okay.
22   Q.  -- that's found in Exhibit No. 38.

1    A.  Fair enough.  Fair enough.  Yeah.  Let
2  me -- I remember that that was in fact in there.
3  I've just got to find which document that is.
4  Keep going.  I'm jumping back and forth.  I'm not
5  keeping anything in order.
6       Interrogatory 3, 522.
7       (The witness reviewed the document.)
8       THE WITNESS:  Okay.  I've got it now.
9       BY MR. WILLIAMS:
10   Q.  And looking back at Exhibit 45, the
11  brokerage account statement, directing your
12  attention to the third page of that statement,
13  would you agree with me that --
14   A.  Page 3.
15   Q.  Yeah.
16   A.  Okay.
17   Q.  Would you agree with me that on that
18  same day, August 12, 2005, you sold 25,000 shares
19  of World Health's common stock?
20   A.  Well, I would also say that I sold a
21  hundred thousand on the 4th, and that wasn't the
22  12th.  That was the settlement date.

1       It was actually sold on the 9th.  You
2  have to read transaction date.
3    Q.  No.  I'm sorry.  I'm looking down at
4  the transaction date 8/12.
5    A.  Oh, okay.  I apologize.
6    Q.  Okay.
7    A.  Yeah.  I see that one, and I also see
8  one on the 11th and I see one on the 10th.
9       I own, as I think we've discussed and
10  as the interrogatory responses reflect, a
11  tremendous amount of this, and I had just
12  personally invested yet another million dollars
13  into the company directly through a warrant
14  exercise.
15   Q.  Right.  And three days later on the
16  15th, you sold another 125,000 shares of World
17  Health, correct?
18   A.  It may or may not be the shares that
19  were received on -- how many shares did I own?
20  That's the bigger question.
21       Over a million and a half just in the
22  month of August; we exercised the warrants.  We

1  purchased debenture from Midsummer at the end of
2  July, and converted it at the request of the
3  company to eliminate the debt from their balance
4  sheet.
5       So I'm now outside of the fund, outside
6  of investment banking activity remuneration, two
7  million personal dollars invested in this
8  company.
9    Q.  And that conversion, that was the
10  conversion that we just spoke of with respect to
11  the two million dollars wire transfer?
12   A.  That was the purchase of it, and those
13  shares, that, that note was converted into common
14  equity.
15   Q.  And those shares were being sold as
16  well, correct?
17   A.  They were in the account.  Some were
18  being sold, and as, as we've already discussed,
19  at the end of the period, I mean we were still
20  sitting with some number of shares.
21       I think you pointed it out to me,
22  there -- 302,000 at the end of the month, and

Page 286

1    another 480,000 on top of that.
2         So I was still long almost 800,000
3    shares of stock.
4         Q.   And you would agree with me that the,
5    that the sale on August 15th of 2005 was your
6    largest sale to that point in the month of World
7    Health stock?
8         A.   I would.
9         Q.   I -- strike that.  You appear to have a
10   $150,000 sale, 150 shares -- 150,000 share sale
11   on August 2nd?
12        A.   Where is that?
13        Q.   The previous page.
14        A.   Okay.  Then I would not agree with your
15   statement.
16        MR. WILLIAMS:  Okay.  Fair enough.  Let
17   me ask the court reporter to label another
18   exhibit as Exhibit No. 47.
19             (Exhibit No. 47
20             was marked for
21             identification.)
22        BY MR. WILLIAMS:

Page 287

1         Q.   And Mr. Reckles, I'll represent to you
2    that Exhibit No. 47 is a two-page document Bates
3    number SEC-MANNION0016235 and 6236.
4         It appears to be a fax cover sheet of
5    PEF Advisors from Paul Mannion, and the second
6    page appears to be a letter to Amber signed
7    Andrew Reckles.
8         And my question is do you recognize
9    this document?
10        A.   I do.
11        Q.   And what is this document?
12        A.   Just a wire request.
13        Q.   And the second page of the document, do
14   you recognize the signature?
15        A.   I do.
16        Q.   And is that your signature?
17        A.   It is my signature.
18        Q.   And do you recognize the writing
19   beneath the signature?
20        A.   That is my writing.
21        Q.   And it indicates that the warrant was
22   assigned at $1.90 a share?

Page 288

1         A.   Right.  That's what it says.
2         Q.   Okay.  And based on your sale of World
3    Health stock on that same day, August 12, 2005,
4    you sold 25,000 shares at $3.56 a share, correct?
5         A.   Okay.  Yes.
6         Q.   So on the day that the warrants were
7    assigned to you, the first day, they were in the
8    money?
9         A.   Well, I was selling shares that I
10   already had in the company.
11        Those weren't the only shares I owned
12   in World Health.
13        Q.   Fair enough.
14        A.   I could not have received shares on the
15   same day that, that I exercised.
16        Q.   Fair enough.  But my question is with
17   respect to the warrants that you were exercising,
18   those warrants were in the money relative to
19   the --
20        A.   To the market price?
21        Q.   Market price?
22        A.   Okay.  Fair.

Page 289

1         Q.   You would agree with that?
2         A.   I would say that you are accurate.
3         Q.   Okay.  I'm going to show you one more
4    document that I'll ask the court reporter to
5    label as Exhibit No. 48.
6             (Exhibit No. 48
7             was marked for
8             identification.)
9        BY MR. WILLIAMS:
10        Q.   And Exhibit No. 48 appears to be a
11   one-page document Bates number SEC-MANNION 0016547.
12        It appears to be an e-mail; subject,
13   "Re:  WHAI Post Effective SB2" including 1Q-10 Q
14   info, July 05 DOC, D-O-C.
15        It appears to be from Andy Reckles to
16   Rich at whstaff.com.
17        And my question to you is do you
18   recognize this document?
19        A.   I don't recall it.
20        Q.   Okay.
21        A.   I mean specifically.
22        Q.   Does it appear to be a communication

1  between yourself and Mr. McDonald?
2      A.  It does, absolutely.
3      Q.  Okay.  And do you know what your, what,
4  what the reference in this first sentence to "you
5  can't increase Palisades because Palisades is not
6  PEF and Palisades cannot buy it from PEF as
7  Palisades is above threshold by a bit...so it has
8  to be us personally or PEF has to be added to
9  this document," do you know what that's in
10  reference to?
11     A.  No, I don't.  I mean I can look at the
12  subject line, but I don't know what all of the,
13  the -- just been a long time.
14         I just don't recall.
15     Q.  Okay.  In particular where it says
16  Palisades is above threshold, do you know what
17  that's a reference to?
18     A.  I don't.  I mean I could speculate,
19  but --
20     Q.  What's your speculation?
21     A.  My speculation is that I just didn't,
22  Palisades didn't really want to own anymore

1  because we weren't above 20 percent at that
2  point, but we did --
3      Q.  How do you know that?
4      A.  Well, because I know that had we bought
5  more, we would have been over 20 percent.
6      Q.  Okay.  Fair enough.  And it was
7  important not to go over 20 percent?
8      A.  Well, we've established that.
9      Q.  Okay.  Fair enough.  Why don't we go
10  off the record briefly and take a brief
11  ten-minute bathroom break?
12         MS. LAMBRAKOPOULOS:  Okay.
13         MR. WILLIAMS:  And I have, I expect
14  we'll go another 45 minutes or so.
15         MS. LAMBRAKOPOULOS:  I may have some
16  questions at the end, too.
17         THE VIDEOGRAPHER:  We're going off the
18  record.
19         The time on the video is 4:30 p.m.
20         (A recess was taken.)
21         THE VIDEOGRAPHER:  Back on the record.
22  The time on the video is 4:45 p.m.

1         BY MR. WILLIAMS:
2      Q.  Okay.  Mr. Reckles, I'm going to show
3  you a document that's been previously marked as
4  Exhibit 28.
5         And looking at it, it appears to be a,
6  an e-mail communication from someone named L.
7  Ellis at rothcp.com, to, appears to be Mr.
8  Mannion's e-mail address, and cc'ed to someone
9  named R. Stephenson at rothcp.com.
10         And my question to you is do you know
11  who R. Stephenson at rothcp.com is?
12     A.  Well, I mean based on the e-mail, it
13  looks like it's somebody named Bob Stephenson
14  that worked at Roth Capital.
15     Q.  Do you know Bob Stephenson?
16     A.  No, not really.
17     Q.  Have you, when you say not really, have
18  you ever had a conversation with him, to your
19  knowledge?
20     A.  I may have had a correspondence or
21  conversation with him at one point some time in
22  the last ten years.

1         He's not somebody that I have any real
2  association with.
3      Q.  Okay.  And directing your attention to
4  the second page of the exhibit, it appears to be
5  a confidential investment proposal for a company
6  called Radyne and ComStream, Incorporated.
7      A.  Okay.
8      Q.  And my question to you is are you
9  familiar with this transaction?
10     A.  Am I familiar with this document, or
11  the overall transaction that was --
12     Q.  The overall transaction.
13     A.  Yes.  Yes.
14     Q.  Okay.  And is this a transaction that
15  Palisades participated in?
16     A.  Yes, I believe so.
17     Q.  And let me show you a document that's
18  been marked as Exhibit Number 29.
19         And Exhibit Number 29 appears to be a
20  two-page document that appears to be an e-mail
21  from L. Ellis at rothcp again.
22         It appears to be L. Ellis.  The subject

Page 294

1    is confidential Radyne communications, and the
2    document appears to have been sent on
3    February 12th, 2004, and then forwarded on
4    February 13th, 2004, from Andy Reckles to
5    mannion1.
6         And my question to you is did you
7    receive documents with respect to a Radyne
8    private offering, a securities purchase
9    agreement, registration agreement, and escrow
10   agreement on about February 12th, 2004?
11    A.   You know, from what you put in front of
12   me, I can't say that I did.
13        I -- honestly, I don't, I don't recall.
14    Q.   This doesn't appear to be you
15   forwarding documents to Mr. Mannion, just looking
16   at it?
17    A.   Well, I mean looking at it, some
18   documents were sent by somebody to a bunch of
19   other people at Roth Capital, and to some law
20   firm people, but they were never sent to me.
21        So I'm not -- I mean I'm not on the
22   distribution list on the message below, so I'm

Page 295

1    not sure what I was forwarding to Mr. Mannion
2    other than -- I mean I'm sorry.
3         I just don't, I don't know how this
4    all, all ties together because I'm not on the
5    original, so I don't know how or if I ever got
6    the documents.
7     Q.   Okay.  You don't know if this was a
8    document that might have been blind courtesy
9    copied to you?
10    A.   Well, it would still show the bcc line.
11   I mean if --
12    Q.   If there was a blind courtesy copy, it
13   would still show the bcc line?
14    A.   I would assume so.  I mean I --
15    Q.   Okay.
16    A.   Again, I can't, I can't say that I did
17   or didn't.
18        From what I have in front of me, I
19   would be speculating at very best.
20    Q.   Okay.  Fair enough.  Do you recall the
21   Radyne transaction?
22    A.   Vaguely.

Page 296

1     Q.   What do you recall about it?
2     A.   Well, I recall that for the most part,
3    I wasn't even around.
4         I mean I was in Florida for the better
5    part of Christmas all the way through until my
6    birthday, which is February 6th, and didn't come
7    back to Georgia until about the very end of the
8    week of the 6th, because Paul was going on
9    vacation.
10        So over the course of the years of this
11   investigation and what not, I've been able to
12   actually verify that document, that I had a condo
13   in Miami, and that's where we were.
14        So I wasn't, I wasn't involved in the
15   transaction.
16        I didn't do any of the legwork on the
17   transaction.
18        I didn't do any of the diligence on the
19   transaction.
20        I wasn't contacted initially about the
21   transaction.
22        And I've got very little I can tell you

Page 297

1    about the transaction.
2     Q.   As far as you know, who did the
3    diligence on the transaction for Palisades's
4    side?
5     A.   Paul, Paul did -- Mr. Mannion.  Sorry.
6     Q.   Mr. Mannion did.  And --
7     A.   Not to interrupt you, but your Exhibit
8    28, I've never seen this before in my entire
9    life.
10    Q.   Okay.  Exhibit No. 28 is the e-mail
11   attaching the confidential investment proposal?
12    A.   Yes.  That's, that's the reason why I
13   asked if you could be more specific with your
14   question where you asked me about the transaction
15   or about what the -- the exhibit, because I've
16   never seen this document, and it was sent to, to
17   Mr. Mannion, and I wasn't in the State of Georgia
18   to share it with him, so -- or I never saw it.
19    Q.   Okay.  And you appear to have forwarded
20   this e-mail on February 13th, 2004.
21        What, what was the timeframe of your
22   vacation again?

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 298

1      A.  Well, I lived part of the year in
2  Florida.  We, we have a second home there, so I
3  was there from long, probably just after
4  Thanksgiving, maybe the first, second week of
5  December all the way through, and I always stayed
6  for my birthday, which is February 6th, so I was
7  always there through my birthday because I wanted
8  to be in warmer weather for my birthday, just
9  kind of -- that's who I was.
10     Q.  And your birthday was February 6th?
11     A.  February 6th, yeah, and I came back,
12  normally we wouldn't come back until the end of
13  February, but because Paul was, as I recall,
14  going on vacation, I came back to make sure that
15  somebody was in the office at Palisades, so we
16  came back very shortly after my birthday.
17     Q.  When you say very shortly after --
18     A.  Day or two, two days, three days, yeah.
19  I'd have to get a calendar out to really look,
20  but we would have always driven on a weekend,
21  so --
22     Q.  So some time between February 6th and

Page 299

1  February 9th?
2      A.  Probably, ballpark.
3      Q.  Okay.  And the reason you came back
4  early was so that there would be someone in the
5  office when Mr. Mannion was out, is that --
6      A.  Yeah, correct.  I mean theoretically, I
7  could have done everything I needed to do from
8  Miami, but it's better to have somebody in the
9  office.
10     Q.  Conceivably as of the day of the
11  forwarded e-mail, Exhibit No. 29, February 13th,
12  you were back in the office by then?
13     A.  Conceivably.
14     Q.  Yeah.
15        (Pause.)
16     BY MR. WILLIAMS:
17     Q.  And the Exhibit No. 29 appears to have
18  in brackets file names of various documents that
19  are identified above and under numbered headings
20  as being a securities purchase agreement and
21  other forms.
22        And it appears that the file names that

Page 300

1  were attached to the e-mail are in DOC format.
2        So my question to you is if you
3  received a securities purchase agreement with a
4  purchaser signature page as a part of the
5  document, and the purchaser's identity was in
6  blank, would you input the name Palisades if
7  Palisades were participating in the deal?
8      MS. LAMBRAKOPOULOS:  Objection --
9  foundation.
10     THE WITNESS:  I don't really even know
11  what you just asked me.
12        I'm sorry.  My apologies.
13     BY MR. WILLIAMS:
14     Q.  I apologize for the, for the unclear
15  question.
16     A.  Are you referring in specificity to the
17  theoretical attachments to this e-mail, or --
18     Q.  Yeah.  Well, my reference is generally
19  with respect to a securities purchase agreement,
20  where the identity of the purchaser is not filled
21  in on the agreement.
22        Have you ever seen a document like

Page 301

1  that?
2      A.  Where the identity of --
3      Q.  Let me hand you a document that's been
4  marked, previously marked as Exhibit No. 30 in
5  this case.
6      A.  Okay.  Maybe that will help.  All
7  right.
8      Q.  I'll represent to you that this
9  document has been previously marked in this case,
10  and it appears to be a securities stock purchase
11  agreement dated effective as of February 12,
12  2004.
13     A.  Okay.
14     Q.  And directing your attention to the
15  very last page of the document, there appears to
16  be a signature page, witness whereof, and there's
17  a blank spot for the purchaser.
18        Do you see that?
19     A.  Yes.
20     Q.  And going back earlier in the document,
21  there appears to be a page 16.
22        It appears to be the signature page for

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 302

1   the securities purchase agreement itself?
2       A.   What did you say that page --
3       Q.   Page 16.
4       A.   Yeah.  What did you say the last page
5   was?
6       Q.   The last page appears to be a signature
7   page for an addendum.
8       A.   Okay.
9       Q.   And page 16 of the document appears to
10  be the signature page for the stock purchase
11  agreement.
12      Do you see that part of the document?
13      A.   Okay.  Yeah, I do.
14      Q.   And if you had received this page 16
15  with purchaser in brackets like that, would you
16  have filled in the name Palisades if Palisades
17  were participating in the offering?
18      MS. LAMBRAKOPOULOS:  Objection --
19  foundation, and to the extent that your question
20  presumes that Exhibit 30 is the document that was
21  circulated as part of Exhibit 29, I would object
22  to that.

Page 303

1       And I would also note for the record
2   that Exhibit 29 appears to be a document that was
3   produced from Defendants' records because I note
4   our Bates number at the bottom, and it appears to
5   be from Mr. Mannion's e-mails, whereas Exhibit 30
6   was not something that Defendants produced, but
7   appears to have been independently produced to
8   the SEC by another party.
9       MR. WILLIAMS:  Okay.  That's fair.
10      MS. LAMBRAKOPOULOS:  Go ahead and
11  answer unless you need it read back, the question
12  read back.
13      THE WITNESS:  If I understand your
14  question correctly, you're asking me that if
15  somebody sent me a securities purchase or stock
16  purchase agreement that was blank, would I fill
17  in the blank?
18      BY MR. WILLIAMS:
19      Q.   Yes.
20      A.   Well, I guess I would have to answer
21  that again, based on facts and circumstances, in
22  most cases, to my recollection, and I've been

Page 304

1   involved in a few of these, better than a
2   hundred, it's rare that you would see documents
3   that look like that.  You would see those in
4   draft.
5       So either these are the sloppiest
6   documents in the world, and they were just
7   crammed together for the purpose of the placement
8   agent, in this case, Roth, to try to get a deal
9   closed, or these are drafts.
10      Typically, at least in most of the
11  deals I've ever seen, the securities purchase
12  agreement is being entered into by already
13  defined purchasers, and a company.
14      Q.   Okay.
15      A.   And thus you know who those parties
16  are, and the documents reflect that.
17      Now, to answer your question, I
18  can't -- possibly, yes, if this was the final
19  set, if I was provided with the final set, if I
20  was told hey, here's the final set of documents,
21  this is the signature sets, then -- and we're --
22  this is how it's getting done, then that's what

Page 305

1   we would do.
2       Q.   Okay.
3       A.   It wouldn't be my, it wouldn't be how I
4   would do it generally, if I was the agent, but
5   everybody's got their own way of doing things.
6       Q.   Fair enough.  I'm going to hand you
7   another document that's been previously marked
8   Exhibit No. 32.
9       A.   Okay.
10      Q.   Exhibit No. 32 appears to be a fax
11  cover sheet on the letterhead of HPC Capital
12  Management along with several accompanying
13  documents.
14      And my question to you, Mr. Reckles, is
15  with respect to the first page of the document,
16  do you recognize the handwriting on that page?
17      A.   It's my handwriting on the cover sheet.
18      Q.   It appears to be faxing sig pages to
19  Lou Ellis.
20      Do you know who Lou Ellis is?
21      A.   Other than what's here in this e-mail,
22  no, not really.

Page 306

1    I'm sorry -- Exhibit 29, the e-mail in
2  Exhibit 29, and in Exhibit 28 as well.
3    Q.  Okay.  And the second page of the
4  document appears to be signature page to a stock
5  purchase agreement signed on behalf of Palisades
6  Master Fund.
7    Do you see that?
8    A.  I do.
9    Q.  Okay.  And it appears to have been
10  faxed on February 12, 2004, from Beacon Capital
11  Management.
12    And is that the administrator for
13  Palisades?
14    A.  That is the administrator, yeah.
15    Q.  Okay.  And it appears to have been
16  faxed subsequently by HPC Capital on the 14th.
17    And my question to you is do you
18  recognize the signature on the second page of the
19  document?
20    A.  Not specifically.
21    Q.  Okay.  Let me ask you this.  Did you
22  ever have occasion to have Palisades's

Page 307

1  administrator sign the securities purchase
2  agreement on behalf of Palisades?
3    A.  Well, I mean I don't know that those
4  are the administrators that are signing.
5    It says here that it's Discovery
6  Management, which was a director of the Master
7  Fund, so --
8    Q.  Okay.
9    A.  And that's what the signature page
10  says.
11    Q.  And who is Discovery Management?
12    A.  They were director of the Master Fund.
13  They were the off-shore director, and they had
14  authorized, they had signatory authority.
15    Q.  And did you ever have Discovery
16  Management sign the security purchase agreement
17  on behalf of Palisades?
18    A.  Clearly we, I did on this occasion.
19    Q.  And why, why would you have the
20  off-shore director sign this?
21    A.  Because I didn't know anything about
22  the transaction.

Page 308

1    I had never ever seen a document, other
2  than the documents that I was told to sign.
3    I didn't do any diligence on the
4  transaction, and Paul was on vacation.  If I
5  remember correctly, he was skiing.
6    So all I know is that he left, and
7  we're doing this deal, get the allocation.
8    I've done all the, the, you know, the
9  diligence on this, and you know, if we get an
10  allocation, just let's take it down.
11    Q.  Okay.  Mr. Mannion told you that he'd
12  done all the diligence on the deal?
13    A.  Yeah.  I mean he's the one that
14  received all the diligence information in the
15  first place.
16    I mean his contacts were with the folks
17  at Roth.
18    I never had any contact with these
19  people other than the limited contacts that I had
20  in exchanging some signature pages back and forth
21  and asking how many, you know, dollars worth of
22  this, of the, of the deal we got.

Page 309

1    Q.  And how much, and when you say Mr.
2  Mannion handled the -- well, strike the question.
3    How would you obtain the signatures of
4  Discovery, how would you obtain the signatures of
5  Discovery Management in this context?
6    A.  I don't recall how it was done.  I mean
7  this is, this is dated 2006.
8    Q.  2004.
9    A.  Four -- gosh, we're, we're going
10  backwards in time.
11    You know, I don't recall.  I just knew
12  that I didn't know anything about the
13  transaction, and so I couldn't comfortably sign a
14  securities purchase agreement that I didn't even
15  have.
16    I just had signature pages.  That's all
17  I had.
18    Q.  How do you know that that's all you
19  had?
20    A.  Well, the best of my recollection,
21  that's what I had, because that's what Discovery
22  Management sent back.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 310

1    Q.  Okay.  And you never had occasion to
2  send signature pages for signature in the absence
3  of a complete agreement?
4    A.  Well, if I hadn't at least read the
5  agreement, I wasn't going to put my signature to
6  it.
7      And I hadn't read the agreements.  I
8  wasn't in the State of Georgia.  I wasn't on any
9  of the e-mail distribution lists.
10      I had no, no inkling as to what the
11 transaction was about or who the company was.
12      It was a transaction that my partner
13 wanted to participate in while I was out of town,
14 and he was going out of town.  It just required
15 signatures, and I wasn't comfortable putting my
16 signature on it.
17      The Discovery Management could based on
18 Paul's assessment that it was a deal to do.
19      MR. WILLIAMS:  Okay.  Let me ask the
20 court reporter to label this document as Exhibit
21 No. 49.
22      (Exhibit No. 49

Page 311

1        was marked for
2        identification.)
3      BY MR. WILLIAMS:
4    Q.  Exhibit No. 49 is a one-page document
5  Bates number SEC-MANNION0049174.
6      Mr. Reckles, I'll represent to you that
7  this is a, an e-mail dated September 19, 2005,
8  forward purchaser signature pages to FLWE
9  securities purchase agreement.
10      And my question to you is do you
11 recognize the ticker symbol FLWE?
12    A.  Not off the top of my head.
13    Q.  Okay.  Does this appear to be an
14 investment that Palisades was entering into?
15    A.  It looks like it's a, signature pages
16 to a securities purchase agreement, so that's a
17 fair, fair leap.
18    Q.  Okay.  And so are you asking Leslie
19 Elliott to have the document signed?
20    A.  Well, I may very well be asking Mr.
21 Mannion to do it.
22      MR. WILLIAMS:  Okay.  Fair enough.  Let

Page 312

1  me show you another document that I'll ask the
2  court reporter to label as number, Exhibit No.
3  50.
4        (Exhibit No. 50
5        was marked for
6        identification.)
7      BY MR. WILLIAMS:
8    Q.  I'll represent to you that Exhibit No.
9  50 is a one-page document Bates number
10 SEC-MANNION0051114.
11      It appears to be subject, forward sig
12 pages and escrow instrux, date, August 17, 2005.
13      And my question to you is do you
14 recognize this document?
15    A.  No, I don't.  I don't.  It's just an
16 e-mail.
17    Q.  Does it appear to be you asking Mr.
18 Elliott to execute something on behalf of
19 Palisades Master Fund?
20    A.  Yeah.  I mean I don't know what that
21 might be.
22      It could be a coffee order for all I

Page 313

1  know.
2    Q.  It appears to be in reference to
3  signature pages and escrow instruction?
4    A.  Yeah, but to what -- yeah.
5      MS. LAMBRAKOPOULOS:  Can I -- let me
6  just say I've allowed these questions to go on
7  for a bit, but I mean I'm obviously not
8  instructing the witness not to answer.  You
9  should answer.
10      But I would like to interpose an
11 objection to Exhibit 50 and Exhibit 49 to the
12 extent that they're not relevant to this lawsuit.
13      MR. WILLIAMS:  Okay.  One more document
14 I want to show you, Exhibit No. 51.
15      (Exhibit No. 51
16        was marked for
17        identification.)
18      BY MR. WILLIAMS:
19    Q.  Exhibit No. 51 is a three-page document
20 Bates number SEC-MANNION0042744 through 2746.
21      It appears to be a series of e-mails
22 with respect to an investment in an entity called

Page 314

1   RSVM.
2       And these e-mails appear to have taken
3   place on about October 28th, 2005.
4       My question to you, Mr. Reckles, is do
5   you recognize the company RSVM?
6       MS. LAMBRAKOPOULOS:  And before you
7   respond, objection as to relevance.
8       Go ahead and answer.
9       THE WITNESS:  You know, I don't
10  remember what, what it stood for, but I actually,
11  I remember the, the transaction.
12      It was a complicated deal.
13      BY MR. WILLIAMS:
14  Q.  Okay.  And it appears to be an e-mail,
15  the original e-mail appears to be one from Mr.
16  Ze-ev, Z-e-e-v, Eiger, E-i-g-e-r, at mofo.com, to
17  yourself and others, with respect to the
18  transaction that appears to have an attachment
19  called Blank Purchaser Signature Pages DOC,
20  D-O-C.
21      Do you see that?
22  A.  I do.  Bottom of page 2, right?

Page 315

1   Q.  Correct.
2   A.  Okay.
3   Q.  And on the first page, you appear to
4   have forwarded that to Mr. Elliott and Mr. David
5   Sims?
6   A.  Okay.
7   Q.  And asked them to execute and send on
8   behalf of the Palisades Master Fund, and
9   indicated an amount and description, correct?
10  A.  Yes.
11  Q.  So my question to you is was it your
12  practice in connection with securities purchase
13  agreement to forward the signature page to Mr.
14  Elliott or Mr. Sims for signature?
15      MS. LAMBRAKOPOULOS:  Objection as to
16  form.
17      THE WITNESS:  So in the particular case
18  here, I was actually traveling.  I was out.
19      BY MR. WILLIAMS:
20  Q.  Okay.
21  A.  So I didn't have a way to get a signed
22  document.

Page 316

1       I didn't have a scanner where I was.  I
2   didn't have a fax machine where I was.  I was
3   just not in.
4       And so in a, in a scenario where one of
5   the normal signatories, one of the general
6   partners of the fund, was unavailable -- and this
7   is a deal that I was most involved in, much like
8   the Radyne deal with Paul, right, so this is a
9   deal that I, I was involved in.
10      That's why -- I don't remember what
11  RSVM stands for.
12      I know that it was a very complicated
13  transaction, and I remember peripherally a lot of
14  the involvement with Lehman Brothers.  They were
15  an investor, and et cetera.
16      And I just wasn't available to sign
17  off, so --
18  Q.  Okay.
19  A.  I blessed off on the signature in that
20  case.
21  Q.  What does that mean?
22  A.  It means that, that I had read through

Page 317

1   the documents.
2       I had been involved since the initial
3   drafting of the documents.
4       I knew this deal.  It was a deal I had
5   worked on.
6       I just wasn't in a place where I could
7   get signatures in reading the e-mails, hey, we're
8   closing today, I've got to have these things
9   signed off.
10      And so I instructed the authorized
11  signatory at Discovery to go ahead, that I had
12  wired funds, and that from my perspective, having
13  been the quarterback on this deal, that I was
14  good with the documents, and it was okay to go.
15  Q.  Okay.  And who, who blessed off on the
16  signature for the Radyne deal?
17  A.  That's a good question.  I don't know.
18  I never read the documents.
19      I never saw the documents.
20  Q.  Why don't --
21  A.  I came in from out of town, literally
22  within probably 48 hours of the date that you put

Page 318

1  an e-mail in front of me, and some documents.
2      Q.  Okay.
3      A.  I was relying on my partner, and that's
4  all I can say.
5          MR. WILLIAMS:  Okay.  And why don't we
6  go off the record briefly so the videographer can
7  change the tape?
8          THE VIDEOGRAPHER:  This concludes Tape
9  No. 5 in the video deposition of Andrew Reckles.
10  The time on the video is 5:11 p.m.
11          We are off the record.
12          (A recess was taken.)
13          THE VIDEOGRAPHER:  This begins Tape No.
14  6 in the video deposition of Andrew Reckles.  The
15  time on the video is 5:12 p.m.
16          We are on the record.
17          (Exhibit No. 52
18              was marked for
19              identification.)
20  BY MR. WILLIAMS:
21      Q.  Mr. Reckles, I've had the court
22  reporter hand you a document that has been

Page 319

1      labeled as Exhibit number?
2      A.  Fifty-two.
3      Q.  Fifty-two -- thank you.
4      A.  Sure.
5      Q.  It is a document entitled, "Stock
6  Purchase Agreement," Bates number
7  SEC-MANNION0024525 through 0024570.
8          And it appears to be two copies of a
9  securities, of a stock purchase agreement
10  effective as of February 12, 2004.
11          And I'll represent to you that these
12  are documents that were produced to the SEC by
13  Palisades or by PEF.
14          And with respect to the first version
15  of the document, there appear to be signature
16  pages beginning on page 15 of the sellers, and
17  then there appears to be a page 16 that's left in
18  blank for purchaser.
19          And my question is with respect to this
20  document, is there a, a representation on behalf
21  of the purchaser that the purchasers held no
22  short position in any shares of the company

Page 320

1  stock?
2      A.  Oh, I don't know.  You want me to read
3  it?  Because I've never seen it.
4      Q.  You've never seen this -- that should
5  have been my first question.
6          Have you ever seen this document?
7      A.  No.
8      Q.  Okay.
9      A.  I've seen the signature pages of some
10  document that was some derivation of this, but I
11  never saw the document itself.
12      Q.  Okay.  So who, who in PEF would have
13  maintained this document?
14      A.  Well, I mean I would have to say Mr.
15  Mannion would have a copy of this document.
16          The production that you received from
17  PEF, you know, I don't know, but my guess is it
18  probably came from him because I didn't have it.
19  I didn't see it.
20      Q.  Okay.  And directing your attention to
21  page 10 of the document in particular --
22      A.  Page 10.

Page 321

1      Q.  Under the heading --
2      A.  Are we talking about paginated page 10,
3  or page 10 ten.
4      Q.  Paginated page 10 --
5      A.  Okay.
6      Q.  -- of the first document that appears
7  on Bates number SEC-MANNION0024534.
8      A.  Okay.  I've gotcha.
9      Q.  Under Article Two, representations of
10  purchaser.
11      A.  Okay.
12      Q.  And under subheading (j), is there a
13  representation that purchaser has no short
14  positions?
15      A.  It says --
16          (The witness reviewed the document.)
17          MS. LAMBRAKOPOULOS:  Objection.  The
18  document speaks for itself.
19          You can answer if you have knowledge.
20          THE WITNESS:  Well, I can just read
21  what it says.
22          It says that the purchaser does not

Page 322

1   hold a short position directly or indirectly.
2       BY MR. WILLIAMS:
3       Q.  And were you aware in about this time,
4   which appears to have been in February 2004, that
5   certain securities purchase agreements had a
6   so-called no short provision?
7           MS. LAMBRAKOPOULOS:  Objection as to
8   foundation and form.
9           THE WITNESS:  Again, I --
10          BY MR. WILLIAMS:
11      Q.  You can answer if you understand the
12  question.  It may have been a bad question.
13      A.  I think I do.  Let me, let me just see
14  if I can, can clarify it.
15          You're asking me if, if in general,
16  industry-wide, it was common practice for there
17  to be no shorting language in a stock purchase
18  agreement?
19      Q.  Yes.  Yes.
20      A.  I can't answer on behalf of an
21  industry.
22          I can only say that in my experience,

Page 323

1   they existed from time to time.
2           I would not say that they were always
3   the norm.
4       Q.  Okay.  If there was a no short position
5   clause in a securities purchase agreement, would
6   it be appropriate to establish a short position
7   prior to the closing of the transaction?
8           MS. LAMBRAKOPOULOS:  Objection --
9   foundation, and speculation.
10          THE WITNESS:  You know, I would think
11  probably not.
12          What was I just looking at here?
13          MS. LAMBRAKOPOULOS:  Let's concentrate
14  on the question.
15          THE WITNESS:  Sorry.  I would guess
16  probably not.
17          BY MR. WILLIAMS:
18      Q.  Do you know if Palisades had a short
19  position in Radyne stock at about, in about
20  February 12th, 2004?
21      A.  You know, I don't recall.
22      Q.  Let me hand you a document that's been

Page 324

1   previously labeled as Exhibit No. 33.
2       A.  Okay.  Thanks.
3       Q.  Exhibit No. 33 appears to be a
4   February 2004 statement for Palisades Master Fund
5   at Global Securities.
6           My first question to you is did
7   Palisades have an account at Global Securities in
8   about February 2004?
9       A.  I have a statement from one, so I
10  assume so.
11      Q.  As far as you know?
12      A.  As far as I know, we did.
13      Q.  And directing your attention in
14  particular to the second page -- excuse me -- the
15  third page of the document.
16      A.  Okay.
17      Q.  It appears with respect to a settlement
18  date of 2/10/2004, a short sale of Radyne
19  ComStream --
20      A.  Okay.
21      Q.  -- of 10,000 shares.  Do you see that?
22      A.  I do.

Page 325

1       Q.  And does that indicate that the fund
2   had a short position in Radyne prior to
3   February 12, 2004?
4       A.  It would.
5       Q.  And let me hand you another document
6   that's previously been labeled as Exhibit No. 27.
7       A.  Let me speak for the record that the
8   funds covered its short position very shortly
9   thereafter, so --
10      Q.  Okay.  Oh, I'm sorry.  I called it
11  Exhibit No. 27.  It's Exhibit No. 34.
12      A.  Okay.
13      Q.  And this appears to be a brokerage
14  account statement from Westminster Securities in
15  the name of Palisades Master Fund, LP, for the
16  period February 2004.
17          And did Palisades have a brokerage
18  account at Westminster --
19      A.  Yes.
20      Q.  -- in about February 2004?
21      A.  Yes, sir.
22      Q.  Okay.  And I'm going to direct your

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

1   attention to the second page of the document.
2        There appears to have been a short sale
3   on the transaction date of February 6, 2004, for
4   Radyne ComStream, 49,000 shares.
5        Do you see that?
6        A.  I -- yes, I do.
7        Q.  Okay.  And does that indicate to you
8   that Radyne, that Palisades had a short position
9   in Radyne as of February 12th of 2004?
10       A.  It, it says sold short, so --
11       Q.  With respect to the short sale
12  transactions that appear to be reflected in
13  Exhibits 33 and 34, who would have placed those
14  trades?
15       A.  I don't, I don't know.  I know one of
16  them was placed on my birthday, so it was
17  probably highly unlikely that it was me.
18       Q.  Okay.  So you don't think you --
19       A.  I generally made -- sorry to interrupt
20  you.
21       Go ahead.
22       Q.  The one on February 6th, is that your

1   birthday?
2        A.  Yeah.
3        Q.  Okay.  I'm sorry.  That one was before
4   you came back from vacation, is that right?
5        A.  Yeah.  That's correct.
6        Q.  Okay.
7        A.  I came -- I mean we talked earlier
8   joking around that I don't, I don't get any
9   Father's Day around the house, but I get a
10  birthday, so that was usually -- I don't usually
11  work on my birthday.  It's kind of a, kind of a
12  deal, so --
13       Q.  So your surmise is that it would have
14  been Mr. Mannion, or it could have been someone
15  else?
16       A.  I don't know if Mr. Batista worked for
17  us at that point, so theoretically, it could have
18  been either.
19       Q.  Okay.
20       A.  As I testified earlier, I don't
21  remember when he joined the firm.
22       MR. WILLIAMS:  And one more document

1   I'll ask the court reporter to label as Exhibit
2   No. 53.
3             (Exhibit No. 53
4                  was marked for
5                  identification.)
6        THE WITNESS:  Okay.
7        BY MR. WILLIAMS:
8        Q.  And I'll represent to you that the
9   Exhibit No. 53 is poorly Bates labeled, but it
10  appears to be labeled SEC-MANNION0000574.
11       A.  Okay.
12       Q.  And it appears to be an e-mail from you
13  to, to various individuals on February 23rd,
14  2004; subject, idul.
15       My question is do you recognize this
16  document?
17       A.  No, not really.
18       Q.  Okay.  It appears to be -- do you
19  recognize the e-mail addresses in the to heading?
20       A.  Do I recognize the -- let's see.  Yeah,
21  some of them.  Yes.
22       Q.  And who are these individuals?

1        A.  Those would be folks that would
2   typically invest in private placements, either
3   that we were investing in or that we were
4   representing, companies that we were
5   representing.
6        Q.  I see.  And do you see in the second
7   line of the first paragraph, a reference "...not
8   to mention there is a NO SHORT positions held
9   going into closing clause"?
10       Do you see that part of the document?
11       A.  I do.
12       Q.  What is that in reference to?
13       A.  Again, I would have to purely
14  speculate.  I would have to speculate unless you
15  could --
16       Q.  You don't remember?
17       A.  I don't.
18       Q.  Okay.
19       A.  I mean I'm not trying to be difficult.
20  It would appear that I'm referencing some,
21  something in the documentation for the
22  transaction, but without the documents, it's all

1  just speculation.
2     Q.  So let me ask you this question.  If,
3  if deal documentation contained a representation
4  that the purchasers had no short positions, would
5  that be a significant fact in your mind in terms
6  of whether or not you could sell short the stock?
7         MS. LAMBRAKOPOULOS:  Objection as to
8  foundation and relevance, and to extent that this
9  has got, that your question presumes that that's
10 what Exhibit 53 reflects, which is not in
11 evidence.
12        MR. WILLIAMS:  Fair.
13        THE WITNESS:  I think I already
14 answered that, if I'm not mistaken.
15        BY MR. WILLIAMS:
16    Q.  Okay.
17    A.  I think you asked me that, and she
18 objected to that earlier, and --
19    Q.  What was your answer?
20    A.  Well, if you're asking me again if, in
21 general terms, if a document contains a no
22 shorting provision, and you're shorting stock,

1  what is your opinion of that?  I think that was
2  how you phrased it?
3     Q.  Yeah.  Would it be appropriate?
4     A.  Would it be appropriate?  I think my
5  answer was no.
6         MS. LAMBRAKOPOULOS:  Are you seeking
7  his opinion?  Because if that's what you're
8  doing --
9         THE WITNESS:  That's what's part of the
10 confusion.
11        MS. LAMBRAKOPOULOS:  -- I'm going to
12 object.
13        He's a fact witness here.  He's not an,
14 an expert here for the purposes of rendering an
15 expert opinion.
16        MR. WILLIAMS:  I'm not asking for an
17 expert opinion.
18        I'm asking for a percipient opinion
19 based on the terms of Exhibit No. 30.
20        MS. LAMBRAKOPOULOS:  Let's get
21 Exhibit 30 out, and let's take, let's take this
22 one at time.

1         BY MR. WILLIAMS:
2     Q.  Actually, instead of going to No. 30,
3  why don't we go to number, it's No. 52.
4         MS. LAMBRAKOPOULOS:  This is 52.
5         THE WITNESS:  Okay.
6         BY MR. WILLIAMS:
7     Q.  And let's go to page 10 of Exhibit
8  No. 52.
9     A.  So Mr. Williams, I guess part of my
10 confusion --
11        MS. LAMBRAKOPOULOS:  Well, let's let
12 him ask a question.
13        THE WITNESS:  He asked it twice.
14        MS. LAMBRAKOPOULOS:  I'd like to hear
15 it again.
16        BY MR. WILLIAMS:
17    Q.  And my question is based on the
18 representation that appears on paragraph (j) of
19 page 10, would that representation be an
20 impediment to, or should that representation be
21 an impediment to Palisades establishing a short
22 position in Radyne stock prior to the closing of

1  the transaction?
2         MS. LAMBRAKOPOULOS:  And then I'm going
3  to object to the extent your question presumes
4  that subsection (j) of Exhibit 52 or indeed
5  Exhibit 52 is the stock purchase agreement that
6  Palisades indeed entered into, which is not in
7  evidence.
8         MR. WILLIAMS:  It appears to be a stock
9  purchase agreement that's executed by Radyne that
10 was produced to the SEC by Palisades.
11        MS. LAMBRAKOPOULOS:  But I will note
12 for the record that Exhibit 52 does not contain
13 any indication that this stock purchase agreement
14 was executed on behalf of Palisades.
15        If you believe that to be the case,
16 please point me to the appropriate page, because
17 I do not see that.
18        MR. WILLIAMS:  Fair enough.  I think I
19 understand your objection.
20        MS. LAMBRAKOPOULOS:  Go ahead and
21 answer to the extent you have factual knowledge.
22        And I'm going to instruct you not to

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 334

1  answer with respect to providing any kind of
2  opinion testimony, which is not the purpose of
3  your testimony here today.
4        THE WITNESS:  Okay.  Since I believe
5  I've already testified that I've never seen the
6  document that you put in front of me --
7        BY MR. WILLIAMS:
8     Q.  Um-hm.
9     A.  So any answer I would give would be an
10  opinion.
11    Q.  Well --
12    A.  It could only be an opinion.
13    Q.  Would you agree with me that exhibit
14  number -- the fax -- would you agree with me that
15  exhibit number -- where is it -- 32, is a
16  document that --
17    A.  Show me what 32 is real quick.  Cover
18  page, Lou Ellis, okay.  Got it.  Okay.
19    Q.  Would you agree with me that Exhibit 32
20  is a document that you appear to have transmitted
21  to the placement agent for Radyne?
22    A.  I can tell you that, from what I have

Page 335

1  in front of me, that these are nothing more than
2  signature pages.
3        That's it.  That's it.
4     Q.  The signature page that appears on page
5  2 is presumably the signature page to the stock
6  purchase agreement, correct?
7     A.  Well, I mean I don't know what document
8  that that's from.
9        I don't.  I don't, I don't -- I've
10  never seen this document before.  I've seen --
11       MS. LAMBRAKOPOULOS:  Meaning exhibit?
12       THE WITNESS:  I'm sorry -- Exhibit 52.
13  I've seen signature pages.
14       That's all I've ever seen.
15       BY MR. WILLIAMS:
16    Q.  Okay, but you, when, when you saw the
17  signature page, you understood that the signature
18  page was relevant to a particular agreement,
19  correct?
20    A.  Absolutely.  Absolutely.  I'm not
21  disputing that.
22       What I'm disputing and what I think

Page 336

1  you're trying to pin me down on is that I can't
2  tie this to this, because I've never seen this,
3  and I've only ever seen the signature pages.
4        My entire role in this transaction from
5  start to finish, to the best of my recollection,
6  and where I was geographically, was to transmit
7  some signature pages back and forth between an
8  authorized signatory of the fund, and the
9  placement agent on the transaction, and
10  confirm -- bear with me -- and confirm with the
11  placement agent our allocation in the deal.
12       That's, that's the best of my
13  recollection of my entire role in anything to do
14  with the Radyne ComStream.
15    Q.  And in obtaining the signature of an
16  authorized signatory of the fund in connection
17  with this transaction, what is it that you
18  believe the fund was agreeing to?
19    A.  I was relying on my partner's diligence
20  in the fact that he said that if, and I believe
21  we looked at a prior e-mail on this subject, and
22  I've got to dig back through this jumble, but

Page 337

1  that if an allocation came in, get the
2  allocation, because I've done the work on this,
3  ostensibly something of that nature.
4     Q.  But the signature page to the
5  securities stock purchase agreement is an
6  attestation to an agreement, correct?
7     A.  Yes.  Yes.
8     Q.  And so --
9     A.  Am I not being clear?
10       MS. LAMBRAKOPOULOS:  No.  You're being
11  clear.
12       BY MR. WILLIAMS:
13    Q.  I'm not saying you're not being clear.
14       MS. LAMBRAKOPOULOS:  You're being
15  clear.
16       BY MR. WILLIAMS:
17    Q.  I'm just trying to get specific answers
18  to, to these, to this question.
19       By obtaining a signature page attesting
20  to a particular agreement, what did you believe,
21  if anything, if you had a belief, what did you
22  believe that, that Palisades was attesting to?

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 338

1      A.  I didn't.  I'm not.  I merely acted as
2  a conduit between a fax machine and some
3  signature pages on a transaction that I think
4  I've repeatedly testified that my partner, Mr.
5  Mannion, had run ground soup to nuts.
6      Q.  Okay.
7      A.  So I relied on the fact that I was out
8  of town during his diligence period and his
9  interplay with the placement agent.
10      My assumption is he had read the
11  documents.
12      That could be correct.  That might not
13  be correct.
14      I know that I've never seen the
15  documents until they were put in front of me I
16  think at our last interview in May of '09.
17      Q.  But you never read the, the documents?
18      A.  Absolutely not.  Never saw the
19  documents.
20      I saw the signature pages.
21      Q.  And where did the signature page come
22  from?

Page 339

1      A.  They were sent to me by counsel, just
2  the signature pages.
3      Q.  The signature page was sent to you by
4  who?
5      A.  By the counsel for the placement agent.
6      Q.  Okay.  And was that by e-mail, or some
7  other --
8      A.  Probably by e-mail, and probably with
9  the copious amount of discovery we sent to you.
10      Q.  And you indicated that you produced to
11  us an e-mail --
12      A.  Every --
13      Q.  -- every signature page that was
14  produced to you?
15      A.  Every e-mail that I've ever had during
16  my term, unless it was deleted during the
17  ordinary course of business, was, was given to
18  you guys.
19      Q.  Okay.  And so in connection with --
20      A.  It wouldn't be uncommon -- I'm sorry to
21  interrupt.
22      It wouldn't be uncommon, Mr. Williams,

Page 340

1  to, to request signature pages directly from
2  counsel.  It wouldn't --
3      Q.  Is that what happened in this case?
4      A.  That's, that's, that's my recollection.
5  I never saw the documents.  I never saw the
6  documents.
7      Q.  Okay.  And so the e-mail that you
8  appear to have forwarded to Mr. Mannion that we
9  looked at earlier today, you, you, you didn't
10  review the documents that were attached to it?
11      A.  Absolutely not.  Absolutely not.
12      Q.  Okay.
13      A.  I knew nothing about the deal, so why
14  would I read through documents on a deal I've
15  never seen a term sheet on, never seen a company
16  presentation on?
17      It would be looking at, it would be
18  like looking at the Chinese phone book to me.
19      It would be, it would be completely
20  irrelevant and not understandable.
21      I don't know if the terms are right,
22  wrong, indifferent.

Page 341

1      I've never spoken to the placement
2  agent.  I've never seen a company presentation.
3  I --
4      Q.  If the particular deal documents that
5  you didn't look at --
6      A.  Right.
7      Q.  -- had a no shorting provision in it,
8  would it be appropriate for Palisades to
9  establish a short position in the, in the
10  transaction?
11      MS. LAMBRAKOPOULOS:  Again,
12  objection -- lack of foundation.
13      And I'm going to at this point instruct
14  the witness not to answer.
15      We've been through this, with all due
16  respect, for two years.
17      This transaction is seven years old,
18  and for the last two years since May of '09,
19  we've been asking to see the entirety of the
20  document that Palisades is purported to have
21  signed.
22      We have not seen it at all in the two

Page 342

1    years, and it's not here today.
2         That is my objection.
3         MR. WILLIAMS:  You're directing the
4    witness not to answer?
5         MS. LAMBRAKOPOULOS:  I'm directing him
6    not to answer.
7         MR. WILLIAMS:  On a relevance
8    objection?
9         MS. LAMBRAKOPOULOS:  On a relevance
10   objection, and on a lack of foundation objection,
11   and on an asked and answered objection.
12        MR. WILLIAMS:  Well, I agree it's been
13   asked.
14        MS. LAMBRAKOPOULOS:  And it's been
15   asked, so I think at this point, I stand by my
16   instruction.
17        MR. WILLIAMS:  Fair enough.  I
18   completely understand.
19        BY MR. WILLIAMS:
20   Q.   And in reference to --
21        MS. LAMBRAKOPOULOS:  Let me also note
22   for the record because I want it to be clear in

Page 343

1    this deposition record, and I noted in Mr.
2    Mannion's deposition, Exhibit 32, at least the
3    signature pages, and the first pages of the stock
4    purchase agreement, and the registration rights
5    agreement that are contained in Exhibit 32 are
6    not the same document that we see in Exhibit 52,
7    or Exhibit 30.
8         MR. WILLIAMS:  I'm sorry, counsel.
9    Would you state your objection again?
10        MS. LAMBRAKOPOULOS:  Absolutely.  I
11   want to make it clear for the record that with
12   respect to Exhibit 32, and the signature pages
13   and the first page of a stock purchase agreement
14   and a registration rights agreement that are
15   contained in Exhibit 32, these documents are not
16   the same documents that are contained within the
17   entirety of either Exhibit 52 or Exhibit 30.
18        BY MR. WILLIAMS:
19   Q.   And my question to you, Mr. Reckles,
20   with respect to Exhibit 53 --
21   A.   Fifty-three.
22   Q.   The one-page e-mail, subject, iduf?

Page 344

1    A.   Okay.  Gotcha.
2    Q.   On the very last sentence where it
3    says, "I am not accusing anyone, but suggesting
4    that perhaps if someone is selling short..they
5    stop."
6         And my question to you is why would you
7    be telling potential investors to stop short
8    selling?
9         MS. LAMBRAKOPOULOS:  Objection --
10   relevance.
11        Go ahead and answer to the extent you
12   have factual knowledge.
13        THE WITNESS:  I don't remember the
14   transaction.  I don't remember the e-mail.
15        So you're asking me to speculate on a
16   state of mind that I might have had seven years
17   ago next month.
18        Mr. Williams, I can't help you.  I
19   can't.
20        I don't know the answer.
21        BY MR. WILLIAMS:
22   Q.   You can't answer that question?

Page 345

1    A.   I don't know the answer.
2    Q.   Okay.  Fair enough.  And with that,
3    I'll conclude my examination --
4    A.   Okay.
5    Q.   -- Mr. Reckles.  Those are all the
6    questions I have for you today.
7    A.   Thank you.
8    Q.   I'll allow your counsel to ask any
9    follow-up questions that counsel may have.
10        MS. LAMBRAKOPOULOS:  Sure.  Give me a
11   moment, please, to -- can we go off the record
12   for two minutes?
13        THE VIDEOGRAPHER:  We're going off the
14   record.
15        The time on the video is 5:36 p.m.
16        (A recess was taken.)
17        THE VIDEOGRAPHER:  We're back on the
18   record.
19        The time on the video is 5:39 p.m.
20        EXAMINATION BY COUNSEL FOR DEFENDANTS
21        BY MS. LAMBRAKOPOULOS:
22   Q.   Yes, Mr. Reckles, I would like to ask

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 346

1   you a few questions following your deposition
2   here today, or as part of your deposition here
3   today.      Earlier in your deposition, there
4   were some questions regarding the management fees
5   that PEF Advisors earned in connection with their
6   management of the Palisades fund.
7        Do you recall those questions?
8      A.   I mean I don't remember the specific
9   questions, but I remember that there was a
10  question or discussion about fees.
11     Q.   Do you recall as to the World Health
12  side pocketed assets how much in the way of
13  management fees the advisor earned that were
14  attributable to those assets in August,
15  September, and October of 2005?
16     A.   I mean I could do the math for you.  It
17  wasn't a tremendous sum in the overall scheme --
18     Q.   Okay.
19     A.   -- of, of things.
20     Q.   I'd like to show you what was
21  previously marked as Exhibit 22.
22     A.   Can I look in here at the exhibits?

Page 347

1      Q.   Sure.
2      A.   Okay.  Thanks.  All right.
3      Q.   You earlier identified Exhibit 22 as
4   the document associated with the funds and their
5   position in August of 2005.
6      A.   Okay.
7      Q.   And I'm going to ask you to take a look
8   at page 1603 of the exhibit, which describes the
9   side pocket investments --
10     A.   Okay.
11     Q.   -- for August of 2005.
12     A.   All rightee.
13     Q.   Based on this information, are you in a
14  position to tell us today what the approximate
15  amount of management fees PEF Advisors earned for
16  August of 2005 that are attributable to the World
17  Health --
18     A.   Yeah, I, I can do that.  That's just --
19  I need to calculate it, though, I mean --
20     Q.   Please go ahead.
21        (Pause.)
22        MR. WILLIAMS:  Can you describe for the

Page 348

1   record what you, what your calculations are --
2        THE WITNESS:  Well, I'm actually
3   playing, I'm playing words with friends right now
4   is what I'm doing.
5        (Laughter.)
6        THE WITNESS:  I'm going to take the,
7   I'm going to take the value of the, of the side
8   pocket on this 1603 at $15,357,421.67 -- and my
9   calculator on my phone won't go that high, so
10  we're going to call it at 60 cents.
11        And I'm going to multiply it by the
12  management fee, which was an annualized fee of
13  one and a half percent, so times .015.
14        And I'm going to divide that number by
15  12 months because she's asking for a monthly
16  snapshot, so it's a, a fee of $19,000.
17        BY MS. LAMBRAKOPOULOS:
18     Q.   And would that be for August of 2005?
19     A.   That would be for August of 2005.
20     Q.   Okay.  And the exhibit that you were
21  looking at, Exhibit 22, reflects a number of
22  positions in the side pocket relating to World

Page 349

1   Health, and in particular, the position that
2   includes the restricted common stock --
3      A.   Um-um.
4      Q.   -- in World Health?
5      A.   Yes.
6      Q.   And I'm going to ask you what part of
7   the management fee for the month was attributed
8   to the restricted common stock valuation.
9      A.   Well, let's see here.  I think the best
10  way for me to do that, if I could borrow your pen
11  and a piece of paper?
12     Q.   Sure.
13     A.   So we know that a hundred percent of it
14  equals 19196.77, so if we take 1,984,921.67, and
15  we divide that by a total of, by the total value
16  of the side pocket in that month, which is
17  15,357,421 spot 6, that percentage to the common
18  stock restricted position represented 12 percent
19  of the total assets of the side pocket.
20        So if I multiply -- 12.3 percent, to be
21  exact, so if I take 12.33 times what we deemed
22  the fee to be, it represents $2,368.00.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 350

1    Q.   Okay.  So I'm going to ask you if you
2  had valued, you meaning PEF Advisors, had valued
3  the restricted common stock at zero for the month
4  of August of 2005, how would that have impacted
5  the management fee that was earned by PEF
6  Advisors for August of 2005?
7    A.   Well, if I did all this right on my
8  i-phone, it would have impacted us by $2,368.00.
9    Q.   Okay.  Now --
10    A.   I want to quickly verify that one other
11  way, just to be sure -- 15,357,421 point 6 minus
12  1894921 point 6, times .015 -- I'm sorry --
13  divided by -- I won't talk out loud.  I'll give
14  you --
15        MR. WILLIAMS:  Well, continue talking
16  out loud --
17        THE WITNESS:  Okay.
18        MR. WILLIAMS:  -- so we'll know what
19  your calculations are.
20        THE WITNESS:  All right.  What I've
21  done now is just, I'm just verifying my own
22  calculations here.

Page 351

1        I've taken the total asset pile of
2  15,357,421, I've subtracted, based on her
3  question if it had no value associated with the
4  common, so I've taken our ascribed value away,
5  and I've multiplied that by one and a half
6  percent annualized.
7        I've divided that by 12, and I get to
8  16,828.12, so I may have done this right.  Yep --
9  2,368.64 -- spot on.
10        BY MS. LAMBRAKOPOULOS:
11    Q.   Okay.  Did you believe as of the time
12  that the NAV for August 2005 was calculated that
13  the value of the restricted common stock in World
14  Health should be valued at zero?
15    A.   No.
16    Q.   Okay.  Did there come a time when you
17  formed that belief with respect to future NAVs of
18  the fund?
19    A.   Absolutely.
20    Q.   And when would that have been?
21    A.   If I remember correctly, we, that Paul
22  Mannion and myself, wrote all of the common, both

Page 352

1  restricted and unrestricted, down to zero in the
2  subsequent NAV period except for the September
3  and going forward NAV periods.
4        So this is one month.
5    Q.   Okay.  Going back to Exhibit 22, I note
6  that there is a valuation on page 1603 regarding
7  or relating to a convertible debenture in World
8  Health that's contained in the side pocket, is
9  that correct?
10    A.   Yes.
11    Q.   And is it fair to say that the
12  valuation for August of 2005 for the convertible
13  debenture was made at cost, the cost to the fund?
14        MR. WILLIAMS:  Object to the form.
15        THE WITNESS:  I, I would imagine so,
16  yes.
17        BY MS. LAMBRAKOPOULOS:
18    Q.   By imagine, what do you mean?
19    A.   Well, without, without some documents
20  to refresh, I don't know for certain.
21    Q.   Can you, can you review Exhibit 22 and,
22  and respond to the question after reviewing

Page 353

1  Exhibit 22, and in particular, 1603?
2    A.   Well, it's being carried at -- yes,
3  it's carried at cost, yes.
4    Q.   Okay.  Now there's been questioning
5  earlier today with respect to a spreadsheet that
6  appears to reflect 35 percent as, in a column
7  under estimated cost recovery for the convertible
8  debenture?  I believe Exhibit 20?
9        MR. WILLIAMS:  Yes.
10        THE WITNESS:  Can I find it?
11        BY MS. LAMBRAKOPOULOS:
12    Q.   Yes.  I'll find that for you.  I've got
13  it right here.
14    A.   Okay.  I'll take those.  All right.
15    Q.   And can you tell us had the convertible
16  debenture been valued at 35 percent of its cost
17  for the NAV for August of 2005, what would have
18  been the impact of that valuation on the
19  advisor's management fees for the month of August
20  of 2005?
21    A.   Well, what's interesting about -- is
22  this 20 you said?

Page 354

1    Q.  Right.
2    A.  There's a couple things that are
3  interesting here to me.
4        And I guess it goes to reinforce that
5  this was nothing more than an internal work
6  product.
7        If you look at what cost was deemed to
8  be next to World Health debenture, I mean there,
9  there was only one.
10       Cost was $9,574,418.  That's what
11  costs were paid for.
12       But when you get to the NAV, we'd
13  already written it down in the same month by $2
14  million below cost.
15       Go, go to your exhibit 1603.
16   Q.  Is it possible that the cost that's
17  noted on Exhibit 20 is the face amount of the
18  bond?
19   A.  That's very possible.  My only point in
20  this exercise is that this is an internal work
21  product.
22   Q.  Meaning Exhibit 20?

Page 355

1    A.  Meaning Exhibit 20; and so what
2  transpires here with Exhibit 20, whether it's 35
3  percent or a hundred percent or whether it's 9.5,
4  it's, it's not -- I mean it's like the sausage
5  making we talked about earlier when we were
6  talking about.
7        There is a lot that we were doing back
8  and forth with the administrators.
9        This is, this is the face value of the
10  bond.  This is the cost for the bond.
11       We elected to carry, if you look at
12  1603, the bond at cost, as opposed to face value.
13       Cost is not face value.  Face value is
14  what you get paid back when a bond comes due.
15       We have every right, according to
16  policy, to carry it at face value, not at cost.
17       We carried it at cost.
18   Q.  And going back to my question, had you
19  not carried it at cost, but carried it at
20  35 percent of its cost --
21   A.  Okay.
22   Q.  -- what would have been the impact of

Page 356

1  that decision on the management fees for the
2  month of August 2005?
3    A.  So what I'm going to do is I'm going to
4  make the assumption that example -- I'm sorry --
5  exhibit 1603, that the self-liquidating debenture
6  cost is this $7,352,500 numbers, because in
7  Exhibit 20, cost is also used at nine million,
8  574, so I'm being given two numbers with both
9  definitions, okay.
10       Assuming that 7,352,500 was cost, and
11  not a mark-down from cost, then that would mean
12  that 7,352,500 times .015 divided by 12, so the
13  management fees associated to that bond at full
14  cost for that month represent $9,190.00 of the
15  total management fees for the side pocket, if we
16  marked it down to 35 percent?
17   Q.  Right.
18   A.  And we want to mark it down from
19  35 percent of what's on the NAV sheet, or what's
20  on the internal work documents?
21   Q.  What's on the NAV, what's NAV --
22  well --

Page 357

1    A.  Because -- okay.
2    Q.  Let's mark it down based on the NAV
3  sheet.
4    A.  Sure.
5    Q.  That's on the exhibit, Exhibit 20.
6    A.  7,352,500 times .35 is a result of
7  2,573,375 carrying value.
8        Multiplying that by .015 and dividing
9  that by 12, it represents $3,200; 3216.71, what's
10  the -- ballpark here is roughly six grand, $5,800
11  worth of addition -- of difference.
12   Q.  And with respect only to the
13  convertible debenture, the number that you just
14  quoted, $3,215, would that have been the amount
15  of the differential in the management fees for
16  the month of September and October 2005?
17   A.  Yeah.  My recollection is we carried
18  the debentures at cost until November I believe.
19  I believe, but I'd have to be refreshed.
20       Assuming that that was the case and
21  that would be correct, it would be a difference
22  of four -- what is that?  Well, I'll just do the

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 358

1  math -- plus 9190.62, it's a difference of
2  $5,973.90.
3      Q.  Okay.
4      A.  Per, per month, per month.
5      Q.  And what happens in November 2005 that
6  caused you to change the way the side pocket was
7  valued?
8      A.  The flow of information coming from the
9  investment banker, who was charged with the
10  disposition of the World Health, the sale of
11  World Health, was not favorable, that they were
12  not finding a successful buyer for the company,
13  outside of bankruptcy, and that the company was
14  likely to be filing a pre-packaged bankruptcy,
15  and potentially, that the company would be sold
16  through a bankruptcy event, which is in fact what
17  happened.
18      Q.  And earlier during this deposition, you
19  testified about a series of negotiations that
20  were ongoing between Palisades and
21  representatives of World Health.
22          Was there any combination or any

Page 359

1  conclusion to those negotiations in either
2  October or November of 2005?
3      A.  In October or November -- well, we were
4  still I believe --
5          MR. WILLIAMS:  I'm going to object to
6  the form.
7          You can answer.
8          THE WITNESS:  Okay.  I believe we were
9  still talking and working with counsel for the
10  company for World Health, that being Ms. Borders.
11      BY MS. LAMBRAKOPOULOS:
12      Q.  Did Palisades ever enter --
13      A.  I'm sorry -- and with their investment
14  banker as well.
15      Q.  Did Palisades ever enter into any kind
16  of stand-still agreement with World Health
17  respecting its debt and securities in World
18  Health?
19      A.  Yes, in fact, we did.  We, we had all
20  of our positions memorialized.
21          We agreed to have certain positions
22  recast as preferred stock, out of debt.

Page 360

1          We also received liquidated damages in
2  the form of additional preferred that we did not
3  even value in the side pocket.
4          They were an asset of the fund, but we
5  didn't feel it appropriate to increase the value
6  of the side pocket in our management fees by
7  adding liquidated damages that were the property
8  of the fund.
9      Q.  Do you recall the timing of that
10  stand-still agreement?
11      A.  October-ish, '05.
12      Q.  Okay.  Earlier today, you were asked
13  whether or not Palisades had filed a lawsuit
14  against World Health.
15          And I believe you testified that, that
16  Palisades had indeed filed a lawsuit, but you did
17  not remember the timing of that lawsuit.
18          Is that a fair summary of your
19  testimony?
20      A.  I think so, yes.
21      Q.  What was the purpose behind Palisades
22  filing a lawsuit against World Health?

Page 361

1      A.  To keep the, the line of communication
2  open.
3          You know, my recollection of events may
4  differ from others, but my recollection was that
5  the correspondence and, and the, the negotiation
6  between ourselves and the company and its counsel
7  was very good all the way through the early part
8  of September, and at which point, as I recall,
9  the company went out and hired a restructuring
10  firm.
11          I believe the first one was Alvarez and
12  Marsal or Marsal and Alvarez, and all
13  communications stopped, for whatever reason.
14          I don't know if it's just standard
15  practice, that that's what they do with the
16  restructuring firms.
17          But we, at that point, could no longer
18  maintain an information flow, which is what was
19  critical to us in being able to do our jobs to
20  value the high pocket and to, to manage this
21  position through to hopefully a positive outcome.
22          And we couldn't get return phone calls.

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 362

1   We couldn't get information.  We couldn't get
2   documentation surrounding our, you know -- just
3   that was, that was, that was the reason.
4       Q.   Okay.  And --
5       A.   Excuse me.
6       Q.   What was the result of your filing of
7   the lawsuit with respect to the communications or
8   the lack of communications with the company?
9       A.   Well, they improved pretty
10  dramatically.  They improved dramatically.
11          We were, we were, as a result, able to
12  be part of the, the working group, if you will,
13  around what was happening.
14          We had information flow from the
15  investment bankers.
16          We were privy to the deal sheets or the
17  valuation sheets that they were sending around to
18  prospective buyers of the company.
19          And that was very helpful to us in
20  helping to formulate our own valuations for the
21  business as it went through a sale process,
22  because they were independent.  They were third

Page 363

1   party, and they were being done by a renowned
2   expert in place.
3           So that was, that was invaluable to us,
4   and frankly, it, it did a good job to, to back up
5   what we believed, that we had -- this was a good
6   business here, that this was a good company.
7           It, it memorialized for all time what
8   we owned.
9           There was no discussion about and no
10  speculation about what securities we owned, and
11  it accrued liquidated damages for months worth of
12  non-payment and non-registration, and all other
13  things, so it was, I mean it was a positive
14  development.
15          Unfortunately, the net result was, at
16  the end of the day wasn't, we didn't get any
17  more, but it was a positive development at the
18  time.
19      Q.   And do you recall whether Palisades
20  voluntarily dismissed its lawsuit against World
21  Health?
22      A.   I believe we did.

Page 364

1       Q.   Okay.  I'm going to ask you to take a
2   look at Exhibit 44 that you were shown earlier
3   today by Mr. Williams, and that was your
4   testimony before the SEC Enforcement Division
5   staff in May of 2009.
6           And Mr. Williams pointed you to I
7   believe page 100 and page 101 of the transcript.
8       A.   Okay.
9       Q.   Do you see that?
10      A.   Um-hm.
11      Q.   And in particular, he pointed you to a
12  series of questions regarding the valuation as
13  identified on what's been marked in this case as
14  Exhibit 22, but was marked as Exhibit 5 during
15  your investigative testimony.
16          Do you recall that?
17      A.   His questions, yes, ma'am.
18      Q.   Okay.  And with respect to your
19  testimony, Mr. Williams pointed you to your
20  May 2009 testimony regarding the valuation of the
21  restricted common stock, and the back and forth
22  between you and I believe Mr. Aderton regarding

Page 365

1   whether or not the valuation as identified on
2   what was then Exhibit 5 and it's now Exhibit 22,
3   might have been an error.
4           Do you recall that?
5       A.   Yes.
6       Q.   Now Mr. Williams did not ask you today
7   to clarify your testimony on the record in May of
8   2009, but I'm going to do so today.
9           Is there anything you would like to say
10  today to clarify your testimony that's reflected
11  on page 100 and page 101?
12      A.   Well, you know, when I was asked the
13  question, and this is, again, one of the benefits
14  of hindsight, you know, couple years post this
15  interview, and the ability to, to review this
16  transcript, the document page number 1603, I mean
17  when I looked at it, it's actually rather
18  confusing to me, to be honest with you, because
19  it uses terms like market value.
20          And so if you, if you look at the
21  question that was asked of me, market value, in
22  my brain, is the price at the market times the

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 366

1  number of shares you have.
2       But definitionally, on our spreadsheet,
3  definitionally, from the, in the administrator's
4  perspective, that's the carrying value for the
5  fund.
6       It's not market value the way I was
7  thinking of market value when the question was
8  posed.
9       And so my initial response was well,
10 somebody obviously doesn't know how to use a
11 calculator because I just did some quick math in
12 my head, and I said well, 22 cents times 1.89
13 million is roughly 190,000.  Somebody just added
14 some extra zeros.
15      But actually market value is the market
16 value that the fund is carrying the asset at, not
17 market value pursuant to what market value is.
18      And it was just a confusion by -- it
19 was just my own misstep back then in May of 2009.
20      And having hindsight and being able to
21 re-review everything, it's very clear that market
22 value to the fund and the NAV means something

Page 367

1  very different than what the market value is in
2  the open market.
3       Q.  Sitting here today, Mr. Reckles, do you
4  agree with the valuation that is reflected on
5  Exhibit 22 pertaining to the restricted common
6  stock for August of 2005?
7       A.  Yes, I do.
8       Q.  Okay.  And you mentioned that, you
9  know, since May of '09, you've had the benefit of
10 hindsight.
11      What did you do to review this question
12 that was posed by the SEC and be able to testify
13 today that, that your testimony here today is
14 reflective of your belief with respect to the
15 restricted common stock value?
16      A.  The only thing that I've done in
17 preparation for any of this is reviewed my, my
18 testimony from the May of '09 interview, so I
19 reviewed my transcripts.
20      That was it.
21      MS. LAMBRAKOPOULOS:  I don't have any
22 further questions.

Page 368

1       FURTHER EXAMINATION BY COUNSEL FOR
2  PLAINTIFF
3  BY MR. WILLIAMS:
4       Q.  Okay.  With respect, with respect to
5  Exhibit No. 44, and --
6       A.  Forty-four is --
7       Q.  The transcript.
8       A.  Okay.  Thank you.
9       Q.  And Ms. --
10      MS. LAMBRAKOPOULOS:  Lambrakopoulos.
11      MR. WILLIAMS:  I apologize.
12      MS. LAMBRAKOPOULOS:  That's okay.
13      BY MR. WILLIAMS:
14      Q.  -- directed you to your testimony, and
15 you indicated that you had clarification of your
16 testimony.
17      In fact, what you just articulated is
18 not a clarification?
19      It's a change in your testimony,
20 correct?
21      A.  Well, I, I don't, I don't know that it
22 is.

Page 369

1       I mean when I testified earlier in the
2  day, you asked me a question, but I didn't get an
3  opportunity to do anymore.
4       You asked a very pointed question.
5  That was it.
6       Q.  Right.
7       A.  So this was just a I, I just didn't -- I
8  didn't answer correctly, and I'm really
9  clarifying what is factual.
10      I mean, by example, if you look three
11 steps above that, SLD, right, you've got a cost
12 there of 7.35.
13      Well, if you multiply 790 three hundred
14 79 by 22 cents, you don't get 7.3, but policy was
15 to carry it at the cost for that month.  That's
16 what we determined, and that's what market value
17 meant, and that's what that column means.
18      Q.  I see.  So, so, just so I understand
19 your testimony, where there's a column on Exhibit
20 No. 22 indicating market value --
21      A.  It's what the fund is carrying.
22      Q.  It's not -- isn't that the fund's best

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 370

1    estimate of what market value is?
2       A.   In the case of the side pocket,
3    absolutely.
4       Q.   But it's not market value?  Didn't you
5    just disagree with the characterization of market
6    value?  I'm sorry.
7       A.   Your question was, the best, to the
8    best of the fund's ability to determine, right?
9            Isn't that what you said?
10      Q.   Yes.
11      A.   And as I, as it pertains to the side
12   pocket, that would be correct, because other
13   things have a printed market value.  I mean
14   there, there was, there was a printed value.
15      Q.   And referring you to page 142 of the
16   transcript.
17      A.   Okay.
18      Q.   And particularly beginning on line 11,
19   the question begins " -- reflected on Exhibit 5.
20   Which is PEF27415.  And Exhibit No. 5 shows a
21   recovery of approximately $2 million for those
22   shares.  It shows a market value of approximately

Page 371

1    $2 million for those shares.  Exhibit No. 14
2    shows a zero dollar recovery.
3            "Do you know why that is?"
4            And you answer "Well, I think that
5    we've already concluded that on your Exhibit 5,
6    or at least I've concluded, 27415, column 'Market
7    value' for the 950,000 shares is just a
8    typographical.  I mean clearly 22 cents times
9    950,000 is not..." 1.49 million.
10      A.   1.489;
11      Q.   1.489; and so first of all, were you
12   asked those questions, did you give that answer?
13      A.   What was the question?
14      Q.   Were you asked that question, and did
15   you give that answer?
16      A.   Clearly.
17      Q.   And you emphasized that it was a
18   typographical error in, on May 14th, 2005,
19   correct?
20      A.   That's what the testimony says.
21      Q.   Okay.  Fair enough.  So today, you've
22   amplified or given, given another explanation, is

Page 372

1    that fair?
2       A.   Well, I think I've clarified it.
3       Q.   Okay.  And finally, you indicated with
4    respect to the lawsuit, prior to the filing of
5    the lawsuit, there was some ambiguity as to
6    exactly what Palisades owned, correct?
7       A.   Not from our perspective.
8       Q.   Right.  Not from your perspective?
9       A.   Yeah.
10      Q.   But from the World Health perspective?
11      A.   Correct.
12      Q.   And you indicated that prior to the
13   filing of the lawsuit, you couldn't get a return
14   phone call from the company, is that right?
15           Is that fair?
16      A.   Yes.  Correct.
17      Q.   And the filing of the lawsuit was
18   shortly after the preparation of the August
19   valuation, correct?
20      A.   I don't recall, as I've testified.  I
21   just don't remember when the suit was filed.
22      Q.   I'll represent to you it was on or

Page 373

1    about September 26, 2005.
2       A.   Okay.  Then that would be several weeks
3    after the August NAV was filed.
4       Q.   Okay.  Finally, as you sit here today,
5    you continue to work in the financial services
6    industry.
7            My question to you is in connection
8    with the allegations in the SEC complaint in this
9    lawsuit, do you think you did anything wrong?
10      A.   You know, that's a good question.  I
11   think that, you know, I think that six and a half
12   years later, I think that, I mean it's, it's been
13   pretty, pretty horrible.  I mean I've got to tell
14   you.
15           You know, lost pretty much all my
16   money.  Lost my house.  Lost my car.  Lost my
17   reputation.
18           So I would say that I have paid an
19   enormous price for actions that I don't think
20   rise to the price that we paid.
21           I don't believe on allegation one that
22   we did anything even remotely bordering on fraud

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 374

1  as it related to our side pocket.
2       I think we used all of the best
3  possible information that we could to formulate a
4  valuation, and as the little exercise with the
5  calculator indicated, what did we benefit?
6  Fifteen grand?  Sixteen grand?  It wouldn't have
7  ever, it wouldn't have been worth it.
8       So no, I don't think in the case of the
9  valuation exercise, there was anything done that
10  was wrong.
11       I think we did the best we could, and
12  we were the biggest victim of all.
13       We were the biggest money loser in
14  World Health bar none, bar none, everybody out
15  there.
16       As it relates to the, the advance or
17  loan, I think I, I think I was pretty clear in my
18  testimony that the facts and circumstances in
19  that particular scenario, the money was repaid on
20  the exact same day.
21       It was almost as if it never actually
22  even occurred.

Page 375

1       So no, I don't think there was anything
2  done wrong.
3       I think we followed procedures and
4  policies.
5       I think we spoke to the administrator
6  and got his permission, and in, in fact he was
7  the party that, that wired the funds.  So, so I
8  think I have a hard time.
9       I think the warrant exercise was one of
10  the dumbest things I've done in the 41 years I've
11  been alive, unquestionably, but that's why we
12  disclosed it.  That's why we self-penalized.
13       I mean we had already lost 980 some
14  thousand dollars, and I think that that was
15  plenty of punishment, but we, we took an
16  additional $165,000 penalty each back to the fund
17  because as you, you deemed earlier, well, were
18  the warrants in the money, sir?
19       Well, based on that date, okay, you
20  could argue they were.  Three days later, the
21  company was 22 cents, so we paid the fund back
22  $165,000 each, each, after having lost a million

Page 376

1  dollars.
2       I think we, I think we, I think we paid
3  our, our due there.  I think we did.
4       So when I look at everything over the
5  last seven years, I think yeah, there were some
6  mistakes made.
7       I think specifically the warrant thing,
8  I think that that was just, just bad judgment,
9  but I think we resolved it.  I think we resolved
10  it appropriately, and I think we followed
11  counsel's advice to resolve it appropriately.
12       I don't think besides that, anything
13  was done wrong.  I just don't.
14       And I think that, with all respect to
15  your organization, because I do have respect for
16  you guys, I do, I think that you guys have spent
17  an awful lot of time and energy on something that
18  amounts to $16,000, 16 grand at best, at best.
19  That's the monetary benefit here.  That's it.
20  Six and a half years, countless man hours, how
21  many dollars and what have you, my reputation,
22  because I'm the one that got lambasted in the

Page 377

1  press.  I don't get to fight back.
2     Q.  Okay.
3     A.  I couldn't even go to church I was so
4  embarrassed.  I couldn't even go to church for
5  four weeks.  I couldn't show my face.
6       I didn't leave my house for four weeks,
7  over sixteen grand, guys.
8       No, I don't think we did anything
9  wrong.
10     Q.  Okay.  So if going forward, you were
11  put in that same situation that you were back in
12  2005, you'd do, you'd do the same thing?
13     A.  No.  That's not the question you asked
14  me.
15       The one beautiful thing about hindsight
16  and getting to be a little bit older and wiser is
17  I'd never allow myself to get in that situation
18  again.
19       I don't have any interest in managing
20  money.
21     Q.  Okay.
22     A.  I don't have any interest in doing

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef

Page 378

1  that.  So -- and if for some strange reason, I
2  ever found myself in that position again, which I
3  can't even fathom, there's, there's no way that I
4  would allow any one position in my fund to even
5  get close to the size of, of a World Health so
6  that it could create such a problem.
7         And I think that that's all I could
8  say, but I don't ever see myself ever managing
9  money again, so that's the beauty of all of this.
10        At least I've come to know myself
11 better after six years of investigation, and I
12 know that this is not what I want to do again.
13    Q.  Okay.
14    A.  It wasn't a lot of fun.
15    Q.  That's all I have for you, sir.
16    A.  Okay.
17    Q.  Thank you very much.
18        MS. LAMBRAKOPOULOS:  I don't have any
19 further questions.
20        BY MR. WILLIAMS:
21    Q.  Okay.  And with that, before we go off
22 the record, I want to stay on the record, thank

Page 379

1  you for --
2     A.  Sure.
3     Q.  Mr. Reckles, for making the trip --
4     A.  Absolutely.
5     Q.  -- to Washington, D.C.  I understand
6  you had a sacrifice in your personal life in
7  terms of your, your grandchild.
8     A.  Well, we're finding out.  My wife keeps
9  texting me stuff, but I can't make heads or tails
10 of it, so either she's either sending me a
11 sonogram or whatever --
12        MS. LAMBRAKOPOULOS:  When counsel
13 concludes the deposition, you can go.
14        THE VIDEOGRAPHER:  This concludes the
15 video deposition of Andrew Reckles.  The time on
16 the video is 6:15 p.m.
17        We are off the record.
18        (Whereupon at 6:15 p.m., the taking of
19 the instant deposition ceased.)
20
21
22

Page 380

1         CERTIFICATE OF DEPONENT
2  I hereby certify that I have read and examined the
3  foregoing transcript, and the same is a true and
4  accurate record of the testimony given by me.
5  Any additions or corrections that I feel are
6  necessary, I will attach on a separate sheet of
7  paper to the original transcript.
8
9         _____
10            Signature of Deponent
11
12 I hereby certify that the individual representing
13 himself/herself to be the above-named individual,
14 appeared before me this _____ day of _____,
15 2011, and executed the above certificate in my
16 presence.
17         _____
18         NOTARY PUBLIC IN AND FOR
19
20         _____
21            County Name
22 MY COMMISSION EXPIRES:

Page 381

1         CERTIFICATE OF NOTARY PUBLIC
2         I, Catherine S. Boyd, the Notary Public
3  before whom the proceeding occurred, pages 1
4  through 379, do hereby certify that the witness
5  was duly sworn, that the testimony of said
6  witness was taken by me and thereafter reduced to
7  this typewritten transcript under my supervision,
8  that said transcript is a true record of the
9  testimony given by said witness, that I am
10 neither counsel for, related to, nor employed by
11 any of the parties to the proceeding, and
12 further, that I am not a relative or an employee
13 of any attorney or counsel employed by the
14 parties thereto, or financially or otherwise
15 interested in the outcome of the proceeding, or
16 any action involved therewith.
17        Witness my signature and seal:
18
19         CATHERINE S. BOYD
20         Notary Public in and for
21         The District of Columbia
22 My commission expires:  September 14, 2012

fe8dacb5-92ec-47a7-9dbe-350136a2f2ef