1

1            IN THE UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF GEORGIA

3     - - - - - - - - - - - - - - - x

4     SECURITIES AND EXCHANGE          :

5     COMMISSION,                      :

6          Plaintiff,                  :

7              v.                      :  Case No.

8     PAUL T. MANNION, JR., et al., :  1:10-cv-03374-WSD

9          Defendants.                 :

10    - - - - - - - - - - - - - - - x

11

12                                      Washington, D.C.

13                                      Friday, May 18, 2012

14

15    Videotaped Deposition of

16           MARC J. BROWN, called for examination by

17    counsel for Plaintiff, pursuant to notice, at the

18    Law Offices of K&L Gates, LLP, 1601 K Street, NW,

19    Washington, D.C., commencing at 10:05 a.m., before

20    Barbara A. Huber, CSR and Notary Public in and for

21    the District of Columbia, when were present on

22    behalf of the respective parties:

Marc J. Brown                                                              May 18, 2012
Washington, D.C.

2

```
 1   APPEARANCES:

 2      On behalf of Plaintiff:

 3         DAVID WILLIAMS, ESQUIRE

 4         ADAM S. ADERTON, ESQUIRE

 5         JOHN BOWERS, ESQUIRE

 6         Securities and Exchange Commission

 7         100 F Street, NE, Room 4221

 8         Washington, D.C. 20549-4010

 9         202.551.4548

10         williamsdav@sec.gov

11      On behalf of Defendants:

12         STAVROULA E. LAMBRAKOPOULOS, ESQUIRE

13         R. JAMES MITCHELL, ESQUIRE

14         MATTHEW B. BOWMAN, ESQUIRE

15         K&L Gates, LLP

16         1601 K Street, NW

17         Washington, D.C. 20006-1600

18         202.778.9000

19         stavroula.lambrakopoulos@klgates.com

20      Also Present:

21         Dan Reidy, Videographer

22                      * * * * *
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

3

1                   C O N T E N T S

2    EXAMINATION BY:                              PAGE

3      Mr. Williams                                5

4      Ms. Lambrakopoulos                        213

5      Mr. Williams                             223

6

7

8

9    BROWN DEPOSITION EXHIBITS:                   PAGE

10   No. 1 - Notice of Deposition                  4

11   No. 2 - Report of Marc J. Brown, CFA          4

12   No. 3 - Rebuttal Expert Report of Bernard Pump  147

13

14

15

16

17

18

19

20

21

22

Marc J. Brown                                                      May 18, 2012
Washington, D.C.

4

1                    P R O C E E D I N G S

2                         (Brown Exhibits No. 1 and 2

3                         marked for identification.)

4             VIDEOGRAPHER:   This begins tape number

5    one in the video deposition of Marc Brown taken by

6    the Plaintiff in the matter of the Securities and

7    Exchange Commission versus Paul T. Mannion.

8             This is filed in the U.S. District Court

9    for the Northern District of Georgia, the Atlanta

10   Division.   Case Number 1:10-cv-03374-WSD.

11            Today's deposition is being held at the

12   law offices of K&L Gates, LLP, 1601 `K Street,

13   Northwest, Washington, D.C. 20006.

14            For identification purposes my name is

15   Dan Reidy, the video operator.   The court reporter

16   is Barbara Huber.   And we both represent Alderson

17   Court Reporting.

18            Today's date is May 18th, 2012.   The time

19   on the video is 10:05 a.m.   We are on the record.

20            At this time will all counsel please

21   introduce yourself and whom you represent, starting

22   with the SEC, please.

Marc J. Brown                                            May 18, 2012
Washington, D.C.

5

1            MR. WILLIAMS:  Good morning.  David

2    Williams, Adam Aderton, and John Bowers for the

3    Plaintiff, Securities and Exchange Commission.

4            MS. LAMBRAKOPOULOS:  Good morning.

5    Stavroula Lambrakopoulos and Matt Bowman from K&L

6    Gates on behalf of all of the Defendants.

7            VIDEOGRAPHER:  Will the court reporter

8    please swear in the witness.

9    Whereupon,

10                 MARC J. BROWN,

11   was called as a witness by counsel for Plaintiff,

12   and  having been duly sworn by the Notary Public,

13   was examined and testified as follows:

14            EXAMINATION BY COUNSEL FOR PLAINTIFF

15   BY MR. WILLIAMS:

16       Q    Morning, Mr. Brown.

17       A    Morning.

18       Q    As I just said, my name is Dave Williams.

19   And I represent the SEC in this matter.

20            I'm going to hand you a document that --

21   labeled as Exhibit Brown 1.  And I'm going to

22   represent to you that this document is the notice

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

6

1    of deposition that this the SEC sent earlier this

2    week --

3         A    Okay.

4         Q    -- noticing your deposition here today.

5              You've been designated by the Defendants

6    in this case as an expert witness.

7              Have you ever -- have you ever been

8    deposed before?

9         A    I have not.

10        Q    Okay.  Well, let me -- let me just sort

11   of explain to you how -- the ground rules here.

12   I'm going to be asking you questions.  Court

13   reporter's going to be taken down every word you

14   say.

15             You're under oath.  It's -- it's sort of

16   like testifying here at trial except there's no

17   judge here today.  So to the extent that opposing

18   counsel may interpose objections from time to time,

19   there's no judge here to rule on those objections

20   today, so they'll be preserved for the record.  But

21   you should, nevertheless, answer the questions.

22   Don't answer any questions that would require you

Marc J. Brown                                                May 18, 2012
Washington, D.C.

7

1    to divulge any privileged information.  Other than

2    that, you should feel free to answer.

3              With respect to my questions, I'll try

4    and make my questions as clear as possible.  If

5    there's something about the question that you don't

6    understand, please let me know and I'll try and

7    phrase my question better.  On the other hand, if

8    you answer my question, I'm -- I'm going to assume

9    that you understood the question.  Is that fair?

10        A    Sure.

11        Q    Okay.  Are you under any medication or

12   any other reason why you can't give `truthful,

13   honest, and complete testimony here today?

14        A    No.

15        Q    Okay.  And, you know, this is not an

16   endurance contest.  If you -- if you'd like to take

17   a break, use the restroom, just let me know and

18   we'll -- we'll be happy to go off the record.  Is

19   that fair?

20        A    That's fair.

21        Q    Okay.

22        A    Thank you.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

8

1        Q     You've been -- you've been retained --

2    you've been identified by the Defendants in this

3    case as an expert witness.

4              Can you tell me what is the -- what

5    you've been asked to opine on?

6        A     Sure.  I was asked to, you know, take a

7    look at the net asset value statements as of August

8    31st, 2005, September 30th, 2005, and October 31st,

9    2005, and ascertain if it was reasonable, the

10   values that they placed for the World Health

11   securities, if that was reasonable.

12       Q     I see.  And I'm handing you another

13   document that's been marked for identification as

14   Brown Number 2.  And I'm going to ask you to take a

15   look at that document.

16       A     [Witness looked at document].

17       Q     And do you recognize that document?

18       A     It appears to be my report.

19       Q     And the report you produced in -- in this

20   matter?

21       A     That's correct.

22       Q     Okay.  And you indicated that you were

9

1    to -- you were asked to take a look at the -- the

2    reasonableness of certain valuations.

3                Reasonableness in terms of what?

4        A    I'm sorry, can you repeat the question?

5        Q    Yeah, I -- I think you indicated that you

6    were asked to -- to take a look at the

7    reasonableness of certain valuations.

8                Is that what you said?

9        A    Yes.

10       Q    Okay.

11       A    I guess if -- if at the time when -- when

12   the Defendants did the valuations, if, you know,

13   looking back in time if those were -- if they were

14   reasonable.  I'm not sure how else to say it.

15       Q    Reasonable in -- in -- in what context?

16       A    I guess the context that I took it in is

17   as a valuation professional, as someone who's

18   worked in restructuring situations, as someone

19   that's worked at a hedge fund, you know, if I was

20   standing in their shoes at the time or in the

21   marketplace at that time, you know, and I did a

22   valuation or I looked at this valuation, would I

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

1    say, you know, these guys are way off base or it's

2    reasonable or somewhere in between.

3         Q    I see.  I see.  Can you tell me -- well,

4    you indicated you're a valuation professional.

5              What's your -- what's your educational

6    background?

7         A    Sure.  I've got a bachelor's of science

8    in finance with high honors from the University of

9    Illinois at Champaign Urbana.  I've got an MBA in

10   finance, accounting, and strategy from the

11   University of Chicago.  It's now the Booth School.

12   When I graduated it was the GSB.  So that's my

13   formal education.  Obviously conferences, you know,

14   those sorts of things.  And then I've got some

15   des -- a designation as well.

16        Q    When did you graduate from the University

17   of Illinois?

18        A    1996.

19        Q    Okay.  And when did you graduate from the

20   University of Chicago?

21        A    2004.

22        Q    I see.  So assuming that business school

11

1    is two years; is that right?

2         A    I went part-time.

3         Q    I see.  So when did you start business

4    school?

5         A    It took me about three years, so I wanna

6    say January of 2001.

7         Q    Okay.

8         A    Graduated in March of '04.

9         Q    Okay.  What did you do after you finished

10   college, or undergraduate?

11        A    Sure.  My first job was at -- in

12   investment banking at a firm called `John Nuveen &

13   Company in Chicago.

14        Q    And when you say investment banking, what

15   does that mean?

16        A    You know, it's a broader company.  They

17   do a lot of municipal finance.  So this was -- I

18   was in their education group.  So I actually helped

19   schools raise money to build dorms, you know, new

20   buildings for -- for sci -- you know, the new

21   science department, what have you.  Raised money

22   for Purdue University, Kent State, Eastern

12

1    Michigan, that sort of thing.  It issued bonds in

2    the marketplace.

3           I also looked at derivative securities,

4    if there was certain strategies that would help

5    them minimize interest rate risk, which is a big,

6    big factor for sort of not-for-profit schools and

7    that sort of thing.

8        Q    Okay.  So -- so bond investing and -- and

9    derivative securities investing?

10       A    I wouldn't call it investing.  I'd call

11   it I guess similar to Houlihan Lokey or

12   Mr. Mannion, Mr. Reckless on the HPC side.  You're

13   actually raising money for people.  It's -- it's --

14   you're an advisor, you're a financial advisor, if

15   you will.

16       Q    Okay.  You're a financial advisor raising

17   money for -- for individuals or -- or entities?

18       A    Entities, yeah.

19       Q    Okay.

20       A    In my case not for profits but --

21       Q    Okay.

22       A    -- same idea.  If you wanna raise money

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

13

 1    for IBM, different focus but that's -- that's what

 2    investment bankers do.

 3        Q    Okay.  And how long did you do that?

 4        A    About 14 months.

 5        Q    Okay.  And what did you do after that?

 6        A    After that I went to work for

 7    Pricewaterhouse in their valuation services group,

 8    also in Chicago.

 9        Q    And Pricewaterhouse is that -- is that an

10    accounting firm?

11        A    It is.

12        Q    Okay.

13        A    It's one of the -- I think at the time

14    the Big Five that -- you know, was Big Six now it's

15    Big Four I think.

16        Q    Okay.  And you indicated you were in the

17    valuation services group?

18        A    That's correct.

19        Q    What did you do there?

20        A    Well, when I started I was I think an

21    analyst and got promoted in a couple months to

22    senior analyst.  And I did valuations of companies

Marc J. Brown                                                    May 18, 2012
                          Washington, D.C.

14

1    for a variety of purposes.

2         Q     Okay.  And was that -- was that your sole

3    responsibility, to do valuations of companies?

4         A     Yes.

5         Q     Okay.  And how did you do those

6    valuations?

7         A     You know, it was usually part of a team.

8    I was, you know, one of the more junior people to

9    start off with.  Got to be still fairly junior but,

10   you know, a level up partway through.  A lot of

11   research, a lot of modeling, using the various

12   standard valuation approaches.  You`know, they sent

13   us through I think a week-long training course, a

14   global basis.  We had people in from Europe as part

15   of the training as well.

16        Q     I see.  And what were the standard

17   valuation approaches that you were taught in your

18   training?

19        A     There's probably -- if you wanna break it

20   down, there's three.  There's what you call a

21   market approach.  There's an income approach.  And

22   there's a cost approach.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

15

1        Q     What's a cost approach?

2        A     A cost approach is you sort of look at

3    the cost of the assets of a business.  Probably

4    more applicable for say a real estate company or,

5    you know, maybe a mining company that's got, you

6    know, proven reserves in the ground and what it

7    would cost to extract those reserves, that sort of

8    thing.  And you make adjustments.

9              If it's a -- let's say it's a -- a piece

10   of machinery that's three years old and you look in

11   the marketplace and when a brand new one sells for

12   a million dollars, the three-year-old one probably

13   won't be the same price.

14       Q     So how do you figure out how -- how the

15   three -- how much the three-year-old one is worth?

16       A     There's various ways of doing it.  It's

17   not a real focus of mine.  It's not something you

18   do a lot of unless you are specific -- we actually

19   had a group -- a sub group within the group that

20   was machinery and equipment appraisal and a second

21   group that was real estate appraisal.

22       Q     Okay.  So -- so the cost approach is

Marc J. Brown                                                    May 18, 2012
                          Washington, D.C.

                                                                        16

1    focused on -- on what it would cost for -- for a

2    firm to -- to obtain a particular asset?

3         A    Yeah, it's one way of looking at it.

4         Q    How about the -- the income approach?

5         A    There are several different methods of

6    that, sub methods.  But it's sort of the

7    overarching theme is you look at sort of the future

8    expected cash flows of a business and you bring 'em

9    back to their present value equivalent.

10        Q    And is -- is included in that, that sort

11   of analysis, what's sometimes referred to as a

12   discounted cash flow --                    `

13        A    Sure.

14        Q    -- analysis?

15        A    That's probably the most common way of

16   doing it.

17        Q    And what is a discounted cash flow

18   analysis.

19        A    With a discounted cash flow, you're

20   typically taking projections from the management of

21   a company and, you know, whether it's five years,

22   seven years, ten years worth of projections.  And

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

17

1    you -- you know, you look at the projections.  You

2    assess 'em.  You say are these reasonable or not

3    reasonable.  And then you -- you bring the value.

4           So if it's gonna say three years out that

5    the -- the cash flow of the business is a million

6    dollars, a million dollars three years from now is

7    not worth a million dollars today.  It's -- it's

8    different obviously.  So you -- you discount that

9    back to today's value using a -- a rate of return.

10       Q    Okay.  Are there any other approaches

11   under which you would call the income approach

12   to -- to value a -- an asset?         `

13       A    Yeah, there's -- there's a royalty rate

14   method that you use for intellectual property.

15   That's -- that's one other sort of subset of the

16   income approach.

17       Q    Okay.  How about multiples of -- of

18   earnings?

19       A    Yeah, that gets to be the market

20   approach --

21       Q    Okay.

22       A    -- that I spoke about.  That's a subset

18

1    of the market approach.

2         Q    Okay.  What's the market approach?

3         A    The market approach is, as the name

4    implies, you look at the actual market to come up

5    with the derivation of values.  So you get a

6    subject company to try -- trying to value.  And you

7    look out in the marketplace publicly traded

8    companies that do the same sort of thing that your

9    subject company does.  And you look at market

10   multiples that are implied by the stock price of

11   those companies.

12        Q    And what sort of market multiples,

13   generally?

14        A    I'd say probably the most common are

15   revenue and EBITDA multiples.  But there's other

16   multiples for specific -- you know, some people

17   may -- may value a hospital, look at price per bed.

18        Q    Okay.  And so in preparing these

19   valuations, you indicated you would be part of a

20   team; is that right?

21        A    Yes.

22        Q    Okay.  And how large was a team,

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

19

1    typically, if you could say?

2         A    Typically three to four people.  We're

3    talking about my time at Pricewaterhouse, right?

4         Q    Yes, sir.

5         A    Yeah.

6         Q    Three to four people?

7         A    Typically.

8         Q    Typically.  And what would be the -- the

9    position of the most senior person on the team, if

10   you could say, typically?

11        A    Sure.  Typically it'd be the partner.

12   And, you know, they would have sort `of overall

13   oversight, you know, client relations, sign off on

14   the final product, probably review it at some point

15   in a draft form, you know.

16        Q    Okay.  And would your -- would your role

17   include drafting valuations?

18        A    What do you mean by drafting valuations?

19        Q    Writing it, writing down what the final

20   determination would be.

21        A    Well, I guess the reason I -- I asked the

22   question, there's sort of two ways.  I mean one is

Marc J. Brown                                                          May 18, 2012
Washington, D.C.

20

1    sort of the math, right?  One's the schedule.  And

2    then often there's a report.  So I think in my time

3    at Pricewaterhouse, I probably did both.  In fact

4    my first project I did almost entirely myself.

5         Q    Okay.  What was your first project?

6         A    I was valuing securities of a safety

7    products manufacturer.

8         Q    Okay.  And was it a public company?

9         A    No.

10        Q    What did you do to value that company?

11        A    We're going back a few years.  I think I

12   looked at an income approach and a market approach.

13   But it's, you know, 15 years ago.

14        Q    Sure.  When you said income approach, is

15   that what you described earlier?

16        A    Yes.  And market approach same, you know,

17   public comparables.

18        Q    And income approach, did you do a

19   discounted cash flow analysis?

20        A    I think so.

21        Q    Okay.  And do you know what that

22   valuation was used for?

Marc J. Brown                                                    May 18, 2012
                        Washington, D.C.

                                                                          21

1        A    I don't, no.  Maybe tax purposes.

2        Q    Okay.  Did you have any interaction with

3    the client on that -- on that valuation?

4        A    I'm not sure.  If I did, it wasn't

5    extensive.

6        Q    Okay.  Do you recall any other valuations

7    that you did at -- at Pricewaterhouse Coop --

8    Pricewaterhouse?

9        A    Sure.  You know, I was there a little

10   over a year.  And, you know, I'm not sure how many

11   I did at the time.  We did a -- a couple of account

12   receivable valuations for tax purposes.  You know,

13   when you look at the accounting firms, they have

14   different focus than some others.  They do a lot of

15   tax-related work.  That's -- that's where a lot of

16   'em got started is in the tax department.

17            So one of those was for a clothing

18   company.  Don't recall what the other two were for.

19   I worked on something for British Petroleum, again

20   for tax purposes there, the marketing --

21       Q    And what was -- I'm sorry.

22       A    Their marketing wing, which is gas

22

1   stations as opposed to, you know, refining or

2   extraction.

3       Q   Okay.  And you -- you indicated earlier

4   that you had -- you had done two accounts

5   receivables valuations.

6           With respect to the British Petroleum

7   engagement, what -- what was the nature of the

8   valuation that you did?

9       A   We were valuing the -- you know, the

10  downstream, you know, the actual gas stations.

11  They -- they owned some piece.  I don't remember.

12  I think it was for tax purposes.  They may have

13  been looking to sell 'em.  I don't recall the

14  purpose.

15      Q   Okay.  Do you recall any other valuations

16  you did at Pricewaterhouse?

17      A   I worked on a staffing company while I

18  was there, valuation.  I think it was a shareholder

19  dispute.  I worked on a retail store.  That was

20  minority shareholder dispute.  I'm sure there were

21  others but those were the ones that I can recollect

22  at this point.

23

1        Q     Okay.  And so with respect to the

2    staffing company that you indicated came in the

3    context of a shareholder dispute, is that --

4        A     Uh-huh.

5        Q     -- what you were saying?

6              What was the nature of the valuation work

7    that you did in -- in that case?

8        A     Similar to others.  You know, doing

9    research, what is the universe of staffing

10   companies, the time, what are their market

11   multiples.  We did a discounted cash flow approach.

12   Those were the two that I recall.  So it was, you

13   know, doing the -- the research and the modeling.

14   I don't believe that I wrote the report at all on

15   that one.

16       Q     Okay.  Did -- did you -- did you -- were

17   you aware of what -- what the -- what the valuation

18   was to be used for or what -- what was the context

19   that --

20       A     Yeah, it was -- it was a dispute.  It was

21   some sort of dispute.

22       Q     Was it litigation?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

24

```
 1      A    It may have been.  I'm not sure if it was

 2   litigation, arbitration.  You know, it -- just to

 3   sort of put it in context, at this point I'm a

 4   year-and-a-half out of undergrad and fairly

 5   involved, certainly for that level, but not

 6   necessarily part of sort of the strategic aspects

 7   of it.

 8           So I don't remember.  You know, it's not

 9   like I was in with the partner and senior manager

10   meetings.  I just don't recall what the -- you

11   know, if it was an actual litigation or if it was

12   on arbitration or -- I don't recall the specifics.

13      Q    Okay.  So and you indicated and -- and,

14   you know, I think you indicated that those were

15   the -- the valuations that you did at

16   Pricewaterhouse that you can recall; is that right?

17      A    Yes.

18      Q    Okay.  And you indicated you worked at

19   Pricewaterhouse for a little over a year.

20           Why'd you leave?

21      A    So two weeks into my starting there, they

22   announced the merger with Coopers & Lybrand.  That
```

25

1    got effectuated the following summer.  And

2    obviously there was a little bit of turmoil along

3    those lines.  And one of the partners -- we had

4    three partners in Chicago.  One of -- one of them

5    left to go to Alix Partners.  It was called Jay

6    Alix at the time.

7              THE REPORTER:  It was called what?

8              THE WITNESS:  Jay Alix.

9              And I saw an opportunity to go with him

10   as sort of his sole staff member, and, you know, do

11   something sort of entrepreneurial, you know, get

12   additional experience, that sort of `thing.

13   BY MR. WILLIAMS:

14        Q    And so you went with that partner?

15        A    Yes.

16        Q    Who was that partner?

17        A    His name was Bruce DenUyl.

18        Q    And when you went to Alix Partners, what

19   was your role there?

20        A    So when I first started my role, on its

21   face there were three of us:  Bruce, a woman who

22   was a -- sort of a manger-type role had also come

26

1     from Pricewaterhouse, and then I was the sole

2     staff.  So that would have been early September of

3     1998.  You know, by November, I was running my own

4     projects.

5          Q    What sort of project were you running?

6          A    Valuation projects.

7          Q    Okay.  And so at Alix Partners, when --

8     when you began there, what was your -- did you have

9     a title?

10         A    Yes.  It was consultant.

11         Q    Okay.  And as a consultant, can you

12    describe generally the types of individuals or

13    entities that you consulted?

14         A    Sure.  It was a variety.  I think I was

15    promoted a couple times between that and later, but

16    I'll try and think back to that.  I mean I worked

17    on a valuation as part of the litigation for a --

18    like a -- a home products company.  I was involved

19    in a valuation for a litigation involving some

20    optical technology companies.

21              You wanted just when I was a consultant

22    or --

Marc J. Brown                                          May 18, 2012
Washington, D.C.

27

    1        Q     Indicate whether or not it changed at --
    2    as the time went on.
    3              You indicated you -- you received
    4    promotions as time --
    5        A     Yeah --
    6        Q     -- went on?
    7        A     -- I mean, you know, initially, the first
    8    month or two, it was sort of the manager, and I
    9    worked underneath the manager.  But given just my
   10    performance and sort of client/company need, I soon
   11    moved in as sort of a similar role as a manager,
   12    without the title.  So probably from three to four
   13    months in, you know, to the present day I've sort
   14    of had the same sort of role.
   15        Q     Okay.  By the way, what's a manager?
   16        A     That wasn't the official title, but
   17    someone who sort of manages a project.  You know,
   18    it's -- it's all valuation project, sort of project
   19    based.  You interface with the client.  You handle
   20    the administrative tasks.  You oversee the work
   21    that's done.  You do the work that's done.  You
   22    probably write the report.  You meet -- you meet

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

28

1    with the partner to review the work and, you know,

2    take their comments and any edits they might have.

3        Q    And who was the partner who supervised

4    you at Alix Partners and -- and indicated the

5    change over time?

6        A    Yeah, I mean it was primarily Bruce

7    DenUyl.  Starting in 2000 another gentleman joined

8    us named Louis Dudney.  And then since then there's

9    other people that have joined or have been

10   promoted.  You know, we grew fairly rapidly.  I

11   think there were 70 people in the company when I

12   started and it's 900 now or something like that.

13       Q    Okay.  And did you report directly to

14   Mr. DenUyl --

15       A    Uh-huh.

16       Q    -- or was -- you have to say --

17       A    Yeah.  Sorry.

18       Q    Okay.  And by the way, DenUyl, that's

19   D-E-N capital U-Y-L?

20       A    Yes.

21       Q    Okay.  And what -- you indicated you did

22   valuations.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

29

```
 1              Did you do anything other than

 2   valuations?

 3        A    Sure.  What time frame are we talking

 4   about?

 5        Q    At any time while you worked for Alix

 6   Partners.

 7        A    Sure.  I also do reinstructing work,

 8   where you're a financial advisor, whether it's to

 9   banks or companies.  I was an advisor to the

10   Department of Justice recently on a restructuring

11   as well.  I've done litigation work.  You know,

12   some general sort of financial and economic

13   analysis, maybe not valuation-related.  There's not

14   a lot of that sort of thing.

15              It's -- it's mostly valuation but a

16   decent amount of restructuring as well.  It just

17   depends on -- in 2009 I worked on the General

18   Motors bankruptcy.  I think in 2009 everything I

19   worked on was restructuring or distressed.

20        Q    Okay.  And so over -- over a period of

21   years you indicate that -- that your focus was

22   varied, but you indicate I think that the majority
```

Marc J. Brown                                                          May 18, 2012
                            Washington, D.C.

                                                                          30

     1    of your time was spent on valuation?

     2         A     I think that's fair.

     3         Q     Okay.  You indicated you -- you worked on

     4    litigation.

     5               You worked on litigation in what respect?

     6         A     Doing financial and valuation economic

     7    analyses.  Primarily sort of valuation-related

     8    cases, shareholder disputes, that sort of thing.

     9    Sometimes it was just a straight damages sort of

    10    litigation.

    11         Q     Okay.  And your -- your report, which

    12    we've labeled as Brown Number 2, has attached to it

    13    as Exhibit 1 your curriculum vitae.  I'm going to

    14    ask you to turn to that part of the document.

    15               You find that part of the document?

    16         A     Uh-huh.

    17         Q     There appears to be a gap in your service

    18    at Alix Partners between 2006 and 2008.

    19               Can you explain that, what you did during

    20    that period of time?

    21         A     Yeah, I wouldn't call it a gap.  I went

    22    to work for a different company.  The Chicago

Marc J. Brown                                                          May 18, 2012
Washington, D.C.

31

```
1    Fundamental Investment Partners --

2         Q    Yes.

3         A    -- that's the hedge fund.

4         Q    Okay.  And well, I mean gap in that

5    inasmuch as you started in '98 and stopped and then

6    started again; is --

7         A    Right.

8         Q    -- that fair?

9         A    That's fair.

10        Q    Okay.  And what do you do for Chicago

11   Fundamental Investment Partners?

12        A    I was an investment analyst.

13        Q    And what does an investment analyst do?

14        A    Generally they look at securities in

15   companies and provide recommendations whether to

16   buy or sell those securities.

17        Q    Okay.  And is that what you did for

18   Chicago Fundamental Investment Partners?

19        A    It is.

20        Q    And did you do anything other than that?

21        A    No.  I mean, you know, I can expand on

22   that role but that's the general role that I had.
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

                                                                         32

1        Q    Why did you leave Alix Partners in 2006?

2        A    Sure.  You know, when I went to undergrad

3   and got a degree in finance -- and I don't think

4   we've talk about it but I've got a Chartered

5   Financial Analyst designation, the CFA.  You know,

6   my intent at some point was to go into money

7   management.  That's one reason why I went in

8   investment banking.  It's one of the reason I went

9   in valuation.  And frankly, working at Alix

10  Partners worked out well.  And I stayed longer than

11  I thought I would.  And figured I'd, you know, give

12  money management a try.                     `

13       Q    Okay.  And why did you go back to Alix

14  Partners?

15       A    Because, you know, there's some good

16  things about money management and some bad things.

17       Q    What -- what were the bad things?

18       A    It's a -- the way the business works, the

19  way the hedge fund industry works is, you know, you

20  need to have your portfolio managers make trades

21  based on your recommendations.  And if for whatever

22  reason if they're risk-adverse and they don't make

33

1    the trade, then you don't really get compensated.

2         Q    Okay.  And as an investment analyst for

3    Chicago Fundamental Investment Partners, did you --

4    did you produce analyst reports?

5         A    No.  It's not -- for -- I'm sorry, for

6    Chicago Fundamental?

7         Q    Yes, sir.

8         A    Yeah, reports, no.  I mean we did memos,

9    presentations.  You'd have -- you know, a room this

10   size, you'd get -- at the time, there were probably

11   ten of us on the investment side of the business.

12   And you'd get in a room and you'd talk about

13   companies.

14        Q    So you -- you'd make oral presentations?

15        A    I mean there'd be schedules and maybe

16   a -- a one- to two-page sort of memo.  But I

17   wouldn't -- I guess I wouldn't call it a report.

18   It's not like this.  I didn't sign it.  It -- you

19   know, it wasn't submitted anywhere.  It was you

20   threw one around the table and you said, you know,

21   turn to page 2, this is why I think it's good.

22        Q    And you were recommending particular

Marc J. Brown                                                          May 18, 2012
Washington, D.C.

34

1    securities?

2         A      Uh-huh.

3                THE REPORTER:   Your response?

4    BY MR. WILLIAMS:

5         Q      You've got to say "yes" or "no."

6         A      Yes.   Sorry.

7         Q      And -- and these were recommendations

8    that -- that you discussed and -- and circulated

9    internally; is that fair?

10        A      That's fair.

11        Q      Okay.   And who would you be discussing

12   your recommendations with?

13        A      It would be the investment team.

14        Q      And it would be up to them whether or not

15   they -- they traded on your recommendations?

16        A      Yeah, there were -- there were six

17   founding partners, if you will, and then four

18   analysts, including myself.   And you'd make a

19   recommendation.   And it was sort of a black box,

20   you know.   They may tell you they loved it.   And

21   then you'd talk to 'em three days later:   Did you

22   put the trade on?   Oh, no, I haven't done it.

                                                                        35

 1              So it was a little unclear how the

 2    process worked.  You'd sort of hear in the room

 3    either I like the idea or I don't like the idea.

 4    And sometimes it got executed, sometimes it didn't.

 5       Q    And did you have -- have a sense of -- of

 6    why they -- they weren't relying on your

 7    recommendations?

 8       A    I don't know if I'd put it that way.

 9    It -- no, I don't.  I mean that was part of my

10    frustration with working there.

11       Q    I mean how would you put it?

12       A    I'm sorry, I don't understand the

13    question.

14       Q    Well, I -- I said did -- I asked you if

15    you had a sense of why they wouldn't rely on your

16    recommendations and you said I wouldn't put it that

17    way.  So I --

18       A    Oh, they --

19       Q    -- don't want to mischaracterize --

20       A    -- that they're not --

21            THE REPORTER:  One at a time, please.  I

22    didn't get the question.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

36

```
 1    BY MR. WILLIAMS:

 2        Q    Well, I asked you if -- if you have a

 3    sense of why they wouldn't rely on your

 4    recommendations.  And you said that I wouldn't put

 5    it that way.  So I wanted to clarify how would you

 6    put it, because I don't mean to mischaracterize

 7    what you said.

 8        A    I guess what I would say is it wasn't

 9    that they didn't rely on my recommendation.  As I

10    indicated, they may say that sounds like a good

11    thesis, we like the idea.

12             Sometimes there were macro aspects that

13    they felt differently about.  Sometimes they were

14    fund needs that they felt differently.  We've got

15    too much exposure to sector X in -- in their view.

16    So it's a good idea but until we get less exposure,

17    we're not gonna implement it.

18        Q    I see.  And this would be explained to

19    you after the fact or --

20        A    Sometimes.

21        Q    Sometimes there'd be no explanation?

22        A    Correct.
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

37

```
 1        Q     Okay.  And so you stayed at for -- with

 2    Chicago Fundamental for -- for two years and --

 3        A     Uh-huh.

 4        Q     -- then you -- you went back to Alix

 5    Partners?

 6        A     I was recruited back, yes.

 7        Q     Okay.  You were recruited back by whom?

 8        A     By a different partner.

 9        Q     Which partner?

10        A     Alan Lee.

11        Q     Okay.  And you were recruited back by --

12    by Mr. Lee to do what?

13        A     To do the same sorts of things that I'd

14    done previously.

15        Q     Which -- which would be what?

16        A     Valuation work, restructuring work,

17    litigation support.

18        Q     Okay.  And did you work for -- for

19    Mr. Lee upon your return to Alix Partners?

20        A     Well, I -- I did, amongst others, Bruce

21    DenUyl, Louis Dudney, other -- you know, we call

22    them managing directors, so those and others.
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

38

1       Q       And what was your position when you

2   returned to Alix Partners?

3       A       A director.

4       Q       What's the difference between a director

5   and a managing director?

6       A       It probably depends on where you're at in

7   that span.  We're a fairly flat organization.

8   We've got five levels.  Managing director's the

9   top, director's second.  A director is someone

10  who -- well, you asked managing director.  I'm

11  sorry.  They're probably more of a sales-focused

12  role.                                              `

13      Q       What does that mean, sales-focused?  In

14  terms of what?

15      A       Generating new projects.

16      Q       I see.  And how about the director?

17      A       Yeah, director's probably more in the

18  nitty gritty details of the analyses.  You sort

19  of -- you know, you oversee any staff that's

20  working on it, you do the administrative tasks, you

21  interface with the clients.  The managing director

22  does as well.  But if you start a project, you

39

1    know, and it's a six-week project, you know, maybe

2    I would talk to the client ten times and the

3    partner would talk to 'em twice, something like

4    that.

5              So, you know, they -- they have overall

6    oversight.  But depending on who the director is,

7    if you're a new director, the MD's probably more

8    involved.  If you're a senior director, such as I

9    am, you know, you know, I don't have all -- you

10   know, less -- the MDs trust me and, you know, know

11   I'm gonna do what's right.

12       Q    Can you -- can you approximate how many

13   managing directors there are at Alix Partners?

14       A    I have no idea.

15       Q    Okay.  And you indicate that there are

16   five levels.  Managing director is the top and then

17   director.

18              What -- what are the other three levels?

19       A    Vice president, associate, and analyst.

20       Q    I see.  And during your time at Alix

21   Partners, have you held any of those titles other

22   than director?

40

```
 1      A    Yeah, we changed -- we changed our title

 2   structure at some point.  So I started as a

 3   consultant.  I was promoted to associate, which is

 4   the same as a VP.  And then I -- I think I made

 5   senior associate, which is the same as a director.

 6   And then I was a senior associate for a year and

 7   then we switched titles, if I recall.

 8      Q    So you -- you went from being a senior

 9   associate to director, but it was essentially the

10   same title?

11      A    Yeah, and just changed the titles.  They

12   were -- the MDs were called principals at the time.

13   And now they're managing directors.

14      Q    I see.

15      A    So I guess I've been promoted twice since

16   I was there.

17      Q    How did you with come to be retained in

18   this case?

19      A    I believe Stavroula knew some of my

20   colleagues at Alix Partners here in our Washington,

21   D.C., office.  And she inquired with them if they

22   knew someone within Alix Partners who, you know,
```

41

1    had valuation experience, maybe hedge fund

2    experience, and, you know, you know, were they

3    interested in -- in potentially testifying in this

4    case.

5         Q    Okay.  And do you have hedge fund

6    experience?

7         A    I worked at one for two years.

8         Q    Oh, the --

9         A    Chicago --

10        Q    -- Chicago --

11        A    -- Fundamental --

12        Q    -- Fundamental --                    `

13        A    -- Investment Partners.

14             THE REPORTER:  Remember, one at a time,

15    please.

16    BY MR. WILLIAMS:

17        Q    Chicago Fundamental?

18        A    That's correct.

19        Q    And when was that that -- that

20    Ms. Lambrakopoulos reached out to you?

21        A    I think we spoke probably the latter part

22    of March of this year.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

42

1        Q    When were you retained?

2        A    I think our engagement letter might be

3   dated March 30th.  May have been signed, you know,

4   a day or two later.  I'm not -- I could be off a

5   couple days but it's -- it's around that time

6   frame.okay.

7        Q    Okay.  Can you -- can you describe for me

8   generally what the terms of your engagement are?

9        A    You know, we charge by the hour.  It's

10  not a contingent upon, you know, what my opinion

11  is.  Sort of work, you know, with K&L Gates.  I

12  don't know, what else would you like to know?

13       Q    How many hours have you worked in your

14  engagement up to this point?

15       A    I'm not sure.  We -- I think I did about

16  140 hours through sort of April and then whatever

17  time I spent in May.  I'm not sure what that is,

18  maybe another forty hours or so.

19       Q    Okay.

20       A    Fifty maybe.  I'm not sure.

21       Q    You indicated that terms of your -- your

22  engagement, you're not contingent on any particular

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

43

1    outcome.

2            To your knowledge has Alix Partners ever

3    entered into -- entered into any valuation

4    engagements where their compensation was contingent

5    upon a particular outcome?

6        A     Yeah.  On the -- on the restructuring

7    side it's different.  So when we do sort of

8    litigation consulting, this is sort of a standard

9    engagement.  You know, we charge by the hour.  And

10   we agree to -- to look at the facts.  And we'll

11   come up with an opinion that we think is

12   appropriate.                             `

13           For the guys that do -- or the

14   restructuring assignments that we do, it's

15   different.  Sometimes there is a -- a success fee

16   component, where, you know, you come in, you charge

17   an hourly rate and you say, you know, we think

18   we're gonna be able to, you know, make your EBITDA

19   go up 30 percent.  And if we hit that, you know,

20   we're gonna get some percentage of that

21   improvement.

22       Q     I see.  My -- my reference to those was

44

```
1    to -- to valuation retentions.

2         A    Umm.

3         Q    To your knowledge.

4         A    Yeah, I -- I don't -- I'm trying to

5    think.  Nothing that I've been involved with, you

6    know.

7         Q    Okay.  How many -- you indicated earlier

8    today that this -- this was your -- your first

9    deposition.

10             How many times have you been retained

11   as -- as an expert witness in a litigation?

12        A    This would be -- a litigation or

13   arbitration or --

14        Q    Well, let's start with litigation.

15        A    Yeah.  This would be the second.

16        Q    And in connection with the -- when was

17   the first time?

18        A    Maybe December of 2011.

19        Q    So --

20        A    Six months --

21        Q    -- six months ago?

22        A    -- ago, yeah.
```

45

```
 1        Q    Okay.  And that's -- and that -- and

 2   that's in connection with just another ongoing

 3   litigation?

 4        A    Yes.

 5        Q    And is that an ongoing litigation in

 6   state court or federal court?

 7        A    Huh.  It's a bankruptcy matter.  It's a

 8   slow mover.  I think it's federal but I'm -- I'm

 9   not certain, actually.

10        Q    Bankruptcy is probably federal.

11        A    Yeah, right.

12        Q    What's the -- the -- name`of the case?

13        A    It is ISB Bank.  And it was a -- we're

14   working for the plaintiffs, which is the trustee.

15   It's a bank -- community bank that, you know, went

16   bankrupt and was seized by the FDIC.  And we're

17   working into fraudulent conveyance, so a valuation

18   solvency analysis.

19        Q    And when you say "we," who do you -- who

20   do you mean?

21        A    Alix Partners.

22        Q    And who -- who is responsible for that
```

46

1    particular engagement?

2         A    I am.

3         Q    And who are you working with in

4    connection with that engagement?

5         A    The trustee.

6         Q    Well, when you -- you refer to "we" at

7    Alix Partners, are you the only person from Alix

8    Partners working --

9         A    No, there's a -- there's another director

10   involved, Jeff Kopa who's working under my

11   direction?  I -- there may -- one of our an -- our

12   analysts may have done some work on`it, but it's

13   not -- it's not a very big case.

14        Q    Okay.  So -- so yourself and Mr. Kopa and

15   perhaps a small amount of work from -- from an

16   analyst and that's -- those are the individuals

17   from Alix Partners that are working on that

18   retention?

19        A    Yes.  There was a managing director

20   involved, who's left the firm, as well.

21        Q    Who was that?

22        A    Kevin Carmody.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

47

1       Q     And did -- did Mr. Carmody have any role

2    in obtaining the -- the engagement?

3       A     Yeah, he and I went and pitched the

4    business to the trustee.

5       Q     When you say pitched the business, what

6    does that mean?

7       A     We met with the trustee and, you know,

8    presented our credentials and said, you know, we'd

9    like to work with you, do you want to work with us.

10      Q     And yourself and Mr. Carmody participated

11   in that meeting with the trustee?

12      A     That's correct.                `

13      Q     And anyone else from Alix Partners?

14      A     No.

15      Q     Okay.  And in connection with this

16   retention in this -- in this case, is there anyone

17   from Alix Partners other than you working on this

18   retention?

19      A     Yes.

20      Q     Who is that?

21      A     It would be Chris Ruble, Matt Reizman,

22   Katie Todd.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

                                                                          48

1        Q     And what's -- what's Mr. Ruble's position

2    at Alix Partners?

3        A     He's a vice president.

4        Q     And so that's --

5        A     One level --

6        Q     -- some --

7        A     -- down from me.

8        Q     Exactly.  One level down from director.

9    Okay.

10             How about Mr. Reizman?

11       A     He's an associate.

12       Q     That's one level down from vice

13   president?

14       A     Correct.

15       Q     Okay.  And how about Ms. Todd?

16       A     She's an analyst.

17       Q     One level --

18       A     One level down as well.

19       Q     Got it.  So that's -- including yourself,

20   that's four individuals from Alix Partners?

21       A     Correct.

22       Q     Anyone else from Alix Partners working on

49

1    this engagement at all?

2        A    Some, you know, admin from the

3    secretaries, but no, no one else.

4        Q    Okay.  Did anyone other than you

5    participate in the drafting of this report?

6        A    I'm sure Mr. Ruble was involved.

7        Q    How was he involved?

8        A    He drafted sections of it, but I, you

9    know, overwrought -- wrote and changed to -- to fit

10   what I thought.

11       Q    Which sections did Mr. Ruble draft?

12       A    Certainly the beginning stuff, you know.

13       Q    When you say the beginning stuff, what do

14   you mean?

15       A    If you look -- if you wanna look at the

16   report --

17       Q    Sure.

18       A    -- you know, flip through it if that's

19   helpful, it'd be, you know, page 1, the background.

20   You know, he would have put the tables in.

21       Q    The background section that appears on --

22   beginning on page 3?

Marc J. Brown                                                      May 18, 2012
Washington, D.C.

50

1       A     Yeah.

2       Q     And continuing to page 11?

3       A     [Witness looked at document].  Yeah, I

4    mean, you know, to -- to make it more clear and

5    fairly standard operating procedure, you know, for

6    efficiency sake, a more junior person'll -- will

7    sort of start, put the basic shell to it.  And

8    the -- the expert will work through it and work

9    over it and say, you know, I -- I don't like how

10   you phrased that, you're saying the wrong thing

11   about my background, change that, and that sort of

12   thing.

13      Q     Okay.  And when you refer to standard

14   operating procedure, how many expert reports have

15   you participated in the drafting of?

16      A     Maybe it's twenty, could be a few more or

17   a few less.

18      Q     Okay.  And of the twenty expert reports

19   that you've participated in the drafting of, how

20   many have gone out under your name?

21      A     None.

22      Q     Well, one, right?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

51

1        A      Well, yeah.

2        Q      Right.  Okay.  Whose names have been

3    the -- the name on the expert reports that you

4    worked on?

5        A      It would have been Bruce DenUyl, Louis

6    Dudney.  There was a declaration, so I don't know

7    if you'd call that a report, if you wanna do that.

8        Q      Appreciate the distinction, but -- but

9    for the declaration, who was -- who was the

10   individual who --

11       A      I be --

12       Q      -- executed that?              `

13       A      I believe it was Al Koch.

14       Q      And is that -- is that another managing

15   director --

16       A      It is.

17       Q      -- at Alix Partners?

18       A      Uh-huh.

19       Q      Okay.

20       A      That was related to General Motors.

21       Q      I see.  How many expert reports that have

22   gone out under the name Bruce DenUyl have you

52

```
 1    participated in the drafting of?

 2         A    If it's twenty, then -- if it's twenty in

 3    total, then Bruce is twelve, fifteen.  I'm not --

 4    I'm not sure.

 5         Q    Approximately twelve to fifteen --

 6         A    Some --

 7         Q    -- give or take?

 8         A    Something like that, yeah.

 9         Q    Okay.  How about for Mr. Dudney?

10         A    I think he would be the remainder, aside

11    from the declaration.  Working with Kevin was

12    mostly restructuring work.  There -- there may be

13    one other, but I -- I'm not recalling.

14         Q    I see.  And the -- speaking particularly

15    the reports that you worked on for -- for

16    Mr. DenUyl, what -- which -- which cases were

17    the -- did -- did those reports involve, if you can

18    recall as you sit here?

19         A    Sure.  There was a case called Iridium.

20         Q    Say again.

21         A    Iridium, I-R-I-D-I-U-M.

22         Q    Uh-huh.
```

53

1       A       Charter Communications.

2       Q       Okay.

3       A       A company called MSC, a company called

4    Hecla, a matter involving Bell South.   There was

5    another one in California.   I forget the acronym

6    that the company was.   Was a marketing company.

7       Q       Okay.

8       A       Edison Brothers was another one.

9       Q       You've -- you exhausted your memory?

10      A       I mean I could sit here and maybe come up

11   with something if you wanna take the time to do

12   that, but that's -- that's what I recall right now.

13      Q       Okay.   You ever heard of a company called

14   Tousa Corporate?

15      A       Uh-huh.

16              THE REPORTER:   Your response?

17              THE WITNESS:   I have, yes.

18   BY MR. WILLIAMS:

19      Q       How have you heard of it?

20      A       I believe there was a ruling out a day or

21   two ago.

22      Q       In terms of what?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

54

```
 1       A    Had to do with I think dispute between

 2   the second lien holders and the unsecureds or

 3   something like that.  I wasn't involved in the

 4   case.

 5       Q    Okay.  You weren't involved in the case?

 6       A    No.

 7       Q    Was Alix Partners involved in the case?

 8       A    They were.

 9       Q    Do you know how Alix Partners is involved

10   in the case?

11       A    I believe that we rendered a solvency

12   opinion in the case.              `

13       Q    But you weren't involved in that opinion?

14       A    Not at all.

15       Q    Okay.  Do you know who rendered the

16   solvency opinion?

17       A    I think it may have been Bruce DenUyl.

18       Q    You -- you indicated that you've been

19   involved in a number of reports under Mr. DenUyl's

20   name.

21            Was there ever a time when you were --

22   you participated in the drafting of a report
```

55

1    where -- where you disagreed with the conclusions

2    that are reflected in the final version of the

3    report, that you can recall?

4         A    I have no idea.

5         Q    You don't recall such a -- such a time?

6         A    No.

7         Q    Okay.

8         A    I may have.  I may not have.  I -- I

9    don't recall.  It's not my report.

10        Q    As you sit here today, you don't recall

11   such a --

12        A    I don't.

13        Q    -- circumstance?

14             When you say it's not your report, you

15   mean it's under someone else's name or --

16        A    Yeah, it's his opinion.

17        Q    Okay.

18        A    I mean he and I certainly differ on

19   opinion on things.  I mean I don't -- I just don't

20   recall if he issued an expert report and I

21   disagreed with it.  I don't think so.  Not in major

22   substance, but I don't recall.

56

1          Q    Okay.  As you sit here, you don't recall

2    an instance in which you disagreed?

3          A    I don't.  I -- I don't.

4          Q    With respect to the -- the twenty --

5    approximately twenty expert reports that you've

6    participated in the drafting in, can you -- and

7    this maybe somewhat an unfair question -- but can

8    you describe what -- what your role was in -- in

9    the preparation of those reports and, you know, or

10   indicate whether or not your role changed?

11         A    Changed over time --

12         Q    Yeah.                          `

13         A    -- or --

14         Q    Or from report to report.

15         A    Yeah, it's certainly different from

16   report to report.

17         Q    Okay.

18         A    I think the basics of what someone does

19   and -- and my role didn't change.  You know, I was

20   responsible for a majority of the analytics,

21   whether -- whether it was me putting the numbers in

22   the spreadsheet or directing someone to do so and

57

```
 1    reviewing them.  I certainly would write a

 2    background section and parts of the report that,

 3    you know, he would change.

 4         Q    When you say analytics, what do you mean

 5    by that?

 6         A    Well, if it was a valuation, it would be,

 7    you know, the company financial statements, market

 8    multiples, you know, that sort of thing.

 9         Q    Okay.  And to your knowledge has the --

10    the expert reports that -- that you're indicating,

11    are those expert reports that were produced in the

12    context of -- of litigation or some `other context?

13         A    Yeah, primarily litigation.  That's what

14    I thought we're talking about.

15         Q    Right.

16         A    If we're talking about valuation reports,

17    it's probably another fifty.

18         Q    Okay.  And valuation reports just sort of

19    beyond the scope of litigation another fifty?

20         A    Correct.

21         Q    Okay.  And in what con -- well, strike

22    the question.
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

58

1            And of those fifty or so valuation

2    reports that -- that you've participated in other

3    context, how many of those have been under your

4    name?

5       A    Typically those are issued under Alix

6    Partners' name or Pricewaterhouse's name as opposed

7    to an individual.

8       Q    I see.  So with respect to the ordinary

9    valuation opinion, would there be a -- the name of

10   an individual who was responsible for the

11   engagement that appeared on -- on the report?

12      A    I think sometimes.  Sometimes not.

13      Q    Okay.  With respect to the fifty or so

14   valuation reports that you worked on, has there

15   ever been a time when your name was listed on the

16   report, best of your recollection?

17      A    I'm not sure.  I've signed reports.  I've

18   done reports.  But I think I signed them as Alix

19   Partners.

20      Q    You don't recall a circumstance in which

21   your name would be printed or signed onto a report,

22   you, Marc Brown?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

59

1        A     No, I understood the question.  I'm

2    thinking about it.

3        Q     Okay.

4        A     Trying to give you my best recollection.

5        Q     Sure.

6        A     Yeah, I'm -- I'm thinking of one.  I -- I

7    don't recall if the final one was under my name or

8    Alex Partners' name.

9        Q     Which one you thinking of?

10       A     It was the valuation of a airplane

11   manufacturing company.

12       Q     Do you recall what the purpose of that

13   valuation report was?

14       A     It was -- it had to do with either tax or

15   financial reporting.

16       Q     And that -- that was at -- at Alix

17   Part -- when you --

18       A     Correct.

19       Q     -- were at Alix Partners?

20             Do you recall the name of the company?

21       A     I do.  I believe it's confidential.

22       Q     So this was a report that was sort of

60

1    internal and shared only with -- well, who --

2    who -- can you say who retained you?

3         A    Yeah, that's -- I'm not sure.  So it was

4    an engagement that we worked on as a firm for other

5    reasons.  And they called me in to assist them.  I

6    often get calls from our other groups to help them

7    with valuations.

8         Q    Okay.

9         A    It's -- if it's important, I can check.

10   Let me know.  But I -- I'm not sure.  It strikes me

11   as something that's potentially confidential.

12        Q    Okay.  That's fair.        `

13             Do you recall when you did this report?

14        A    It would've been within the last six

15   months.

16        Q    Okay.  I was asking you earlier about

17   your vitae, which appears in Exhibit 1 of Exhibit

18   Brown 2.

19        A    Exhibit 1, yes.

20        Q    Yes.  And I'm going to ask you to turn to

21   the second page, under the heading selective

22   engagements.

Marc J. Brown                                                              May 18, 2012
Washington, D.C.

61

1       A     Second -- okay.  Page 3 of the document?

2       Q     Yes.

3       A     Yeah.

4       Q     And it talks about, the first bullet

5    point, a $3.7 billion fraudulent conveyance

6    litigation, the Seventh Direct of New York?

7       A     Okay.  I was on the wrong page.  I got

8    it.

9       Q     Oh, sorry.

10      A     That's the Iridium engagement.

11      Q     Okay.  And this is -- this is a report

12   that you worked on with Mr. DenUyl?`

13      A     Correct.

14      Q     Do you know if Mr. DenUyl testified in

15   that case?

16      A     He did.

17      Q     And what was your role in -- in the

18   preparation of the report in that case?

19      A     That was a large, frankly, landmark

20   decision of a fraudulent conveyance that involved a

21   satellite phone services provider.  See the big

22   phones that went bankrupt.  And the unsecured

62

1   creditors were alleging that a fraudulent

2   conveyance had occurred and that Motorola was to

3   blame for that.

4           We worked for counsel for Motorola.  And

5   it was a project that went on for a number of

6   years.  In fact when Bruce testified, I had left

7   the firm and was at the hedge fund.  The report was

8   issued while I was still there.  So it would have

9   been the same sort of things, you know.  There were

10  a lot of documents.  It was the sort of age before

11  digital documents so boxes upon boxes of documents,

12  reviewing depositions, analyzing the company.

13          It was a -- you know, there was a -- a

14  lot of materials I guess to look at.  I mean it

15  was -- at the end of the day, it was a valuation of

16  the business.

17      Q    What was your role in the valuation of --

18  in the production of the expert report?

19      A    Similar to others.  I was a director on

20  the in -- sort of what I would deem a manager.  I

21  oversaw the process.  You know, I would write

22  sections of the report.  I would do or oversee the

63

 1    analysis behind it.

 2         Q    Let me ask you to look at the fourth

 3    bullet point where it talks about assessing the

 4    value of a Latin American wireless telecom provider

 5    for a purchase price dispute.

 6              It states, Provided litigation support to

 7    counsel and the testifying expert.

 8              What does that -- what does that mean,

 9    litigation support?

10         A    Certain -- certain attorneys will ask you

11    what does this mean, you know, I don't understand

12    numbers, I don't understand revenue; I don't

13    understand profit.

14         Q    I frequently ask those questions.

15         A    Okay.  So it's just sort of instructing

16    them and helping them through financial issues, if

17    you will.

18         Q    Okay.  And who was the -- the testifying

19    expert in that case?

20         A    There were two I believe.  Bruce DenUyl

21    and Louis Dudney.

22         Q    Okay.  And what was the name of that

64

1    case?

2         A     I think it was Bell South versus Argenta

3    Finance.  I think there was a longer title, but

4    that's the -- the gist of it.

5         Q     Okay.  And let me ask you to look at the

6    next page and the first bullet point where it talks

7    about valuing and assessing the solvency of $21

8    billion U.S. cable company as part of a plan of

9    reorganization, confirmation dispute regarding the

10   reinstatement of a multibillion dollar prepetition

11   secured debt facility.

12             What -- what case was that?

13        A     That was Charter Communications.

14        Q     Okay.  And what was your role in that

15   litigation?

16        A     Probably similar to the Iridium

17   engagement.

18        Q     Okay.  And who was the testifying expert

19   in that case, if you recall?

20        A     That would've been Bruce DenUyl.

21        Q     And with that, Mr. Brown, we're going to

22   go off the record briefly, take a short break so

Marc J. Brown                                                        May 18, 2012
                                Washington, D.C.

                                                                            65

1    that the videographer can change the tape.

2        A    Okay.

3             VIDEOGRAPHER:   This concludes tape number

4    one in the video deposition of Marc Brown.  The

5    time on the video is 11:05 a.m.  We are off the

6    record.

7                              (Recess)

8             VIDEOGRAPHER:   This begins tape number

9    two in the video deposition of Marc Brown.  The

10   time on the video is 11:23 a.m.  We are on the

11   record.

12   BY MR. WILLIAMS:                           `

13       Q    Mr. Brown, I am going to continue my --

14   my questions with exhibit -- third page of Exhibit

15   1 to your --

16       A    Okay.

17       Q    -- vitae, which I believe is the page

18   that you have in front of you.

19       A    Okay.

20       Q    And I want to ask you about the sixth

21   bullet point that deals with analyzing issues of

22   fraudulent conveyance.

66

1           Do you see that part of the title?

2      A    I do.

3      Q    Okay.  And reasonably equivalent value

4   related to an air cargo company, performed

5   valuation analysis to determine solvency at various

6   points in time, provided litigation support to

7   counsel as a testifying expert.

8           My question is what case was that?

9      A    It was called Southern Air Transport.

10     Q    Okay.  And you did a valuation analysis

11  in that case?

12     A    I was there -- was a different testifying

13  expert, but yeah I supported him.

14     Q    Who was the testifying expert?

15     A    It was Bruce DenUyl.

16     Q    And to the extent that there was an

17  expert report in that case, is it fair to say that

18  it went out under Mr. DenUyl's name?

19     A    Yes.

20     Q    Because the -- the report in that case

21  went out under Mr. DenUyl's name, is it -- would

22  you agree with me that he had final say in the

67

```
 1    opinion?

 2        A    Yes.

 3        Q    Okay.  And is it the case that the only

 4    time in which you've prepared an expert report in

 5    federal court litigation in which you had final say

 6    is -- is this case?

 7        A    That I've had final say?

 8        Q    Yes.

 9        A    Yes.

10        Q    Let me ask you to go to the next page of

11    the document.

12             And I want to ask you a question about

13    the seventh bullet point down where it indicates

14    you are, Providing litigation support to the U.S.

15    Government related to its interests in litigation

16    trust established for the pursuit of a fraudulent

17    conveyance involving a chemical company.

18             What case is that?

19        A    I'm not sure if we've been disclosed in

20    our role.  So I'll answer if you want, but I don't

21    know if it's confidential or not.

22        Q    Well, I'm not going to ask you to divulge
```

68

1    anything that's conditional.

2              Is that an ongoing engagement?

3        A    It is.  It's the -- it's the Tronox

4    litigation, T-R-O-N-O-X.

5        Q    Okay.  What kind of litigation is that?

6        A    It's a fraudulent conveyance action.

7        Q    And is that in federal court?

8        A    Yes.

9        Q    In -- in New York, or somewhere else?

10       A    You know, I don't know.  The trial's

11   actually going on as we speak.  We were involved

12   sort of in a consulting role.  Alix`Partners was

13   not in a testifying role, but we were involved

14   earlier in the case.  I mean we have an ongoing

15   role.  My part of it has been less in the last

16   couple months.

17             I think it's in New York.  I think it's

18   probably Southern District of New York, which is I

19   think where the bankruptcy was, but I'm -- I'm just

20   not certain.  The companies themselves involved are

21   in Texas and Oklahoma.

22       Q    I see.  And it indicates that the work

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

1   includes reviewing and commenting on multiple

2   testifying experts' analyses and conclusions on

3   valuing solvency?

4        A    Yes.

5        Q    Is it fair to say that your work didn't

6   include providing an expert report in that matter?

7        A    No, it was basically telling the retained

8   experts, you know, is your work product good.

9        Q    And were the retained experts, experts

10  from -- from Alix Partners?

11       A    No.

12       Q    I'm going to ask you to turn two more

13  pages.  And what I want to ask you about is the

14  sixth bullet point from the top dealing with

15  calculated damages.

16            Do you see that?

17       A    Uh-huh.

18            THE REPORTER:  Your response?

19            THE WITNESS:  Yes.

20  BY MR. WILLIAMS:

21       Q    It says, Calculated damages and provided

22  litigation support as a part of an arbitration

Marc J. Brown                                                    May 18, 2012

Washington, D.C.

70

1    regarding a European joint venture between a global

2    pharmaceutical company and a European pharma

3    company.

4              And did you produce a report in that --

5    in that arbitration?

6         A    Lewis Dudney produced a report.

7         Q    Okay.  And that's -- and that's a

8    managing director of --

9         A    Correct.

10        Q    -- Alix Partners?

11             And what was your role in that retention?

12        A    I had overall oversight of the project,

13   client interaction, the -- the analytics behind it,

14   part of drafting the report.

15        Q    You indicated that as part of this

16   retention as -- in terms of leading your retention

17   in this case, inquiries were made in terms of

18   whether or not there was someone at Alix Partners

19   who might be interested in -- in the retention.

20             Was Mr. DenUyl consulted?

21        A    How do you mean consulted?

22        Q    Spoken to?

Marc J. Brown                                                May 18, 2012
                        Washington, D.C.

 1              MS. LAMBRAKOPOULOS:  I ask by whom?

 2    BY MR. WILLIAMS:

 3        Q    By anyone in connection with your

 4    retention in this case?

 5        A    Yeah, he -- he may have been.  I think

 6    the call came in to one of our directors and

 7    managing directors here in Washington.  And I'm

 8    sure they reached out to Bruce and Louis and some

 9    others as well as me in terms of, you know,

10    interest and availability in taking on the

11    assignment.

12        Q    Did Mr. DenUyl lack interest or

13    availability, to your knowledge?

14        A    Yeah, he lacked availability.

15        Q    Okay.

16        A    He was fairly busy at the time.

17        Q    Okay.  He was too busy?

18        A    Yes.

19        Q    How about Mr. Dudney?

20        A    Same.  Mr. Dudney's in a trial right now.

21        Q    So he --

22        A    As we speak.

Marc J. Brown                                                                    May 18, 2012
Washington, D.C.

72

1       Q     He was too busy?

2       A     Both of them, yeah.

3       Q     Anyone else who was consulted?

4       A     I think I was the other person consulted.

5       Q     You -- you weren't too busy, I take it?

6       A     I had more flexibility in my schedule,

7    yes.

8       Q     Is it fair to say that -- that this

9    retention is -- is the biggest retention you've

10   ever had?

11      A     I don't understand the question.

12      Q     Sure.  You indicate that -- that you've

13   spent upwards of 200 hours on this engagement; is

14   that -- is that right?

15      A     I think the high end of my range is 190.

16      Q     Okay.

17      A     My rough range, but --

18      Q     Approximately 190?

19      A     Approximately.

20      Q     Have you ever had an engagement where you

21   were the senior person in which the firm generated

22   as much business as this case?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

73

1               MS. LAMBRAKOPOULOS:  Objection.  Form.

2               THE WITNESS:  Possibly.

3    BY MR. WILLIAMS:

4        Q     When?

5        A     Currently.  We have an ongoing project

6    that I can't disclose that I am part of the team

7    on.  And, you know, part of the getting credit on

8    that is significantly larger than this.

9        Q     I see.  So other than your -- your

10   current engagement that you indicate began in

11   December; is that right?

12       A     Which engagement?          `

13       Q     The -- the engagement that you just

14   referred to.

15       A     That's a different engagement.

16       Q     Oh, when did the -- when did this -- this

17   other engagement begin?

18       A     Maybe February.

19       Q     February of 2012?

20       A     2012, yes.

21       Q     Okay.  When did this engagement, the

22   Mannion engagement, begin?

Marc J. Brown                                                                    May 18, 2012
Washington, D.C.

74

1       A    The end of March, early April of 2012.

2       Q    Okay.  So maybe a month later?

3       A    Roughly, sure.

4       Q    And other than your -- your February of

5    2012 engagement, is this the largest engagement

6    that -- that you're you getting credit on, as you

7    put it?

8       A    That we've actually been retained in?

9       Q    Yes, sir.

10      A    I'm not sure.  I'm not sure.

11           MS. LAMBRAKOPOULOS:  Can I -- just a

12    clarifying question.  I think you're asking two

13    separate questions, Dave.  One is largest

14    engagement that they've been -- that -- that

15    Mr. Brown has been retained on.  And I guess there

16    was a second question, the largest engagement for

17    which he's getting credit on.

18           MR. WILLIAMS:  I meant to ask the second

19    question.

20           THE WITNESS:  That I'm getting credit on?

21    BY MR. WILLIAMS:

22      Q    Yes.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

75

```
 1        A    I'm not sure.  The way we get credit is

 2   complicated.

 3        Q    Okay.  Fair to say this is an important

 4   case to you?

 5        A    I guess I'd say all my cases are

 6   important.  I mean I try to do a -- a good job for

 7   any engagement of mine.

 8        Q    Sure.  And that would be consistent with

 9   this case?

10        A    Yes.

11        Q    Okay.  And let me to turn -- I'm going to

12   ask you some questions about the --`the -- your

13   report here.  And first I'm going to ask you to

14   look at page 3 of -- of the report.

15        A    [Witness looked at document].  Okay.

16        Q    And it's a summary of opinion.

17             And you say, Based on my analysis, it's

18   my opinion that the total value attributed to

19   Palisades' side pocket investments in World Health

20   on its NAV statements as of the valuation dates

21   appear reasonable.

22             Is that your opinion?
```

76

1        A     Yes.

2        Q     Do you have any other opinions in this

3    case?

4        A     I mean this report was issued prior to

5    the issuance by Mr. Pump of two reports.  So I -- I

6    could potentially have opinions on his reports but

7    in general that's my opinion.

8        Q     Okay.  In general, to the extent that you

9    had opinions in this case, did you endeavor to

10   reflect them in your report?

11       A     Yeah, my report is reflective of my

12   opinions the date I signed -- signed it, yeah.

13       Q     Okay.  And were there any opinions that

14   you reached as of the date that you signed in your

15   report that you didn't include in your report?

16       A     No.

17       Q     Okay.  Were there any analysis that you

18   performed as of the date of your opinion that --

19   that are not reflected in this report?

20       A     What do you mean by analysis?

21       Q     Any sort of examination, calculation, or

22   study?

Marc J. Brown                                                    May 18, 2012
                              Washington, D.C.

                                                                        77

 1        A    It's kind of a broad question.

 2        Q    Yes.

 3        A    You know, as you go through looking for

 4    guideline companies, you -- you know, you have a

 5    larger set of companies.  And you say company X

 6    makes sense, company Y doesn't.  So I certainly did

 7    that sort of exercise.

 8        Q    Any other exercises?

 9        A    There may have been.  I mean nothing

10    substantial, I guess.

11        Q    What other exercises can you recall?

12        A    I'm not sure if I talk about what the

13    general economy was doing in here.  I certainly

14    looked at some of those materials.

15        Q    Any other analysis or exercises?

16        A    I don't think so.

17        Q    You don't recall any as you sit here

18    today?

19        A    No.

20        Q    Okay.  What other companies did you look

21    at?

22        A    I think it was a broad list at first.

78

1   And then we narrowed it down to sort of medical

2   staffing companies.

3        Q    When you say a broad list, as list of --

4   can you -- can you ballpark the --

5        A    You can do a screen and various databases

6   that says give me staffing companies.  Manpower,

7   Inc.'s not the same kind of company as World Health

8   so you sort of exclude them.

9        Q    And so -- so you -- would -- am I fair in

10  characterizing it as you took a broad section of

11  companies and excluded companies that weren't in

12  the same sort of business as World Health?

13       A    Correct.

14       Q    And what other steps did you take in --

15  in that -- in that analysis?

16       A    Well, it's probably like a multi step

17  analysis.  You sort of throw out the very obvious

18  ones and then you might get a larger set that might

19  have some potential to be relevant.

20       Q    And with respect to the -- the ones who

21  might have some potential to be relevant, do you

22  recall approximately how many companies you

79

1    identified?

2         A     Yeah, so some private ones showed up; but

3    public companies at the time, I think there was

4    four in total.

5         Q     And then how did you eliminate any of

6    those companies?

7         A     Sure.  One -- one company was called On

8    Assignment.  They were losing money and did some

9    things that were a little different than what World

10   Health did.  And you couldn't develop profit

11   multiples on 'em and didn't -- didn't seem like a

12   relevant comp.                    `

13        Q     Didn't seem relevant because they were

14   losing money?

15        A     Losing money and you couldn't get a

16   multiple because they had negative profits,

17   negative EBITDA.

18        Q     And were there any similarities between

19   that company and World Health?

20        A     There were some.

21        Q     Which similarities do you recall?

22        A     And they are generally -- they had five

80

1    or six segments of business, you know.  Some

2    portion of that overlapped in terms of travel

3    nursing or per diem.

4         Q    Do you recall any other similarities?

5         A    No.

6         Q    Okay.  And what was the other company

7    that you were able to eliminate?

8         A    I think it was called Medical Staffing

9    Network.

10        Q    Okay.  And why did you eliminate them?

11        A    They actually had a very high EBITDA

12   multiple, 20, 30-something, times EBITDA, which

13   seemed like an outlier.

14        Q    Okay.  And was that the only reason you

15   eliminated that company?

16        A    They also weren't a -- as diversified.  I

17   think they operated in much fewer states than World

18   Health did.

19        Q    And was that -- were those the only

20   reasons that you eliminated --

21        A    There may have been others.  Those --

22   that's what comes to mind.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

81

1        Q     Okay.  And then the other two companies

2   you didn't eliminate; is that right?

3        A     Yeah, those are what's in my report.

4        Q     You say the total value attributed to

5   Palisades' side pocket investments in World Health

6   and its NAV statement as of valudation -- valuation

7   dates appear reasonable.

8              Is it your opinion that the valuations of

9   the side pocket investments in World Health in the

10  Palisades' NAV statements are accurate?

11       A     I wasn't asked to form that opinion.

12       Q     Okay.  But is it your opinion that they

13  were accurate?

14       A     I don't have an opinion.

15       Q     You don't have an opinion one way or the

16  other?

17       A     I wasn't asked to determine their

18  accuracy.

19       Q     I understand you weren't asked to, but my

20  question is do you have an opinion?

21       A     My opinion is they appear reasonable.

22       Q     I understand.  But -- but my question is

Marc J. Brown                                                    May 18, 2012
                          Washington, D.C.

                                                                    82

1    do you have an opinion as to whether or not they're

2    accurate?

3         A    I don't have an opinion.

4         Q    You don't have an opinion one way or the

5    other as to whether or not they're accurate?

6         A    It's not what I was asked to do.

7         Q    And because it wasn't what you were asked

8    to do, you don't have an opinion one way or the

9    other as to whether or not they're accurate?

10        A    I don't.

11        Q    You've conducted a number of valuations

12   in your career; is that fair?           `

13        A    Probably more than 150.

14        Q    Okay.  And as part of conducting a

15   valuation purpose generally is to figure out how

16   much something is worth; is that fair?

17        A    That is the usual purpose, yes.

18        Q    Okay.  In connection with this retention,

19   did you come to any -- based on your experience,

20   did you come to any opinion as to how much the

21   relevant assets were worth?

22        A    Can you rephrase the question?

83

1        Q     Yeah.

2              Did you come to any opinion or

3    conclusion, based on your expertise, as to whether

4    or not the side -- as to what the value of the side

5    pocket assets were?

6        A     Yeah, well, maybe I should just sort of

7    reiterate what I was engaged to do.  And it was to

8    look at the side pocket investment in World Health

9    and how it was marked on the books of Palisades'

10   master fund at the time of the three valuation

11   dates, and, you know, does this seem reasonable,

12   were they off base, were they, you know, that --

13   that was what I was asked to do so that's what I

14   did.

15             Did I -- did I look at it and say it

16   should be a penny more or a penny less?  No.

17       Q     Well, would it be helpful to -- to -- to

18   the analysis that you are -- that you're -- that

19   you're referring to to calculate how much the

20   assets were worth?

21       A     I did.  That's -- that's -- if you wanna

22   turn to the part -- my Exhibit 5-2 and 5-3, that's

84

1    where I sort of walk through the math.  And I

2    discuss it starting on I guess page 11.

3        Q    Okay.  Starting on page 11, you calculate

4    how much the side pocket assets were worth?

5        A    I do my -- I start talking about my

6    valuations as to World Health.

7        Q    Right.  But my question is did you

8    calculate how much the assets were worth?

9        A    Yeah, I tested the value of World Health.

10       Q    What does that mean, you tested the value

11   of World Health?

12       A    It means I looked at a range of values,

13   which are in Exhibit I think 5-1 of my report, the

14   summary of it.  And again, back to the original

15   reason I was retained was the managers put a value

16   on the assets in the side pocket.  The allegations

17   I guess are that it's inflated.  And I was asked to

18   say:  In your opinion do these values appear

19   reasonable?  And that's what I did.

20       Q    And then that -- that's exactly how it

21   was explained to you, what you were supposed to do,

22   to opine as to whether or not they were reasonable?

Marc J. Brown                                                    May 18, 2012
                        Washington, D.C.

                                                                    85

1        A     Yes.  I mean I -- I might be paraphrasing

2   a little bit but that's -- that was what I was

3   retained to -- to opine on.

4        Q     And did you undertake any analysis to

5   determine -- putting aside the question of

6   reasonableness -- what the accurate value of -- of

7   the -- of the various World Health assets was as of

8   the valuation dates?

9        A     I guess I don't understand your -- your

10  question about accurate value.  I mean you've asked

11  it four or five times now, so maybe it's -- I -- I

12  just don't understand what you're asking.

13       Q     You don't understand what accurate value

14  of World Health assets means?

15       A     I -- I don't.

16       Q     Okay.

17       A     I mean are you saying -- are you saying

18  that was the value, the only value it could have

19  been at the time?

20       Q     I'm asking did you, as a result of your

21  valuation expertise, calculate how much the assets

22  were worth as of the valuation date?

Marc J. Brown                                              May 18, 2012
Washington, D.C.

86

1        A    As I stated, I tested the value.  I took

2    a look at -- they had a value of X.  And I looked

3    to see if it was reasonable.  I -- I think maybe --

4    maybe the misunderstanding is, you know, if anyone

5    tells you that a company like this is worth

6    exactly, you know, down to the penny something,

7    that's -- there's some judgment in any valuation.

8        Q    Okay.  And did you apply your judgment

9    to -- to calculate or to determine what you thought

10   the value --

11       A    Absolutely.

12            THE REPORTER:  I didn't hear all the

13   question.  To determine?

14   BY MR. WILLIAMS:

15       Q    Did you use your judgment to calculate or

16   determine what you believe the valuation should be?

17       A    I looked at it, yes.

18       Q    You looked at it?

19       A    Yeah, I mean that's what my analysis

20   entailed.

21       Q    And let's talk about your analysis, on

22   page -- beginning at page 11.

Marc J. Brown                                                    May 18, 2012
                          Washington, D.C.

                                                                        87

 1        A     Uh-huh.

 2        Q     You there?

 3        A     I am.

 4        Q     You say as of each of the valuation dates

 5   you tested the reasonableness of the aggregate

 6   values attributed to the World Health securities on

 7   the NAV statements.

 8              Why did you test the reasonableness of

 9   the aggregate values?

10        A     Well, I guess as I understood the

11   allegations, it was -- you know, and through part

12   of reading the depositions and that`sort of thing,

13   you know, the discussion appeared to be that the --

14   the portfolio was inflated, all right, the total

15   package of assets were inflated and that they were

16   earning excess management fees on that total value.

17   So that's why I looked at it.

18        Q     Did you test the value of the individual

19   assets?

20        A     Well, I tested whether they were covered

21   by the overall enterprise value of World Health.

22        Q     What's that mean, covered?

Marc J. Brown                                              May 18, 2012
Washington, D.C.

88

```
 1        A     I guess it means when you have a company

 2    that has debt in the capital structure as World

 3    Health did, that's in a situation that they were

 4    in, sort of a restructuring mode, it means do I

 5    have enough value to get paid on the securities.

 6    It is a -- it's -- it's how you do restructuring

 7    valuations.

 8        Q     Would you agree with me that a valuation

 9    of an asset is something that is how much a willing

10    buyer would be willing to pay for the asset?

11        A     No.  I'd say it's a willing buyer and a

12    willing seller.

13        Q     Okay.  You would agree that the value of

14    an asset as of a particular date is how much a

15    willing buyer would be willing to pay a willing

16    seller for the asset?

17        A     Yeah, you gotta have both, a willing

18    buyer and a willing seller.  That's a -- that's a

19    specific fair market value definition that you're

20    quoting, sort of.

21        Q     Would you agree that for say a publicly

22    traded security that the -- the value of the
```

89

1    security is how much the security trades for?

2         A     Sure.  You've got willing buyers and

3    sellers of IBM stock every day.

4         Q     How about a -- a bond?  Would you say

5    that a -- the value of a bond is how much a -- a

6    willing buyer will be willing to pay for -- for the

7    bond from a willing seller?

8         A     Under that hypothetical, that you have a

9    willing buyer and a willing seller on each side of

10   the bond transaction?  Sure.

11        Q     And you talk about testing the total

12   enterprise value of World Health.   `

13              What's -- what's enterprise value?

14        A     It's -- it's like the value of the

15   assets.  It's one way to think about it.  The other

16   way is it's sort of -- I mean that's what it is.

17   It's a value of an entire enterprise.  So typically

18   done from the -- the cash flows of the business,

19   you know, not -- you've got an enterprise value.

20   Then it might have debt components.  It might have

21   equity components.  But it's -- it's the total

22   company.

Marc J. Brown                                                    May 18, 2012

Washington, D.C.

90

1        Q     Total value of the company, all of its

2    assets?

3        A     Correct.

4        Q     And what's the relevance of enterprise

5    value to your analysis?

6        A     Well, it -- it forms the basis of my

7    valuation test.

8        Q     And describe your valuation test.

9        A     You want me to walk through the analysis

10   or --

11       Q     Yeah.

12       A     Sure.  So I, you know, was asked to look

13   at the reasonableness of -- of the -- of the

14   portfolio of value.  And as part of that, I looked

15   at the enterprise value.  I looked at two different

16   indicia of value, the first being the guideline

17   company approach, which is a standard valuation

18   methodology.  And I developed market multiples

19   based on publicly traded companies.  I applied

20   those multiples to an estimate of World Health's,

21   you know, performance, and developed an enterprise

22   value.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

91

```
 1      Q    How does the enterprise value of World

 2   Health relate to the value of the Palisades World

 3   Health assets?

 4      A    Which assets?

 5      Q    The side pocket assets.

 6      A    It -- it relates because that's how you

 7   would determine if they're covered or not.

 8      Q    What do you mean covered?

 9      A    To reiterate, it's -- it's do I have

10   enough value for this to get paid back?

11      Q    Okay.  And so is your assumption that if

12   World Health has enough value to pay back whatever

13   they owed to -- to Palisades, that the assets are

14   valued correctly?

15      A    That's not my opinion.  My opinion is was

16   the -- the total portfolio value reasonable?  And I

17   looked at the enterprise value and the standard

18   restructuring valuation and said there is more than

19   enough coverage, such that those individual assets,

20   that portfolio of assets, is covered.

21      Q    How is that relevant to the -- what the

22   value of the portfolio is, whether or not the
```

Marc J. Brown                                          May 18, 2012
                        Washington, D.C.

                                                             92

1    assets are covered?

2         A    I thought I answered the question but

3    I'll -- I'll try to phrase it differently.  When --

4    when you're working a restructuring, okay, which is

5    what this was, effectively, one -- you know, you do

6    couple things early on in the restructuring.

7              And then at some point when you start

8    thinking about value, you say, all right, the

9    debt's a hundred million dollars, this business is

10   worth 70, you're not covered.  Vice versa:  The

11   debts a hundred million dollars, this business is

12   worth $150 million, you're covered, you -- your

13   bondholders are -- are good, your equity holders

14   are good, 'cause there's enough left over for the

15   equity in that -- in that scenario.

16        Q    So in a scenario where the bondholders

17   are covered, that means that they're going to get

18   paid on their bonds?

19        A    Correct.

20        Q    Necessarily?

21        A    Yes.  In a restructuring scenario.

22        Q    And what do you mean a -- a restructuring

Marc J. Brown                                                    May 18, 2012

Washington, D.C.

93

1    scenario?

2         A    So in a scenario such as we had here

3    where you had three debt instruments, two of which

4    were due and owing, and the company was in the

5    process of either exchanging those securities or

6    selling the company, those debts need to get paid

7    off in order for that to move forward.

8         Q    I see.  So in the context of a company

9    sort of being -- being required to -- to satisfy

10   its debts in a restructuring, the fact that the

11   company had enough assets means that the -- the

12   debt -- the debtholder's being paid; is that -- is

13   that fair?

14        A    Yeah, that's what you test for.

15        Q    Okay.  And in determining whether or not

16   the company had enough assets, you calculated

17   its -- its enterprise value; is that right?

18        A    Yes.

19        Q    And in order to calculate -- in order to

20   perform your test, you used what you say -- called

21   a guideline approach?

22        A    Yes.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

94

1        Q     What's a guideline approach?

2        A     It's looking at publically traded

3    companies that are similar guidelines to the value

4    of your subject company.

5        Q     Okay.  And which companies did you use

6    as -- as guideline companies?

7        A     A company called Cross Country, another

8    one called AMN Healthcare.

9        Q     And do you believe that these companies

10   were -- were similar to World Health?

11       A     Yeah, similar.

12       Q     Okay.  Similar in what respects, if you

13   recall?

14       A     All three of them have full coverage in

15   the U.S.  They have similar services, allied

16   staffing, travel nurses, per diem nurses.  I think

17   Cross Country doesn't do a lot of the doctor or the

18   locum tenens, but generally similar services.

19       Q     Okay.  Let me ask you to look at page 13

20   of your report.  You talk about World Health

21   financial metrics.

22              Do you see that part of the document?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

95

```
 1      A     I do.

 2      Q     And are you familiar with this part of

 3  the document?

 4      A     I -- I wrote it, yes.

 5      Q     Okay.  And you -- and you -- so you talk

 6  about the latest available World Health

 7  comprehensive financial report was its first

 8  quarter 2005 10-QSB SEC filing.

 9            My question to you is do you have reason

10  to believe that that report was accurate?

11      A     I have reason to believe it probably

12  wasn't fully accurate.                    `

13      Q     And what's your reason to believe that?

14      A     World Health came out in the end of

15  August with a series of 8-K filings that talked

16  about some of the accounting problems they had.

17      Q     And in what respect was -- were the

18  previous filings inaccurate?

19      A     It wasn't really known at the time.

20      Q     Was it ever known?

21      A     I don't know that it fully was.  Sort of

22  outside the time frame I looked at.  But I think
```

96

 1    more clarity came out years later.  But I don't --

 2    I don't think there was full clarity.

 3        Q    You don't think there was ever full

 4    clarity?

 5        A    I -- I don't.  I -- I don't --

 6        Q    As far as you know?

 7        A    -- remember spe -- as far as I know.

 8        Q    Okay.  And you talk about World Health

 9    rapidly acquiring companies throughout 2003 and

10    2004, including three acquisitions in the fourth

11    quarter of 2004 alone.  Its reported trailing 12

12    months revenue and earnings before interest, taxes,

13    depreciation, amortization figures were not

14    indicative of its current operations as of the

15    valuation dates.

16             What does that mean?

17        A    It means when a company is growing

18    rapidly, whether it's through acquisitions in

19    particular or just let's say it's a brand new

20    technology -- you know, Google, you know, six

21    months after it started is very different than the

22    first month -- that you need to be careful in

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

97

1    looking at historical results as a -- you know, as

2    indicative of -- of what the business is worth.

3           So in this case, because they did so many

4    acquisitions in 2004, their 2004 and even their

5    trailing 12 at March of '05 doesn't relet -- just

6    the way accounting works, doesn't reflect the full,

7    you know, revenues and cash flows of those

8    acquisitions.  So they paid for them so it'll be on

9    the balance sheet, the debt they issued in order to

10   pay for it'll be there.  But the -- the full

11   revenues and cash flows aren't in the financials.

12        Q    I see.  And in the next paragraph you

13   talk about, Due to the both the observed growth and

14   World Health's -- World Health's revenue in the

15   first quarter of 2005 and the expectation of

16   significant further growth in the future, simply

17   applying market valuation multiples to World

18   Health's latest publicly reported 12-month figure

19   would underestimate its enterprise value.

20           What -- what's your basis of that?

21        A    It's what I just spoke to.

22        Q    Okay.  Because of the -- the new and

98

1    apparently increasing business?

2        A    Yes.  You purchase a business.  And it's

3    full revenue is not reflected yet in your

4    financials.  It won't be until a year from the day

5    that you acquired it.

6        Q    Okay.  And so what do you -- what do

7    you -- what -- on your analysis on page 14 here, at

8    the -- at the -- the end of page 14 you talk about,

9    again, how the -- the 12-month trailing EBITDA of

10   6.4 million was likely in -- indicative --

11       A    Uh-huh.

12       Q    -- of what one could reasonably expect

13   the company to achieve over the course of 2005

14   given its recent acquisitions and level of growth

15   in its 2005 earnings.

16            Do you know what the actual final numbers

17   for 2005 were?

18       A    I don't.  I don't think they were

19   available at the time that I did my analysis in

20   terms of August, September, and October 2005.

21       Q    So with respect to the assumptions for

22   what World Health's revenues and -- and EBITDA for

99

1    2005 would -- would be, you -- is there any way to

2    test those assumptions?

3         A    Well, I mean there's a couple ways.  One

4    is they're very conservative assumptions.  And I

5    guess the second is, you know, Houlihan Lokey had

6    materials out there that showed an EBITDA of much

7    higher than I utilized, on a trailing 12 basis as

8    of 9/30.

9         Q    Okay.  And -- and what documents were

10   those?

11        A    They were, you know, basically -- I think

12   in the testimony, you know, Mannion`and Reckless

13   called teasers.  There are sale documents, you

14   know, here's what Parker does, here's what World

15   Health Staffing, here's what JC Nationwide does,

16   Financial Metrics, those sorts of things.

17        Q    And these are documents you reviewed?

18        A    Yes.  They're on the list.

19        Q    Okay.  And these documents indicated

20   revenues for 2005 of World Health of how much?

21        A    I don't recall what the revenues were.  I

22   recall that it indicated.  And it was three

100

1    separate parts that you had to add together.  You

2    know, it was Parker, it was JC Nationwide, and it

3    was World Health Staffing.  It was some -- it was

4    an EBITDA of like 9.4 million versus the, you know,

5    7 one to 8 five that I used.

6          Q    Okay.  So 9.4?

7          A    9.4.

8          Q    I'm going to ask you to turn to page 16.

9    And it appears to be an analysis that -- that you

10   are undertaking, talking about in reference to

11   Exhibits 5-2 and 5-3.

12              What are you doing here?  `Can you explain

13   that to me?

14        A    Yeah, this is the valuation test under

15   the guideline approach.

16        Q    Okay.  And --

17        A    So it's -- in the report I talk about

18   table 8.  I show you sort of the summary of it and

19   then, you know, the details back in the exhibit.

20        Q    Okay.  And -- and you state that the --

21   as of the valuation dates, the market valued the

22   guideline companies, AMN and Cross Country and an

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

101

1    enterprise value of approximately 0.9 times

2    trailing 12 months revenue, and between 14.1 and

3    14.6 times trailing 12 months reported EBITDA.

4         And so with respect to the -- the

5    companies that you're comparing World Health to,

6    calculating the valuation as of the trailing 12

7    months revenue?

8        A    Yeah, I think it's at -- you know,

9    whatever they report at the time, which -- in June

10   30.  So if you're looking at it at August 31, those

11   are the results that they've got.

12       Q    And also a multiple of trailing 12 months

13   reporting EBITDA?

14       A    Correct.

15       Q    And did you use the reported -- did you

16   use the trailing 12 months revenue for World

17   Health?

18       A    Trailing 12 months revenue?  No, I

19   actually used a -- a pro forma 2004 number, which

20   is probably a lot lower than where they were at.

21       Q    But you didn't use a trailing 12 months

22   revenue for World Health?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

102

1       A    The data wasn't available.

2       Q    You didn't use the trailing 12 months

3   EBITDA for World Health?

4       A    Same issue:  The data wasn't available.

5       Q    Okay.  Do you know why the data wasn't

6   available?

7       A    They hadn't issued their Q-2 results.

8       Q    And why was that?

9       A    Because of some of the issues of the

10  company.

11      Q    Okay.  And were there similar issues at

12  AMN?                                          `

13      A    Similar?

14      Q    Issues in terms of lack of reliability of

15  financial statements?

16      A    Not that I'm aware of.

17      Q    Were there similar issues at Cross

18  Country?

19      A    Not that I'm aware of.

20      Q    Does that factor in your analysis?

21      A    Sure.

22      Q    Okay.  How -- how did it factor in your

103

1   analysis?

2       A    Well, I guess it factored in because --

3   ignoring for a minute the discounts that I took to

4   the actual revenue in EBITDA of World Health, I

5   discounted the value derived from those two

6   companies.

7       Q    Why?

8       A    Because World Health was having some

9   issues.

10      Q    Then how do you know how much to

11  discount?

12      A    How do I know how much to discount?

13  There's a lot of factors that go into it.  But

14  it -- it's essentially a -- a judgment call.

15      Q    How much did you discount it?

16      A    33 percent.

17      Q    And what's -- what's the basis of that

18  number?

19      A    It seemed doing a reasonable test.  And I

20  think it's good to understand that the ultimate

21  discount is more like 65 percent.  It's a fairly

22  significant discount to what a -- a healthy,

Marc J. Brown                                                          May 18, 2012
Washington, D.C.

104

1    untroubled World Health could have been worth.  I

2    mean the day before the announcement it was $203

3    million.  I'm saying it's -- you know, the test

4    range is 76 to 86, 60 percent less.

5         Q    By what standard do you calculate the

6    discount?

7         A    By what standard?

8         Q    Yes.  If any.

9         A    I don't understand the question.

10        Q    Is there -- are there -- are there

11   guidelines that -- that inform how valuations

12   appear to be done?                        `

13        A    Other guidelines?

14        Q    Yes.

15        A    There's certainly guidelines in some

16   instances.

17        Q    What are the guidelines?

18        A    You know, for tax purposes, there's

19   Revenue Ruling 5960, which gets to that fair market

20   value definition you were talking about before.

21   There's -- there's some other guidelines in the

22   industry.

Marc J. Brown                                                                May 18, 2012
Washington, D.C.

105

1        Q    Can you -- are you familiar with them?

2        A    Yeah, I mean there -- there's discourse

3   on fair value, depending on your jurisdiction and

4   your time frame.  So currently, there's something

5   called ASC820, which used to be called FAS 157,

6   that speaks to fair value.  That's all sort of

7   after the fact.  That came out after, you know, the

8   time period at issue here.

9        Q    Any other standards?

10       A    Yeah, I mean there's similar standards

11  for international financial reporting.  There's

12  general industry practice.  I mean, you know, like

13  I said, I had training at Pricewaterhouse.  There's

14  books.  You read books.  You -- you do these sorts

15  of things.  You review other people's valuations

16  over the years.

17       Q    And are any of the standards referenced

18  in your report?

19       A    Well, I didn't -- there's no standards.

20  I mean there's guidelines but there's no standards.

21       Q    Is -- is the concept of fair value

22  mentioned anywhere in your report?

106

1      A    I'm not sure if it is or not.

2      Q    You don't -- as you sit here today, you

3  don't recall it being mentioned?

4      A    I -- I don't recall.

5      Q    Okay.  And you indicated the discount of

6  33 percent was reasonable given that where -- where

7  World Health had been prior to August of 2005.

8           Am I -- am I recalling that testimony?

9      A    Prior to August, no.

10     Q    Okay.

11     A    I'm not looking at it prior to August

12  2005.

13     Q    Okay.  Well, you indicated that you'd

14  thought the 33 percent discount was -- was fair and

15  reasonable, right?

16     A    Yeah, it's reasonable, right.

17     Q    Okay.  Are you aware of --

18     A    It's conservative.

19     Q    It's conservative.

20          Are you aware of how much World Health's

21  publically traded stock price fell after the -- the

22  August disclosures of potential impropriety?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

107

1       A       Yes.

2       Q       How much did it fall?

3       A       It's probably around $3.  And by the end

4   of August it was 22 cents.

5       Q       Would you agree with me it fell in the

6   neighborhood of 90 percent?

7       A       Yeah, that's probably about right.

8       Q       Why wouldn't you apply a 90 percent

9   discount?

10      A       It's not how it works.

11      Q       Why?

12      A       Because it's an enterprise value.  You're

13  talking about the bottom piece of a levered capital

14  structure.  It -- it will move more -- in a more

15  volatile fashion than -- than -- it's not the same

16  as a discount that you'd apply to -- to value.

17      Q       Why?

18      A       Well, it's different math, different

19  concepts.

20      Q       Okay.  Would you agree with me that the

21  stock price of a company is -- is indicative of how

22  much a company's worth?

Marc J. Brown                                                                                    May 18, 2012
Washington, D.C.

108

1        A     Sure.

2        Q     Okay.

3        A     That's why I talk about it in here.

4        Q     What do you say about it?

5        A     Well, if you turn to page 17, I talk

6    about the public market approach.

7        Q     Okay.

8        A     And I talk about what the stock price

9    was, and given the debt at the time what that

10   implies for an enterprise value, and how that's an

11   indicia of value.  And it's also Exhibit 5.5 to my

12   report.                              `

13       Q     Okay.  Let's look at Exhibit 5.5.

14       A     Okay.

15       Q     And you indicate that between -- in

16   Exhibit 5.5, you indicate that between August 15th

17   of 2005 and August 31st of 2005, the market

18   capitalization of World Health goes from

19   approximately 162 million to approximately

20   17.3 million, correct?

21       A     Yes.

22       Q     How does the market capitalization as of

Marc J. Brown                                                        May 18, 2012
Washington, D.C.

109

1    August 31st of 2005 of World Health compare to

2    the -- the companies that -- that you deem to be

3    comparable?

4        A    How does the market cap?

5        Q    Yeah.

6        A    It's smaller.

7        Q    Significantly smaller?

8        A    Yeah, it's a distress situation.

9        Q    Is that relevant to whether or not those

10   two companies are comparable, in your opinion?

11       A    Well, that's why I applied a 33 percent

12   discount.                              `

13       Q    I see.  And was the market capitalization

14   in the order of 33 percent smaller for World

15   Health?

16       A    No.  But it's -- that's not really how it

17   works.

18       Q    Well, where does the 33 percent come

19   from?

20       A    It comes from my experience in dealing

21   with distressed companies and restructurings.  It's

22   actual transactions.  It's actually a higher

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

                                                                        110

1    discount than I've ever applied or seen applied.

2        Q    In what case did you apply a 33 percent

3    discount for some -- any discount to the -- the

4    value of a company?

5        A    When I looked at the General Motors

6    global liquidation analysis -- and that's a

7    liquidation analysis -- there were some --

8                         (Interruption)

9            MS. LAMBRAKOPOULOS:  Pat, not here.

10           Can we go off the record for a minute?

11           VIDEOGRAPHER:  We're going off the

12   record.  The time on the video is 12:11 p.m.

13                    (Discussion off the record)

14           THE WITNESS:  We're back on the record.

15   The time on the video is 12:11 p.m.

16   BY MR. WILLIAMS:

17       Q    I'm sorry, you -- you were talking about

18   General Motors?

19       A    Yes.  So you asked where I've applied

20   discounts.  I believe I applied a discount in that

21   instance.

22       Q    What did you apply a discount to in that

111

1    instance?

2        A    The EBITDA of their Latin American

3    operations.

4        Q    And in what context?

5        A    It was in the context of so the way a

6    bankruptcy works is you -- however you're going to

7    come out of bankruptcy, out of a Chapter 11,

8    whether it's a sale of the business or a

9    reorganization, you have to pass what's called the

10   best interest test, which means the creditors would

11   be better off under that scenerio than if you just

12   liquidated the business.  So I was asked to look at

13   the liquidation value of General Motors for the

14   best interest test.

15       Q    And so in -- in evaluating the litigation

16   value, how was the discount relevant?

17       A    Well, you had a bankruptcy in North

18   American of the North American assets.  You did not

19   have the Latin Americans or the Asian operations

20   operating the bankruptcy.  So the idea was could

21   they stand alone if GM disappeared, would its

22   operations globally be able to survive.

Marc J. Brown                                                      May 18, 2012
Washington, D.C.

112

 1              A lot of people talked about it, yes, but

 2     we assumed they'd be sold at a significant, you

 3     know, distressed value from what they were actually

 4     worth, you know, under that scenario.

 5         Q    You assumed that the assets would be sold

 6     at a significant --

 7         A    The businesses, right.

 8              THE REPORTER:  I didn't get all the

 9     question.  You assumed that the assets --

10     BY MR. WILLIAMS:

11         Q    -- the assets would be sold at a

12     significant distressed value?

13         A    Yes.

14         Q    Okay.  In what context did you apply the

15     discount?

16              I'm sorry I interrupted you.

17         A    I applied it to their EBITDA as part of a

18     market approach.

19         Q    In terms of trying to calculate what?

20         A    The value of -- of these operations and

21     a -- a liquidation.

22              THE REPORTER:  The value of what?

Marc J. Brown                                                                May 18, 2012
Washington, D.C.

113

1              THE WITNESS:   The assets and a

2     liquidation.

3     BY MR. WILLIAMS:

4          Q     So you were calculating the value of

5     assets?

6          A     Yes.

7          Q     Okay.

8          A     Those specific assets.   I mean there were

9     different pieces that were done differently.   The

10    North American operations were done differently.

11    It was what could I sell a, you know, a

12    hundred-year-old factory with environmental

13    problems for?

14         Q     So in that circumstance, you were

15    calculating how much the assets were worth?

16         A     In what circumstance?

17         Q     In the General Motors circumstances

18    you're referring?

19         A     Yes.

20         Q     Okay.  And --

21         A     Total assets of General Motors of

22    those -- of the Latin American operations, Daewoo

                                                                    114

1    and South Korea.

2         Q    And in doing that, you valued each asset?

3         A    Each business, yeah.

4         Q    Yeah.

5         A    So as a subset, you know, the Latin

6    American business of General Motors.

7         Q    Okay.  What's the value of the side

8    pocket assets of Palisades?

9              What's the value of the side pocket World

10   Health assets of Palisades as of August 31st, 2005?

11        A    Of the total side pocket?

12        Q    Yeah.  What's the value?  `

13        A    I think it was listed at about

14   15.35 million.

15        Q    You agree that that was the value?

16        A    I tested whether it was reasonable.

17        Q    And you tested whether it was reasonable,

18   but do you agree that was the value?

19        A    Well, that's -- that's what the documents

20   show, yes.

21        Q    And you agree with the documents?

22        A    I -- I don't know.  Yeah, they were

115

```
 1    produced in the case.  They seemed to be the -- the

 2    right documents.  I'm not sure I'm understanding

 3    your question.

 4         Q    You agree that the value was correct?

 5         A    I -- again, I tested the reasonableness

 6    of that value.

 7         Q    I understand.

 8              And with respect to the Exhibit Number

 9    5-5, you have at the bottom of the column for

10    8/15/2005 --

11         A    Bear with me a second.

12         Q    I'm sorry.                    `

13         A    Okay.  5-5.

14         Q    Yeah.  And at the bottom of the column

15    where it's 8/15/2005, there's a market -- at the

16    bottom there's a market deprived -- derived

17    enterprise value.

18              Do you see that?

19         A    Correct.

20         Q    What is that?

21         A    That's taking the stock price of 346 a

22    share times the shares of 46.88 million.
```

Marc J. Brown                                                              May 18, 2012
Washington, D.C.

 1       Q     Uh-huh.

 2       A     You get a market capitalization.  That's

 3   the equity.  And then you add on the debt.

 4       Q     Why do you add the debt?

 5       A     'Cause that's how you calculated

 6   enterprise here.

 7       Q     So by adding on the debt, you're assuming

 8   that the company has the ability to pay the debt?

 9       A     Yeah, that's what the market was

10   assuming.

11       Q     Why do you believe that?

12       A     'Cause you've got a publicly traded stock

13   price at 346 a share with a lot of stock value.

14       Q     Okay.  And was the market aware of the

15   company's debt?

16       A     Well, that's the debt I used, what they

17   were aware of.

18       Q     I see.  I see.  As of March 31st?

19       A     Uh-huh.

20       Q     I see.

21             THE REPORTER:  Your response?

22             THE WITNESS:  Yes, as of March 31st, or

117

1    whenever they issued the financials, probably May,

2    they would've come out with their 10-QSB.

3    BY MR. WILLIAMS:

4         Q    And where does this 12.8 million,

5    where -- where's that come from?

6         A    That is a Series A convertible preferred

7    stock.  That's from the financial statements as

8    well.

9         Q    From which financial statements?

10        A    Well, I don't know that'll show up on the

11   March 31 exact of that number, due to accounting,

12   the way they account for things like that.  You

13   have to go back to the notes of -- probably the

14   notes of the December -- or the 2004 10-K.  They

15   did the transaction where they issued those

16   securities.

17        Q    And why do you believe the market was

18   aware of that transaction?

19        A    Because it's in their SEC filings.

20        Q    Okay.  Which SEC filing?

21        A    2004 10-K.

22        Q    In the 10-K.  Okay.

118

```
 1              And as you're go on to August --

 2              MS. LAMBRAKOPOULOS:  I'm sorry, was that

 3   a "yes" or "no"?

 4              THE WITNESS:  Yes.

 5   BY MR. WILLIAMS:

 6       Q    -- August 31st, 2005, you appear to be

 7   adding 22 million in convertible debentures, 2.5

 8   million in additional cap source debt, and 4

 9   million in terms of a promissory note.

10              Do you see that?

11       A    I do.

12       Q    And where do you get these figures from?

13       A    Various 8-K filings from World Health

14   that came out prior to 8/31.

15       Q    Okay.

16       A    And you'll note that the -- the

17   convertible preferred comes off the 12.8.

18       Q    All right.  And so -- and so -- so just

19   so I understand what -- what you've explained about

20   enterprise value, the assumption is that the market

21   believes that the company's value is whatever the

22   company's worth after having paid back all its
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

119

1    debt?

2         A    No.  It's -- an enterprise value is the

3    value of the total assets.  One way you can get to

4    that value is by looking at the enterprise value,

5    which once you have the value of the assets, let's

6    say it's $50 million, if it has 20 million of debt,

7    then the remainder, the 30, is what flows to

8    equity.

9              So this is sort of looking at it the

10   reverse way.  The -- the equity is out there at 162

11   million.  They know there's 53 million of debt.  So

12   they applied enterprise values, you`know, of 215 or

13   so.

14        Q    I see.  I see what you're saying.

15             Let me ask you to turn to -- turn to page

16   8.

17        A    Okay.

18        Q    I want you -- you're describing the

19   various World Health assets that are there in the

20   side pocket, at the top, the top four bullet

21   points.

22             Do you find that part of the document?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

120

1        A      Yes, I see it.

2        Q      And I'm going to ask you about the

3    restricted common stock.

4        A      Okay.

5        Q      And it says, As of August 31st, 2005,

6    Palisades held 950,000 shares of World Health

7    restricted common stock in the side pocket.

8               And you talk about the cost basis.  And

9    you say it was carried on Palisades' NAV statement

10   at a value of 1,894,921 and 67 cents.  And then in

11   parentheses, $1.99 a share, as of August 31st,

12   2005.                                      `

13              In your opinion, do you test the

14   reasonableness of that particular value?

15       A      Of that particular value?  No.  I looked

16   at it in totality.

17       Q      So you didn't test the reasonableness of

18   restricted common stock?

19       A      Not on a specific basis.

20       Q      Would you agree with me that if the stock

21   price for World Health as of August 31st, 2005, was

22   22 cents a share, the value of that restricted

Marc J. Brown                                                May 18, 2012
Washington, D.C.

121

1    stock is too high?

2        A    If you're looking at it as just

3    restricted stock, sure.

4        Q    Do you have any reason to believe that as

5    of August 31st, 2005, there was anything but

6    restricted stock.

7        A    My understanding is there were

8    significant discussions and negotiations about

9    exchanging it for some other sort of security,

10   more -- more senior to it.

11       Q    Assuming that there were discussions, do

12   you have any reason to believe that`as of August

13   31st, 2005, that restricted stock was anything but

14   a restricted stock?

15       A    Beyond the expectations that it would be

16   converted to something else, no.

17       Q    Yeah, future expectations?

18       A    Based on current discussions.

19       Q    Well, I'm sorry, what was your answer?

20       A    I said -- you said future expectations.

21   And I said future expect -- I completed your

22   thought I guess.  I don't know if I can do that.

Marc J. Brown                                                          May 18, 2012
Washington, D.C.

```
 1     But future expectations based on contemporaneous

 2     discussions.

 3          Q    Okay.  Future expectations based on

 4     contemporaneous discussions of what?

 5          A    Of an exchange of securities.

 6          Q    Okay.  As of August 31st, 2005, had there

 7     been an exchange of securities?

 8          A    No.

 9          Q    So then you would agree with me that as

10     of August 31st, 2005, World Health restricted stock

11     was World Health restricted stock?

12          A    I -- I would agree with that, yeah.

13          Q    Okay.  You'd agree with me that World

14     Health restricted stock, as a general -- as a --

15     would you agree with me as a general matter that

16     restricted stock is worth less than freely tradable

17     stock?

18          A    As a general matter, yes.

19          Q    Okay.  Would you agree with me that World

20     Health restricted stock is worth less than World

21     Health unrestricted stock?

22               MS. LAMBRAKOPOULOS:  Objection.  Form.
```

123

1     Timing.

2     BY MR. WILLIAMS:

3         Q     As of August 31st, 2005?

4         A     What I would say is I think what you're

5     asking, a hypothetically yes, the common -- the

6     restricted stock would be less than common.

7         Q     Okay.  And you also reference a loan, at

8     the very top of the page --

9         A     Uh-huh.

10        Q     -- on August 24th, 2005, $2 million.

11              What were the terms of that loan?

12        A     It was a short-term loan.` I think it was

13    seven days.  I think it says it right there.

14        Q     What was the interest rate to be paid on

15    the loan?

16        A     I don't think it had an interest rate.

17        Q     And the loan was to be paid on seven

18    days?

19        A     Uh-huh.

20              THE REPORTER:  Your response?

21    BY MR. WILLIAMS:

22        Q     You have to say "yes."

Marc J. Brown                                                    May 18, 2012
                        Washington, D.C.

                                                                      124

1        A    Yes.   Sorry.

2        Q    And you -- and you believe the loan was

3   to be paid at seven days and had no interest?

4        A    That's my recollection, yes.

5        Q    Okay.   And how do you -- how do you value

6   a debt instrument?

7        A    You're asking a hypothetical?

8        Q    I'm asking you in general.   How do you

9   value a debt instrument?

10            MS. LAMBRAKOPOULOS:   Objection.

11   BY MR. WILLIAMS:

12        Q    If you can say.                    `

13            MS. LAMBRAKOPOULOS:   Objection.   Form.

14            THE WITNESS:   How do I val -- well,

15   one -- one way to do it is how I did it.   You --

16   you have to look at the circumstances.   That's how

17   valuations all are.   You have to look at the facts

18   and circumstances.

19   BY MR. WILLIAMS:

20        Q    Okay.

21        A    So I need -- I need more for your

22   hypothetical to -- to answer the question.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

125

1        Q    When you say that's how I did it, what

2    did you -- well, what value did you determine

3    this -- this $2 million loan to have?

4        A    Well, I didn't value the loan, per se.  I

5    valued the portfolio through my valuation test

6    through the coverage concept we discussed.

7        Q    Through the coverage concept?

8        A    Yes.

9        Q    And is the coverage concept articulated

10   in any of the -- the literature that we talked

11   about earlier today?

12       A    Not that we talked about thus far.  It's

13   certainly in literature, though.

14       Q    What literature?

15       A    It's in the private equity guidelines

16   that Mr. Pump talks about.

17       Q    Okay.  What does it say about the

18   coverage concept?

19       A    It basically says that the best way to

20   value a investment in a business is to look at the

21   total value of the company.

22       Q    Okay.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

1                MR. WILLIAMS:  And with that, why don't

2      we go off the record briefly so the videographer

3      can change the tape.

4                THE WITNESS:  Okay.

5                VIDEOGRAPHER:  This concludes tape number

6      two in the video deposition of Marc Brown.  The

7      time on the video is 12:26 p.m.  We are off the

8      record.

9                          (Recess)

10               VIDEOGRAPHER:  This begins tape number

11     three in the video deposition of Marc Brown.  The

12     time on the video is 12:37 p.m.  We`are on the

13     record.

14     BY MR. WILLIAMS:

15        Q    Okay.  Mr. Brown, I was asking you

16     earlier about the -- the bullet points at the top

17     of page 8 of your report.

18               Do you recall it?

19        A    Yes.

20        Q    Okay.  And I was asking you about the $2

21     million loan.

22               And the $2 million loan was due to be

Marc J. Brown                                                                                          May 18, 2012
Washington, D.C.

1    repaid you indicate in seven days --

2         A    Yes.

3         Q    -- on August 31st?

4         A    Yes.

5         Q    Do you know whether the loan was repaid?

6         A    Not the time, no.

7         Q    Do you know if the loan was ever repaid?

8         A    It was restructured in the middle of

9    October, towards the end of October.

10        Q    Was any -- ever any cash change hands?

11        A    Not in the window that I looked at.

12        Q    As far as you know ever? `

13        A    Yeah, I mean I -- I looked at those three

14   months.

15        Q    Okay.  Do you believe that the -- the $2

16   million loan as of August 31st, 2005, was worth $2

17   million?

18        A    I'm sorry, the loan was worth?

19        Q    Yeah.  Do you believe the $2 million loan

20   was worth $2 million?

21        A    That's not the analysis I undertook.

22        Q    Okay.  So -- so you don't know whether or

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

128

```
 1    not it was worth $2 million?

 2         A    You know, back to my opinion.  I tested

 3    sort of the overall portfolio.  I didn't look at it

 4    on a security by security basis.

 5         Q    Okay.  So you don't know one way or the

 6    other whether or not the $2 million loan was worth

 7    $2 million as of August 31st, 2005?

 8         A    Well, what I'll say again is that on a

 9    total basis, the level of value attributed to the

10    side pocket, the side pocket that they set aside,

11    you know, because valuation was a challenge as the

12    managers indicated, that that total value is

13    reasonable given, you know, a reasonable valuation

14    of World Health at the time.

15         Q    Yeah.  I understand your -- your opinion

16    as to the total value.  But right now I'm asking

17    you about the value of the $2 million loan.

18              And am I correct in understanding that --

19    that you don't want to say one way or the other

20    whether or not the $2 million loan was worth $2

21    million as of August 31st?

22         A    I didn't analyze the $2 million loan.
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

129

1       Q    You didn't analyze the $2 million loan,

2   how --

3       A    Not specifically.

4       Q    Okay.  Fair enough.

5            How about -- one of the previous pages is

6   a promissory note that appears for $4 million.

7            Do you see that?

8       A    Yes.

9       Q    Did you analyze whether or not that $4

10  million promissory note was worth $4 million as of

11  August 31st, 2005?

12      A    Again, I looked at the total portfolio

13  and whether -- whether it had coverage, which is

14  what the managers did at the time, which is what

15  restructuring people do, which is what I did at the

16  hedge fund.  And that's how you value debt

17  securities in a distressed company.

18      Q    Okay.  And coverage -- coverage in terms

19  of assets of the company --

20      A    Yes.

21      Q    -- that would be available to satisfy the

22  debt?

130

1        A     Yes.

2        Q     Do you know whether or not World Health

3    ever declared bankruptcy?

4        A     They did.  It's in my report.

5        Q     Okay.  And do you know whether or not as

6    a result of that bankruptcy these debts were

7    covered?

8        A     I don't think they were fully covered six

9    months, eight months later --

10       Q     Do you --

11       A     -- when the bankruptcy unwound.

12       Q     Do you know whether they were covered at

13   all?

14       A     Yeah, I -- I believe some payment was

15   received but I'm not sure.  It was beyond the time

16   period I focused on.

17       Q     Well --

18       A     I mean I -- I was retained to look at,

19   you know, the reasonableness as of August 31,

20   September 30th, and October 31st, where you have a

21   hedge fund in the market at the time, as to whether

22   their marks and their -- and their side pocket that

Marc J. Brown                                                                    May 18, 2012
Washington, D.C.

131

1    they set up, you know, to sort of tell the

2    investors like, you know, there's some issues here,

3    we're concerned about it, and we're not sure what's

4    gonna happen, which is why they side pocketed these

5    assets.  I was asked to see if that was reasonable.

6              So as of that time, as of the information

7    that I saw, both in the record and, you know,

8    independent research and analysis that I did, you

9    know, it appears reasonable.

10        Q    Okay.

11        A    You -- you could have expected -- they --

12   they expected, you can tell from their testimony

13   and from the letters to the -- to the investors

14   that they were doing coverage analysis, which is

15   the typical way you do this, and saying yeah, we're

16   covered here.

17        Q    You ever spoken to Mr. Mannion?

18        A    No.

19        Q    You ever spoken to Mr. Reckless?

20        A    No.

21        Q    Okay.  So -- so you're just offering your

22   opinion based on your reading of their testimony?

Marc J. Brown                                                          May 18, 2012
Washington, D.C.

                                                                            132

1        A     Yeah, I mean that's -- they said it

2    repeatedly.  They said --

3        Q     Yeah.

4        A     -- it in documents that I read, so --

5        Q     They said it repeatedly?

6        A     And it's in documents.

7        Q     Well, I guess my question is if your

8    analysis indicates that all these assets were --

9    were covered, why weren't they covered when the

10   company finally went through bankruptcy?

11       A     I don't know the full fact and

12   circumstances.

13       Q     Isn't that something that you might want

14   to know in terms of testing the reliability of your

15   analysis?

16             MS. LAMBRAKOPOULOS:  Objection.

17   Foundation.

18             THE WITNESS:  It's six, eight months

19   after the fact.

20   BY MR. WILLIAMS:

21       Q     Do you know if anything materially

22   changed during those eight months?

Marc J. Brown                                                                May 18, 2012
Washington, D.C.

133

1       A       During those eight -- I don't.

2       Q       Okay.

3       A       I mean if -- if you put yourself back at

4    the time of the three NAV statements at the time of

5    what was going on, which is what in the valuation

6    practice you typically do -- I mean I did a

7    valuation for estate planning for a gentleman that

8    died a year ago.  The report's probably gonna get

9    issued next week, you know.  You have to look back

10   to that time period as to when the gentleman died.

11   It's March of 2011.  You have to put yourself in

12   the shoes at that time, which is what I did.

13           So at that time, with the data that -- in

14   the marketplace and what I saw and the materials I

15   reviewed as part of this case, it appeared

16   reasonable.

17       Q      But would you agree with me that the fact

18   that the assets were almost entirely not covered as

19   a result of the bankruptcy, that -- that would

20   appear to -- that -- that would indicate that the

21   valuations used in August 2005 were inaccurate?

22       A      No.

134

1       Q    But you don't know why -- why the assets

2    that -- that you believe were covered weren't

3    covered?

4       A    Yeah, I mean that happened many months

5    after my analysis.  Yeah, facts and circumstances

6    change.

7       Q    Okay.

8       A    Valuations get stale.  I mean you --

9    that's why you do them.

10      Q    But you -- you don't know what facts and

11   circumstances changed?

12      A    It was beyond the time period I needed to

13   look at.

14      Q    Because it was beyond the time period

15   that you looked at, you don't know why the

16   circumstances were different?

17      A    No, I mean there's -- there's stuff in

18   the record that talks about -- I think that some of

19   the testimony makes it sound that, you know, they

20   expected more bidders to show up for the assets

21   than did.  But beyond that, I don't know.

22      Q    Do you know how much the assets of World

Marc J. Brown                                                    May 18, 2012
                        Washington, D.C.

                                                                        135

1    Health were ultimately worth?

2         A    I think I know what they were sold for,

3    something like --

4         Q    What were they sold for?

5         A    $53-ish million.

6         Q    Okay.  And you estimate the enterprise

7    value as of August 15th as -- excuse me, August

8    31st, 2005, as what?

9         A    Between 77 and 86 million, I think, 85.7.

10   Based on what was known and knowable at the tine,

11   as of August of --

12        Q    You --

13        A    -- 2005.

14        Q    -- you estimated it at 86 million as of

15   August 31st, on Exhibit 5-5?

16        A    5-5, no.  Well, that's -- that's what the

17   market was saying it was worth.

18        Q    Okay.  Based on your analysis, that's

19   what the market was saying it was worth?

20        A    Well, that is what the market was saying

21   it was worth.

22        Q    Okay.

Marc J. Brown                                        May 18, 2012
Washington, D.C.

136

```
 1       A     It was a publically traded stock price.

 2       Q     Well, the publically traded stock price

 3   was 22 cents, correct?

 4       A     Yes.

 5       Q     And it had a market capitalization of 17

 6   million, correct?

 7       A     Yes.  You asked me about that specific

 8   exhibit.  And that's what that exhibit is.

 9       Q     Yeah, and -- and the enterprise value

10   that you indicate is $86 million, correct?

11       A     Well, that's what the market derived for

12   enterprise value is, yes.                    `

13       Q     Okay.  And that enterprise value is less

14   than the ultimate price that the company received

15   in the sale of its assets, correct?

16       A     Yes.  Ultimately when it was sold several

17   months letter, it was sold for less.  But that

18   wasn't known or knowable at the time.

19       Q     Okay.  And is it pos -- is it possible

20   that the enterprise value that you calculated

21   reflects an -- an overestimation of the -- of the

22   actual value of the company?
```

137

1        A      Could be an underestimation.

2        Q      Well, it could be an overestimation?

3        A      Could be, either.  But based on my

4    analysis, which is extremely conservative, I mean

5    it was a reason -- it was reasonable for the value

6    ascribed to the side pocketed portfolio assets they

7    ascribed.

8        Q      Okay.

9        A      I mean I -- we haven't really talked

10   about it.  We talked about my 33 percent -- percent

11   discount to the value from the guideline companies.

12   But I've also cut revenue 25 percent from where

13   they expected to be.  I've also cut their EBITDA

14   margin by 33 percent.  So effectively, the all-in

15   discount, 65 percent.

16       Q      I thought -- I thought you testified that

17   you didn't know what the companies revenues were in

18   2005?

19       A      Well, they were expecting, even after the

20   accounting allegations came out, to do 190 million

21   of revenue.  I used 142.  That's about a 25 percent

22   discount.

138

```
 1      Q     Who -- who was expecting?

 2      A     The new management of the company after

 3  McDonald had left.

 4      Q     And what was the result of the internal

 5  investigation with respect to the accounting

 6  irregularities?

 7      A     The one that came out four or five years

 8  later?

 9      Q     Yeah, what was known and know -- knowable

10  about that in August of 2005?

11      A     What was known and knowable was that

12  there were some potential problems.` There's a

13  letter from the auditors who are dismissed that

14  talks about some of those issues, which is another

15  reason why I used a smaller revenue number and

16  didn't use their reported EBITDA numbers.

17      Q     Okay.  And would you agree with me that

18  the fact that the $2 million loan that was due on

19  August 31st, 2005, wasn't repaid, that was a fact

20  that was known and knowable on August 31st, of

21  2005?

22      A     Yeah, of course.  I mean that was part of
```

139

1    the discussions for the restructuring.

2         Q    Would you agree with me that when you

3    loan someone $2 million and expect it to be repaid

4    and they don't repay it when they say they're going

5    to repay it, that that's a bad sign?

6         A    I would say it's a technical default.

7         Q    You wouldn't say that's a bad sign?

8              Let me put it that way.  If you loaned

9    somebody $2 million and they didn't pay you back

10   when -- when you asked them to, would that be more

11   than a technical default, in your opinion?

12        A    So you're asking --

13             MS. LAMBRAKOPOULOS:  Objection.

14             You can answer.

15             THE WITNESS:  You're asking me a

16   hypothetical?

17   BY MR. WILLIAMS:

18        Q    Yeah.

19        A    If I loaned an individual $2 million?

20        Q    Sure.

21        A    Yeah, an individual is different than

22   a -- than a business.

Marc J. Brown                                              May 18, 2012
Washington, D.C.

140

1       Q    Okay.  You loan a business $2 million --

2       A    Uh-huh.

3       Q    -- seven days, interest rate -- first of

4  all, would you loan -- would loan someone seven

5  day -- a seven-day -- well, make a -- make a

6  seven-day loan for $2 million with no interest?

7       A    I am not a banker.

8       Q    Sure.  And if -- if you made the loan and

9  they didn't repay, would that be a bad sign?

10           MS. LAMBRAKOPOULOS:  Objection.  Form.

11           THE WITNESS:  I think you need to look at

12  the total picture here.  They loaned them some

13  money because you have a company that is in a

14  short-term liquidity crunch because their

15  traditional lender has frozen lending for what I

16  understand was, you know, it's gonna take us two

17  weeks to figure this out.

18           It's a rescue loan, which hedge funds do.

19  And, you know, if you're loaning it to -- in a

20  different circumstance, maybe.  But in this case

21  it -- you need to look at the facts and

22  circumstances.

141

1           It actually -- frankly, that's one reason

2    why I did the coverage test, because this is a

3    restructuring.  This is -- that is how you do it.

4    You look at -- you look at:  Am I covered?  If I'm

5    gonna loan this money, can I get it back?  If

6    everything goes south, am I gonna get this back?

7    BY MR. WILLIAMS:

8        Q    So in the circumstance -- facts and

9    circumstance that you've describe, where the -- the

10   ordinary lender has cut off funding, the hedge fund

11   makes an emergency loan to the business of $2

12   million because they need to -- to continue their

13   operations, and they don't pay you back, wouldn't

14   that indicate to you that the $2 million is

15   probably worth less than $2 million?

16       A    Not necessarily.  I -- I mean you'd look

17   at the coverage, like I said.  They expect -- they

18   fully expected to get paid on this.

19       Q    Okay.

20       A    They thought the company was worth -- you

21   know, they threw a lot of numbers around, but --

22   120 to 190, a hundred, whatever.

142

1      Q      They threw a lot of numbers around but

2      the -- the money never actually came back to the

3      Defendants, did it?

4      A      I don't think in full.  But that's sort

5      of outside what I -- you know, the time period I

6      focused on.

7      Q      Okay.  So in evaluating how much a loan

8      was worth, you didn't focus on how much of the loan

9      was actually repaid?

10     A      No, I -- I looked at, at the time, what

11     was known and knowable 8/31/05, 9/30/05, 10/31/05.

12     Whether it wasn't paid or was paid in January,

13     February, or March of 2006, I don't know.

14     Q      Okay.

15     A      I will say that it was exchanged for

16     another security in an arm's length, willing buyer,

17     willing seller transaction in October of 2005.

18     Q      In an arms length, willing buyer, willing

19     seller.  So -- and -- and that's -- and that's how

20     you value something, right, whether or not -- how

21     much it would be -- be sold for in an arm's length,

22     willing buyer, willing seller transaction, right?

143

```
 1       A    It can be.  Depends on the facts and

 2   circumstances.

 3       Q    Okay.  So if -- how much a -- how much an

 4   asset would sell for in an arm's length, willing

 5   buyer, willing seller transaction, that's --

 6   that's -- there's circumstances where that wouldn't

 7   be the value of the asset?

 8       A    I'm sorry, can you repeat the question?

 9       Q    Yeah.  So if you have an arm's length,

10   willing buyer, willing seller exchanging

11   consideration for a particular asset, is there a

12   circumstance where that amount of consideration

13   wouldn't be the value of the asset?

14       A    I mean it -- it depends on if it's truly

15   a willing buyer, a willing seller, if there was a

16   distress element or a forced sale.

17       Q    Is --

18       A    Or what -- what the expectations were.

19   In that case, you know the -- you know the

20   transaction occurred.  It's not a hypothetical,

21   right?

22       Q    Right.
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

144

```
 1       A    So two parties did a transaction.  It's

 2   an indic -- it's indication of value.  Could've

 3   been worth more.  Could've been worth less.  But

 4   it's an indication of value.

 5       Q    And was -- was the exchange situation

 6   that you're referring to, was that -- did that

 7   involve a distressed party?

 8       A    Yeah, it involved World Health.

 9       Q    You agree World Health was distressed?

10       A    At some level, sure.

11       Q    Okay.  And so if you're holding $2

12   million worth of debt from a distressed party --

13       A    And I'll say -- let --

14       Q    -- whose primary -- whose primary lender

15   has cut off funding, you believe that in a willing

16   buyer, willing seller transaction, as of August

17   31st, 2005, that $2 million note would be -- would

18   be sold for $2 million?

19       A    You asked a lot of questions in there.

20   Can you -- can you break that down --

21       Q    Sure.

22       A    -- a little bit?
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

145

1        Q    And given the -- the distressed nature of

2   World -- World Health, given that World Health

3   had -- it's, you know, primary lender had cut off

4   funding, as you say it was a distressed party,

5   there's a $2 million note issued by Palisades to

6   World Health, short-term note with no interest,

7   note hadn't been repaid, do you believe that under

8   those circumstances in a willing buyer, willing

9   seller transaction, that $2 million note would be

10  worth $2 million?

11          MS. LAMBRAKOPOULOS:  I've got a number of

12  objections but there are too many of the details so

13  let me just say objection.

14          You can answer.

15          THE WITNESS:  So you're asking me a

16  hypothetical?

17  BY MR. WILLIAMS:

18       Q    Yes.

19       A    And you're asking me to assume that the

20  seller of that loan is a willing seller.  'Cause

21  that's -- that's not the case -- it's a different

22  situation than what we were talking about in

Marc J. Brown                                                    May 18, 2012
                        Washington, D.C.

146

1   October.  So I just want to make that clear.

2        Q    Okay.

3        A    So we're on a hypothetical?

4        Q    Right.

5        A    And you're assuming that the seller wants

6   to sell?

7        Q    Right.

8        A    And you're asking what?

9        Q    Would the $2 million note be worth $2

10  million?

11       A    It's unclear.  I didn't -- I didn't

12  undertake that analysis.                `

13       Q    Would you buy the $2 million note for $2

14  million?

15            MS. LAMBRAKOPOULOS:  Objection.

16            THE WITNESS:  I'm not in the business of

17  buying notes, but I'd have to look at the facts and

18  circumstances.

19  BY MR. WILLIAMS:

20       Q    I understand.

21            Let me hand you another document.

22            MR. WILLIAMS:  And I'm going to ask the

Marc J. Brown                                                                    May 18, 2012
Washington, D.C.

147

1    court reporter to label it as Exhibit Number Brown

2    3.

3                        (Brown Exhibit No. 3 marked

4                         for identification.)

5    BY MR. WILLIAMS:

6        Q    And Mr. Brown, I'm going to represent to

7    you this document is a multiple page document

8    entitled, Rebuttal Expert Report of Bernard Pump,

9    and it's May 4th, 2012.

10              My question to you is have you -- have

11   you seen this report before today?

12       A    I have.                          `

13       Q    Have you reviewed it?

14       A    I have.

15       Q    Do you know Mr. Pump?

16       A    I don't.  Same town I know, but don't

17   know him.

18       Q    You ever heard of him?

19       A    No.

20       Q    Let me ask you to turn to page 6 of

21   the -- of the first part of the report that --

22   that's label 6 of 16.

148

1        A      Okay.

2        Q      And Mr. Pump states, under Basis For

3   Opinions, The methodology used by Mr. Brown to test

4   the reasonableness of the valuations performed by

5   the Defendants World Health Securities is

6   misleading, fails to test whether the values

7   assigned by the Defendants were reasonable, fails

8   to test whether the valuations were either

9   consistent with the valuations policies of the

10  relevant funds or consistent with fair value, and

11  ignores facts known in this matter.

12          My question to you is did`you test the --

13  the reasonableness of the valuations performed by

14  the Defendants?

15       A      Absolutely.

16       Q      Okay.  Did you test them individually?

17       A      No.  I tested the -- the total side

18  pocket, which is what was at issue.

19       Q      I see.  And you indicated that because

20  the side pocket assets were covered by equity in --

21  in World Health, that they were reasonable.

22              Is -- is that a fair sum --

149

1        A    I didn't --

2        Q    -- summation?

3        A    I didn't say equity in World Health.  I

4   said value.  But sure.

5        Q    Okay.  And if the fund managers had

6   valued those assets at instead of approximately $15

7   million as of August 31st, if they'd valued them at

8   $20 million, would that have been reasonable if --

9   given that the assets would've been covered?

10       A    Potentially.

11       Q    How about if you'd valued them at 50

12   million?

13       A    Probably not.

14       Q    Probably not.

15            30 million?

16       A    I'm not sure.  I didn't -- I didn't

17   undertake that analysis.

18       Q    Sure.  Did you -- did you evaluate

19   whether or not the values of the -- the side pocket

20   of World Health assets were consistent with the

21   fund's valuation policies?

22       A    I wasn't asked to, but I certainly

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

150

1    reviewed those policies as part of reading his

2    report and actually going through it before I

3    issued my own report.

4         Q    Okay.  Having -- having reviewed them,

5    did you test whether or not the -- the managers'

6    valuations were consistent with those policies?

7         A    Did I test it?  No, I tested the

8    reasonableness.  But I -- I did note that they had

9    discretion to assign a value to it, which is what I

10   was testing.

11        Q    And you were testing the reasonableness

12   of the value that they assigned?        `

13        A    Correct.

14        Q    Did you test whether or not the value

15   they assigned was consistent with fair value?

16        A    How do you define fair value?

17        Q    Well, let me ask you how do you define

18   fair value?

19        A    In this context.

20        Q    In any context.

21        A    Well, that's why I asked the question,

22   because it's --

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

151

1        Q     Okay.

2        A     -- it's a different definition in fifty

3    different states and different countries and --

4        Q     Okay.

5        A     -- different time periods.

6        Q     Well, in this time period then.  Fair

7    enough.

8        A     Sure.  In this context, you know, the

9    documents that governed here, the -- you know, the

10   PPM and the confidential offering memorandum, talk

11   about both fair market value and fair value.  You

12   know, you look at some of the accounting regs that

13   Mr. Pump cited, and they all generally say the same

14   thing:  Willing buyer, willing seller sort of

15   concept.

16       Q     Uh-huh.

17       A     So that's what I tested.  I tested a -- a

18   situation.  And it's -- a lot of them also say, you

19   know, and not a distressed sale or not a forced

20   sale.  I conservatively looked at it from a forced

21   situation because it -- given the facts and

22   circumstances of World Health, where it was at that

152

```
 1   point, I'm gonna say it's distressed, okay.

 2            The operations actually appeared fairly

 3   sound, from everything that, you know, I've read

 4   and seen.  But obviously they had some

 5   irregularities.  They had some issues.  So I tested

 6   the reasonableness of that, assuming that the

 7   management of World Health at the time was a

 8   willing seller, even though it's a distressed sale,

 9   even though they realized they're not gonna get

10   full value for their -- their enterprise if they

11   had to sell it that day.

12       Q    I guess you lost me a little bit.

13            My question was did you test whether or

14   not the fund manager's valuations were consistent

15   with fair value?

16       A    That's what I'm saying.  I -- I tested

17   the reasonableness.  And -- and by going through my

18   test of the reasonableness of their valuations, I

19   employed a methodology which is a conservative view

20   of fair value.

21       Q    Okay.  And as -- as you mentioned, Mr. --

22   Mr. Pump cited various accounting literature and so
```

153

1    forth.

2              Is there any accounting literature

3    that -- that articulates a view of fair value

4    consistent with the analysis that you performed?

5         A    Well, like I said, I think you gotta look

6    at the facts and circumstances.  And obviously said

7    this is a distressed situation so I did a lower

8    value than what the regulations probably indicate

9    that you would look at.

10        Q    But -- but with respect to accounting

11   literature that -- that sort of embraces your --

12   your form of analyses?                    `

13        A    There's not really accounting literature

14   for distressed companies.

15        Q    Okay.

16        A    I mean what I did is what is done in the

17   marketplace on a day-by-day basis with

18   restructuring companies, with distressed hedge

19   funds.  I looked at it.  And when I -- I when I saw

20   what they had done and when I saw their testimony

21   about coverage, you know, I'm like that makes

22   sense.  That's how I would approach it.  That's how

154

1    I did approach it.  That's how people in the

2    industry approach it.

3        Q    So as long as the asset was covered, then

4    they have every reason that it's gonna be paid.

5             Do you agree with that, or no?

6        A    You have every reason to believe that you

7    will receive that value in some form.

8        Q    Let me ask you to turn to page 12 of his

9    report.

10       A    Okay.

11       Q    And Mr. Pump is talking about the two

12   guideline companies that you select.  And he -- he

13   asserts that they were not comparable to World

14   Health as of August 31st through October 31st of

15   2005, and produce an estimate of enterprise value

16   of World Health is likely overstated.

17            First of all do you -- do you disagree

18   with that?

19       A    Absolutely.

20       Q    Okay.  And he goes on to assert that

21   they -- they provide similar services to those

22   provided by World Health but they're substantially

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

155

1    different in a number of ways.  And he refers, in

2    the next sentence, that they are financially

3    healthy companies.  And by August 31st, 2005, there

4    was significant uncertainty about the future of

5    World Health and its ability to operate as a

6    going -- as a going concern.

7           Do you agree with that?

8       A    It'd say there is certainly uncertainty

9    about the future of World Health.  I don't know if

10   it's significant.  And I'm not sure about the going

11   concern part.  I mean --

12      Q    You --                          `

13      A    -- it certainly operated as a going

14   concern until it was sold.

15      Q    I thought you indicated that you would

16   agree that World Health was distressed?

17      A    Yeah, that's -- that's different.

18      Q    Okay.  Well, how's it different?

19      A    Because you can be distressed and come

20   out of your distress.  It doesn't -- I mean when

21   you're -- when you stop being a going concern,

22   it's -- you're -- you're liquidating.

Marc J. Brown                                                              May 18, 2012
Washington, D.C.

156

```
 1      Q    Okay.

 2      A    Which is not fair value.

 3      Q    Okay.  And you don't believe that there

 4  was any reason to believe that -- that World Health

 5  had any concerns about whether or not it would --

 6  could continue as a going concern as of August

 7  31st, 2005?

 8      A    Well, it says significant uncertainty.  I

 9  would say there was uncertainty.  There was

10  uncertainty for any business.

11      Q    And on -- on the next page there are

12  seven factual bullet points that Mr. Pump cites.

13           And do you -- do you disagree with any of

14  these factual assertions?

15      A    Other than the fact that three and four

16  are the same point.  And I don't know about number

17  two.  I don't think that there's enough evidence to

18  support that.

19      Q    Number two says, World Health needed but

20  was unable to raise additional financing?

21      A    Correct.

22      Q    You don't believe there's enough evidence
```

Marc J. Brown                                                            May 18, 2012
Washington, D.C.

157

1   of that?

2        A    Yeah, I mean there was indications that

3   they needed financing and it was provided by

4   Palisade.  And there was indications they were

5   looking to raise financing or sell the business.

6        Q    And --

7        A    They ultimately sold the business without

8   raising new funds.  I -- I mean they got lending

9   back from Cap Source, which increased their

10  borrowing throughout the period I looked at.  So

11  they -- they had financing.

12       Q    Okay.  And so World Health was -- was --

13  attained financing from -- for Palisades, right?

14       A    From Palisades and from Cap Source.

15       Q    Okay.  And the funding -- the financing

16  that -- that World Health had obtained from

17  Palisades was -- was due to be repaid in a fairly

18  short term, correct?

19       A    Yeah, as I understood it -- and it's a

20  little unclear -- but as I understood it, it was

21  basically to bridge between Cap Source, you know,

22  stopping lending and restarting.

158

1      Q    And during the period that you look at,

2   August 31st through October 31st, 2005, was that

3   short-term financing ever repaid?

4      A    Was it ever repaid.  It was exchanged for

5   a new interest bearing security in October 24th of

6   '05.

7      Q    Was it ever repaid in cash?

8         MS. LAMBRAKOPOULOS:  Objection.  Form.

9         THE WITNESS:  Again, it was exchanged for

10   security.  So by it's nature, if it was exchanged,

11   it wasn't repaid in cash.

12   BY MR. WILLIAMS:

13      Q    Okay.  And he goes on to state that --

14   that the market capitalization of equity for AMN

15   and Cross Country were approximately 488 and 636

16   million as of August 31st, 2005, respectively,

17   while according to Mr. Brown World Health's market

18   capitalization of equity was approximately 17

19   million.

20         And he -- at the -- at the final sentence

21   of the paragraph says the -- The differences in

22   size alone reduced the reliability of the two

Marc J. Brown                                                                May 18, 2012
Washington, D.C.

159

1    companies used by Mr. Brown to estimate the

2    enterprise value.

3            Do you agree with that?

4        A    No.

5        Q    Okay.

6        A    I mean size is certainly a factor, but I

7    accounted for it.

8        Q    Okay.

9        A    As is growth, as are other things.

10       Q    Okay.  Let me ask you to take look at

11   page 14, at the last paragraph there, where it's

12   talking about your -- your calculation of

13   enterprise value.

14       A    Uh-huh.

15       Q    And in the second sentence of the final

16   paragraph there it says, It is not uncommon for

17   publicly traded companies to have common stock with

18   a positive market capitalization, but have

19   preferred stock or debt with a value below the

20   principal or par value or below the price that

21   investors paid for these securities.

22           Do you agree with that?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

160

1        A    Sure.  PepsiCo bonds trade for less than

2    par.

3        Q    Okay.

4        A    So did General Mills.

5        Q    And so would you agree with me that --

6    that a bond that trades for less par is worth less

7    than par?

8        A    Not necessarily.

9        Q    Okay.  So if a bond sells for $10, you

10   believe that the bond wouldn't be worth $10 on the

11   day it's sold?

12       A    You gotta look at the facts and

13   circumstances of that transaction.

14       Q    Okay.

15       A    If it was a distressed sale, right?  I

16   mean during the financial crisis hedge funds were

17   selling stuff like crazy 'cause they were -- they

18   had to.

19       Q    Okay.  But --

20       A    Those were distressed sales.

21       Q    You mentioned Pepsi bonds, right?

22       A    Uh-huh.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

161

1        Q    Is that a "yes"?

2        A    Yes.

3        Q    Okay.  And -- and a bond that trades

4   for -- you -- would you agree with me that the

5   publically traded value of a -- of a bond-type

6   security is -- is the value of the bond?

7        A    Again, it depends on the security.  I

8   don't know how liquid Pepsi is.  I would assume --

9        Q    It's probably --

10       A    -- more --

11       Q    -- pretty liquid?

12       A    -- probably fairly liquid.  So it's a

13  good indication.  But if it's an illiquid security,

14  not necessarily.

15       Q    Okay.  Did you account for the fact that

16  the market value of certain debt securities might

17  be lower than the -- than the indicated enterprise

18  value?

19       A    I'm sorry, I don't understand the

20  question.

21       Q    Right.  Well, did -- did you account for

22  the fact that the market value in terms of what a

Marc J. Brown                                               May 18, 2012
Washington, D.C.

162

1    willing buyer would pay a willing seller for a

2    particular debt security might be less than the

3    amount indicated by the face value of the security?

4         A    Are you asking me a hypothetical or --

5    I'm not sure of --

6         Q    No, I'm --

7         A    -- your question.

8         Q    -- I'm asking in the context of your

9    analysis, as I understand it, that the debt that --

10   that Palisades had in -- in World Health was -- you

11   indicated that the valuations were reasonable

12   because they were, as I understand it, covered by

13   potential equity or assets of the company?

14        A    Correct.

15        Q    Did you account for the fact that

16   notwithstanding the fact that the assets were --

17   that the -- that the debt was covered, that it

18   may -- that the market value of the -- of the debt

19   might be less than indicated on face?

20        A    Well, they didn't have publically traded

21   bonds, if you're asking about World Health.  Are

22   you asking about World Health?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

163

1        Q      Yeah.

2        A      They didn't have publicly traded bonds.

3    The last two bond transactions that I'm aware of

4    both went off at a premium.

5        Q      Right.  But what I'm asking you is did

6    you account for the fact that -- or maybe you

7    didn't.

8               Did you -- did you endeavor to -- to

9    calculate what the value of World Health's debt

10   owned by Palisades was?

11       A      Again, I -- I tested the reasonableness

12   of their total portfolio of World Health

13   securities.

14       Q      And is testing the reasonableness of the

15   total portfolio of World Health securities

16   different than calculating the value of World

17   Health securities in Palisades' portfolio?

18       A      No.  I mean it's -- it's -- that's how

19   you would ascertain if the value is reasonable:  Is

20   it covered?  Will I -- will I get value back for

21   this?

22       Q      I understand that's how you tested it,

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

164

1   whether or not a value is -- is reasonable.

2            My question is, is it -- is it different

3   than calculating the value?

4       A    I -- I don't understand your question

5   'cause -- I'm sorry if I'm not answering it

6   correctly.  I -- I don't understand it.

7       Q    Okay.

8       A    That's what I did.  I -- I tested the

9   value.  I looked at a range of enterprise values

10  based on a guideline approach.  And I also looked

11  at what the market indicated it was worth.

12      Q    And let's -- let's go back to your --

13  your report for a minute.

14           And can you show me where in your report

15  you indicate that the value of the -- the -- the

16  bundle of World Health assets held by Palisades was

17  reasonable?

18      A    Where I indicate it?

19      Q    Yeah.

20      A    It's my opinion on page 3.

21      Q    No, I mean is there -- is there a

22  calculation that shows it?

165

```
 1        A     Yeah, there is.  There is a calculation

 2    on page 20, table 10.

 3              And I should note that if you wanna look

 4    at this table and you wanna look at the convertible

 5    debentures line of 22 million at both August and

 6    September and then about 12 million in October,

 7    that number is -- I've subsequently come to find

 8    out that it's too high, that they exchanged some of

 9    the debt in July and August, such that the numbers

10    at the bottom of 7.58 in August and 3.8 in

11    September and 5.2 in October actually go up by

12    about 7.52 million.                              `

13        Q     Okay.  And so you talked about --

14        A     Which would increase the coverage.

15        Q     Okay.  So what -- where -- where is the

16    coverage?  Is this --

17        A     It's that last line, excess debt and

18    preferred stock coverage.

19        Q     Okay.  So --

20        A     So you take that number and add

21    7-and-a-half million to it.

22        Q     Okay.  So you have an enterprise value
```

166

1    you're talking about as of August 31st?

2         A    Correct.

3         Q    Okay.  So --

4         A    As of each of the dates.

5         Q    Okay.  So as of August 31st, you have

6    78.8 million as an estimated enterprise value, and

7    from that you're subtracting the company's debt?

8         A    Correct.

9         Q    Okay.  And you say excess debt coverage

10   before a preferred stock?

11        A    Yeah, that's only -- it doesn't matter

12   for August or September.  But then in October

13   they've got the preferred through the standstill

14   securities exchange.

15        Q    Uh-huh.  And so your conclusion is the

16   company had -- and you indicated it's higher than

17   this -- but your conclusion is the company had

18   approximately $7.5 million in assets more than it

19   owes?

20        A    As of what period?

21        Q    As of August 31st, two thou --

22        A    No, it's 15.  Adjusted for, in my new

Marc J. Brown                                                      May 18, 2012
Washington, D.C.

167

```
 1   understanding of the debt levels of the --

 2        Q    But they chart it's 7.5.

 3             But based on your new understanding it's

 4   15 --

 5        A    Correct.

 6        Q    -- is that what you're saying?

 7             THE REPORTER:  Remember, y'all.  I didn't

 8   get all the question and -- nor the answer.

 9   BY MR. WILLIAMS:

10        Q    Based on the chart, it's approximately

11   7.5 million; based on your new understanding it's

12   approximately 15 million; is that --

13        A    That's correct.

14        Q    Okay.

15        A    For August 31st.

16        Q    Okay.  And for August 31st, 2005, you

17   indicate the $2 million loan, $4 million promissory

18   note, 22 million in convertible debentures.

19             Is there any indication with respect to

20   the -- the companies unrestricted or restricted

21   stock in this chart?

22        A    No.  This is showing the coverage of the
```

168

1    debt securities.

2         Q    I see.

3         A    But the fact that there is coverage,

4    right.  So in August there's $15 million.  That's

5    the same as saying there's equity.  There's 15

6    million available to equity.

7         Q    So in August if -- is it fair to say that

8    what you're at -- your analysis here indicates is

9    that the debt that Palisades holds in World Health,

10   World Health has the abil -- has the ability to

11   repay?

12        A    No.  What I'm saying is that it is

13   covered in the sense if -- if you had to go through

14   a restructuring, which it appears what was gonna

15   occur, would be able to receive that value.

16        Q    And so you -- you believed, based on your

17   analysis, that Palisades would be able to receive

18   the value that's reflected in its debt?

19        A    Yes.  They -- they had full coverage,

20   according to my analysis.

21        Q    Okay.  Well, the value of the -- the

22   company's unrestricted and restricted stock is --

169

1   is not included in this chart, is it?

2        A    Not directly, but it's -- it shows the

3   coverage at 7-and-a-half in the chart and 15

4   million in total.  So that would imply that the

5   stock is covered.  And I mean it dovetails with

6   what the market cap was at the time.

7        Q    Stock is covered in terms of what?

8        A    If you -- there's -- there's equity

9   value.

10       Q    The stock --

11       A    If you -- if you wanna cha -- turn to

12  page -- well, Exhibit 5-5.  You wanna look at the

13  top.  And you can look at the publically traded

14  equity, the market capitalization line.

15       Q    Yeah.

16       A    So that's 17.38 million at August 31st.

17       Q    Yeah.

18       A    That's the same sort of concept as the --

19  the 15 million that we're talking about from a

20  revised version of table 10.

21       Q    Uh-huh.

22       A    It's the same idea.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

170

1      Q    Okay.  So the idea with respect to the

2   debt is the debt will ultimately be repaid

3   because --

4      A    Yeah, you'll receive that value, yes.

5      Q    With respect to the stock, the stock

6   sells for what the stock sells for; is that fair?

7      A    The stock sells for --

8      Q    For example, on table -- Exhibit 5-5, you

9   indicate the price of the stock at 22 cents?

10     A    Correct.

11          MS. LAMBRAKOPOULOS:  I'm sorry, is your

12   question related to the restricted stock or the

13   common stock?

14          MR. WILLIAMS:  That's -- that's a good

15   clarification.

16   BY MR. WILLIAMS:

17     Q    So with respect to the company's common

18   stock, if the -- if Palisades wanted to sell the

19   Pal -- the company's unrestricted common stock,

20   they could expect 22 cents a share; is that fair?

21     A    That's what it was trading for in the

22   marketplace, yeah.

171

1               I think maybe what you're failing to

2       understand is the subtlety behind table 10, though,

3       that if you look back to table 9, it probably

4       describes it a little bit better.

5               And the idea is, you know, I looked at

6       the total value of the portfolio.  And because of

7       the nature of the face value of the securities

8       versus what they were on the NAV at, for example,

9       the convertible debenture, so when you -- when you

10      turn that into the company and said pay me back,

11      give me value, it's 9.67.  But on the NAV, it's at

12      7.35.  It's at a 24 percent discount.

13              So, you know, there's a difference there

14      that that sort of provides additional coverage, if

15      you will.

16         Q    I see.  So -- so you're saying that what

17      you'd really get back from the convertible

18      debenture, it is actually more than what they

19      valued it at, so that offsets the fact that they

20      inflated the value of the restricted stock?

21              MS. LAMBRAKOPOULOS:  Objection.

22      Foundation.

172

1           THE WITNESS:  I don't think that's my

2    testimony at all.  If you look on a total portfolio

3    basis, they were covered.

4    BY MR. WILLIAMS:

5        Q    On a total -- total portfolio basis, big

6    picture?

7        A    I don't know what that means.

8        Q    Okay.  And in table 9 there is a

9    reference to World Health common entity NAV.

10           And -- and that's the -- the value of the

11   unrestricted and restricted stock?

12       A    Yes.                            `

13       Q    Okay.  And you add this all up to the

14   aggregate what the -- what the company -- what the

15   managers valued the -- the side pocket assets of as

16   of 8/31/2005?

17       A    Yeah, that aggre -- aggregate NAV matches

18   that number.  So 15.357 is what's on the -- the NAV

19   statement at August 31, '05.

20       Q    Okay.  And you go ahead and calculate the

21   face value of the debt.

22           And my question to you is did the

Marc J. Brown                                                          May 18, 2012
Washington, D.C.

173

1   managers value the debt at face value?

2       A     Well, they -- they put it on their books

3   originally at cost, which is what they paid for,

4   which is the 7.35.  They didn't -- they didn't

5   increase the value.  They didn't raise the value.

6       Q     Okay.  But you raised it here in your

7   table 9?

8       A     I didn't raise the value.  I'm showing

9   the coverage.  I'm showing you that when you hand

10  in the convertible security, you don't get 7.35

11  back, you get 9.67.

12      Q     Well, they didn't get back 7.35, did

13  they?

14      A     I don't know what they got back.

15      Q     Okay.

16      A     But at the time, at 8/31/05, there was

17  adequate coverage of that value in order that you

18  could expect to receive that value.

19      Q     Based on your calculation?

20      A     And what the market was saying as well.

21      Q     Based on your evaluation of what the

22  market was saying?

Marc J. Brown                                                          May 18, 2012
Washington, D.C.

174

1      A    Based on my "valuation" of the market?

2      Q    Yeah.

3      A    I don't think that's -- I didn't value

4    the market.

5           MS. LAMBRAKOPOULOS:  Is your question "a

6    valuation" or "evaluation" of the market?

7    BY MR. WILLIAMS:

8      Q    "Evaluation."

9      A    Yeah, I mean that's what the market said.

10   That's where the stock price indicated.

11     Q    And the stock price was approximately 90

12   percent lower than it was prior to the -- the

13   accounting irregularities?

14     A    Yeah, approximately.

15     Q    Okay.  So based on the 90 percent decline

16   in stock price, the market believed that -- that

17   all of these debt securities were -- would be paid

18   ultimately at full -- at face -- full face value?

19     A    You have a company that was worth 216

20   million the day before.  The market's saying it's

21   worth 86, 87 the next day.  Or not the next day,

22   but two weeks later.  Yeah, they're showing that

175

1    there's coverage of these securities, absolutely.

2         Q    86, 87, that's ind -- an indication

3    that -- well, you would agree with me that the --

4    the market capitalization was -- was not 86 or 87

5    million, it was approximately 17 million?

6         A    Approximately.  That's the equity

7    component of it.

8         Q    Right.

9         A    Right.

10        Q    And you indicated -- and correct me if

11   I'm misremembering what you said -- you indicated

12   that you did an analysis of the -- of the total

13   portfolio, total side pocketed assets of World

14   Health that -- that -- held by Palisades as of

15   three dates?

16        A    Yes.  I looked at if the value in the

17   side pocket that they set aside, if it was

18   reasonable.

19        Q    Okay.

20        A    In total.

21        Q    If you were advising someone who wanted

22   to buy those assets, how would you have evaluated

176

1    the value of those assets?

2         A    Same way.

3         Q    Same way?

4         A    Sure.

5         Q    And so you would have advised someone --

6    and so did -- did you -- did you determine what --

7    what a fair price for those assets was?

8         A    That's what I tested the reasonableness

9    of.

10        Q    Okay.  And so based on your test, you

11   believe that the -- the 15.357422 as of August

12   31st, 2005, would have been a fair price for those

13   securities?

14        A    Yes.  They were covered.  Absolutely they

15   were covered.

16        Q    And you believe that would have been a

17   fair price to pay, if you were advising someone who

18   wanted to buy --

19        A    On a portfolio basis, yeah.

20        Q    Yeah.

21        A    Yes.  Doesn't mean -- I mean that's what

22   they're worth, sure.

177

1        Q    So if you were advising someone on a

2   portfolio basis, so you -- strike the question.

3             If you were advising someone who wanted

4   to buy these assets on a portfolio basis, you would

5   have advised them that the valuation created by the

6   managers' share was reasonable?

7        A    That's what my opinion was.

8        Q    And but -- but that's not my question.

9             If you were advising someone who wanted

10  to buy the assets, you would advise them that

11  the -- that the price being set by the fund

12  managers was a reasonable one?              `

13       A    Yes.

14       Q    Okay.  Would you have advised a willing

15  buyer to purchase the restricted stock for

16  $1.9 million?

17       A    You're asking me hypothetically?

18       Q    Yeah.

19       A    I didn't -- I didn't look at the

20  individual value of the restricted stock.

21       Q    You don't want to comment on that?

22             MS. LAMBRAKOPOULOS:  Objection.

Marc J. Brown                                                    May 18, 2012
                        Washington, D.C.

                                                                        178

1              THE WITNESS:  I -- is that a question?

2    BY MR. WILLIAMS:

3        Q    Yeah.

4        A    I don't want to comment on it?  That's

5    the question?

6        Q    Yeah.

7        A    I did not undertake that analysis.

8        Q    Fair enough.

9              As you sit here and think about it today

10   with respect to the -- the $1.9 million valuation,

11   approximately, on the restricted stock as of August

12   31st, 2005, do you believe that valuation was

13   reasonable?

14       A    You're asking me on that specific

15   security?

16       Q    Yes, sir.

17       A    You know, back to my original testimony,

18   my opinion is laid out in my report.  I didn't -- I

19   didn't look at it on an individual basis.  I didn't

20   need to.  That's not what at -- what's at issue

21   here.

22       Q    Well --

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

179

```
 1        A    My understanding of the allegations are

 2    the portfolio was inflated.  The management fees,

 3    which are calculated on the portfolio were

 4    inflated.  And what -- what my analysis shows is

 5    that on a portfolio basis it wasn't unreasonable.

 6        Q    Okay.  Well, thank you for your -- your

 7    understanding of the allegations, but my question

 8    is with respect to the restricted stock in

 9    particular, is -- is it your opinion that the

10    $1.9 million valuation as of -- approximately

11    $1.9 million valuation as of August 31st, 2005, was

12    reasonable?                              `

13        A    I didn't -- I didn't form an opinion one

14    way or the other.

15        Q    Okay.  If you were advising a buyer who

16    wanted to buy a restricted stock in World Health

17    when the stock was currently trading at 22 cents a

18    share, would you have advised them that restricted

19    stock priced at approximately $1.99 a share was

20    reasonable hair?

21             MS. LAMBRAKOPOULOS:  Objection.  Outside

22    the scope of his opinion.
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

180

1              THE WITNESS:  Yeah, I mean I certainly am

2    in the advising someone on buying it.  You have to

3    look at the facts and circumstances.  Maybe.  I

4    don't know.  I didn't look at that analysis.

5    BY MR. WILLIAMS:

6         Q    Maybe?

7         A    If -- if the -- if -- if there's

8    significant value here, as the indications show,

9    that stock could potentially be in the money.  I

10   don't know.  I didn't look at it.

11        Q    Let me ask you to take a look back at the

12   Pump report, if you -- if you would; the Pump

13   rebuttal report.

14        A    Okay.

15        Q    And I'm directing you to page 8 of that

16   document.

17        A    Okay.

18        Q    And under subheading 3, talking about the

19   methodology used by Mr. Brown to test the

20   reasonableness of the valuation performed by the

21   Defendants of the PMF convertible debenture and

22   bridge loan securities fails to test whether the

181

1    values assigned by the Defendants were reasonable,

2    and ignores facts known to this matter.

3           Have you read this part of Mr. Pump's

4    report?

5        A    I have.

6        Q    Okay.  And he says in the second

7    sentence, As discussed in the Pump report, a

8    willing buyer of the convertible debenture and

9    bridge loans owned by PMF would have considered the

10   significant risk that World Health would be able

11   to -- would be unable to service and repay its

12   debt, which typically lowers the value of a

13   business and its debt securities.

14          Do you agree or disagree with that?

15       A    If you wanna look at it solely from a

16   buyer's perspective, they always want to pay less

17   money, sure.

18       Q    Do you agree with that?

19       A    The fact that he doesn't use the word

20   "seller," yeah, a buyer's always gonna look to pay

21   less.

22       Q    Okay.  And he goes on to say that,

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

                                                                        182

 1    Nowhere in Mr. Brown's report does he attempt to

 2    evaluate the credit-worthiness of World Health or

 3    the company's ability to service and repay its

 4    debts.

 5              Is -- is that fair?

 6         A    I don't know that that's fair.  We're

 7    talking about a restructuring event here.  So

 8    that's how the debt's gonna get serviced.  It's

 9    going to be restructured as it was.  They swapped

10    it out for different interest-bearing securities

11    six weeks later, so --

12         Q    Okay.  So creditworthiness is -- you

13    don't believe is relevant?

14         A    I -- I didn't -- I -- can you ask the

15    question?  I -- I don't understand.

16         Q    Yeah, well, he refers to -- he criticizes

17    your report for not attempting to evaluate

18    creditworthiness of World Health or the company's

19    ability to service and repay its debt.

20              And first of all, do you agree that you

21    didn't do that?

22         A    No, I don't agree.  I -- that's what my

183

1    test does.  It looks at the exchange of value.  It

2    looks at -- in a restructuring, whether that

3    restructuring hacan -- happened August 31,

4    September 30, you know, or whatever point, would

5    they have been able to receive value for those

6    securities.  My report absolutely considers that.

7         Q    Okay.  So -- so in your view, your report

8    does evaluate the credit-worthiness of World Health

9    or the company's ability to service and repay its

10   debts?

11        A    Yeah, to repay that debt through a --

12   whether it's via a sale or an exchange of

13   securities such as they did, yes.

14        Q    Okay.  He also criticizes you for not

15   performing any direct valuation of the convertible

16   debenture or bridge loan securities.

17             Do you agree with that?

18        A    No.

19        Q    Did you perform a direct valuation of the

20   convertible debenture?

21        A    I am not sure what a direct valuation

22   means.

Marc J. Brown                                                    May 18, 2012
                        Washington, D.C.

184

1        Q    A value -- a determination of how much

2   the convertible debenture is worth.

3        A    Yeah, I -- you know, Mr. Pump I think is

4   coming at this from sort of a tax valuation or

5   accounting valuation perspective.  In a

6   restructuring, as was fully anticipated here and is

7   what eventually came to bear, for good or for bad,

8   that's how I conducted the analysis.  That's how

9   Standard & Poor's, the credit rating agency -- are

10  you familiar with them?  That's how they conduct

11  their analysis.  I mean that's what you do in a

12  restructuring scenario.

13       Q    But my question is did you perform a

14  direct valuation of the convertible debenture?

15       A    And I -- again, I guess I'll defer to

16  what I opined on --

17       Q    Okay.

18       A    -- which is I looked -- tested the

19  reasonableness of the portfolio.  That portfolio

20  contains those securities.  And it was covered.

21       Q    Okay.  And did you perform a direct

22  valuation of the bridge loan securities?

185

1       A    Same answer.

2       Q    Okay.  And he goes on to criticize you

3    for failing to even mention much less analyze the

4    fact that as of the valuation dates World Health

5    was in default on its debenture and bridge loan

6    securities.

7             And first of all, I think that's true,

8    right?  You don't -- you don't mention that in your

9    report?

10      A    I'm not sure.  I -- I mean it's certainly

11   part of my analysis.

12      Q    Okay.  How does that fact `-- how does the

13   fact that the World Health was in default factor

14   into your analysis?

15      A    It makes a restructuring more likely.

16      Q    Why?

17      A    Because it's due and owing.  It's due and

18   owing.  You have -- you have -- you have a creditor

19   you owe money to.  You're in default.  You have to

20   deal with them.

21      Q    Okay.

22      A    Whether it's by paying in cash and other

186

1    security, selling the business and taking care of

2    that debt, that's -- you have to deal with that.

3         Q    Okay.  Well, he says that this is a

4    significant fact that would have altered the val --

5    affected the value of the debenture and bridge loan

6    securities and should have been part of Mr. Brown's

7    analysis.

8              Do you agree with that?

9         A    No.  Mr. Pump doesn't seem to understand

10   how restructuring works.

11        Q    Okay.  He doesn't understand how -- how

12   restructuring works?

13        A    Apparently.

14        Q    Okay.  And -- and fair to say you have

15   vast experience in restructuring valuations?

16        A    I've probably done a -- I've got

17   experience on three different sides of

18   restructuring.

19        Q    Okay.  But actually performing a

20   valuation analysis in a restructuring?

21        A    Yeah, forty to fifty times.

22        Q    Okay.  Under your own signature?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

187

```
 1        A     Yeah, sure.  I mean part of those were at

 2   a fund where I put together a memo.

 3        Q     You put together a memo on -- on

 4   valuation in terms of restructuring?

 5        A     Absolutely.

 6        Q     Okay.  And that was at the hedge fund?

 7        A     Correct.

 8        Q     And what -- what was the purpose of those

 9   memos?

10        A     To advise upon the buying or selling of

11   securities.

12        Q     Okay.  The internal memos that we talked

13   about earlier today?

14        A     Correct.

15        Q     Okay.  And then Mr. Pump goes on to say,

16   The debt securities that are in default typically

17   trade at values that are substantially below par,

18   often at prices that are only a small fraction of

19   par value.

20              Is that true?

21        A     It can be true.  Sometimes they trade

22   above par.
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

188

1                THE REPORTER:  Sometimes what?

2                THE WITNESS:  They trade above par.  It's

3    based on coverage.

4    BY MR. WILLIAMS:

5        Q    So you don't agree that -- that -- with

6    what he says about -- necessarily agree with what

7    he says about debt securities and default being a

8    value substantially below par?

9        A    Some are.  Some aren't.

10       Q    Can you say whether or not most are below

11   par?

12       A    Yeah, maybe it's most.  I'm not -- I'm

13   not sure.  I haven't done an analysis, but you --

14       Q    Based on your experience.

15       A    Yeah, usually, if you're talking about a

16   distressed entity, there's some form of distress.

17   It depends on if there's coverage or not.  But if a

18   company is covered, if your bonds are covered, then

19   you know it's gonna -- it's gonna trade at par or

20   above.  And there's numerous examples of that.

21       Q    Okay.

22       A    So it's a facts and circumstances thing.

189

1    That's -- that's the point.

2        Q    Facts and circumstances?

3        A    Of that specific case, absolutely.

4        Q    Okay.  Let me ask you to turn to page 10

5    of the report.

6             And on page 10, the last paragraph above

7    subheading B, it says, It should be noted that

8    while the guideline public company method used by

9    Mr. Brown is a standard valuation methodology used

10   to estimate enterprise value and common stock

11   value, it is not a standard methodology used to

12   value debt.                          `

13            Do you agree with that?

14       A    No.

15       Q    And so is that a standard methodology

16   that you employed to value debt?

17       A    It's the methodology I employed.

18       Q    Apart from this case?

19       A    Yes.

20       Q    Is it a standard methodology used by Alix

21   Partners to value debt?

22       A    Sure.

190

1        Q    Okay.  Is it a standard meth --

2    methodology used by the managing directors that

3    you've worked with to value debt?

4        A    I'm not sure if all of them have

5    conducted that analysis.  I can't speak to all of

6    them.

7        Q    Okay.  How about Mr. DenUyl?

8        A    He doesn't typically look at debt.

9        Q    Okay.  And so when he does look at debt.

10   Do you know if he uses a -- an enterprise value

11   methodology?

12       A    I would say in the circumstances that

13   I've worked with him on, yes.

14       Q    Okay.

15       A    I mean that's a -- again, it's an

16   industry standard, you're looking at coverage.

17   That's how restructurings are done.

18       Q    Okay.

19       A    That's how you get to -- that's how you

20   carve up the pie in a restructuring.  Whether it's

21   in court, out of court, a -- a swap of securities,

22   that's how it's done.

Marc J. Brown                                                May 18, 2012
Washington, D.C.

191

1        Q     And I think you've indicated that -- that

2    you worked with Mr. DenUyl on a number of -- of

3    expert reports, correct?

4        A     That's correct.

5        Q     And is -- is the methodology that you

6    employed in this case consistent with the

7    methodologies that -- that you've undertaken in

8    previous engagements?

9        A     What do you mean by consistent?  Did I --

10       Q     Same approach.

11       A     -- value -- well, there's a -- I mean

12   there's a wide ran -- yes, I've used market comp

13   approaches.  I've looked at the public market cap.

14   I mean we didn't value a potentially distressed

15   healthcare staffing company, if that's what you

16   mean.

17       Q     Okay.

18             MR. WILLIAMS:  And why don't we go off

19   the -- go off the record.  I may be pretty much

20   done.

21             MS. LAMBRAKOPOULOS:  Okay.

22             MR. WILLIAMS:  Just give me --

192

```
 1            MS. LAMBRAKOPOULOS:  Yeah, I have about

 2    15 -- maybe 10 or 15 minutes worth of questions,

 3    so --

 4            MR. WILLIAMS:  Okay.

 5            MS. LAMBRAKOPOULOS:  Do you want to --

 6            VIDEOGRAPHER:  This concludes tape number

 7    three in the video deposition of Marc Brown.  The

 8    time on the video is 1:38 p.m.  We are off the

 9    record.

10                            (Recess)

11            VIDEOGRAPHER:  This begins tape number

12    four in the video deposition of Marc Brown.  The

13    time on the video is 1:51 p.m.  We are on the

14    record.

15    BY MR. WILLIAMS:

16        Q    Okay.  Mr. Brown, I just wanted you to

17    take a look back at your -- your report, which

18    we've labeled as Brown Exhibit Number 2, briefly.

19        A    Okay.

20        Q    And I'm going to direct your attention to

21    page 7 of the document.

22        A    Yes.
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

193

1        Q    And in the first bullet point you

2   indicate here, as you're describing the various --

3   the five groups of World Health securities in the

4   side pocket.  It's convertible debenture.

5             Do you know what -- what Palisades'

6   policy on valuing convertible debentures was?

7        A    Yeah.  I guess it had two parts.  One was

8   sort of the formulaic convention that they had in

9   their -- in their offering documents, the PPM, the

10  COM.  And then I guess the second part is, you

11  know, their ability to use discretion if they don't

12  think that's fair value.                  `

13       Q    Okay.  And do you know what the formulaic

14  convention was with respect to convertible

15  debentures?

16       A    Yeah, it was something fairly

17  conservative.  You know, you take the -- the

18  principal plus accrued interest and take the

19  difference between the conversion price and the

20  share price and multiply by 50, or something to

21  that affect.

22       Q    Do you know if they were -- they were

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

194

```
 1    supposed to value convertible debentures as if

 2    converted?

 3         A    That is what they adopted in their

 4    agreements I think in March of '05.  I think the

 5    testimony from David Sims and maybe some others,

 6    that prior to that they did it on a, you know, more

 7    of a par plus accrued basis.

 8              THE REPORTER:  More of a which basis?

 9              THE WITNESS:  Par plus accrued.

10    BY MR. WILLIAMS:

11         Q    Do you know what the value of -- of

12    Palisades' position in World Health `convertible

13    debentures would have been if they had val -- if it

14    had been valued on an as-of converted basis?

15         A    I think Mr. Pump makes an attempt to do

16    that in his reports.

17         Q    Other than Mr. -- what you read in

18    Mr. Pump's reports, do you -- do you know?

19         A    No.

20         Q    Did you make any effort to analyze that?

21         A    No.

22         Q    Did you determine, apart from your
```

195

1    valuation of -- of the what I'll call the basket of

2    World Health securities held in the side pocket,

3    did you make any individual valuation of the -- the

4    fund's position in World Health convertible

5    debentures?

6        A    No.  That's not what I was asked to do.

7    I mean I was asked to test the reasonableness of

8    the -- of the totality of it.  And it was

9    reasonable.  I mean that's why they had the

10   discretion, because that was not -- and it gets --

11   it gets -- you know, this is I think what Mr. Pump

12   fails to realize.

13          At some point there -- there's a lot of

14   testimony about it from Mr. Mannion and

15   Mr. Reckless.  And so the reason why you do it this

16   way, that you have a debenture that's convertible,

17   is you have downside protection 'cause you have

18   debt, and then if the stock goes through the roof

19   and you convert and you sell the stock and you make

20   your money.

21          So they were looking at on a coverage

22   basis, which is consistent with how you -- how you

196

1    invest via debenture.

2         Q    Okay.  And then -- and you indicated that

3    apart from following the formulaic procedures of --

4    of the offering memorandum, the fund managers also

5    had discretion.

6              And do you believe that -- that -- strike

7    the question.

8              Apart from the -- the formulaic

9    procedures that -- that you described with respect

10   to convertible debentures, the managers also had

11   discretion.

12             And based on the exercise `of that

13   discretion, is -- is it your -- is it your

14   understanding that they exercised that discretion

15   in calculating the value of the convertible

16   debentures?

17        A    That's what it would appear to have

18   occurred.  I mean that's -- I -- I think -- I think

19   what -- what you need to understand what happened

20   is, as I understand it, because I've been in this

21   situation, is you sort of take off one hat and put

22   on another, right.

197

1              August 8th, everything's fine.  You know,

2     you're doing whatever you're doing.  August 17th,

3     August 31, you're in a restructuring scenario.

4     You've now sort of -- thinking about am I covered.

5     You know, am I gonna get value back in exchange for

6     this.  And that's how you would look at the thing.

7     So that's what I looked at in totality.

8         Q    So if --

9         A    And I think that's what -- and from --

10    from what I've read, you know, whether it's the

11    September 8th letter or their testimony, that

12    appears to be what they were thinking as well.

13    Which makes sense.

14        Q    Are you covered in terms of liquidation

15    of the assets?

16        A    I don't know about liquidation.  I mean

17    it -- which I don't think was necessarily on the

18    table at this point.  It's a -- it's a sale of the

19    assets or a, you know, exchange of securities or,

20    you know, an infusion of capital or what have you.

21        Q    And so -- so the concern would be -- or

22    the thought process, as -- as you indicated would

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

198

1    be that because of the distressed situation that

2    the thought produce would turn to:  Am I covered?

3    Did I say that right?

4         A    Yes.

5         Q    Okay.

6         A    I believe they testified to that.

7         Q    Okay.  So prior to the distressed

8    situation, the thought process wouldn't necessarily

9    be:  Am I covered?

10        A    No, if you've got a company that doesn't

11   have any distress and, you know, you invest in the

12   convertible debentures for a reason; it's to give

13   you protection, but you've got more of an equity

14   hat on at that point.

15        Q    Okay.  So if -- if originally the

16   convertible debentures were valued at -- at 7

17   million, once the company becomes distressed and

18   you go into am-I-covered mode, the asset might be

19   worth more?

20        A    Well, it was always worth more.  I mean

21   7's what was on the books.  I mean when they turned

22   it in, when they said it's time to pay up, they

199

1    would've gotten 9.67 million.

2          Q    Okay.

3          A    So they were at a discount to what its

4    face value was.

5          Q    Okay.  They're at a discount to face

6    value?

7          A    And face value was covered, right.

8          Q    And -- and do you know -- I'm --

9    consistent with the -- the valuation policies of

10   the fund, were they at a discount?

11         A    Were they at -- I -- I -- can you re-ask

12   the question?  I don't understand.  `

13         Q    Yeah.

14              With respect to the valuation policies of

15   the fund, were the convertible debentures valued at

16   a discount or were they valued where they were

17   supposed to be or were they overstated?

18         A    Well, they -- it was what it cost them.

19   So they paid 7.35 million for this 9.67 million

20   face debenture.

21         Q    Okay.

22         A    So it was on their books at cost.

200

```
 1        Q    And being on their books at cost, was

 2   that consistent with the fund's valuation policy?

 3        A    I don't know that it was inconsistent.  I

 4   mean there's certainly -- one of them is a

 5   provision for putting things at cost plus accrued.

 6   And I think before they switched to as-converted

 7   basis, that's how they accounted for it.

 8        Q    Do you know if -- if -- what the value of

 9   the convertible debentures would have been on an

10   as-converted basis?

11        A    I don't.

12        Q    Do you know if it's less -- would have

13   been less than $7 million?

14        A    I would expect that it would be because

15   necessarily it's a very conservative measure that

16   factors in a stock price that's now below your

17   strike.

18        Q    Because the stock price is greater?

19        A    Yeah, it's -- your stocks -- you're --

20   you're of the money on -- on your -- you go from

21   being in the money to out of the money on the

22   option vetted.
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

1          Q    Okay.  And with respect to the promissory

2     note, did you -- do you know what the funds'

3     valuation policies called for in terms of valuing a

4     promissory note?

5          A    I think it's -- you know, there was

6     provisions in a couple of the documents.  One was

7     sort of a -- you know, like a cost plus expected

8     profit and then back to, you know, using your --

9     your opinion, your, you know, your good faith

10    estimate of fair value.

11         Q    Okay.  Good faith estimate of fair value?

12         A    I think that's what it says.

13         Q    Okay.  And you talked about your -- your

14    extensive experience in -- in restructurings.

15              With respect to your experience, have you

16    ever known a -- a promissory note that was in

17    default to trade at face value?

18         A    Promissory notes typically don't trade.

19         Q    To be sold at face value?

20         A    They typically -- they're not really

21    exchanged.

22         Q    Okay.  Why is that?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

202

```
 1        A    Because you are sort of waiting for it to
 2    play out.  You may get paid par plus interest and
 3    come out ahead.  You may loose a little at the --
 4    the end of the restructuring.  It's hard to say.
 5        Q    In your experience they're typically not
 6    sold?
 7        A    They're -- I'm sorry, they're not?
 8        Q    They're typically not sold?
 9        A    Yeah, a promissory note, it's -- it's a
10    unique -- it's not -- you know, it's not a typical
11    instrument that gets sold in the restructuring.
12        Q    Okay.                        `
13        A    It may be exchanged.  It'll be settled
14    when the restructuring's settled, whether it's a
15    debt for equity swap or if it eventually goes to
16    bankruptcy.
17        Q    It'll be settled by -- by the -- the
18    person -- the entity that's obligated under the
19    note?
20        A    It'll be settled by a consensual
21    agreement amongst all the creditors and
22    stakeholders.  So the company, the senior lenders,
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

203

1    the jury lenders, equity, everybody sort of in the

2    mix has to come together and vote on a --

3              THE REPORTER:  What?  What?  Please say

4    that louder?  I didn't hear it clearly.

5              THE WITNESS:  Everybody in the mix has to

6    come together and -- and vote the plan of

7    reorganization if you're impaired.

8    BY MR. WILLIAMS:

9         Q    Is that -- is that a bankruptcy?

10        A    Yes.

11        Q    Okay.

12        A    If you're out of bankruptcy, you need an

13   even higher margin of people going to --.

14        Q    Have you ever known individuals who held

15   assets or who are creditors of a -- of an entity in

16   bankruptcy to sell those obligations?

17        A    Sure.  People'll sell that stuff.

18        Q    They typically sell it on the face value?

19        A    Typically, probably not.  There -- that's

20   how a distressed debt investing got started.  You'd

21   have commercial banks that made a loan.  And when

22   it went into default, they would panic and sell it

204

1    at a massive discount and guys would step in and

2    buy it and make a ton of money.

3        Q    Okay.  And you --

4        A    And there's -- there's mutual funds and

5    specifically I think insurance companies that can

6    only invest in investment grade bonds.  So the

7    minute General Motors and Ford got downgraded in

8    May of 2005 to junk status, people had to sell

9    their bonds.  They couldn't hold it by regulation,

10   by policy.

11       Q    And so there's a market for these --

12   these distressed debt, what I'll refer to?

13       A    Yes.

14       Q    And these distressed debts, would you

15   agree they typically sell at less than face value?

16       A    Typically, probably.

17       Q    And with respect to the --

18       A    But it's not --

19       Q    Well, go ahead.

20       A    The point is, it's -- it's people that

21   are forced to sell.  It's not fair value.

22       Q    Okay.  But you agree that there's a

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

205

1   market?

2        A    There is a market.  It's -- it's not

3   necessarily liquid.  It's not necessarily fully

4   informed.  It certainly isn't necessarily willing

5   on a seller's part.

6        Q    Okay.  And the discounts that -- that are

7   reflected in this market, are they -- are they

8   substantial discounts from face?

9        A    Facts and circumstances.  It depends.

10  Sometimes stuff sells at a premium.  Tronox's bonds

11  sold at a premium.

12            THE REPORTER:  Which one?` I didn't --

13            THE WITNESS:  Tronox, T-R-O-N-O-X.  So we

14  advised -- we advised the Government on.

15  BY MR. WILLIAMS:

16       Q    Okay.  So sometimes bonds sell at a

17  premium?

18       A    Yeah.  It's all about coverage.  Mr. Pump

19  talks about his American Airlines bonds.  In there,

20  he picks one series of bonds which sits up at a

21  holdco level.  And it doesn't have the securities

22  that other bonds that trade more close to par.

206

```
 1       Q    Okay.  So it's not -- so if -- if at

 2    times these -- these obligations sell at -- at a

 3    premium, it's not al -- always distressed sellers?

 4       A    It's not always distressed sellers.  I

 5    don't understand the question.

 6       Q    Well, you indicate that these -- I think

 7    you indicate -- and correct me if I'm

 8    misunderstanding you -- I thought you indicated

 9    that these bonds tended to sell at below face value

10    because there were a lot of distressed sellers who

11    were desperate to get rid of them?

12       A    Yeah, that's -- that's your typical

13    source of these source of instruments, yes.

14       Q    Okay.  And -- and these -- these

15    instruments are -- because the -- these instruments

16    are -- are sold publicly, that there's a market for

17    them, would you agree with that?

18            MS. LAMBRAKOPOULOS:  I'm sorry, which

19    instruments are you talking about?

20    BY MR. WILLIAMS:

21       Q    Distressed debt securities.

22            MS. LAMBRAKOPOULOS:  Generally speaking?
```

207

1    BY MR. WILLIAMS:

2         Q    Generally.

3         A    Yeah, it's a little more complicated than

4    that.  Because sometimes it's bank loans, which is

5    technically not a sale.  It's a -- it's an

6    assignment.

7         Q    Okay.

8         A    So there's various mechanics that are

9    different behind that.  But there is a market.

10   It's not always active.  It's not all liquid.  It's

11   certainly on a security-by-security basis.

12        Q    Okay.                          `

13        A    But it's all driven by what I used to do,

14   and that's:  Am I covered?

15        Q    Okay.  And would you agree with me that

16   with respect to the -- the bank loans that are

17   assigned, they're typically assigned for less than

18   face value?

19        A    I would not agree with that at all.

20        Q    They're not?

21        A    No.

22        Q    Okay.  Would you say that they're

208

```
 1    typically assigned at face value or -- or greater?

 2         A    I don't know.  I mean they trade all over

 3    the place.  It depends on -- it depends on the

 4    circumstances.  There's -- most bank loans are

 5    secure.  Some aren't.  So that's gonna be a

 6    difference.  Some companies, you look at it and go,

 7    wow, that's covered.  That -- the value of those

 8    assets is 300 million and there's only 200 million

 9    of debt, so I'm fine.

10         Q    Okay.  And so buyers typically buy

11    these -- these instruments, or assign these

12    instruments as you indicate, at face value?

13         A    It's -- it's a range.  I don't know what

14    it is.

15         Q    Okay.  And with respect to the -- the

16    loan that you indicate at the top of page 8, do you

17    know what the -- what the fund's valuation policy

18    with respect to loans is?

19         A    I'm not sure there's a specific policy to

20    loans.  It struck me that it fell under sort of two

21    baskets.  One was cost plus a profit or loss

22    estimate, or the good faith assessment of fair
```

209

1    value.

2         Q     Did the fact that you couldn't quite find

3    a specific policy pertaining to loans, did -- did

4    that suggest to you that perhaps the fund was not

5    contemplating loaning money?

6         A     I think their -- their offering documents

7    looked like they changed a little bit over time.

8    You know, strategies change.  Opportunities change.

9    In the investment field, you can't just necessarily

10   stick to what you thought you'd do day one.

11        Q     Okay.  And other than the -- the

12   evaluation of the World Health assets and sort of

13   taken together, did you perform any individual

14   analysis of the -- the value of this $2 million

15   loan?

16        A     I believe you already asked me that

17   question.  No.  I looked at the portfolio and when

18   it was covered.

19        Q     And the restricted stock we've discussed.

20              With respect to the common stock, the

21   common stock is valued at $110,000, which is

22   approximately 22 cents a share as of August 31st,

Marc J. Brown                                              May 18, 2012
Washington, D.C.

210

1    2005.

2              And do you know what the company's -- the

3    fund's policy with respect to the valuation of

4    common stock was?

5        A    I think it was, you know, whether it was

6    the last price of the day or, you know, a bid out

7    spread on a day, I'm not sure.  But it was

8    something in line of 22 cents.

9        Q    Something approximating with -- with the

10   closing price that the stock --

11       A    Yeah, something approximating it.

12       Q    Okay.

13       A    Which I mean they actually went

14   conservative when in September and October, even

15   though there was a price, they marked both the

16   common and the restricted down to zero.

17       Q    Okay.  Do -- do you know whether or not

18   the fund needed a registration statement to be

19   effective in order to trade?

20       A    I don't know.

21       Q    Do you know whether there was a

22   registration statement in fact during the period of

Marc J. Brown                                                                    May 18, 2012

Washington, D.C.

211

1    the analysis of the World Health's restatement?

2         A    I did not -- I did not look at that.  It

3    was outside of the scope of what I was asked to do.

4         Q    Fair enough.

5              And with respect to the -- the common

6    stock, they -- they valued the common stock at --

7    at the exact closing price of the company's stock

8    price; is that right?

9         A    I think that's right.

10        Q    And that's consistent with the --

11        A    At least in August.

12        Q    At least in August.            `

13        A    And then in September and October, they

14   put zero weight to it, zero value.

15        Q    Fair enough.

16             And at least in August, with respect

17   to -- to that particular valuation, would you agree

18   with me that they followed the -- what you

19   characterized as I think the formulaic valuation

20   policy of the fund?

21        A    I'm sorry, can you ask the question

22   again?

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

212

1        Q      Yeah.

2               With respect to the valuation of the

3    common stock in August of 2005, would you agree

4    with me that at least with respect to those 500,000

5    shares, they valued the stock according to the

6    stated formulaic policy of the fund?

7        A    I don't -- I -- I don't think it's

8    formulaic.  That's why I mean the --

9        Q    I'm sorry, I --

10       A    -- debenture --

11       Q    -- was --

12              THE REPORTER:  Wait, wait; y'all.  One at

13   a time, please.  I can't get two.

14   BY MR. WILLIAMS:

15       Q    Go ahead.

16       A    The debenture was formulaic.  The -- the

17   common stock is whatever it's on at the market at

18   the time.

19       Q    Fair enough.

20              Common stock is whatever the stock price

21   is?

22       A    I believe that's -- I believe that's

213

```
 1   right.

 2            MR. WILLIAMS:  Okay.  Those are the only

 3   questions I have for you today, Mr. Brown.  Thank

 4   you very much.

 5            THE WITNESS:  Okay.

 6            EXAMINATION BY COUNSEL FOR DEFENDANTS

 7   BY MS. LAMBRAKOPOULOS:

 8       Q    I just have a few more questions for you,

 9   Mr. Brown.

10            Have you also had an opportunity --

11   you've reviewed Mr. Pump's rebuttal to your expert

12   report.                              `

13            Have you also had an opportunity to

14   review his opening report in this matter?

15       A    I did.

16       Q    Okay.  And you discussed today some of

17   your disagreements with Mr. Pump's opinions in --

18   in his report.

19            Beyond that discussion, are there any

20   other disagreements that you had with Mr. Pump's

21   analysis?

22       A    Yeah, I mean on the rebuttal report, as I
```

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

214

1    said, I think he misses the picture of what the

2    facts and circumstances were of the situation that

3    were -- in a restructuring environment were not

4    marking the books for your tax return at the end of

5    the year.  You know, you need to look at what the

6    most likely outcome of the situation is in terms of

7    how you look at -- at value.

8              So I think he misses the mark there with

9    some of his criticisms of me and some of his stuff

10   in his original report.

11             You know, he also -- I'm not a lawyer,

12   you know.  I -- I review valuation documents all

13   the time, contracts.  I mean he's citing various

14   things that I'm not sure they apply.  You know, the

15   fund documents sort of speak for themselves.  And

16   this private equity guideline that he brings up

17   is -- I mean it -- it -- the guideline itself says,

18   you know, don't listen to us, go to your fund

19   documents for how you should value the securities,

20   so --

21        Q    And did the fund documents provide for

22   the private equity guidelines to be applied by the

215

```
 1    fund --

 2         A    No.

 3         Q    -- managers?

 4         A    No.  They -- fairly new guidelines.  I

 5    don't even think they really apply to this

 6    situation.  And they're designed for private

 7    equities like LBO shops and venture capital funds.

 8         Q    Did the fund documents, the Palisades

 9    fund documents, require that GAAP, G-A-A-P, be

10    applied in valuing the portfolio?

11         A    Not that I saw.  But I'm -- I'm -- you

12    know, I -- I didn't see them say that they had to

13    account for GAAP, no.

14         Q    Did you have any other disagreements with

15    Mr. Pump?

16         A    You know, I disagreed -- I don't think he

17    supported his comments about, you know, my analysis

18    being misleading.  And, you know, he seemed to fail

19    to understand my analysis.  You know, he talks

20    about the differences between the comparables and

21    how -- he sort of ignores my discounts, you know,

22    the fact that I discount those multiples
```

Marc J. Brown                                                        May 18, 2012
Washington, D.C.

216

1    effectively by 33 percent and applied further

2    discounts to the revenue and EBITDA used.

3        Q    Now, you seem to have taken a different

4    approach from Mr. Pump in rendering an opinion here

5    as to the three months at issue in the complaint.

6            Why was it that you took the approach

7    that you took?

8        A    Yeah, I -- I took the approach I took

9    sort of based on my own experience and putting

10   myself in the shoes of what a hedge fund manager

11   would be doing at the time.  They would be reacting

12   to the markets and to the situation.

13           And it changed from everything's doing

14   well to, you know, there's some problems here and

15   we have some distressed.  At what level, it's

16   unclear.  But we're gonna need to work this out.

17   We're gonna bridge them some money.  It's gonna

18   become due in short order.  And it's, frankly, it's

19   gonna give us leverage on the situation.

20           So they've got leverage now.  And they're

21   looking to effectuate a restructuring.  Whether

22   it's through a security swap or a sale or what have

217

 1   you, that's how these situations play out.  So

 2   that's how they appeared to have looked at it,

 3   which made complete sense to me.  That's how I

 4   would look at it.  It's how I looked at it when I

 5   worked at the hedge fund when I was investing in

 6   the markets.

 7            That's how you look at it when you're a

 8   restructuring advisor, whether you're advising

 9   banks or the unsecured creditors or the debtors

10   themselves or other interested parties.

11       Q    And based on your experience, is it your

12   expert opinion that that approach is what's

13   typically used in the types of circumstances that

14   Mr. Mannion and Mr. Reckless found themselves in?

15            MR. WILLIAMS:  Objection.

16            THE WITNESS:  Yes.  I mean it -- it was

17   clear to me it was a restructuring event.  How it

18   was gonna play out was uncertain, but you sort of

19   switch how you think about things.

20   BY MS. LAMBRAKOPOULOS:

21       Q    Mr. Pump references in his report willing

22   sellers and willing buyers in certain instances.

218

1           To your knowledge, were Mr. Mannion and

2     Mr. Reckless willing sellers on behalf of Palisades

3     of the debt and securities that were in the World

4     Health side pocket?

5           MR. WILLIAMS:  Objection.

6           THE WITNESS:  Not to my knowledge.  And

7     their actions sort of seemed to indicate the

8     reverse, where they put additional money in.  They

9     were working, trying to get more information.  They

10    ended up suing trying to get more information.

11    They end up doing a securities exchange.  So, you

12    know, they didn't seem to go out to`seek to sell

13    these securities.

14    BY MS. LAMBRAKOPOULOS:

15       Q    So how did impact Mr. Pump's analysis

16    respecting a value based on willing sellers and

17    willing buyers?

18       A    If they're not willing sellers, then it

19    sort of renders his hypothetical -- which he

20    actually doesn't do.  I mean he states that he

21    wasn't asked to value securities.  But his

22    hypothetical that there's a willing seller, it --

219

1    it doesn't appear that there was.

2        Q    I'd like to ask you to look at page 11 of

3    Mr. Pump's rebuttal report, Exhibit 3.

4        A    Okay.

5        Q    Okay.  And sort of in the middle of

6    the -- the page, Mr. Pump indicates, The Brown

7    report does not mention that World Health's

8    financial results may have significant -- may have

9    been significantly overstated, according to a

10   complaint filed by the SEC against World Health's

11   former CEO.

12            And there's a quote from the complaint

13   in -- in that --

14       A    Uh-huh.

15       Q    -- that paragraph.

16       A    Yes, I see it.

17       Q    Do you know when the complaint was filed

18   by the SEC against Mr. McDonald?

19       A    Well, he doesn't footnote this one like

20   he does other ones.  My understanding, it was filed

21   in late 2009.

22       Q    And do you know how long an investigation

Marc J. Brown                                                                    May 18, 2012
Washington, D.C.

220

1    preced -- by the SEC preceded the filing of that

2    particular complaint?

3         A    I -- I don't know.  I mean obviously, you

4    know, four-ish years potentially, right -- I mean

5    it comes -- they filed a complaint late 2009.  And

6    these things happened in August of 2005.  So I

7    would say approximately four years.  But I don't

8    specifically know.

9         Q    And in your analysis, did you factor into

10   your analysis the allegations that were made by the

11   SEC regarding World Health's financial statements

12   in 2009?                                    `

13        A    No.  It -- it wasn't known or knowable at

14   the time.

15        Q    At the time meaning?

16        A    As of August 31, September 30th, and then

17   October 31st, 2005.

18        Q    Now, you also testified a bunch of times

19   today about a standstill agreement that was entered

20   into between Palisades and World Health?

21        A    Correct.

22        Q    Did you review the terms of the

Marc J. Brown                                                                           May 18, 2012

Washington, D.C.

221

```
 1    standstill agreement in connection with rendering

 2    your opinion?

 3         A    I did.

 4         Q    And were the terms of the standstill

 5    agreement a factor in your rendering the opinion?

 6         A    Yeah, I'd say so.  I mean it -- the fact

 7    that they went out and did a -- an exchange of

 8    securities with the company -- again, willing

 9    seller/willing buyer at the time -- to me supported

10    their belief that their valuations were reasonable,

11    they had coverage.

12              I mean they traded from a `debt security

13    down to a preferred stock, which is sort of lower

14    in their coverage universe.  The debt gets paid

15    before stock does.  So that strikes me as having

16    faith in the company and in that the coverage that

17    they -- they expected.

18         Q    With respect to the NAV that was

19    performed by the fund managers for the Palisades'

20    side pocket as of October 31st, 2005, how did that

21    NAV compare with the terms of the standstill

22    agreement?
```

222

1      A     The total sort of value reported on the

2   NAV at October 31st, '05, was actually a little bit

3   lower than what the standstill agreement indicated.

4      Q     Okay.  And did you reflect that in your

5   report?

6      A     Yeah, I showed -- I showed both of them.

7   I actually tested the higher number, what they

8   actually did.  You know, they actually were holding

9   these different securities by 10/31.  As I

10  understood it.  I don't know if there was some

11  delay, but as -- that's the transaction that

12  occurred, so I -- I reflected that in my notes.

13     Q     So in terms of testing the reasonableness

14  of the October 31, 2005, NAV with respect to the

15  side pocket, would you say that the -- the numbers

16  assigned were reasonable?

17          MR. WILLIAMS:  Objection.

18          THE WITNESS:  Yes.

19  BY MS. LAMBRAKOPOULOS:

20     Q     And with respect to each of the three

21  periods at issue in the SEC's complaint regarding

22  the side pocket, August 31st, September 30th, and

Marc J. Brown                                                   May 18, 2012
Washington, D.C.

223

1   October 31st, 2005, is it your opinion that the

2   values assigned to the World Health side pocket by

3   Mr. Mannion and Mr. Reckless were reasonable?

4            MR. WILLIAMS:  Objection.

5            THE WITNESS:  Yes.

6            MS. LAMBRAKOPOULOS:  Okay.  I do not have

7   any other questions.

8            MR. WILLIAMS:  A couple.

9            EXAMINATION BY COUNSEL FOR PLAINTIFF

10  BY MR. WILLIAMS:

11     Q   You testified that you believed that the

12  values were reasonable.              `

13            Do you believe the values were accurate?

14     A   I -- I didn't look at whether they were

15  accurate.  I looked at if they were reasonable.

16  They sort of were what they were, right.  They were

17  on the books, and was it reasonable.

18     Q   Okay.  And you talked about your

19  experience at a hedge fund.

20            You ever worked as a hedge fund manager?

21     A   As a hedge fund manager.  No.  I was an

22  analyst.

Marc J. Brown                                                          May 18, 2012
Washington, D.C.

224

1        Q     Did you make investment decisions for the

2    hedge fund?

3        A     I made investment recommendations.

4        Q     Did you make investment decisions?

5        A     I made recommendations to the guys that I

6    guess ultimately made or did make the decision,

7    yes.

8        Q     Okay.  So but you never make the actual

9    decision?

10       A     Yeah, but to the -- to the extent that

11   they were gonna buy a bond that I recommended, it's

12   because I told them to.                        `

13       Q     And you indicated I think earlier today

14   that some of your dissatisfaction with that

15   position was that you never really knew why they

16   were or weren't acting on your recommendations?

17       A     Mine and the rest of the analysts, yes.

18       Q     You mentioned the -- the private equity

19   guidelines that -- that Mr. Pump referred to in his

20   analysis.

21             And you indicated that -- that you didn't

22   believe that those guidelines were necessarily

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

225

1    applicable to the -- to the valuation decisions

2    made by the -- the Defendants in this case; is that

3    fair?

4         A    It's fair.  I mean the -- the guidelines

5    themselves appear to be structured for different

6    industries.

7         Q    Okay.

8         A    And note that if, you know, you should be

9    doing what your fund documents tell you to do, not

10   what we're suggesting.

11        Q    Okay.  And you indicated that in this

12   case the fund documents provided certain formulaic

13   requirements in terms of valuing certain assets and

14   providing the fund managers with discretion; is

15   that fair?

16        A    I believe that's what the documents say,

17   yes.

18        Q    Okay.  So in the circumstances where the

19   fund managers were exercising their direction --

20   discretion, what guidelines were they using?

21        A    What guidelines were they using?

22        Q    Yeah.

Marc J. Brown                                                    May 18, 2012
                          Washington, D.C.

                                                                      226

1        A    They were trying to estimate what the

2    fair value of those securities were.

3        Q    Right.  And in doing that, were they

4    using any guidelines that you're aware of?

5        A    I -- I don't know what guidelines they

6    were using.  It's --

7        Q    Okay.

8        A    There's no guidelines laid out in the --

9    in the documents.  I don't -- they haven't

10   testified about it, so I don't know.

11       Q    Fair enough.

12            And you indicated that --`that Mr. Pump's

13   approach was more of a -- like tax accountant

14   type -- type of analysis; is that right?

15       A    Yes.

16       Q    Are you an accountant?

17       A    No.

18       Q    What do accountants do?

19       A    They do a lot of things.

20       Q    What do they do in terms of the books and

21   records of a company, if you know?

22            MS. LAMBRAKOPOULOS:  Objection.  Form.

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

227

1          THE WITNESS:  Are you speaking about the

2  comptroller?  The staff accountant?  The auditors?

3  What --

4  BY MR. WILLIAMS:

5      Q    Well --

6      A    -- sort of accounts are you talking

7  about?  The CFO?

8      Q    Is it fair to say that accountants --

9  would you agree with the statement that accountants

10 tend to document transactions?

11         MS. LAMBRAKOPOULOS:  Objection.  Form.

12         THE WITNESS:  I am not an`accountant.

13 BY MR. WILLIAMS:

14     Q    Okay.  Fair enough.

15         MR. WILLIAMS:  Okay.  Those are the only

16 questions that I have for you, Mr. Brown.

17         THE WITNESS:  Okay.

18         MR. WILLIAMS:  Appreciate you

19 accommodating all of us and not requiring us to

20 travel to Chicago to speak to you.

21         THE WITNESS:  It's a good thing.  There's

22 some activity going on in Chicago this weekend,

Marc J. Brown                                                    May 18, 2012
Washington, D.C.

228

1   so --

2              MR. WILLIAMS:  Is that right?

3              THE WITNESS:  Yeah.

4              MR. WILLIAMS:  With that, we can go off

5   the record.

6              VIDEOGRAPHER:  This concludes the video

7   deposition of Marc Brown.  The time on the video is

8   2:22 p.m.  And we are off the record.

9

10

11

12                        (Whereupon at 2:22 p.m., the

13                         deposition of MARC J. BROWN

14                         was adjourned.)

15

16

17

18

19

20

21

22

Marc J. Brown                                          May 18, 2012
Washington, D.C.

229

1              CERTIFICATE OF DEPONENT

2    I hereby certify that I have read and examined the

3    foregoing transcript, and the same is a true and

4    accurate record of the testimony given by me.

5    Any additions or corrections that I feel are

6    necessary, I will attach on a separate sheet of

7    paper to the original transcript.

8

9                     _____

10                    Signature of Deponent

11

12   I hereby certify that the individual representing

13   himself/herself to be the above-named individual,

14   appeared before me this _____ day of _____,

15   2012, and executed the above certificate in my

16   presence.

17                    _____

18                    NOTARY PUBLIC IN AND FOR

19

20                    _____

21                    County Name

22   MY COMMISSION EXPIRES:

Marc J. Brown                                                                May 18, 2012
Washington, D.C.

230

1                CERTIFICATE OF NOTARY PUBLIC

2                I, BARBARA A. HUBER, CSR, the officer

3    before whom the foregoing deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly sworn

6    by me; that the testimony of said witness was

7    taken by me in stenotypy and thereafter reduced to

8    print under my direction; that said deposition is

9    a true record of the testimony given by said

10   witness; that I am neither counsel for, related

11   to, nor employed by any of the parties to the

12   action in which this deposition was `taken; and,

13   furthermore, that I am not a relative or employee

14   of any attorney or counsel employed by the parties

15   hereto, nor financially or otherwise interested in

16   the outcome of this action.

17

18

19   _____

20   BARBARA A. HUBER, CSR

21   Notary Public, in and for District of Columbia

22   My Commission Expires:  March 14, 2012