IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>     v.<br><br>PAUL T. MANNION, JR.,<br>ANDREW S. RECKLES,<br>PEF ADVISORS LTD., and<br>PEF ADVISORS LLC,<br><br>                    Defendants,<br><br>     and<br><br>PALISADES MASTER FUND, L.P.,<br><br>                    Relief Defendant. | 1:10-cv-3374-WSD |

## OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Summary Judgment [59], Defendants' Cross Motion for Summary Judgment [66], and Plaintiff's Motion *in limine* to Exclude the Expert Opinions of Marc J. Brown [79] ("Motion to Exclude").

I.      BACKGROUND

        A.      Procedural History

This is a civil enforcement action brought by the Securities and Exchange

Commission ("Commission") under the Securities Exchange Act of 1934

("Exchange Act") and the Investment Advisers Act of 1940 ("Advisers Act").  On

October 19, 2010, the Commission filed its Complaint [1] against Defendants Paul

T. Mannion, Jr. ("Mannion"), Andrew S. Reckles ("Reckles"), PEF Advisors Ltd.

("PEF Ltd."), and PEF Advisors LLC ("PEF LLC") (collectively, "Defendants").

The Complaint names Palisades Master Fund, L.P. (the "Palisades Master Fund" or

the "Fund") as Relief Defendant.  PEF Ltd. and PEF LLC are alleged to be the

investment advisors to Palisades Equity Holdings Ltd. and Palisades Equity Fund,

L.P., hedge funds that served as feeder funds for, and otherwise made investments

through, the Fund.  Mannion and Reckles are alleged to be the principals and co-

owners of PEF Ltd. and PEF LLC.

In its Complaint, the Commission alleges that (i) in August, September, and

October 2005, Defendants reported inflated values of certain assets held by the

Fund (the "Valuation Claim"); (ii) in July and August 2005, Defendants personally

exercised stock warrants belonging to the Fund and were improperly "advanced"

$2 million from the Fund for a personal investment, and approximately $13,000 for

administrative expenses (the "Misappropriation Claim"); and (iii) in February

2004, Defendants sold short certain securities in which they represented they did

not have short positions (the "Non-Disclosure Claim").  In Count I of the

Complaint, the Commission alleges that Defendants' actions upon which the Valuation, Misappropriation, and Non-Disclosure Claims are based constitute violations of Section 10(b) of the Advisers Act and Rule 10b-5 of the Commission's Rules Under the Exchange Act.  In Count II, the Commission alleges that Defendants' actions upon which the Valuation and Misappropriation Claims are based constitute violations of subsection (1) of Section 206 of the Advisers Act.  In Count III, the Commission alleges that Defendants' actions upon which the Valuation and Misappropriation Claims are based constitute violations of subsection (2) of Section 206 of the Advisers Act.

On January 20, 2011, Defendants filed their Motion to Dismiss [18] under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  On June 2, 2011, the Court entered its Order on the Motion to Dismiss [31] (the "Motion to Dismiss Order").  With respect to Count I, the Court held that Section 10(b) and Rule 10b-5 apply to the Valuation Claim only to the extent Defendants communicated the allegedly inflated valuations to a new investor.  The Court limited the scope of the Valuation Claim in Count I to the single new investor identified in the Complaint as having invested $3 million in the Fund.  With respect to Counts II and III, the Court held that Section 206 applies to the Claims only to the extent Defendants' conduct was directed to the Fund, Defendants' actual "client," as opposed to

3

individual investors in the Fund.  The Court limited Defendants' liability for the Valuation Claim in Counts II and III to the amount of Defendants' increased management fees received as a result of the allegedly inflated valuations.

On June 28, 2012, the Commission filed its Motion for Summary Judgment seeking judgment on Defendants' liability under the following Claims: the Valuation Claim in Counts I, II, and III, and the portion of the Misappropriation Claim based on Defendants' alleged exercise of the stock warrants in Counts I, II, and III.  The Commission does not seek summary judgment on Defendants' liability for the portion of the Misappropriation Claim based on the alleged improper advances or on the Non-Disclosure Claim.  The Commission's motion is limited to a request for summary judgment as to Defendants' liability, requesting later to litigate damages or other relief if liability is determined.

On July 30, 2012, Defendants filed their Cross Motion for Summary Judgment on all of the Commission's claims, including the Valuation Claim, both portions of the Misappropriation Claim, and the Non-Disclosure Claim.  The Commission did not oppose, or otherwise respond to, Defendants' request for summary judgment on the "improper advances" allegations in the Misappropriation Claim.

On August 30, 2012, the Commission filed its Motion to Exclude

Defendants' expert Marc Brown ("Brown").  The Commission argues that Brown's

opinions, on the reasonableness of Defendants' valuation of the assets at issue in

the Valuation Claim, do not satisfy the standards for admissibility under Rule 702

of the Federal Rules of Civil Procedure or under <u>Daubert v. Merrell Dow</u>

<u>Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

    B.   <u>Relevant Facts</u>[1]

Mannion and Reckles were the principals and co-owners of PEF Ltd. and

PEF LLC.  (Defs.' Resp. Pl.'s SUMF [67] ¶¶ 1–2.)  PEF Ltd. was the investment

adviser for Palisades Equity Holdings Ltd., and PEF LLC was the investment

adviser for Palisades Equity Fund, L.P.  (<u>Id.</u> ¶¶ 3–4.)  Palisades Equity Holdings

Ltd. and Palisades Equity Fund, L.P. (the "Feeder Funds") were hedge funds that

acted as feeder funds for, and made investments through, the Palisades Master

---

[1] These facts are taken from the following statements of facts, along with their
accompanying exhibits, and responses to statements of facts, submitted with the
summary judgment motions in accordance with Local Civil Rule 56.1: Plaintiff's
Statement of Undisputed Material Facts in Support of Motion for Summary
Judgment [59-2] ("Pl.'s SUMF"); Statement of Undisputed Material Facts in
Support of Defendants' Cross-Motion for Summary Judgment and In Opposition to
Plaintiff's Motion for Summary Judgment [66-2] ("Defs.' SUMF"); Defendants'
Response to Plaintiff's Statement of Undisputed Material Facts [67] ("Defs.' Resp.
Pl.'s SUMF"); Plaintiff's Response to Defendants' Statement of Undisputed
Material Facts [78] ("Pl.'s Resp. Defs.' SUMF"); and Defendants' Replies to
Plaintiff's Responses to the Statement of Undisputed Material Facts in Support of
Defendants' Cross-Motion for Summary Judgment [84-1] ("Defs.' Replies
SUMF").  Unless otherwise indicated, the facts are undisputed.

Fund.  (Id. ¶ 5.)  Mannion and Reckles managed the Feeder Funds and the

Palisades Master Fund.  (Id. ¶ 8; Defs.' Replies SUMF [84-1] ¶ 3.)

The Fund had several investors, including Mannion and Reckles, all of

whom were sophisticated and accredited and understood the risks of investing in

the Fund.  (Defs.' Replies SUMF [84-1] ¶¶ 7–8.)  The Fund made primarily

illiquid, high-risk investments.  (Id. ¶ 9.)  By August 2005, the Fund held

approximately $60 to $70 million in assets.  (Id. ¶ 10.)

In August 2004, the Fund began investing in World Health Alternatives, Inc.

("World Health"), a publicly-traded medical staffing company.  (Defs.' Resp. Pl.'s

SUMF [67] ¶¶ 6, 12.)  By July 2005, the Fund had invested several million dollars

in World Health, and the company was the Fund's largest single position.  (Id.

¶ 12.)  In August 2005, the Fund's World Health holdings included 500,000 shares

of unrestricted common stock, 950,000 shares of restricted stock, convertible

debentures with a cost of $7.35 million and a face value of $9.67 million, and

unexercised warrants for at least 1.5 million shares of World Health stock.  (Defs.'

Replies SUMF [84-1] ¶¶ 74–76, 152; see Defs.' Resp. Pl.'s SUMF [67] ¶¶ 32–33.)

On August 15, 2005, when World Health's stock was trading at $3.46,

World Health's CEO failed to attend a conference call with investors, and the next

day, World Health announced that its CEO had abruptly resigned.  (Defs.' Replies

SUMF [84-1] ¶¶ 30, 32; Defs.' Resp. Pl.'s SUMF [67] ¶ 15.)  On August 19, 2005, World Health's "interim management" announced that the company's auditor had been discharged and that the company was investigating (i) misconduct by World Health's former CEO and (ii) possible misstatements in World Health's public filings.  (Defs.' Replies SUMF [84-1] ¶ 31; Defs.' Resp. Pl.'s SUMF [67] ¶ 17.)  By August 31, 2005, World Health's stock price had dropped to $0.22 per share. (Defs.' Replies SUMF [84-1] ¶ 32.)

Based on the "uncertainty" at World Health, the company's lender suspended its financing, leaving World Health without sufficient revenue to meet its payroll obligations.  (Id. ¶¶ 34–35.)  The company turned to the Fund for a loan, and on August 18, 2005, the Fund loaned World Health $4 million.  (Id. ¶¶ 35–36.) On August 24, 2005, the Fund loaned the company an additional $2 million (these loans are collectively referred to as the "bridge loans").  (Id.)  The bridge loans were required to be repaid on August 31, 2005.  (Defs.' Resp. Pl.'s SUMF [67] ¶¶ 17, 19.)  They were not, and in February 2006, World Health declared bankruptcy.  (Id. ¶¶ 23, 25.)

1.      *Facts Relevant to the Valuation Claim*

Mannion and Reckles, with the Fund's third-party administrator Beacon Fund Advisors, Ltd. ("Beacon"), each month calculated the "net asset value"

("NAV") of each asset in the Fund's portfolio and determined a NAV per share. (Id. ¶ 50; Defs.' Replies SUMF [84-1] ¶¶ 11, 19, 24.)  Beacon transmitted the monthly NAV to the Fund's investors.  (Defs.' Replies SUMF [84-1] ¶ 24.)  Defendants' management fees were assessed at 1.5% per year of the Fund's assets, and were collected monthly using the NAV.  (Id. ¶¶ 133–134; Defs.' Resp. Pl.'s SUMF [67] ¶¶ 50, 78.)  The NAV was calculated according to the methods stated in the Fund's offering memoranda.  (Defs.' Replies SUMF [84-1] ¶ 17.)  For example, restricted convertible debentures were valued at cost plus accrued interest or dividends, marked up or down by fifty percent of the amount by which the value of the unrestricted common stock exceeded or fell below the conversion price of the debentures.  (Id. ¶ 20.)  Defendants had the discretion to adjust the valuation of any holding to reflect a "fair value," which could be "significantly higher or lower" than the actual value of the investments.  (Id. ¶¶ 18, 21–22; Defs.' Resp. Pl.'s SUMF [67] ¶ 55.)

Beginning in August 2005, the uncertainty surrounding World Health's financial condition made it difficult, and complicated, to value the Fund's World Health assets.  (Defs.' Replies SUMF [84-1] ¶ 56.)  Mannion and Reckles, along with Beacon, were concerned that the value of any asset in the Fund that was uncertain would make satisfying redemption requests problematic because

allowing redemption based on an incorrect valuation could unfairly prejudice other Fund investors.  (Id.)  As a result, in late August 2005, Defendants decided to segregate the Fund's World Health holdings, including the restricted and unrestricted stock, the convertible debentures, and the bridge loans, into a "side pocket" (the "Side Pocket"), a mechanism for segregating illiquid or difficult-to-value assets from assets that did not suffer from valuation uncertainty of the type from which the World Health assets suffered.  (Id. ¶ 55–56; Defs.' Resp. Pl.'s SUMF [67] ¶ 56.)  The Fund's investors at the time the Side Pocket was created were allocated a pro rata share of the Side Pocket.  (Defs.' Replies SUMF [84-1] ¶ 58.)  New investments into, and redemptions from, the Side Pocket were prohibited.  (Id.)

On September 7, 2005, Access International Advisors ("Access") made its first investment, of $3 million, in the Fund.  (Id. ¶ 114.)  Access's investment did not include an investment in the Side Pocket.  (Id. ¶¶ 123–124.)[2]

---

[2] In its response to Defs.' SUMF, and not in a separate statement of material facts, the Commission contends that, on November 1, 2005, Access, through a different fund called "Super Stablerock Fund, Ltd," invested $50,000 in the Fund.  (Defs.' Replies SUMF [84-1] ¶ 114.)  To support this contention, the Commission references a one-page document purporting to show that Super Stablerock Fund, Ltd was issued $50,000 worth of Fund shares in November 2005.  (Pl.'s Resp. Defs.' SUMF Ex. 11 [77-13].)  The document does not show any information about the purchase and does not show any connection between Access and Stablerock Fund, Ltd.

In September 2005, Defendants and Beacon began the process of calculating the Fund's NAV for August 2005 (the "August NAV"), including the value of the Side Pocket.[3]  On September 13, 2005, Mannion emailed to Beacon a spreadsheet listing Fund assets and amounts.  (Id. ¶ 80; Defs.' Resp. Pl.'s SUMF [67] ¶ 74.)  The amounts on the spreadsheet for the Side Pocket assets totaled approximately $9.4 million.  (Defs.' SUMF Ex. 42 [66-8] at 107[4]; Defs.' Resp. Pl.'s SUMF [67] ¶ 74.)  Mannion testified that the spreadsheet was a "very early draft" circulated to begin the discussion of how to calculate the August NAV.  (Defs.' Replies SUMF [84-1] ¶ 80; Defs.' SUMF Ex. 4 [66-5] at 132–33.)[5]

---

[3] The Commission contends Beacon internally valued the Side Pocket, as of August 31, 2005, at $4 million.  (Def.'s Resp. Pl.'s SUMF [67] ¶ 76.)  In support of this contention, the Commission relies only on certain deposition testimony by Beacon's principal.  (See id. (citing Pl.'s SUMF Ex. 10 [59-12] at 8–9).)  The cited testimony appears to be a discussion of a spreadsheet indicating that the value of the Fund's World Health assets as of September 14, 2005 (not August 31, 2005) was $4 million.  (See Pl.'s SUMF Ex. 10 [59-12] at 8–9.)  The testimony does not identify who assigned the valuations in the spreadsheet or the extent to which Beacon or Defendants relied on or credited the valuations.  (Id.)  The spreadsheet itself is not in the record.

[4] Pincites to ECF documents are to the ECF page numbers.

[5] The Commission purports to dispute Mannion's testimony and argues that the spreadsheet represents Defendants' internal August valuation of the Side Pocket.  (See Defs.' Replies SUMF [84-1] ¶ 80; Defs.' Resp. Pl.'s SUMF [67] ¶ 74.)  The Commission does not offer any evidence, other than the spreadsheet itself, to support its position.

Two days later, on September 15, 2005, Defendants finalized the August

NAV.  (Defs.' Resp. Pl.'s SUMF [67] ¶ 75.)  The NAV valued the Side Pocket

assets at approximately $15.3 million, as follows: the bridge loans at their face

value of $6 million; the convertible debentures at their cost of $7,352,500; the

restricted stock at $1,894,922 (representing a share price of $1.99); and the

unrestricted stock at $110,000 (representing its trading price of $0.22 per share).

(Id.; Defs.' Replies SUMF [84-1] ¶¶ 73–76.)[6]  Defendants' August 2005

management fee based on the Side Pocket valuation was $19,197.  (Defs.' Replies

SUMF [84-1] ¶ 135.)

On October 17, 2005, Beacon distributed to Fund investors the NAV for

---

[6] The Commission concedes that the August NAV was not final until September 15, 2005, but it argues Access was given a "sneak preview" of the NAV before making its September 7, 2005, investment in the Fund.  (Pl.'s Opp'n/Reply Br. [77] at 30.)  In support of this allegation, the Commission relies exclusively on an excerpt from the deposition testimony of Ted Dumbauld, whom the Commission describes (without citing record evidence) as an Access "representative."  (Id. (citing Pl.'s Resp. SUMF [78] ¶ 78).)  The testimony describes an email (which is not in the record) that Dumbauld apparently sent to Mannion and Reckles on September 13, 2005, six days after Access made its investment.  (See generally Pl.'s Supp. Ex. 20 [77-22] at 6.)  According to the testimony, Dambauld asks, in the email, whether Defendants have a final August "performance number" for the Fund, as opposed to an estimate, of negative 1.5 percent, that Dumbauld appears to have seen previously.  (Id.)  The testimony contains no information about the "estimate," including information about when it was given, by and to whom it was given, whether it included the value of the Side Pocket, or whether or how it correlated to the August NAV.

September 2005 (the "September NAV"), and on November 11, 2005, Beacon distributed the NAV for October 2005 (the "October NAV").  (Defs.' Replies SUMF [84-1] ¶¶ 83, 102.)[7]  The September and October NAV valuations of the Side Pocket were identical, valuing it at approximately $13.35 million, as follows: the bridge loans at their face value of $6 million; the convertible debentures at their cost of $7,352,500; the restricted stock at $0; and the unrestricted stock at $0.  (See id. ¶¶ 85, 87–88, 104.)  Defendants' September and October 2005 management fees, based on the Side Pocket valuations, were $16,691 for each month.  (Id. ¶ 135.)

The Commission's valuation expert, Bernard Pump ("Pump"), submitted a report stating the Side Pocket valuations in the August, September, and October NAVs were inflated above fair value.  (See generally Pl.'s SUMF Ex. 9 [59-10, 59-11].)  Pump opined it was unreasonable to value the restricted stock in the August

---

[7] Access received NAVs excluding the valuations of the Side Pocket.  (Defs.' Replies SUMF [84-1] ¶ 127.)  In response to paragraphs of Defs.' SUMF, and not in a separate statement of material facts, the Commission contends that, on October 17, 2005, Beacon emailed Access the full September NAV, including the overvalued Side Pocket.  (Id.)  The Commission cites only an email, without additional explanation, in support of this claim.  (Id. (citing Pl.'s Supp. Ex. 15 [77-17]).)  The email, which appears to be sent from someone at Beacon, states the full September NAV, but does not state or attach the full NAV analysis.  (See Pl.'s Supp. Ex. 15 [77-17].)  The recipients of the email, "myriam.protch@degroof.lu" and "funds," do not appear to be associated with Access.  (See id.)

NAV at a per-share price greater than $0.22, the then-trading price of World

Health's unrestricted stock.  (Pl.'s SUMF Ex. 9 (pt. 1) [59-10] at 27–28.)  Based on

his valuation opinion, Pump concluded that the 950,000 shares should have been

valued at no more than $209,000 and not $1,894,922.  (Id.)  Pump stated the share

value thus was inflated by at least $1,685,922.  (Id.)  Pump next opined that the

August, September, and October NAVs' values of the convertible debentures and

bridge loans were inflated because the holdings should not have been valued at

their cost, but at a "significant discount."  (Id. at 29; Pl.'s SUMF Ex. 9 (pt. 2) [59-

11] at 4–5.)  Pump did not offer an opinion on the extent to which the convertible

debentures and bridge loans should have been discounted.[8]

  2. *Facts Relevant to the Misappropriation Claim*

    i. World Health Warrants

On August 8, 2005, Mannion and Reckles transferred to themselves certain

World Health warrants belonging to the Fund.[9]  (Defs.' Resp. Pl.'s SUMF [67]

¶¶ 32–34; Defs.' Replies SUMF [84-1] ¶ 158.)  They did not pay the Fund any

---

[8] As noted in the Court's discussion of the Commission's Motion to Exclude, below, Defendants' expert Brown opined that the disputed NAVs' valuations were "reasonable."

[9] The Fund retained other World Health warrants that were never exercised. (Defs.' Replies SUMF [84-1] ¶ 154.)

consideration for the warrants at the time of the transfer.  (Defs.' Resp. Pl.'s SUMF [67] ¶ 35.)[10]  When the warrants were exercised, Mannion and Reckles each paid $992,175 from their personal funds to buy 522,198 shares of World Health stock, at the warrant price of $1.90 per share.  (Defs.' Resp. Pl.'s SUMF [67] ¶¶ 33, 37–38; Defs.' Replies SUMF [84-1] ¶ 158.)  On the day the warrants were exercised, World Health's stock price was $3.55, and each Defendant, in the exercise of the warrants, was able to purchase for $992,175 World Health shares worth over $1.85 million.  (Defs.' Resp. Pl.'s SUMF [67] ¶¶ 39.)[11]

Defendants testified that they exercised the warrants in response to a request by World Health's CEO that the Fund exercise some of its warrants to help the company with short-term financing needs.  (Defs.' Replies SUMF [84-1] ¶ 154.)  Defendants believed that it would be imprudent for the Fund to hold additional World Health shares at that time, and thus Mannion and Reckles stated that they

---

[10] Defendants contend that later, in 2006, Mannion and Reckles paid the Fund back with the then-value of the shares purchased with the warrants.  (Defs.' Resp. Pl.'s SUMF [67] ¶ 35.)

[11] Defendants contend that the warrants had no value because, under the Fund's valuation policies, warrants were valued at $0 for purposes of monthly NAVs.  (See Defs.' Replies SUMF [84-1] ¶ 155.)  The fact that Defendants did not assign a value to warrants on NAVs does not change the fact that the World Health warrants at issue, when exercised by Defendants, were worth almost twice their exercise price.

decided to exercise the warrants themselves with the hope of helping World Health with its financing requirements, thereby bolstering the value of the Fund's considerable World Health holdings, without increasing the Fund's exposure to World Health.  (Id. ¶¶ 156, 159.)

    ii.    Advances

The Commission's Complaint alleges two improper "advances" of funds by the Fund to Mannion and Reckles: (i) $2 million for an investment made by Mannion and Reckles, and (ii) $13,000 for administrative expenses.  With respect to the $2 million advance, in July 2005, a World Health investor was preparing to demand payment on debt owed to it by World Health.  (Id. ¶ 139.)  Defendants believed this would be detrimental to World Health, and, consequently, would endanger the Fund's investment in the company.  (Id. ¶ 140.)  For these reasons, the Fund, PEF Ltd., and PEF LLC agreed to purchase the investor's debt.  (Id. ¶ 141.)  The transaction was scheduled to close on July 19, 2005, at which time the Fund, PEF Ltd., and PEF LLC were required to tender $5,427,675 to the investor, which was the agreed amount to be paid to purchase the investor's receivable.  (Id. ¶ 141.)  $2 million of this amount was to be paid by PEF Ltd. and PEF LLC.  (Id. ¶ 142.)  Funds from PEF Ltd. and PEF LLC could not be wired in time for the July 19, 2005, closing.  (Id. ¶ 142.)  As a result, the full amount to be paid to the

investor was paid by the Fund.  (Id. ¶ 143.)  The next day, the Fund was

reimbursed $2 million by PEF Ltd. and PEF LLC.  (Id.)  One of the Commission's

experts, Hugh Cohen, described the advance by the Fund as a "technical violation"

of the Fund's policies but done so under mitigating circumstances.  (Id. ¶ 148.)

Regarding the $13,000 advance, in July 2005, Beacon sent an email to

Defendants requesting Defendants to reimburse the Fund for the amount of

$12,083, that was used to exercise warrants in Bluefly, Inc., which were held by

PEF Ltd. and PEF LLC.  (Id. ¶ 149.)  Beacon also requested Defendants to pay an

invoice from Beacon to PEF Ltd. and PEF LLC for certain administrative fees.

(Id.)  Neither Defendants nor Beacon recall this reimbursement request.  (Id.

¶ 150.)  Mannion and a representative of Beacon testified that they did not recall

why Beacon did not simply account for these amounts by reducing the

management fee owed to PEF Ltd. and PEF LLC.  (Id. ¶ 151.)  The record does not

contain any additional information regarding the $13,000 advance.

> 3.    *Facts Relevant to the Non-Disclosure Claim*

On February 5 and 6, 2004, the Fund sold short 60,000 shares of stock in

Radyne Comstream ("Radyne").  (Id. ¶ 169.)  Neither Mannion nor Reckles recalls

these transactions or who placed the sales order.  (Id.)

In early February 2004, the Fund, through Defendants, was approached

about purchasing shares of Radyne in a private stock sale.  (<u>Id.</u> ¶¶ 166–167.)

Defendants expressed an interest in the purchase, and the investment bank

handling the sale emailed a proposal to Defendants.  (<u>Id.</u> ¶ 168.)  Potential buyers

included entities other than the Fund.  (<u>See id.</u> ¶ 174.)  The seller and various

potential buyers circulated multiple drafts of a stock purchase agreement ("SPA")

for the transaction.  (<u>See id.</u> ¶¶ 170, 173–176.)  Some versions of the draft SPAs

contain a provision requiring the buyer to represent that it is not holding short

positions in Radyne at the time the SPA is executed (the "Short Restriction").  (<u>Id.</u>

¶ 173.)  Other iterations of the SPA do not contain a Short Restriction.  (<u>Id.</u>)

Defendants' files contained a version of the SPA containing the Short Restriction

(the "Form SPA").  (<u>Id.</u> ¶ 171.)  The Form SPA is undated and is not signed on

behalf the Fund.  (<u>Id.</u>)

On February 13, 2004, the Fund executed a SPA to purchase 50,000 shares

of Radyne in a private sale (the "Executed SPA").  (<u>Id.</u> ¶ 178.)  Todd Murray

signed the SPA on behalf of the Fund.  (<u>Id.</u> ¶ 179.)  The cover page and signature

pages of the Executed SPA differ from those of the Form SPA.  (<u>Id.</u> ¶ 179.)

Defendants contend that they do not possess a complete copy of the Executed SPA.

(<u>Id.</u> ¶ 180.)  The record does not contain any evidence showing which, if any, of

the Defendants had knowledge of the contents of the Executed SPA or whether the

Executed SPA included the Short Restriction.

## II.   MOTION TO EXCLUDE EXPERT

### A.   Legal Standard

The admissibility of expert opinions is governed by Rule 702 of the Federal

Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The proponent of expert testimony must establish the factors

contained in Rule 702 by a preponderance of the evidence.  United States v.

Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).

The standard of admissibility in Rule 702 was discussed in the Supreme

Court's seminal decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509

U.S. 579 (1993).  Under Daubert,

> Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562–63 (11th Cir. 1998) (footnote omitted) (citing Fed. R. Evid. 702; Daubert, 509 U.S. at 589). Daubert enumerated several factors which *may* be used in assessing expert testimony, including (1) whether a theory or technique applied by the expert can be or has been tested, (2) whether the theory has been subjected to peer review and publication, (3) in the case of a particular scientific technique, the Court should consider the known or potential rate of error, (4) and whether the theory or technique has gained general acceptance in the relevant community. 509 U.S. at 593–94. The Supreme Court emphasized that the Rule 702 inquiry is a flexible one. Id. at 594.

Daubert focused on the admissibility of scientific expert testimony. In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court held Daubert's methodology applies equally to experts who are not scientists. The Court held that a trial court *may* consider one or more of the specific factors mentioned in Daubert in assessing non-scientific expert testimony, but that the trial retains discretion to decide if non-scientific testimony is reliable and relevant to the case. Kumho Tire, 526 U.S. at 141. The Court must

> make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an

19

expert in the relevant field . . . .  [T]he trial judge must have
considerable leeway in deciding in a particular case how to go about
determining whether particular expert testimony is reliable.  That is to
say, a trial court should consider the specific factors identified in
<u>Daubert</u> where they are reasonable measures of the reliability of
expert testimony.

<u>Id.</u> at 152.

B.    <u>Analysis</u>

Defendants' expert Brown seeks to offer an opinion that the "total value

attributed to [the Fund's] side pocket investments in World Health on its NAV

statements as of the Valuation Dates appear reasonable."  (<u>See</u> Defs.' MTE Ex. 2

[85-2] at 4.)  Brown bases his opinion of "reasonableness" on his conclusion that

the "enterprise value" of World Health, at the relevant times, was sufficient to

"cover" the Fund's World Health holdings.  (<u>See id.</u> at 19–20.)

As noted above, determining the admissibility of expert testimony includes

an evaluation of whether "the testimony assists the trier of fact . . . to understand

the evidence or to determine a fact in issue."  <u>See</u> <u>Harcros</u>, 158 F.3d at 562–63

(citing Fed. R. Evid. 702; <u>Daubert</u>, 509 U.S. at 589).  "The party offering the

expert testimony has the burden of demonstrating that the testimony is 'relevant to

the task at hand' and 'logically advances a material aspect' of its case.  <u>Boca</u>

<u>Raton Comty. Hosp., Inc. v. Tenet Health Care Corp.</u>, 582 F.3d 1227, 1232 (11th

Cir. 2009) (citing <u>Daubert</u>, 509 U.S. at 597; <u>Allison v. McGhan Med. Corp.</u>, 184

F.3d 1300, 1312 (11th Cir. 1999)).  "[I]f an expert opinion does not have a 'valid

scientific connection to the pertinent inquiry' it should be excluded because there

is no 'fit.'"  Id. (citing Daubert, 509 U.S. at 591–92; McDowell v. Brown, 392 F.3d

1283, 1299 (11th Cir. 2004)).

The "pertinent inquiry" here is whether the disputed NAVs inflated the value

of the Side Pocket.  This inquiry turns on whether the values assigned to the Side

Pocket holdings were "fair values."  (See Defs.' Replies SUMF [84-1] ¶¶ 18, 21.)

Courts have recognized that the "fair value" of a security or other property is the

price that a "willing buyer" would pay a "willing seller."  See, e.g., Multitex Corp.

of Am. v. Dickinson, 683 F.2d 1325, 1328–29 (11th Cir. 1982).  The parties do not

dispute that the willing buyer/willing seller inquiry must be considered in the "fair

value" analysis.[12]

In his report, Brown applies two valuation methods to determine World

Health's "enterprise value," or the market value of the entire company: the

Guideline Company Approach, which involves comparing similar companies, and

the Public Market Approach, which involves calculating the sum of a company's

_____

[12] The Commission argues that the willing buyer/willing seller inquiry is necessary.
(See Pl.'s MTE Br. [79] at 15.)  Defendants assert that Brown indicated "he
considered willing buyer and seller in his fair value analysis."  (Defs.' MTE Br.
[85] at 17 n.11.)

market capitalization, debt, and preferred stock.  (See Defs.' MTE Ex. 2 [85-2] at

12–19 .)  Under the Guideline Company Approach, Brown calculated the

enterprise value of World Health over the relevant time period to be between $76.5

and $85.7 million.  (Id. at 17.)  Under the Public Market Approach, Brown

calculated the enterprise value to be between approximately $80.7 and $86.6

million.  (Id. at 19, 38.)  Brown then compared the enterprise values to World

Health's known debts and obligations, including the Side Pocket holdings, and

calculated them to be between $65.4 and $73.2 million.  Brown concluded that, at

each relevant time period, World Health's enterprise value exceeded its debts and

obligations, and, therefore, World Health's obligations to the Fund were "covered"

at the values assigned by the NAVs to the Side Pocket.  Based on this "coverage,"

Brown concludes that the Side Pocket valuations were reasonable.

Brown's report does not explain how the "coverage" conclusion is relevant

to assessing the "fair value" of the Side Pocket holdings.  In his deposition, when

asked how his calculations are relevant to valuing the Side Pocket, Brown

answered that, in the case of bankruptcy restructuring, "coverage" of debts allows

a creditor to be repaid.[13]  In other words, Brown's method shows that World Health

---

[13] The relevant testimony is as follows:

was solvent.  During the relevant time periods here, World Health was not in

bankruptcy, and its solvency was not in question.  Brown does not explain how

World Health's solvency relates to the willing buyer/willing seller analysis of the

---

> Q.    How is that relevant to the – what the value of the portfolio is, whether or not the assets are covered?
>
> A.    . . . .  When – when you're working a restructuring, okay, which is what this was, effectively, one – you know, you do couple things early on in the restructuring.
>
> And then at some point when you start thinking about value, you say, all right, the debt's a hundred million dollars, this business is worth 70, you're not covered. Vice versa: The debts a hundred million dollars, this business is worth $150 million, you're covered, you – your bondholders are – are good, your equity holders are good, 'cause there's enough left over for the equity in that – in that scenario.
>
> Q.    So in a scenario where the bondholders are covered, that means that they're going to get paid on their bonds?
>
> A.    Correct.
>
> Q.    Necessarily?
>
> A.    Yes.  In a restructuring scenario.
>
> Q.    And what do you mean a – a restructuring scenario?
>
> A.    So in a scenario such as we had here where you had three debt instruments, two of which were due and owing, and the company was in the process of either exchanging those securities or selling the company, those debts need to get paid off in order for that to move forward.
>
> Q.    I see.  So in the context of a company sort of being – being required to – to satisfy its debts in a restructuring, the fact that the company had enough assets means that the – the debt – the debtholder's being paid; is that – is that fair?
>
> A.    Yeah, that's what you test for.

(Defs.' MTE Ex. 3 [85-3] at 18–20.)

Side Pocket holdings or is otherwise relevant to the "fair value" of the holdings.[14] Based on the record here, the Court concludes Defendants have failed to meet their burden in demonstrating that Brown's opinion is relevant to the valuation issue presented. For the reasons stated above, the Commission's Motion to Exclude is granted.

## III.   MOTIONS FOR SUMMARY JUDGMENT

### A.   Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

---

[14] Defendants contend that Brown testified that "he considered willing buyer and seller in his fair value analysis." (Defs.' MTE Br. [85] at 17 n.11 (citing Defs.' MTE Ex. 3 [85-3] at 15–16).) Brown testified that he agreed that willing buyer/willing seller is part of the valuation of a security and a bond. (Defs.' MTE Ex. 3 [85-3] at 15–16.) He did not testify that he "considered" willing buyer/willing seller. (See id.)

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record."  Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    <u>Analysis</u>

In the Valuation and Misappropriation Claims, the Commission alleges that Defendants violated (i) Section 10(b) of the Exchange Act and SEC Rule 10b-5 and (ii) subsections (1) and (2) of Section 206 of the Advisers Act.  In the Non-Disclosure Claim, the Commission alleges that Defendants violated Section 10(b) and Rule 10b-5.

Section 10(b) makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."  15 U.S.C. § 78j(b) (Supp. V 2011).  Rule 10b-5 makes it

> unlawful for any person . . . by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

26

17 C.F.R. § 240.10b-5 (2012).  To prove a violation of Section 10(b) and Rule

10b-5, the Commission must show (i) "a material misrepresentation or materially

misleading omission," (ii) "in connection with the purchase or sale of a security,"

(iii) "made with scienter."[15]  SEC v. Morgan Keegan & Co., 678 F.3d 1233, 1244

(11th Cir. 2012) (citing SEC v. Merch. Capital, LLC, 483 F.3d 747, 766 (11th Cir.

2007)).

> Section 206 the Advisers Act makes it
>
> unlawful for any investment adviser, by use of the mails or any means
> or instrumentality of interstate commerce, directly or indirectly—
>
> > (1) to employ any device, scheme, or artifice to defraud any
> > client or prospective client; [or]
> >
> > (2) to engage in any transaction, practice, or course of business
> > which operates as a fraud or deceit upon any client or prospective
> > client . . . .

15 U.S.C. § 80b-6(1)–(2) (2006).  The elements of the claims that arise under

subsections (1) and (2) of Section 206 are similar to each other—and to the

elements of a Section 10(b) claim—but differ in key respects.  Like Section 10(b),

both subsections (1) and (2) of Section 206 require proof of a "material"

misrepresentation or omission.  See, e.g., SEC v. Tambone, 550 F.3d 106, 146 (1st

---

[15] Because the elements of liability under Section 10(b) and Rule 10b-5 are the
same, the Court hereafter uses "Section 10(b)" to refer to both the statute and the
Rule.  See SEC v. Zandford, 535 U.S. 813, 816 n.1 (2002).

Cir. 2008), <u>withdrawn and reinstated in part</u>, 597 F.3d 436 (1st Cir. 2010) (en banc).  Unlike Section 10(b), both subsections require that the misrepresentation be directed toward a "client or prospective client."[16]  <u>See</u> 15 U.S.C. § 80b-6(1)–(2).

Subsection (1) further requires that the misrepresentation be made with scienter. <u>Steadman v. SEC</u>, 603 F.2d 1126, 1134 (5th Cir. 1979),[17] <u>aff'd</u>, 450 U.S. 91 (1981).  Subsection (2) does not have a scienter requirement.  <u>Id.</u>

   1. *Valuation Claim*

  The Commission alleges that Defendants inflated the value of the Side Pocket, containing the Fund's World Health holdings, in the August, September, and October NAVs (the "disputed NAVs") and thereby violated Section 10(b) and Section 206.  The Commission and Defendants both seek summary judgment on the Valuation Claim.

     i. Misrepresentation—Whether the Side Pocket Was Overvalued

  Liability under both Section 10(b) and Section 206 requires a

---

[16] Unlike Section 10(b) claims, Section 206 claims do not require that the misrepresentation be made "in connection with the purchase or sale of any security."  <u>Compare</u> 15 U.S.C. § 78j(b) <u>and</u> 17 C.F.R. § 240.10b-5 <u>with</u> 15 U.S.C. § 80b-6.

[17] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Former Fifth Circuit issued before the close of business on September 30, 1981.

misrepresentation.  The Commission contends that Defendants made a misrepresentation by communicating inflated values of the Side Pocket in the disputed NAVs.  In his report, the Commission's expert Pump identifies the following overvaluations: in the August NAV, the restricted World Health stock was overvalued by at least $1,685,922 (Pl.'s SUMF Ex. 9 (pt. 1) [59-10] at 28); and in the August, September, and October NAVS, the convertible debentures and bridge loans were overvalued because they did include a discount to their cost (Pl.'s SUMF Ex. 9 (pt. 1) [59-10] at 29; Pl.'s SUMF Ex. 9 (pt. 2) [59-11] at 5, 8, 10–12, 17–18).  Defendants contend that Pump's report is not sufficient to show an overvaluation because Pump does not offer an opinion on the amount of the overvaluation.  Defendants do not cite, and the Court is not aware of, any authority holding that the Commission is required to prove the correct value of Side Pocket in order to demonstrate, as a threshold matter, that Defendants' ascribed value was inflated.[18]  Defendants also ignore that Pump's report states that the August NAV was overvalued by at least $1,685,922.  The record supports that the disputed NAVs overvalued the Side Pocket or that there is at least a dispute over whether there was an overvaluation and, if so, the overvaluation amount.

---

[18] As discussed below, the amount of an overvaluation is relevant to its *materiality*.

ii.    Section 10(b) "In Connection With" Element

Section 10(b) forbids deceptive conduct "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  In its Motion to Dismiss Order, the Court held that this "in connection with" element requires that the alleged fraud coincide either with trading activity on behalf of existing investors or the solicitation of new investors.  (See Order [31] at 19–21 (citing SEC v. Northshore Asset Mgmt., No. 05 Civ. 2192, 2008 WL 1968299, at *8 (S.D.N.Y. May 5, 2008)).)  Because the Complaint does not allege that Defendants' inflated NAVs coincided with any trading activity for existing clients but does allege that the NAVs were provided to a new investor, the Court limited the Section 10(b) claim based on overvaluation to the solicitation of the new investor.  (Id.; see also Compl. [1] ¶ 60.)

Defendants move for summary judgment on the Section 10(b) overvaluation claim on the ground that the record does not show that a new investor ever received the disputed NAVs.  The record shows that the Fund had one new investor, Access, during the relevant time period.  On September 7, 2005, Access invested $3 million in the Fund, excluding the Side Pocket.  The Commission concedes that this investment occurred before the August NAV was issued on September 15, 2005, but asserts that Access was given a "sneak preview" of the

30

August NAV before making its investment.  (Pl.'s Opp'n/Reply Br. [77] at 30.)  To support this argument, the Commission relies exclusively on Dumbauld's deposition testimony describing an email he sent to Mannion and Reckles on September 13, 2005, six days after Access made its investment.[19]  According to the testimony, Dambauld asks, in the email, whether Defendants have a final August "performance number" for the Fund, as opposed to an estimate, of negative 1.5 percent, that, the Commission claims, Dumbauld must have seen previously. Contrary to the Commission's argument, this testimony shows that Dumbauld had *not* seen the August NAV before Access's investment and that he *wanted* to see it. The testimony does not contain any information about the "estimate," including when it was given, by and to whom it was given, whether it included the value of the Side Pocket, whether it correlated to the August NAV, or whether it included an overvaluation of the Side Pocket.  Dumbauld's testimony is not sufficient to support a reasonable juror finding that Access received a disputed NAV prior to its investment.[20]  Defendants are entitled to summary judgment on the Commission's

---

[19] The email itself is not in the record before the Court.

[20] In its opposition and reply brief, the Commission further argues that, on November 1, 2005, Access made a subsequent investment of $50,000 in the Fund. This factual assertion does not appear in any statement of material facts and is not properly before the Court.  See LR 56.1(B), ND Ga.  The Commission mentions this investment only in response to certain paragraphs of Defs.' SUMF discussing

Section 10(b) claim based on overvaluation of the Side Pocket.

iii.     Materiality Under Section 206

Section 206 proscribes misrepresentations made to a "client or prospective client."  15 U.S.C. § 80b-6(1)–(2).  As the Court held in its Motion to Dismiss Order, because Defendants' "client" was the Fund itself, Defendants' overvaluations of the Side Pocket are material under Section 206 only to the extent that the overvaluations resulted in improperly inflated management fees for Defendants.  (Order [31] at 36; see also id. at 32–34 (citing Goldstein v. SEC, 451 F.3d 873, 878–82 (D.C. Cir. 2006)).)

The record shows that three assets in the Side Pocket were overvalued, thus causing the Side Pocket to be overvalued in each of the disputed NAVs: the World

Access's $3 million investment, and solely to dispute the accuracy of those paragraphs.  Defendants have been denied the opportunity to fully respond to this factual assertion.  See id.  Even if the Court were to consider the $50,000 investment, the Court finds that the record does not establish that Access received a disputed NAV prior to that subsequent investment.  In response to Defs.' SUMF, but not in a statement of material facts, the Commission contends that, on October 17, 2005, Beacon emailed Access the full September NAV, including the overvalued Side Pocket.  (Defs.' Replies SUMF [84-1] ¶¶ 114, 124.)  The Commission cites only an email in support of this assertion.  (Pl.'s Supp. Ex. 15 [77-17].)  The email, which appears to be sent from someone at Beacon, states the full September NAV, but does not state or attach the full NAV analysis.  The recipient of the email is not clearly someone associated with Access.  This email alone is not sufficient to show that Defendants (as opposed to Beacon) provided a disputed NAV or that Access received the NAV.

Health restricted stock (in the August NAV only), the convertible debentures (in each NAV), and the bridge loans (in each NAV).  The record does not show the amount by which the convertible debentures and bridge loans were overvalued in any NAV.  The Court, therefore, cannot determine the extent to which Defendants' management fees were inflated by the convertible debentures and bridge loans.  Absent evidence of the extent of these overvaluations, whether these overvaluations are material cannot be determined.  See In re Allied Capital Corp. Sec. Litig., No. 02 Civ. 3812, 2003 WL 1964184, at *5–6 (S.D.N.Y. Apr. 25, 2003) ("Because plaintiffs have not alleged the amounts by which Allied allegedly overvalued the questioned investments, plaintiffs have not pleaded any facts that would permit a rational jury to conclude that a reasonable investor would have viewed the overvaluation as significant.").  A trier of fact cannot conclude that the overvaluations of the Side Pocket based on the convertible debentures and bridge loans were material, and Defendants are entitled to summary judgment on the Commission's overvaluation claims based on these assets.

The record does contain evidence of the extent of the overvaluation of the restricted stock in the August NAV.  The Commission' s expert Pump concludes that the stock was overvalued by at least $1,685,922.  (Pl.'s SUMF Ex. 9 (pt. 1) [59-10] at 28.)  Because Defendants received a management fee of 1.5% per year

(or 0.125% per month) of the valuation of the Fund's assets, assessed monthly, the Fund was charged at least $2,107 in inflated management fees based on the August NAV.  The Court cannot conclude as a matter of law that this amount, representing 11% of Defendants' August 2005 Side Pocket management fee and a much smaller share of Defendants' overall fees for 2005, is, or is not, material.  See Morgan Keegan, 678 F.3d at 1253 ("[T]he materiality test requires 'delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.'" (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976))).  Neither Plaintiff nor Defendants are entitled to summary judgment on the materiality of the August NAV overvaluation.

iv.    Scienter Under Subsection (1) of Section 206[21]

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  SEC v. Ginsburg, 362 F.3d 1292, 1297 (11th Cir. 2004) (quoting SEC v. Adler, 137 F.3d 1325, 1340 (11th Cir.1998)).  In securities fraud cases, scienter may be shown by "severe recklessness" on the part of the defendant.  McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989).  "Severe

---

[21] As discussed above, scienter is not an element of liability under subsection (2) of Section 206 of the Advisers Act.

recklessness is limited to those highly unreasonable omissions or

misrepresentations that involve not merely simple or even inexcusable negligence,

but an extreme departure from the standards of ordinary care, and that present a

danger of misleading buyers or sellers which is either known to the defendant or is

so obvious that the defendant must have been aware of it." Id. (quoting Broad v.

Rockwell Int'l Corp., 642 F.2d 929, 961–62 (5th Cir. Apr. 1981) (en banc)).

Scienter generally is not appropriate for determination on summary

judgment. See, e.g., In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d 68,

77 (1st Cir. 2012); Goshawk Dedicated Ltd. v. Am. Viatical Servs., LLC, No.

1:05-CV-2343-RWS, 2013 WL 424891, at *7 (N.D. Ga. Feb. 4, 2013); see also

Ross v. Bank South, N.A., 885 F.2d 723, 751 n.8 (11th Cir. 1989) (en banc) (Clark,

J., dissenting) (citing Poller v. Columbia Broad. Sys., 368 U.S. 464, 473 (1962))

("It is well-established that summary judgment is inappropriate to decide questions

of scienter, knowledge and intent."). When a defendant offers an "innocent

explanation" for his conduct, the trier of fact must be allowed to decide whether to

credit the explanation. See Adler, 137 F.2d at 1342; SEC v. Roszak, 495 F.

Supp. 2d 875, 890 (N.D. Ill. 2007). In "rare cases," where "there is overwhelming

evidence of severe recklessness and the defendants fail to bring forward

countervailing evidence," scienter may be established on summary judgment. SEC

v. Brown, 579 F. Supp. 2d 1228, 1236 (D. Minn. 2008) (citing SEC v. Lyttle, 538

F.3d 601, 602–05 (7th Cir. 2008)).

The Commission argues that scienter is established here based on the

September 13, 2005, spreadsheet Mannion emailed to Beacon purporting to value

the Fund at $9.4 million.[22]  Although the spreadsheet suggests that Defendants

believed that the Fund was worth only $9.4 million when they issued the NAVs

valuing it at $13 to $15 million, it is not "overwhelming evidence."  See Brown,

579 F. Supp. 2d at 1236.  Mannion testified that the spreadsheet did not represent

his valuation of the Side Pocket and that it was simply a "draft" from which

Defendants and Beacon would "begin discussions" of the valuation of the Side

Pocket.  (See Defs.' Resp. Pl.'s SUMF [67] ¶ 74.)  The trier of fact must be

allowed to decide whether to credit this explanation of the spreadsheet.  See Adler,

---

[22] In its opposition and reply brief, the Commission further argues that scienter is
established by (i) a September 2, 2005, email from Reckles to Mannion stating that
they "need to 0 this investment now," and (ii) an independent valuation performed
by Beacon valuing the World Health holdings at approximately $4 million.  The
factual assertion regarding the email does not appear in any statement of material
facts and is not properly before the Court.  See LR 56.1(B), ND Ga.  The
Commission mentions the email only in response to certain paragraphs of Defs.'
SUMF and solely to dispute the accuracy of those paragraphs.  Defendants have
been denied the opportunity to fully respond to this factual assertion.  See id.  The
paragraphs of Pl.'s SUMF purporting to establish the independent valuation cite
only evidence that does *not* support that Beacon made such a valuation.  The Court
does not consider either the email or the independent valuation here.

137 F.2d at 1342; <u>Roszak</u>, 495 F. Supp. 2d at 890.  Scienter is disputed, and neither Plaintiff nor Defendants are entitled to summary judgment on the Commission's claim under Section 206(1) regarding overvaluation of the restricted stock in the August NAV.

### 2.   *Misappropriation Claim*

The Commission alleges that Defendants misappropriated the Fund's assets, and thereby violated Section 10(b) and Section 206, when (i) Mannion and Reckles assigned to themselves and exercised the Fund's World Health warrants and (ii) the Fund advanced $2 million to cover Defendants' share of the purchase of certain World Health debt and $13,000 for Defendants' administrative expenses. The Commission and Defendants both seek summary judgment on the portion of the Misappropriation Claim relating to the World Health warrants.  Defendants also seek summary judgment on the portion of the Claim relating to the improper advances.  Because the Commission does not oppose Defendants' motion for summary judgment on the advances, the Court limits its discussion to the claims based on the warrants.[23]

---

[23] Defendants move for summary judgment on the Commission's claims based on the advances on the ground that the advances do not constitute misappropriations under either Section 10(b) or Section 206.  The Commission did not respond to Defendants' motion for summary judgment on these claims.  The Court concludes that the Commission has abandoned its claims based on the advances and that

In August 2005, Mannion and Reckles personally exercised World Health warrants belonging to the Fund.  In exchange for just under $1 million from each of them, they each were issued, into their personal accounts, over 522,000 shares of World Health Stock worth, at the time it was issued, approximately $1.85 million.  Defendants do not dispute that the exercise of the warrants was a material misrepresentation or omission, made in connection with the purchase or sale of a security, and directed toward a client.  Defendants argue, in opposition to the Commission's Motion for Summary Judgment and in support of their own Motion for Summary Judgment, that the evidence does not support that they acted with scienter, or the intent to deceive the Fund.  Accordingly, the Court limits its analysis to the scienter element.[24]  See FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1309 (11th Cir. 2011).

---

Defendants are entitled to summary judgment on the claims.  See St. Andrews Presbyterian Coll. v. S. Ass'n of Colls. & Sch., 679 F. Supp. 2d 1320, 1334–35 (N.D. Ga. 2009); Hudson, 209 F. Supp. 2d at 1324.

[24] As discussed above, scienter is not an element of liability under subsection (2) of Section 206 of the Advisers Act.  See Steadman, 603 F.2d at 1134.  Because Defendants do not dispute any element of subsection (2) with respect to the World Health warrants misappropriation claim, the Court finds that Defendants concede their liability for this claim under subsection (2) of Section 206.  See Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001); FDIC v. White, 820 F. Supp. 1423, 1426 (N.D. Ga. 1993).  The Commission is entitled to summary judgment on the claim.

The record here shows that Reckles and Mannion took the World Health warrants and that, at the time, the warrants had value.  The Commission argues that this alone establishes scienter because, as numerous courts have held, "[m]isappropriation of investor funds for personal benefit in and of itself establishes the requisite state of mind for committing securities fraud."  See SEC v. Eldridge, No. 1:05-CV-0735-CC, 2007 WL 7654404, at *9 (N.D. Ga. Mar. 20, 2007) (citing SEC v. George, 426 F.3d 786, 795–96 (6th Cir. 2005); Lowry v. SEC, 340 F.3d 501, 506 (8th Cir. 2003); SEC v. Infinity Grp. Co., 212 F.3d 180, 192, 194 (3d Cir. 2000)).  The Court disagrees.  The fact that Defendants personally exercised the warrants does not in itself show that they did so "for personal benefit."  See id.  Unlike the cases relied on by the Commission, the evidence here does not show that Defendants used the warrants to pay personal expenses or that they personally profited or benefited from the warrants.  Cf. Brown, 579 F. Supp. 2d at 1236–37 (defendant directly took investors' money to pay personal debts and make personal purchases); SEC v. Merrill Scott, 505 F. Supp. 2d 1193, 1214–15 (D. Utah 2007) (defendant used investors' funds to pay personal expenses and company expenses); Eldridge, 2007 WL 7654404, at *4, *9 (defendants used investors' funds to pay personal credit card bills, rent, restaurant tabs, and other personal expenses).

Defendants contend that they exercised the warrants themselves to protect the Fund because they believed exercising the warrants would help World Health, which would improve the holdings of the Fund, but they did not believe it was prudent for the Fund to hold any additional World Health stock at the time.  The Court concludes that evidence on why Mannion and Reckles exercised the warrants is a question of fact, and the Court denies the Commission's and Defendants' motions for summary judgment on the Commission's misappropriation claim based on the assignment and exercise of the warrants.

### 3.   *Non-Disclosure Claim*

The Commission alleges that Defendants violated Section 10(b) in connection with the Fund's February 2004 purchase of Radnye shares by short selling Radnye stock, on behalf of the Fund, after representing in a SPA that the Fund did not hold any short positions in the company.  Defendants move for summary judgment on the Non-Disclosure Claim on the ground that the record does not contain any evidence that they agreed to a short sale restriction. Defendants argue also that, even if a misrepresentation was made on behalf of the Fund regarding its short positions, there is not any evidence showing which, if any, of the Defendants in this action made the misrepresentation.  The Commission did not respond to this argument, and the Court considers the Commission to have

abandoned its Non-Disclosure Claim.  See St. Andrews, 679 F. Supp. 2d at 1334–35; Hudson, 209 F. Supp. 2d at 1324.  Section 10(b) liability can be imposed only on the person or entity that "makes" a misrepresentation, not on affiliated persons or entities.  See Janus Capital Grp. v. First Derivative Traders, 131 S. Ct. 2296, 2302–04 (2011).  Absent any evidence showing that Mannion or Reckles made the misrepresentation at issue here, they are entitled to summary judgment.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment [59] is **GRANTED IN PART** and **DENIED IN PART**.  It is **GRANTED** with respect to Defendants' liability under subsection (2) of Section 206 of the Advisers Act for the misappropriation of the Fund's World Health warrants.  It is **DENIED** with respect to the other grounds asserted.

**IT IS FURTHER ORDERED** that Defendants' Cross Motion for Summary Judgment [66] is **GRANTED IN PART** and **DENIED IN PART**.  It is **GRANTED** with respect to (i) Defendants' liability under Section 10(b) of the Exchange Act and SEC Rule 10b-5 for the Valuation Claim, (ii) Defendants' liability under subsections (1) and (2) of Section 206 of the Advisers Act for the portion of the Valuation Claim based on the September and October NAVs,

(iii) Defendants' liability for the portion of the Misappropriation Claim based on the "advances" by the Fund, and (iv) Defendants' liability for the Non-Disclosure Claim.  It is **DENIED** with respect to the other grounds asserted.

**IT IS FURTHER ORDERED** that Plaintiff's Motion *in limine* to Exclude the Expert Opinions of Marc J. Brown [79] is **GRANTED**.

**SO ORDERED** this 25th day of March, 2013.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE