**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**,<br><br>Plaintiff,<br><br>v.<br><br>**PAUL T. MANNION, JR.**, **et al.,**<br><br>Defendants. | : | Civil Action No.:<br>1:10-cv-03374-WSD |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR IMPOSITION OF REMEDIES**

Plaintiff the United States Securities and Exchange Commission ("SEC" or "Commission") submits the following Memorandum of Law in support of its Motion For Imposition of Remedies against the Defendants Paul Mannion, Andrew Reckles, PEF Advisors Ltd., and PEF Advisors, LLC (collectively, "Defendants").

## BACKGROUND

This case involves Defendants' theft from a client to which they owed a fiduciary duty in violation of the federal securities laws. By order dated March 25, 2013, the Court granted the SEC's Motion for Summary Judgment as to each Defendant's violation of Section 206(2) of the Investment Advisers Act of 1940

("Advisers Act"), 15 U.S.C. § 80b-6(2), as a result of their misappropriation of assets of their client Palisades Master Fund, L.P. (the "Fund"). The Court ordered a hearing on the remedies to be imposed. This memorandum outlines legal and factual support for the remedies the SEC seeks.

## SUMMARY OF ARGUMENT

In this enforcement action the Commission does not seek damages; the SEC appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Management Dynamics, Inc*., 515 F.2d 801, 808 (2d Cir.1975). The Commission seeks (1) to "protect the public interest" by obtaining prospective injunctive relief; *id*.; (2) disgorgement of profits to "force a defendant to give up the amount by which he was unjustly enriched"; *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir.1985); and (3) civil monetary penalties to "to punish the individual wrongdoer and to deter him and others from future securities violations." *SEC v. Monterosso*, __ Fed. Appx. __, 2014 WL 815403, at *8 (11th Cir. March 3, 2014).

## FACTS

The fraudulent conduct for which the SEC seeks relief involves the theft of assets belonging to the hedge fund Palisades Master Fund, L.P. ("Fund") by the advisers to the Fund -- Defendant Paul T. Mannion, Jr. ("Mannion"), Defendant

Andrew S. Reckles ("Reckles"), and the investment advisory entities Mannion and Reckles wholly owned.[1] [Dkt. No. 87, March 25, 2013 Order on Cross-Motions for Summary Judgment, pp. 5-6]. Mannion and Reckles' misappropriation breached their fiduciary duty to the Fund and was not permitted by the Fund's offering documents.

Mannion and Reckles each obtained securities worth millions of dollars, and each thereby obtained illicit unrealized profits of hundreds of thousands of dollars. *Id*. at 14, n. 11. In particular, on August 9, 2005, Mannion and Reckles each paid approximately $1 million to World Health to exercise, without a valid assignment, valuable, in-the-money World Health warrants belonging to the Fund. *Id*. at pp. 13-14. The warrants permitted the purchase of World Health stock at the below-market price of $1.90 per share. *Id*. at pp. 14. On Friday, August 12, 2005, when Mannion and Reckles each received 522,198 unrestricted shares from their exercise of the Fund's warrants, World Health common shares closed at $3.55, resulting in an unrealized net profit (after subtracting their $1.90 exercise cost) of approximately $861,628 each. *Id*. While Mannion and Reckles immediately

[1] Palisades Master Fund, L.P., Palisades Equity Fund, L.P. (an onshore feeder fund to Palisades Master Fund, L.P.), Palisades Equity Holdings Ltd. (an offshore feeder fund to Palisades Master Fund, L.P.), PEF Advisors LLC (the adviser to the onshore fund), PEF Advisors Ltd. (the adviser to the offshore fund), Mannion, and Reckles are collectively referred to as "Palisades."

began selling the World Health shares received through the exercise in an effort to monetize their profits, their misappropriation was ultimately ill-timed. On Monday, August 15, 2005, World Health's CEO abruptly and mysteriously failed to attend a corporate earnings call, and widespread fraud at World Health began to be disclosed. *Id*. at 6. As a result of the disclosures, World Health's share price dropped below Mannion and Reckles' warrant exercise price. *Id*. at p. 7.

The Court granted summary judgment in favor of the Commission, determining as a matter of law that Mannion and Reckles' fraudulent misappropriation of Fund assets violated 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(2)], a provision that proscribes any investment adviser from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." [Dkt. No. 87, p. 38].

## **LEGAL STANDARD**

The federal securities laws confer general equity powers upon the district courts. *See SEC v. Texas Gulf Sulphur Co*., 446 F.2d 1301, 1307 (2d Cir.), *cert. denied*, 404 U.S. 1005 (1971). "Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy." *SEC v. Manor*

*Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972); *SEC v. Solow*, 554 F.Supp.2d 1356, 1362 (S.D. Fla. 2008). In determining appropriate remedies the Court may consider all relevant evidence, including evidence not presented on the question of liability. *SEC v. Tourre*, __ F.Supp.2d. ___, ___, 2014 WL 969442, at *5, n. 10 (S.D.N.Y. March 12, 2014); *SEC v. Levine*, 279 Fed. Appx. 6, 8 (D.C. Cir. May 12, 2008).

**A. Injunctive Relief Is Warranted**

Among the remedies appropriate in this case is injunctive relief. Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] provides that the Court "shall" grant a permanent injunction upon a proper showing that any person has engaged or is about to engage in any acts or practices that violate any provision of the Advisers Act. *See SEC v. Mize*, 615 F.2d 1046, 1051 (5th Cir. 1980). This language is broader than analogous provisions of the Securities Exchange Act of 1934 ("Exchange Act") or Securities Act of 1933 ("Securities Act"), which provide for injunctive relief only where a person "is engaged" or is "about to engage" in violative conduct. *See* Exchange Act Section 21(d)(1) [15 U.S.C. § 78u(d)(1)]; Securities Act Section 20(b) [15 U.S.C. § 77t(b)]. By contrast, under the Advisers Act – which governs investment professionals who owe their clients fiduciary duties – injunctive relief is appropriate upon a showing that a person

previously "has engaged" in conduct that violates the Act. *SEC v. Olsen*, 243 F. Supp. 338, 339-40 (S.D.N.Y. 1965) (By "the plain terms of Section 209(e) of the Act . . . the SEC is entitled to the relief which it seeks upon the basis of defendant's past undisputed violations even if it be assumed that defendant in fact has ceased.").[2]

The Commission is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated. *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 n.2 (11th Cir. 1999).

Previous violations of the federal securities laws have been established here as a matter of law. Indicia that a wrong will be repeated include the "egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *SEC v. Carriba Air, Inc.*, 681 F.2d

[2] While the Commission does not assert that the imposition of injunctive relief is mandatory upon a showing of a past violation, *compare Hecht v. Bowles*, 321 U.S. 321, 328-29 (1944), the breadth of the statutory language emphasizes that the Court's discretion "must be exercised in light of the large objectives of the Act," *id.* at 331, which are the dual objectives of substituting "a philosophy of full disclosure for the philosophy of caveat emptor" and achieving "a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963).

1318, 1322 (11th Cir. 1982). While scienter is an important factor in this analysis, it is not a prerequisite to injunctive relief. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004).

Here, all of the factors weigh in favor of the imposition of injunctive relief. **First**, the conduct was egregious. This was not a technical violation of the securities laws. Mannion and Reckles, investment advisers held to "high standards of business morality" and the highest fiduciary duties, *see Capital Gains*, 375 U.S. at 200-01, took assets that belonged to their client for themselves. The Commission has repeatedly observed that "conduct that violates the antifraud provisions of the federal securities laws is especially serious." *In the Matter of Franz*, A.P. File No. 3-14960, 2013 WL 208970, *4 (Jan. 18, 2013) (quotation omitted). And, even among the various means of committing fraud, the misappropriation of client assets by an investment adviser is particularly "egregious." *E.g., In the Matter of Murray*, 94 SEC Docket 2032, 2008 WL 4964110, at *10 (Nov. 21, 2008); *In the Matter of Gibson*, 92 SEC Docket 1591, 2008 WL 294717, at *3 (Feb. 4, 2008); *see SEC v. Opulentica*, 479 F.Supp.2d 319, 329 (S.D.N.Y.2007) (misappropriation of investor funds a "blatant" fraud). The Eleventh Circuit has recognized that the regulatory regime promulgated by the Commission governing investment advisers contemplates complete "segregation

between advisor and client assets" because "segregation makes misuse harder in that an advisor cannot directly spend his client's funds." *Lamm v. State Street Bank and Trust*, __ F.3d __, __, 2014 WL 1410172, at *7 (11th Cir. April 14, 2014). The fraud here resulted in exactly the commingling of adviser and client assets that the Eleventh Circuit recognized as improper and directly harmed Mannion and Reckles' client to whom they owed a fiduciary duty. Such conduct represents an egregious departure from the standards to which investment advisers are held by the federal securities laws.

**Second**, the violations here were not isolated. While the violations at issue are predicated upon a single transaction, that transaction occurred in the context of an ongoing scheme by Mannion and Reckles to enrich themselves at the expense of the Fund. Over a period of months, Mannion and Reckles each personally received millions of shares of World Health stock – essentially, undisclosed kickbacks from World Health worth millions of dollars – in payment for "investment banking or financing work" they supposedly provided *to World Health* as part of *the Fund's* investment in World Health. [*See* Doc. No. 59-2, ¶¶ 26 through 31.] For instance, on July 19, 2005 – a month before they misappropriated the Fund warrants – Defendants caused the Fund to waive its contractual right to liquidated damages for no consideration. *Id*. At the same time, Mannion and Reckles personally

received an additional 300,000 World Health shares from the company pursuant to an undisclosed side letter for "negotiating" the waiver. *Id*. Thus, Mannion and Reckles caused the Fund to give up a valuable right in return for nothing while they received – personally – World Health shares worth nearly $1,000,000. *Id*.

Indeed, between February 14, 2005 and August 12, 2005, Mannion and Reckles each secretly received 2,407,668 shares of World Health stock from World Health, which was trading at prices between $2.37 and $3.94 per share – *millions* of dollars' worth of undisclosed payments. [Doc. No. 59-2, Exhibit 21, Response of Defendant Paul T. Mannion, Jr. to Plaintiff's First Set of Interrogatories to Defendant Paul T. Mannion, Jr. (Sept. 21, 2011); Exhibit 22, Response of Defendant Andrew S. Reckles to Plaintiff's First Set of Interrogatories to Defendant Andrew S. Reckles (Sept. 21, 2011); Exhibit 26, Chart of World Health's Stock Price (2005).] The fraudulent misappropriation that forms the basis of the violation is part and parcel of Mannion and Reckles' fraudulent scheme to enrich themselves at the expense of the Fund. *See SEC v. Softpoint*, 958 F. Supp. 846, 863 (S.D.N.Y. 1997) (Sotomayor, J.) (granting summary judgment to SEC on fraud claims for failure to disclose broker's commissions, noting that such a kickback arrangement "raises an inherent conflict of interest"). Given the ongoing nature of Mannion and Reckles' scheme, injunctive relief is warranted. *See SEC v.*

*Fitzgerald*, 135 F.Supp.2d 992, 1030 (N.D. Cal. 2001) (injunction warranted where "the defendants' infractions are not mere isolated incidents but instead are a recurring feature of the defendants' practices").

And prior to their involvement with the Fund, both Mannion and Reckles worked as stock brokers, where each was subject to a number of regulatory arbitrations where clients alleged violations of the federal securities laws. This prior history further emphasizes the need for an injunction here. *See SEC v. First Jersey Securities*, 890 F. Supp. 1185 (S.D.N.Y. 1995), *rev'd in part on other grounds*, 101 F.3d 1450 (2d Cir. 1996) ("Highly material to determining the relief appropriate here is the fact that over many years there have been numerous other securities regulatory proceedings involving [the defendants]").[3]

**Third**, the Defendants acted with scienter.[4] Mannion and Reckles took the warrants from the Fund to invest their own money in World Health at a time when

---

[3] In one of these actions, a NYSE arbitration in which Mannion's former employer alleged that Mannion committed a "breach of fiduciary duty" by "raiding [its] office and convert[ing] all of its proprietary information," Mannion was ordered to pay $250,000 of a total award of $1.1 million. The propriety of this award was confirmed by this Court. *Josephthal Lyon & Ross, Inc. v. JW Charles, Inc., et al.*, No. 1:97-cv-1982 (WBH) (N.D. Ga. 1997), Docket Nos. 26, 27, 32 (confirming arbitration award, entering judgment in the amount of $250,000, assessing costs, prejudgment and postjudgment interest against Mannion).

[4] Because the Court's grant of summary judgment in the Commission's favor on the Commission's claims under Section 206(2) of the Advisers Act entitles the Commission to substantially the same relief that would have been available had the Commission prevailed at trial on its remaining claims, the Commission elected, in the interest of efficient use of the Court's and its own resources, to dismiss its remaining claims and to proceed to the

the investment appeared to be lucrative. Later, after irregularities at the company were publicly disclosed and the company's stock price cratered, they expended millions of dollars of *the Fund's* money to make further World Health investments. While Mannion and Reckles profess that they exercised the warrants for the ultimate benefit of the Fund – to infuse World Health with cash to protect Fund investments in the company while avoiding overly concentrating the Fund's investments in the company – in fact just days *after* exercising the warrants they caused the Fund to *buy* 500,000 shares of World Health stock at market prices higher than the exercise price of the warrants. And just days after that, Mannion and Reckles caused the Fund to advance World Health millions of dollars in unsecured "loans" which were never repaid, including a $2 million dollar "loan" for which Defendants did not even bother to obtain written documentation.

Plainly the investments that Mannion and Reckles were truly seeking to protect were their own – they used the Fund's assets to try to prop up their own undisclosed World Health positions after first acquiring those positions at the

determination of remedies. Thus, while the claim upon which the Commission prevailed does not require proof of scienter, the Commission submits that there is substantial evidence of the Defendants' scienter in the record. The Court may, of course, take into account the Defendants' scienter even as to violations of non-scienter based provisions. *SEC v. Elliott*, 2011 WL 3586454, at *15-16 (S.D.N.Y. Aug. 11, 2011) (Court may determine whether non-scienter based violations of Section 5 of the Securities Act were committed with scienter to determine appropriate remedies at evidentiary hearing.)

expense of the Fund. Such thorough misuse by fiduciaries of their client's assets evidences a high level of scienter.[5]

**Fourth**, neither Mannion nor Reckles offer any assurance – far less sincere assurance – against future violations, nor any meaningful recognition of the wrongful nature of their conduct. Mannion, for his part, asserts that he did nothing wrong in taking valuable warrants from the Fund. He claims that because the Fund did not assign a value to the in-the-money warrants they were not an "asset" of the Fund. [Dkt. No. 60, Mannion Dep., 225:21 to 226:16]. Reckles at least approached an acknowledgement of his wrongdoing at his deposition, admitting that the assignment of the World Health warrants was a "terrible decision" that "just wasn't the right thing to do." [Dkt. No. 61, Reckles Dep., 273:15 to 273:22]. Unfortunately, as the litigation has proceeded Reckles has walked back even this modest admission, claiming that what he really meant was that the misappropriation was a "terrible decision" only because he and Mannion "lost all of their investment." [Dkt. No. 67, ¶ 46].

---

[5] Moreover, given the overriding purposes of the Advisers Act of "full disclosure" and "a high standard of business ethics in the securities industry," *Capital Gains*, 375 U.S. at 186, courts have found injunctive relief appropriate for Advisers Act violations even as to defendants who defraud clients though they did *not* act with scienter. *SEC v. Moran*, 944 F. Supp. 286, 294 (S.D.N.Y. 1996) (imposing injunctive relief for violations of Section 206(2) predicated upon business practice "indicating a lack of vigilance. Such laxness cannot be tolerated in the securities field.").

In short, neither Mannion nor Reckles have offered any assurances whatsoever throughout this case that their conduct will not be repeated. The absence of such assurance emphasizes the importance of injunctive relief. Where a defendant comes before the Court "and offer[s] equivocal and evasive testimony, claiming lack of memory of various facts and events, which in many instances strain[s] credulity, and insisting that he did nothing wrong," the defendant provides no assurance that the conduct will not be repeated, and an injunction is warranted. *SEC v. Michel*, 521 F. Supp.2d 795, 830 (N.D. Ill. 2007).

And **finally**, both Mannion and Reckles remain in the investment business. Mannion is presently associated with a broker-dealer, and Reckles, already associated with a broker-dealer, has recently sought to affiliate himself with another investment adviser. Where, as here, the defendants' professional responsibilities continue to entrust them with similar obligations and opportunities, they are obviously in a position to violate the law again. "[T]he same circumstances as occurred here, with the same enticements may well crop up again. One who has displayed such frailty in the past and faces so many temptations in the future may well need the admonition of an injunction to obey the law." *SEC v. Gaspar*, 1985 WL 521, *19-20 (S.D.N.Y. April 16, 1985) (*quoting SEC v. Shapiro*, 494 F.2d 1301, 1308 (2d Cir. 1974)).

For these reasons, permanent injunctive relief is warranted as to both Mannion and Reckles. "Permitting injunctions of some breadth in the context of civil enforcement actions brought by the SEC is warranted." *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012). Here, in light of the Defendants' misconduct, the Commission requests that they be permanently enjoined as follows:

> IT IS ORDERED AND ADJUDGED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, while acting as an investment adviser, Section 206 (2) of the Investment Advisers Act of 1940 (the "Investment Advisers Act") [15 U.S.C. § 80b-6 (2)] by using the mails or any means or instrumentality of interstate commerce, directly or indirectly:
>
> (a) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client
>
> by, directly or indirectly, (i) taking, misappropriating or making unauthorized use of the assets or property of any client or prospective client, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any client or prospective client, about:
>
> (A) the use of client funds, assets, property or investment proceeds; or
> (B) the misappropriation of client funds, assets, property or investment proceeds.

**B. The Court Should Impose Disgorgement and Prejudgment Interest**

Upon a showing of a violation of the federal securities laws, the SEC is "entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d at 1217. "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id*. In this case, the ill-gotten gains are the amount by which Mannion and Reckles were enriched by their fraud – the value of the securities they fraudulently obtained subtracted from the amount the defendants paid. *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008) (disgorgement in the "amount of proceeds [defendant] received from unlawful transactions" held proper).

Accordingly, the amount of disgorgement is simply the $1,984,350 price that Defendants paid for the stock when they exercised the warrants subtracted from the $3,707,606 market value of the stock on the date they received the shares. The total combined disgorgement amount for Mannion and Reckles is therefore $1,723,256, or $861,628 each.

Mannion and Reckles have asserted that they "repaid" to the Fund (and only after being subpoenaed to testify before the SEC) approximately $325,000 (or $162,500 each). But the Commission is unaware of any bank or brokerage

statements, wire transfer documents, or other similar evidence substantiating such payments beyond the defendants' own self-serving statements. In order to offset any portion of the disgorgement, Mannion and Reckles bear the burden of putting forth evidence demonstrating that they did, in fact, "repay" actual funds to their fiduciary beyond their self-serving statements. *See SEC v. Merchant Capital, LLC*, 486 Fed.Appx. 93, 96 (11th Cir. Aug. 7, 2012) ("Once the SEC produces a reasonable approximation the burden shifts to the defendants to demonstrate that the SEC's estimate is not a reasonable one.").

Mannion and Reckles have also asserted that just days after they received the proceeds of their fraud, public disclosure of financial irregularities at the company caused a precipitous decline in the value of World Health stock, which ultimately resulted in the Defendants selling the illicit stock at a loss. While Defendants accurately summarize the sequence of events, the post-fraud decline in World Health's stock price has no bearing on the question of disgorgement. For more than forty years, courts have held that losses sustained as a result of post-fraud market declines are simply irrelevant to the question of disgorgement. *SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir.1973) (ordering disgorgement of "paper" profits notwithstanding the fact that defendant held stock through subsequent decline in stock price). This proposition has been upheld in an unbroken line of

cases. *SEC v. Seghers*, 298 Fed.Appx. 319, 2008 WL 4726248, *14 (5th Cir. Oct. 28, 2008) (noting that "profits . . . obtained by wrongdoing are ill-gotten gains whether [defendant] retained them or lost them in [the scheme] or another investment"); *SEC v. McCaskey*, No. 98-cv-6153, 2002 WL 850001, *5 (S.D.N.Y. Mar. 26, 2002) ("The disgorgement amount should not be offset by any losses incurred by the wrongdoer when the scheme collapsed.") *citing SEC v. Commonwealth Chem. Sec*., 574 F.2d 90, 102 (2d Cir. 1978); *see also, e.g., SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1192, n. 6 (9th Cir. 1998) ("the fact that [the] scheme ultimately failed and [defendant] lost $1,000,000 of his own funds [does not] release him from his obligations to the defrauded investors."); *see SEC v. Aerokinetic Energy Corp*., 444 Fed. App'x 382, 385 (11th Cir. 2011) ("[T]he cases overwhelmingly hold that how a defendant chooses to spend his ill-gotten gains, whether it be for business expenses, personal use, or otherwise is immaterial to disgorgement.").

Disgorgement is appropriate as to each defendant in the amount of $861,628.[6] The Commission is further entitled to prejudgment interest on this

[6] The total amount of disgorgement, $1,723,256, along with appropriate interest, should be imposed against both Defendants as well as their Defendant entities jointly and severally. Joint and several liability "is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct." *Calvo*, 378 F.3d at 1215 (*citing SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3rd Cir. 1997).

amount, calculated through the date of entry of a final judgment, as "[w]ithout prejudgment interest, the appellants would have benefitted from what in effect amounted to interest-free loans of the ill-gotten funds." *SEC v. Merchant Capital, LLC*, 486 Fed.Appx. at 96, *citing SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir.1996).

**C. A Substantial Penalty Should be Imposed**

Section 209(e) of the Advisers Act sets forth three tiers of civil penalties a court may impose upon defendants found liable for Advisers Act violations. 15 U.S.C. § 80b-9(e). Here, Mannion and Reckles' violations involved fraud or deceit. The violations also "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."[7] Accordingly, the violations are "third-tier" violations. For a third-tier violation, the Court is authorized to impose upon Mannion and Reckles a penalty that shall not exceed the greater of (a) $130,000 for each violation or (b) "the gross amount of pecuniary

[7] By misappropriating the warrants from the Fund, Mannion and Reckles prevented the Fund from exercising the warrants for itself. Instead, as World Health began to collapse, the Defendants caused the Fund to purchase 500,000 World Health shares on August 16, 2005 at market prices – prices higher than the exercise price of the warrants. If the Fund had purchased the 500,000 shares at the warrant price of $1.90 instead of the market price of $2.54 per share, the Fund would have paid $320,000 less for the same stock. In addition, on the day Defendants misappropriated the warrants, the Fund suffered an unrealized loss equal to Defendants calculated disgorgement -- $1,723,256. By almost any measure, $1.7 million constitutes a substantial loss.

gain to such defendant as a result of the violation." *See id.*; 17 C.F.R. 201.1001-02.[8]

"Congress enacted civil penalties to punish and deter securities law violations, and such penalties may be imposed in addition to disgorgement and injunctive relief." *SEC v. Tanner*, No. 02 Civ. 0306(WHP), 2003 WL 21523978, at *2 (S.D.N.Y. July 3, 2003) (citations omitted). In determining the civil penalty to impose, courts consider various factors including several of the factors relevant to the necessity for injunctive relief. *See SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003) (courts examine egregiousness, scienter, repeated nature of the violations, failure to admit wrongdoing, whether the violations created substantial losses or the risk thereof, lack of cooperation and honesty with authorities, whether the penalty should be reduced because of defendant's demonstrated financial condition), *aff'd sub nom, SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005). Those factors support the imposition of a substantial penalty here. As previously discussed, Mannion and Reckles' violations were egregious, involved a high degree of scienter, the Defendants remain unrepentant, and the violations created substantial losses to the Fund. A substantial penalty is warranted. *See SEC*

[8] Under the first two tiers, the Court would have similarly been authorized in this matter to impose a penalty equal to the gross amount of pecuniary gain (*i.e.*, $861,628) to each of Mannion and Reckles as a result of their violations.

*v. Levine*, 517 F.Supp.2d 121, 141–42 (D.D.C.2007) (imposing a penalty approximating defendant's gross pecuniary gain); *SEC v. Koenig*, 532 F.Supp.2d 987, 995-96 (N.D.Ill.2007) (penalty equal to gross pecuniary gain).

**D. Conclusion**

For the reasons set forth above, the Court should impose permanent injunctive relief, disgorgement and prejudgment interest, along with a civil monetary penalty against each Defendant.

Respectfully submitted this the 19th day of May, 2014.

By: /s/ *M. Graham Loomis*
M. Graham Loomis
Ga. Bar No. 457868
U.S. Securities and Exchange Commission
950 East Paces Ferry Road, Suite 900
Atlanta, Georgia 30326
Email: LoomisM@sec.gov
Phone: (404) 842-7627
Fax: (404) 842-7633

/s/ *David Williams*
David Williams (*pro hac vice*)
Adam S. Aderton (*pro hac vice*)
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4010
Email: WilliamsDav@sec.gov
Phone: (202) 551-4548 (Williams)
Fax: (202) 772-9246 (Williams)

*Attorneys for Plaintiff Securities and Exchange Commission*

**CERTIFICATE OF SERVICE AND COMPLIANCE**

I hereby certify that on May 19, 2014, I electronically filed the attached document with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Ross A. Albert
Morris, Manning & Martin, LLP
990 Hammond Drive
Suite 300
Atlanta, GA 30328, USA

Stavroula E. Lambrakopoulos
Richard James Mitchell
Matthew B. Bowman
K & L Gates-DC
1601 K Street, NW
Washington, DC 20006

I also certify under LR 7.1 D, NDGa that this motion has been prepared with 14-point Times New Roman font, as required by LR 5.1C, NDGa.

*/s/ David Williams*
David Williams (*pro hac vice*)
U.S. Securities and Exchange Commission